May 24, 2019

**BY ECF**
The Honorable Alvin K. Hellerstein
United States District Court
  for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York  10007-1312

Re:    *Girl Scouts of the United States of America v. Boy Scouts of America*
         *18-cv-10287 (AKH)*

Dear Judge Hellerstein:

        The parties in the above-captioned proceeding jointly write in compliance with the Court's Order of May 8, 2019 to request that the Court resolve the discovery disputes detailed below.  Pursuant to Your Honor's Individual Rule 2.E., except as otherwise noted below, the parties agree they have met and conferred extensively regarding these issues prior to submitting this letter.  In particular, unless otherwise noted, the parties telephonically met and conferred on these issues on April 4, April 5, and April 10, for over an hour at each meeting.  Rachel Herrick Kassabian and Donald Reinhard participated in all of these discussions on behalf of defendant Boy Scouts of America (the "BSA"), and Fara Sunderji and Kimberly Frumkin participated in all of these discussions on behalf of plaintiff Girl Scouts of the United States of America ("GSUSA").  Unless otherwise noted, the parties also met and conferred in writing on these issues on March 19, March 31, April 18, April 24, May 3, May 10 and May 14.  Both parties also served amended discovery responses on May 15, as required by the Court's order.

        This joint letter is organized as follows:

| | |
|---|---|
| Part I: | GSUSA's and the BSA's respective introductions; |
| Parts II-III : | GSUSA's and the BSA's respective positions regarding the BSA's responses to certain of GSUSA's discovery demands; and |
| Parts IV-V: | The BSA's and GSUSA's respective positions regarding GSUSA's responses to certain of the BSA's discovery demands. |

## I.    **Introductions**

### A.    **GSUSA'S Introduction**

        As the Court is aware, this is a case in which GSUSA asserts that the offering of BSA's services using GSUSA's famous GIRL SCOUTS trademarks and other trademarks like SCOUT

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 2

ME IN, SCOUTS BSA, SCOUTS, SCOUTING and FAMILY SCOUTING has caused rampant
confusion in the marketplace and inflicted significant damage on the goodwill and reputation that
GSUSA and its trademarks have long enjoyed among the consuming public.  The core elements
of GSUSA's brand identity among the American public are its famous, registered GIRL
SCOUTS trademarks, which are powerful symbols of a unique, extraordinarily valuable
goodwill that has grown over decades and been carefully protected by GSUSA.  To the vast
majority of Americans, the GIRL SCOUTS trademarks embody the values of an organization
whose unique and specific mission is to advance the cause of girls leadership and empowerment
through programs exclusively for girls.

BSA does not have the right under either federal or New York law to use terms like
GIRL SCOUTS, or SCOUTS or SCOUTING by themselves in connection with services offered
to girls, or to rebrand itself as "the Scouts" for services to girls and thereby falsely communicate
to the American public that it is now the organization exclusively associated with leadership
development services offered under that mark to girls.  Such misconduct will not only cause and
has caused confusion among the public, damaged the goodwill of GSUSA's GIRL SCOUTS
trademarks, and eroded its core brand identity, but it also causes the public to believe that
GSUSA's extraordinarily successful services are not true or official "Scouting" programs, or are
a subset of the "Scouting" services provided by BSA.

Before discussing the specific problems GSUSA has with many BSA discovery
responses, the parties have taken a different approach in presenting their respective concerns of
which the Court should be aware.  BSA has taken the position that it will only present to the
Court issues concerning the parties' initial discovery responses on which they have met and
conferred and reached an impasse prior to May 15, when its section of this letter delineating its
difficulties with some of GSUSA's discovery responses was transmitted to GSUSA.  In contrast,
GSUSA waited until the morning of May 17 to provide BSA with its section of this letter
outlining its problems with BSA's discovery responses so that it could review the amended
responses BSA provided on May 15 and consider whether issues on which the parties had met and
conferred did or did not remain in dispute.  GSUSA's submission below therefore concerns
BSA's amended discovery responses, not its prior versions.

B.      The BSA's Introduction

The BSA is one of the most iconic non-profit organizations in the United States, preparing
this nation's youth for more than 100 years to make good ethical and moral choices over their
lifetimes.  (Compl., Ex. J. at 2).  In addition to its Cub Scouts and Boy Scouts programs (which
were traditionally single-gender programs until 2018 and 2019, respectively), the BSA also has
had several co-ed programs for decades.  The BSA has been using its registered and common law
trademarks for SCOUT, SCOUTS and SCOUTING (among other marks) in connection with
programs and services for boys **and** girls for nearly 50 years.  Despite this longstanding, ubiquitous
use, GSUSA remarkably now seeks to prohibit the BSA from continuing to call its own members

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 3

SCOUTS – simply because the BSA has begun welcoming girls into two more of its youth programs, Cub Scouts and Scouts BSA (formerly known as Boy Scouts).

In its Complaint, GSUSA alleges to hold common law trademark rights not only in GIRL SCOUTS, but also in SCOUTS and SCOUTING. However, the BSA's investigations have revealed that since at least 2011, if not earlier, GSUSA has expressly directed that SCOUTS and SCOUTING should ***not*** be used alone (*i.e.*, without being preceded by the word "girl") when referencing GSUSA or its members – thereby abandoning any such rights it may have held in the past. Thus, the core of GSUSA's case goes to the question of whether the BSA's longstanding use of its SCOUT, SCOUTS and SCOUTING marks in connection with offering services to all young people somehow now infringes or dilutes GSUSA's rights in its GIRL SCOUTS-related marks, particularly in light of GSUSA's consistent and express disclaimer of the SCOUT or SCOUTING marks alone. It does not. GSUSA's concerns are not actionable under trademark law.

The BSA's Instant Motion to Compel. In furtherance of its defense against GSUSA's claims, the BSA propounded various document requests concerning issues relevant to the case, including GSUSA's claims and the BSA's defenses. Despite several weeks of meeting and conferring, GSUSA still refuses to produce several important categories of documents. Thus, for the reasons set forth below, the BSA respectfully seeks an order to compel discovery from GSUSA for those documents. *See* Parts IV-V below.

GSUSA's Instant Motion to Compel. GSUSA's motion seeks irrelevant and unnecessary materials, and would impose significant, undue burdens on the BSA – in the form of hundreds if not thousands of additional hours of costly attorney review time – if granted. It should be denied.

The BSA has been more than diligent in fulfilling its discovery obligations in response to GSUSA's requests for documents, many of which are vastly overbroad, such as demanding 100+ years' worth of documents referencing "Girl Scouts" in any way.[1] Notwithstanding GSUSA's

---

[1]  As one example of GSUSA's overreaching, its RFP No. 14 sought all documents within the BSA's possession referencing the Girl Scouts, ever – with no date or subject matter restriction:

> DOCUMENT REQUEST NO. 14: **All documents concerning the GS Marks** [broadly defined as all registered and common law marks of the GSUSA, including "Girl Scouts," plus any "related logos, symbols and other designations of source"] (emphasis added).

These two organizations have coexisted, corresponded and interacted for more than a century, including via overlapping members, volunteers and professionals, and joint events and collaborations. The BSA struggles to see how GSUSA could have earnestly believed, in propounding this RFP, that every bare mention of the GS Marks dating back 100 years would be relevant to this litigation, which relates to an alleged new BSA branding campaign launched in

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 4

overreaching, the BSA has made many concessions during its negotiations with GSUSA in hopes of resolving the parties' disputes, and has agreed to produce documents in response to the majority of GSUSA's demands. Regrettably, GSUSA has refused many of the BSA's offers of compromise, and insisted on bringing this motion anyway.

The BSA has diligently pursued its discovery efforts, and currently is in the midst of its collection, review and production of documents. The BSA began its collection efforts in December 2018 (before even receiving any document requests from GSUSA), and subsequently commenced its rolling document productions on March 15, 2019. The BSA has made three productions since then, and its discovery work is ongoing. To date, the BSA has produced more than 32,000 pages of documents – nearly three times the page count of the GSUSA's 11,708-page production to date. The BSA has already produced a large range of document types, including internal and external emails, marketing plans, power point presentations, spreadsheets and financial documents, talking points, memos, newsletters, press releases, and advertising images. Indeed, the BSA has already produced responsive documents as to about two thirds of the non-disputed RFPs in GSUSA's first set of document requests – and that number increases as the BSA's rolling productions continue. And, perhaps most importantly, the BSA also has already produced documents relevant to the core issues in this case – namely, the development and launch of the "Scout Me In" campaign and the renaming of the Boy Scouts program to "Scouts BSA."

The BSA is a non-profit youth serving organization. It does not have unlimited resources, and cannot undertake the burden and expense involved in collecting, reviewing, and producing many thousands of documents that are largely – if not completely – irrelevant to the claims in this case, as are the RFPs GSUSA has chosen to press in this joint letter. These demands do not meet the proportionality requirements of Federal Rule of Civil Procedure 26(b)(1). GSUSA's motion to compel should be denied in full.

## II.    GSUSA'S Position Regarding Discovery Responses of the BSA

### A.    BSA's Non-Compliance with Fed. R. Civ. P. 34

1.    Lack of Production Target Date: As an initial matter, Defendant's Amended Responses and Objections to Plaintiff's First Set of Document Requests to Defendant, excerpts of which are attached as Exhibit 1, do not indicate when documents will be produced, as required under the 2015 amendments to Rule 34. *See Fischer v. Forrest*, 14 Civ. 1304, 2017 U.S. Dist. LEXIS 28102, at *2 (S.D.N.Y. Feb. 28, 2017) (confirming that, in order to comply with Rule 34, a producing party must "specify the time for production and, if a rolling production, when production will begin and when it will be concluded"); *Michael Kors LLC v. Su Yan Ye*, 18 Civ. 2684 (KHP), 2019 U.S. Dist. LEXIS 60057, at *7-8 (S.D.N.Y. Apr. 8, 2019) (characterizing

2018. In response to the BSA's objections, GSUSA subsequently inserted a January 2016 date cutoff, but even that still sweeps in tens of thousands of irrelevant documents.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 5

as "unacceptable" plaintiff's failure to provide "any information as to when it would produce documents to which it had no objection.").

BSA simply states that it will produce responsive documents that "may be located after a reasonable and diligent search."  *See, e.g.*, Exh. 1 at Response to Document Request No. 14.  Despite raising this issue with BSA numerous times, both in writing and by phone, BSA has remained steadfast in its position that Rule 34 does not require a party to provide any target date to complete its production – an interpretation at odds with the text of Rule 34 and relevant cases.  BSA has also rebuffed GSUSA's proposal to agree to a May 31 production deadline for both parties and never made a counterproposal beyond the one stated in this joint letter of June 28 for "substantial" completion of its document production.

If the parties are to adhere to the Court's Order setting September 25 as the deadline for completion of fact discovery, *see* Dkt. 28, the completion of the parties' document productions responsive to their respective first sets of discovery requests cannot be delayed well into the summer, especially when both parties have also served a second set of requests for production where there are also a number of as-yet-unresolved disputes.  Accordingly, the Court should order both parties to complete their productions of documents responsive to the first requests by May 31, and if there are any additional documents whose production is required from either side as a result of the Court's resolution of the issues set forth in this letter, the deadline for their production should be June 14.

2.   <u>Failure to Specify What is Being Withheld and on What Basis</u>: BSA's responses, in many instances, state only that certain subsets of requested documents will be produced, without stating what is being withheld and on what basis, which is another obvious violation of Rule 34 ("An objection must state whether any responsive materials are being withheld on the basis of that objection."). For example:

**GSUSA Request No. 15:** All documents concerning the use by BSA or its affiliated councils, troops and leaders of the GS Marks, including, but not limited to, all communications with councils, troops and leaders, as well as all communications with FleishmanHillard and/or Johnson & Sekin, concerning the GS Marks.

**BSA's Amended Response:** The BSA incorporates by reference the foregoing Objections Applicable to Each Request. The BSA further objects to this Request on the basis that it is overly broad, unduly burdensome, seeks documents not relevant to the causes of action or defenses of any party to this action, or is not proportional to the needs of the case, considering the factors provided by Fed. R. Civ. P. 26(b)(1), including because it requests all documents concerning various subjects, and because it is unlimited as to time period. The BSA further objects to this Request on the grounds that it is vague, ambiguous, and confusing so as not to be susceptible to a reasoned interpretation or response, including to the extent that it does not define "use" in the context of the GS

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 6

Marks. The BSA further objects to this Request to the extent it calls for a legal conclusion and/or characterizes certain information, allegations or ideas as undisputed fact. The BSA further objects to this Request on the grounds that the definition of "BSA" is vague, ambiguous, unduly burdensome, costly, oppressive, and not proportional to the needs of the case, considering the factors provided by Fed. R. Civ. P. 26(b)(1), to the extent this definition captures entities or individuals over whose documents the BSA does not have possession, custody or control; as used by the BSA in its Response, the "BSA" means Defendant the Boy Scouts of America. The BSA further objects to this Request on the ground that the definition of "GS Marks" is vague, ambiguous, and confusing so as not to be susceptible to a reasoned interpretation or response, including to the extent that it does not define "all variations of GIRL SCOUTS that GSUSA has used in connection with girls leadership development services and related products or services" and "any related logos, symbols and other designations of source"; as used by the BSA in its Response, "Asserted GS Marks" means the claimed GSUSA registered trademarks specifically identified in Paragraph 27 of the Complaint, as well as the common law trademark rights associated with each of those registered trademarks, which GSUSA claims to own. The BSA further objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work product protection, or any other privileges or immunities.

Subject to, as limited by, and without waiver of the foregoing objections, the BSA responds as follows: ***The BSA will produce, for the time period January 1, 2016[2] through the present, non-privileged documents regarding the BSA's instructions and/or guidance not to use the Asserted GS Marks in connection with the BSA's services for girls, that may be located after a reasonable and diligent search***." (emphasis added).

As the foregoing, lengthy excerpt illustrates, BSA has rewritten GSUSA Request No. 15 to limit its production to documents covering only "BSA's instructions and/or guidance not to use the Asserted GS Marks in connection with the BSA's services for girls." It appears – but is not stated – that BSA is apparently planning to withhold documents based on boilerplate objections, like overbreadth, undue burden and relevance, which are meaningless because they lack specificity as to why BSA is withholding documents. *See Fischer*, 2017 U.S. Dist. LEXIS 28102, at *8 (stating that the "overly broad and unduly burdensome'" [objection] is meaningless boilerplate. Why is it burdensome? How is it overly broad? This language tells the Court nothing"). After meeting and conferring on this point, BSA still believes that it can assert objections lacking specificity; it should be held accountable for its choice. *See Michael Kors, L.L.C.*, 2019 U.S. Dist. LEXIS 60057, at *7 ("a number of courts have held that an objection that does not appropriately explain its grounds is forfeited").

---

[2] As a compromise, GSUSA agreed to restrict this Request to the time period January 1, 2016 through the present.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 7

Apart from procedure, the documents sought in Request No. 15 are plainly relevant, and BSA should be compelled to produce them except those that are privileged. At its core, this is a trademark infringement case in which GSUSA has alleged that BSA has used its marks on identical services. Documents concerning the use by BSA or its affiliated councils, troops and leaders of GSUSA's trademarks go to the heart of this case. *See Gap, Inc. v. G.A.P. Adventures, Inc.*, 07 Civ. 9614 (AKH), 2011 U.S. Dist. LEXIS 71675, at *31 (S.D.N.Y. June 24, 2011) ("To prevail on its federal trademark infringement claims under the Lanham Act, [plaintiff] must prove that (1) its trademarks merit protection, and (2) [defendant] has used similar marks in commerce such that there is a likelihood of confusion as to source or deception as to affiliation, connection, or sponsorship of [its] services."). BSA has limited its response to this Request to "instructions and/or guidance not to use" GSUSA's trademarks, but that is not the universe of documents GSUSA requested. If BSA has other documents that mention GSUSA's marks and concern use of those marks by BSA or its councils, troops and leaders, they should be produced.

This is just one example of BSA's failure to specify what it intends to withhold, if anything, and on what basis. *See, e.g.*, BSA Amended Responses to GSUSA Request Nos. 16, 17, 18, 19, 22, 23, 25, 26, 30 and 41 in particular. It is not clear to GSUSA whether BSA is in fact withholding documents responsive to these Requests. But, but rather than occupy the Court's time with parsing through all of them now, before the parties have met and conferred on any disputes that may exist, all GSUSA respectfully requests at this time is that the Court order BSA to state ***specifically*** any categories of documents that it is not producing in response to any GSUSA request ***as written*** – not just Request No. 15, but throughout, as Rule 34 requires.

B.     <u>Quality and Reputational Requests</u>:  Despite significantly narrowing the Requests discussed in this Section,[3] BSA remains either completely unwilling to comply with them or has only agreed to produce a very limited set of documents:

> <u>**GSUSA Request No. 36**</u>: *All non-privileged documents dated since January 1, 2016 concerning complaints made by any person concerning the quality of services offered by BSA under the SCOUTS BSA Marks to girls that concerned: (i) the physical and emotional health of children participating in or that have participated in the programs offered or sponsored by BSA; and (ii) the inclusion or exclusion of certain consumers on the basis of religion, gender, sexual orientation, gender identity, or otherwise.*

> <u>**BSA's Amended Response:**</u> *BSA agreed to produce "non-privileged documents reflecting complaints concerning the quality of the BSA's services for girls offered under*

---

[3] The Requests as reproduced in this portion of the letter reflect compromises GSUSA afforded to BSA during the meet-and-confer process. Also, as shown in Exhibit 1, BSA interposed multiple, mostly boilerplate, objections to GSUSA Request Nos. 36, 37, 38 and 40, and Interrogatory No. 15.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 8

*the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark and/or SCOUTING Mark since January 1, 2018, that may be located after a reasonable and diligent search, provided that GSUSA agrees to produce reciprocal documents, namely, documents reflecting complaints concerning the quality of the GSUSA's services for girls offered under the Asserted GS Marks since January 1, 2018.[4]*

**GSUSA Request No. 37:** *All non-privileged documents concerning public perceptions of BSA or the SCOUTS BSA Marks generated or received since January 1, 2012, including, but not limited to, surveys, tracking studies, awareness studies or other market research conducted among consumers with respect to: (i) the physical and emotional health of children participating in or that have participated in the programs offered or sponsored by BSA; and (ii) the inclusion or exclusion of certain consumers on the basis of religion, gender, sexual orientation, gender identity, or otherwise.*

**BSA's Amended Response:** *BSA agreed to produce: "(1) public statements and press releases concerning public perceptions of the BSA or the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark and/or SCOUTING Mark since January 1, 2017, that may be located after a reasonable and diligent search; and (2) non-privileged internal research or surveys regarding the public's perceptions of the BSA, or the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark since January 1, 2017, that may be located after a reasonable and diligent search."*

**GSUSA Request No. 38:** *All non-privileged documents dated since January 1, 2012 reflecting concerns voiced or complaints raised by consumers, whether directly to BSA, to media organizations, in legal proceedings or otherwise, concerning the quality of BSA programs offered by BSA or via its affiliated councils, troops and leaders with respect to (i) the physical and emotional health of children participating in or that have participated in the programs offered or sponsored by BSA; and (ii) the inclusion or exclusion of certain consumers on the basis of religion, gender, sexual orientation, gender identity, or otherwise.*

---

[4] In multiple BSA Responses, it conditions its willingness to produce certain documents on GSUSA's willingness to produce the same types of documents. This is obviously improper in multiple respects, primarily because: (i) the relevance of documents sought by a party is not dependent on the relevance of documents sought by another party; and (ii) there is nothing in the Federal Rules contemplating a "one size fits all" approach to discovery. Notwithstanding, GSUSA has advised that is willing to search for and produce reciprocal categories of documents in certain instances, like those covered by Request Nos. 36 and 38, ***when*** BSA actually serves requests for them, which it has yet to do.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 9

**BSA's Amended Response:** *BSA agreed to produce "non-privileged documents reflecting complaints concerning the quality of the BSA's services for girls offered under the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark and/or SCOUTING Mark since January 1, 2018, that may be located after a reasonable and diligent search, provided that GSUSA agrees to produce reciprocal documents—namely, documents reflecting complaints concerning the quality of the GSUSA's services for girls offered under the Asserted GS Marks since January 1, 2018."*

**GSUSA Request No. 40:** *All documents concerning efforts made by BSA to improve public perceptions of BSA or the SCOUTS BSA Marks generated or received since January 1, 2012 with respect to: (i) the physical and emotional health of children participating in or that have participated in the programs offered or sponsored by BSA and (ii) the inclusion or exclusion of certain consumers on the basis of religion, gender, sexual orientation, gender identity, or otherwise.*

**BSA's Amended Response:** *To date, BSA has not agreed to produce any documents in response to this Request on the ground of relevance.*

**Interrogatory No. 15:** *"Identify the persons most knowledgeable concerning concerns voiced or complaints raised by consumers, whether directly to BSA, to media organizations, in legal proceedings or otherwise, since January 1, 2016, concerning the quality of BSA programs offered by BSA or via its affiliated councils, troops and leaders, including, but not limited to, with respect to the safety, health and emotional well-being of participants in such programs."[5]*

**BSA's Amended Response:** *BSA provided the names of persons with knowledge concerning concerns voiced or complaints raised by consumers regarding the quality of the Cub Scouts and Scouts BSA programs servicing girls.*

The foregoing discovery requests concern issues that are all highly relevant to GSUSA's claims of trademark infringement and dilution by tarnishment – namely the quality of BSA's services and public perceptions of BSA, its services and its trademarks at issue in this case. *See CSL Silicones, Inc. v. Midsun Grp. Inc.*, Case No. 3:14-cv-01897 (CSH), 2016 U.S. Dist. LEXIS 82923, at *6 (D. Conn. June 27, 2016) ("It is true that a central factor of the 'likelihood of confusion' test arising out of *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2d Cir. 1961) is the 'respective quality of the products.'"); *Nat'l Baseball Hall of Fame & Museum, Inc. v. All Sports Promotions Grp., Inc.*, Case No. 99 Civ. 3635 (KMW), 2001 U.S. Dist. LEXIS 1591, at *37 (S.D.N.Y. Feb. 20, 2001) ("A trademark may be tarnished when it is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context.'") (citation and internal quotations omitted).

---

[5] Excerpts from BSA's Interrogatory Responses are attached as Exhibit 2.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 10

While "the Second Circuit has expressly held that 'tarnishment is not limited to seamy conduct,'" *Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307-08 (S.D.N.Y. 2007) (quoting *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996)), it is well documented in news coverage that BSA and its programs have been implicated in multiple, highly publicized allegations of abuse and misconduct, s*ee, e.g.*, https://www.nytimes.com/2019/04/23/nyregion/boy-scouts-sex-abuse.html.  Thus the documents and information sought in these substantially narrowed requests are entirely relevant to GSUSA's claims. *See Deere & Co. v. MTD Prods.*, 41 F.3d 39, 43 (2d Cir. 1994) ("In such situations, the trademark's reputation and commercial value might be diminished because the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods, or because the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services."); *Saxon Glass Techs., Inc. v. Apple Inc.*, No. 15-CV-581W(Sr), 2018 U.S. Dist. LEXIS 16810, at *8 (W.D.N.Y. Feb. 1, 2018) (granting plaintiff's motion to compel information on how defendant manages public perception of its products and other marketing related documents).

During the meet-and-confer process and as stated in BSA's Responses, BSA has downplayed the negative associations that have arisen concerning its programs and trademarks in recent years as unrelated to "the specifics of the actual BSA programs . . . . Complaints about particular BSA programs or troops, or discussion of particular events that happened to particular troop members, are not analogous to the kinds of information this Polaroid factor [quality of the parties' services] concerns itself with."  *See* R. Kassabian letter to B. Ewing dated May 10, 2019 at 11.  That argument is fundamentally incorrect.  The extraordinary volume of lawsuits, complaints and negative press coverage of BSA's programs offered under the ***identical*** trademarks that are at issue in this proceeding is unquestionably relevant to the *Polaroid* factor concerned with the quality of the parties' services.  BSA therefore should not be permitted to prevent GSUSA from obtaining discovery concerning the associations the public has had with respect to BSA's name, services and trademarks for many years and, in particular, documents concerning these issues that BSA itself has compiled.[6]

BSA has also stated during the meet-and-confer process that it believes that May 2018, which is when girls could first enroll in its CUB SCOUT programs, is the start of the only time period in which complaints about BSA's programs could be relevant because that is the time in

---

[6]  BSA has also argued that "as a predicate to any discovery into public perceptions of the BSA and its marks," GSUSA "must establish the public's perceptions of its own marks in connection with its own goods and services."  *See* R. Kassabian letter to B. Ewing dated May 10, 2019 at 12, n. 5.  As noted, *supra*, in footnote 3, GSUSA is willing to produce similar categories of documents concerning the quality of its services and the public's perceptions of its marks when and if BSA serves specific discovery requests, but there is no case requiring a party asserting a dilution claim to prove its own reputation as a "predicate" to obtaining discovery concerning the negative reputation of an adverse party.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 11

which the dilution and infringement of which GSUSA complains has occurred.  Once again, this argument is fundamentally flawed.  While the tarnishment of GSUSA's trademarks and the confusion BSA has caused in the marketplace began when it announced that it would begin offering services to girls in October 2017 (not May 2018), the negative associations many consumers have with respect to BSA's services and trademarks began years before, and GSUSA is entitled to know what BSA knows about the depth and breadth of those negative, highly damaging associations.  This is not a case involving a marketplace newcomer whose use of infringing and diluting trademarks began only recently.  In fact, BSA has touted that "under the new name of 'Scouts BSA,' that program, ***which is the same iconic program it has always been***, will continue to offer Scouting in single-gender troops, through which Scouts – ages 11 through 17 – can work to earn the Eagle Scout rank." *See* https://scoutingwire.org/the-boy-scouts-of-america-organization-name-is-not-changing-and-other-facts-to-set-the-record-straight/ (emphasis added).  The Court should therefore order BSA to produce documents and information responsive to these requests, as amended by GSUSA and set forth above.

C.      Other GSUSA Requests

**GSUSA Document Request No. 14**: This Request originally sought all documents concerning its trademarks in BSA's possession, custody or control.  During the meet-and-confer process, GSUSA agreed to limit this Request to:

> *All documents concerning (i) GSUSA's use or rights, or lack thereof, of or in the terms SCOUTS and SCOUTING without "Girl" or some other distinguishing term; (ii) any overlap or conflict between any of the GS Marks and any of BSA's trademarks; (iii) all documents concerning the impact of BSA's offering of services to girls on GSUSA's trademark rights, whether in 1971 or at any time thereafter; and (iv) any documents mentioning the GS Marks dated after January 1, 2016.*

In its Response to Request No. 14, BSA largely agreed to produce documents in response to sub-parts (i), (ii) and (iii) of this narrowed Request,[7] but not sub-part (iv) above.

There is no basis for BSA's refusal to produce any documents mentioning GSUSA's trademarks dated after January 1, 2016.  Such documents are at least relevant to the sixth *Polaroid* factor, namely the defendant's good or bad faith. *See Gap, Inc. v. G.A.P. Adventures, Inc.*, 2011 U.S. Dist. LEXIS 71675, at *38-39 (relying on evidence showing that defendant accepted the idea that his mark would likely capitalize on an association with plaintiff and that defendant acted to strengthen that association).  Accordingly, BSA should be required to produce them.

---

[7]  Once again, BSA has conditioned its willingness to produce certain documents in response to this Request on GSUSA's willingness to produce the same types of documents. *See* Exh. 1 at Amended Response to Request 14.  GSUSA has no issue doing so as to this Request.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 12

**GSUSA Document Request No. 27**: This Request as originally interposed sought all documents concerning the creation of packaging for products whose sale has been licensed or authorized by BSA, including, but not limited to, Trails End popcorn, on which the SCOUTS BSA trademarks have appeared and that have either depicted girls or concerned programs aimed at girls.  During the meet-and-confer process GSUSA agreed to narrow Request No. 27 as follows:

> *All documents created after January 1, 2016 concerning the creation of packaging for products whose sale has been licensed or authorized by BSA, including, but not limited to, Trails End Popcorn, on which the SCOUTS BSA Marks have appeared and that have either depicted girls or concerned programs aimed at girls.*

In its Response to Request No. 27, BSA agreed to produce:

> *non-privileged documents sufficient to show product packaging for products on which the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark have appeared, and that have depicted girls, since January 1, 2016 that may be located after a reasonable and diligent search, provided that GSUSA produces reciprocal documents—namely, packaging for products whose sale has been licensed or authorized by GSUSA on which the Asserted GS Marks have appeared, and that have depicted girls, since January 1, 2016.*

As an initial matter, BSA's Amended Response to GSUSA Request No. 27 does not specify why it has apparently decided (without saying so) to withhold documents concerning the creation of packaging for BSA products on which the relevant trademarks have appeared that concern "programs aimed at girls."  As discussed above, this violates Rule 34.  During the meet-and-confer process, BSA indicated that this Request was unduly burdensome, but never specified why.  BSA similarly never contradicted GSUSA's contention that there cannot be that many products fitting this description, given the recent offering of BSA's services to girls.

As for BSA's demand for "reciprocity" in the context of this Request by conditioning its willingness to produce a subset of the requested documents on a production by GSUSA of the same types of documents, the parties are not on equal footing with respect to this Request.  *All* of GSUSA's programs offered since January 1, 2016 are offered to girls, and the vast majority of its licensed products – including its famous GIRL SCOUT COOKIES – use packaging that depicts girls.  A production by GSUSA of such a vast quantity of documents would be tremendously burdensome, and BSA has not articulated why such documents would be relevant to the claims at issue in this case.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 13

## III.   BSA's Response to GSUSA's Position Regarding BSA's Discovery Responses

### A.   GSUSA's Fed. R. Civ. P. 34 Arguments

#### 1.   The BSA Has Provided A Production Target Date.

It is unclear why GSUSA included this issue in this joint letter, because the BSA provided an end-of-June target completion date in its meet and confer correspondence of May 10, 2019.  By GSUSA's own argument, nothing further is required, and this issue is moot.  *See* Part IV.B below (reiterating June 28 target completion date for substantial completion[8] of the BSA's document production responsive to GSUSA's first set of document requests).[9]

#### 2.   The BSA Clearly Identified What It Is Producing – Nothing More Is Required Under Rule 34.

GSUSA's demand that the BSA be ordered to identify what it is withholding with respect to ten specific RFPs should be denied because GSUSA misapprehends Rule 34's requirements, which the BSA has in fact satisfied.

Specifically, as GSUSA's own cited case confirms, "Rule 34 imposes the responsibility on a responding party to state what it is withholding ***or describe the scope of the production it is willing to make***."  *Michael Kors, L.L.C. v. Su Yan Ye*, 2019 WL 1517552, at \*3 (S.D.N.Y. Apr. 8, 2019) (emphasis added).  The BSA has done so here, by describing the scope of the production it is willing to make, with respect to each and every document request.  *See* Exh. 5 (the BSA's amended responses to GSUSA's first set of document requests).  Nothing more is required, as the Rule 34 advisory committee notes confirm: "An objection that states the limits that have controlled the search for responsive and relevant materials qualifies as a statement that the materials have

---

[8]   The BSA has undertaken extensive efforts to collect, search and review documents as efficiently as possible, *See* Exh. 3 (Declaration of Sara Jenkins) ¶ 3 (detailing the BSA's collection and review efforts, including beginning collections in December 2018, commencing its rolling productions on March 15, 2019, and making three more productions since then).  In addition to the several weeks' worth of remaining attorney review of the collected electronic documents, the BSA also must review older, archived paper files in order to search for documents responsive to GSUSA's document requests.  These paper files must first be retrieved, scanned, and electronically formatted (or "OCR'd") in order to be text-searchable.  Only then can they be searched and reviewed by an attorney for responsiveness.  This process takes substantial additional time, which the BSA can only roughly estimate given the physical nature of this manual process.

[9]   While GSUSA goes on to quibble with the BSA's specific date provided, the sole basis for its motion was that it wanted a "target date" – which the BSA has provided.  Moreover, the parties each have propounded a second set of document requests, and the BSA anticipates propounding a third set as well, so the parties' document productions are very much ongoing.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 14

been 'withheld.'"  2015 Adv. Comm. Notes to Rule 34.[10]  *See also Rowan v. Sunflower Elec. Power Corp.*, 2016 WL 3743102, at \*5 (D. Kan. July 13, 2016) (denying motion to compel where Defendant's responses "state the limits that controlled its search for responsive documents. Consequently, the Advisory Committee's note makes clear that [Defendant's] responses are sufficient to put Plaintiff on notice that [Defendant] withheld documents in connection with its objection.  Rule 34 does not require [Defendant] to provide a detailed description or log of the documents withheld.").

As for GSUSA's arguments going to the merits of its RFP No. 15 and seeking an order compelling the BSA to produce all responsive documents, GSUSA has never met and conferred on it.  Its motion should be summarily denied for this reason alone.[11]  Had GSUSA properly met and conferred, the BSA would have explained that RFP No. 15 is impossibly overbroad:

> DOCUMENT REQUEST NO. 15: **All documents concerning the use by BSA** or its affiliated councils, troops and leaders **of the GS Marks** [defined to include all variations of "Girl Scouts"], **including, but not limited to**, **all communications with councils, troops and leaders,** as well as all communications with FleishmanHillard and/or Johnson & Sekin, **concerning the GS Marks**. (emphasis added).

This Request thus calls for 100+ years' worth of documents – literally any BSA document or communication "mentioning" the Girl Scouts, according to the GSUSA's arguments above – with no date restriction or subject matter limitation.  It is no wonder that the BSA has to assert multiple objections to this Request as written.[12]  To the extent the Court is inclined to reach this issue

---

[10]  Nor have the parties met and conferred on this issue.  In its correspondence, GSUSA did nothing more than list a string of RFP numbers; the BSA repeatedly asked GSUSA for more detail as to what further information it was seeking, but GSUSA has not provided details about its specific concerns about each RFP.  In contrast, when GSUSA asked for clarity on any of the BSA's specific RFPs for a specific reason, the BSA provided further explanation..

[11]  *See* Fed. R. Civ. P. 37(a)(1); Judge Hellerstein's Individual Practices 2.E ("[s]trict adherence to the meet and confer rule is required"); *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 2012 WL 4791804, at \*6 (S.D.N.Y. Oct. 9, 2012) ("There is no indication that any attempts were made to resolve any *specific* discovery disputes as they relate to particular demands or responses .… This deficiency alone is a sufficient ground for denying the motion."); *Excess Ins. Co. v. Rochdale Ins. Co.*, 2007 WL 2900217, at \*1 (S.D.N.Y. Oct. 4, 2007) ("Only those matters that remain unresolved after serious attempts to reach agreement should be the subject of a motion to compel."); *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, 1998 WL 67672, at \*3 (S.D.N.Y. Feb. 18, 1998) ("[T]he failure to meet and confer mandates denial of a motion to compel.").

[12]  It also bears note that the BSA has already produced, in response to RFP No. 42, almost 1,500 pages of communications with its marketing agencies, FleishmanHillard and Johnson & Sekin, concerning the SCOUT ME IN campaign (*see* Exh. 3 (Declaration of Sara Jenkins) ¶ 7), and also

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 15

despite GSUSA's failure to meet and confer, GSUSA's motion should be denied on the merits as well.

### B.   GSUSA's Claimed "Quality" and "Reputational" Requests

As referenced above, this is a trademark case concerning the BSA's use of certain marks in connection with its welcoming of girls into its Cub Scouts and Scouts BSA programs beginning in May 2018.  But GSUSA's discovery demands are not even remotely confined to the scope of these claims.

For instance, GSUSA has propounded several RFPs demanding that the BSA spend hundreds if not thousands of hours searching its records for complaints it may have received from individuals over the past 7+ years concerning subjects unrelated to this lawsuit, such as services for *boys* – which have nothing to do with its case concerning services for *girls*.  Likewise, GSUSA is demanding production of complaints concerning other irrelevant subjects such as abuse claims, and inclusion/exclusion of LGBT members.  GSUSA claims it needs these complaints for its tarnishment claim – but it doesn't need them at all.  Per GSUSA's own argument, above, "it is well documented in news coverage" that the BSA has been involved in lawsuits concerning these issues.  GSUSA should not be permitted to embark on an expansive fishing expedition for materials it doesn't even need (since these issues are in the public record), by forcing the BSA to look for individual complaints on unrelated subjects.[13]  Moreover, tarnishment claims look to public perceptions of the defendant's use a mark – not to individual complaints, or negative publicity, about a company generally.  *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1083 (5th Cir. 1997).  And, to the extent these RFPs were intended to embarrass or harass the BSA (which the BSA hopes is not the case), they should be rejected for that reason as well.  Given the proportionality requirements of Rule 26(b)(1), GSUSA's motion on these RFPs should be denied.

---

has agreed to produce documents responsive to at least 13 different RFPs seeking documents referencing matters including the GS Marks, such as those "regarding the BSA's instructions and/or guidance not to use the Asserted GS Marks in connection with the BSA's services for girls" since 2016 (RFP No. 15), those "comparing the services for girls offered by the BSA" under the BSA's relevant marks with "services for girls offered by GSUSA under the Asserted GS Marks, existing as of January 1, 2016" (RFP No. 21), and "BSA press releases since January 1, 2016 referring to GSUSA and/or the Asserted GS Marks" (RFP No. 22).  (*See* RFPs 2, 14, 15, 16, 21, 22, 31, 32, 45, 46, 56, 58, and 59).  GSUSA's additional request for all documents containing any bare reference to GSUSA is therefore excessive and unnecessary.

[13]   *See, e.g.*, *Collens v. City of N.Y.*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) (Rule 26 forbids discovery requests "that amount to nothing more than a 'fishing expedition'"); *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 114 (D. Conn. 2005) ("the information in question appears to be publicly available from a source that is more convenient, less burdensome, or less expensive, without subjecting Travelers to undue burden").

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 16

1.    GSUSA Document Request No. 36:  Quality of services.

GSUSA's motion to compel a further response to RFP 36 should be denied because the BSA has already agreed to produce the subset of potentially relevant documents it calls for, assuming GSUSA reciprocates; the remainder of the requested documents are irrelevant and present an undue burden.

GSUSA's request initially sought the following:

DOCUMENT REQUEST NO. 36:  All documents concerning complaints made by any person concerning the quality of services offered by BSA under the SCOUTS BSA Marks [defined as SCOUT, SCOUTS BSA, SCOUTING, FAMILY SCOUTING and SCOUT ME IN and variations thereof] to girls.

While this request is facially overbroad in every respect, the BSA nonetheless tried to avoid motion practice by agreeing to produce responsive documents going back to 2018 (the year the alleged infringement began, per the Complaint) if GSUSA agreed to produce reciprocal responsive documents as to the Asserted GS Marks.  GSUSA refused to a compromise (other than offering to insert a January 1, 2016 date restriction).[14]  To moot this dispute, the BSA remains willing to produce those documents as offered, and expects GSUSA to honor a similar request to produce its own complaints concerning the quality of its services for girls, upon receiving it.

GSUSA's request is an unnecessary fishing expedition for irrelevant documents:  Under Rule 26(b)(1), any discovery request must be "proportional to the needs of the case" in light of that discovery's "importance in resolving the issues"  But in its section of this letter, GSUSA does not explain why the documents that the BSA has offered to produce, assuming reciprocity,[15] are insufficient, or otherwise articulate what else they need but is missing (or even offer specific argument about this RFP).  Having failed to do so, the Court should deny GSUSA's motion.

---

[14]    After a meet and confer, GSUSA purported to "narrow" this request (and others) by focusing exclusively on complaints concerning "health" of members and the "inclusion or exclusion" of certain groups in BSA programs.  But these particular subjects have no bearing on quality of services to girls.

[15]    Reciprocity is appropriate here by GSUSA's own logic.  If privately submitted, individual complaints are indeed relevant to the "quality of services" element of the *Polaroid* factors, then, of course, GSUSA must produce its own internal complaint documents so that the respective "qualities" can be compared.  *Star Indus. Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 389 (2d Cir. 2005) (evaluating evidence of quality of both parties' products under this factor).  To the extent these materials are deemed appropriate for production, the BSA will issue its own document request in due course.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 17

This is particularly true in light of the marginal (at best) relevance of this discovery to GSUSA's infringement claim.  Indeed, ***nowhere in its 50-page Complaint does GSUSA even allege that the BSA's services for girls are somehow inferior or of low quality***.[16]  And in any event, GSUSA concedes it already has "complaints" from public sources; there is no compelling need to burden the BSA with this oppressive request.

To the extent GSUSA claims that "quality of service" complaints are relevant to tarnishment, this too is incorrect.  As a preliminary matter, GSUSA does not cite a single case ordering the production of a company's internal, privately submitted complaints in a tarnishment case – nor did the BSA locate any such cases.  Under 15 U.S.C. § 1125(c)(2)(C), such a claim must be based on an "association arising from the similarity between a mark … and a famous mark that harms the reputation of the famous mark."  Here, any individual complaints submitted to the BSA about inclusion/exclusion of LGBT members, for instance, has nothing to do with any association or similarity between the BSA's marks and an alleged diminishing of the GIRL SCOUTS mark.[17]

GSUSA's 2016-onward time period is overbroad and unduly burdensome:  Claims of infringement and tarnishment are measured at the time the alleged infringement or dilution commenced.  *See, e.g., CSI Entm't, Inc. v. Anthem Media Grp., Inc.*, 2016 WL 11263667, at *9 n.11 (E.D.N.Y. Dec. 30, 2016) (rejecting evidence about quality of products from  before launch); 15 U.S.C. § 1125(c) (dilution measured at the time defendant "commences use of a mark").  As GSUSA concedes, the earliest alleged date of the BSA's use of the relevant marks for its programs servicing girls is May 2018, so complaints before that date would be irrelevant for this additional reason.  *See* Compl. ¶ 50 ("In May 2018, BSA … unveil[ed] a new *Scout Me In* advertising campaign" that welcomes girls); *id.* ¶ 51 (alleging SCOUTS BSA was "introduced as the new name" for a program "targeted to girls" on "May 2, 2018").[18]

---

[16]   Any application of the "respective quality of the products" *Polaroid* factor is dubious at best, because (1) the "complaints" now sought are not analogous to a party's use of comparatively shoddy or cheap material, as is the typical inquiry under this factor; and (2) even if GSUSA had alleged it, this is a minimally probative factor in determining the likelihood of confusion.  *See, e.g.*, *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 455 (S.D.N.Y. 2017) (factor probative where defendant uses "less expensive, synthetic oils" and "less expensive packaging" than plaintiff); *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278-79 (S.D.N.Y. 2006) ("The difference in the quality of the products is one of the less probative factors in a determination of the likelihood of confusion.").

[17]   In its Complaint, GSUSA alleges that only its registered GIRL SCOUTS mark is famous.  *See* Compl. ¶ 114 ("GSUSA's GIRL SCOUTS mark is famous ….").

[18]   In its portion of this letter, GSUSA newly asserts that October 2017 is the relevant date.  But that is when the BSA announced it was welcoming girls into its Cub Scouts and Boy Scouts (later renamed Scouts BSA) programs;  GSUSA does not contend that the BSA started using any

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 18

Moreover, reviewing the requested documents for the 2016-onward time period would be unduly burdensome. As discussed in further detail below, the BSA fields thousands of comments and inquiries every month. *See* Exh. 4 (Declaration of Teresa Condon), ¶¶ 2-4. The BSA estimates that it would have to search through approximately 12,400 customer care "tickets" dating back to January 1, 2016 to locate potentially responsive documents; even after using automated search processes to reduce the tickets requiring manual review to about 8,100 tickets, it would take nearly ***three weeks*** of full-time review by a BSA attorney to review these tickets for responsiveness (not including any necessary redactions of personal information). *See* Exh. 3 (Declaration of Sara Jenkins), ¶¶ 8-9. Given the irrelevance of any complaints pre-dating the May 2018 commencement of the alleged infringement at issue here, GSUSA's request fails to satisfy the proportionality requirements of Rule 26(b)(1) and should be denied.

2.     <u>GSUSA Document Request No. 37: Public perception documents</u>

The Court should reject GSUSA's motion as to RFP No. 37 because the BSA has already agreed to produce the subset of potentially relevant documents it calls for; the remainder of the requested documents are irrelevant and present an undue burden, as described above.

GSUSA's request initially sought the following:

DOCUMENT REQUEST NO. 37: All documents concerning public perceptions of BSA or the SCOUTS BSA Marks [defined as SCOUT, SCOUTS BSA, SCOUTING, FAMILY SCOUTING and SCOUT ME IN and variations thereof] generated or received since January 1, 2012, including, but not limited to, surveys, tracking studies, awareness studies or other market research conducted among consumers.

In an effort to compromise, the BSA ***agreed*** to produce the following in response to this request:

(1) public statements and press releases concerning public perceptions of the BSA or the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark and/or SCOUTING Mark since January 1, 2017; and

(2) non-privileged internal research or surveys regarding the public's perceptions of the BSA, or the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark since January 1, 2017.

---

disputed marks at that date in connection with programs for girls. This exemplifies GSUSA's conflation between the BSA's intention to begin offering programs for girls (which may be GSUSA's real concern here) versus its use of the marks at issue in connection with those programs (which is what is pleaded in the Complaint).

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 19

While GSUSA's request is both overbroad and vague (what is a document concerning "public perception"?), the BSA sought to avoid motion practice by agreeing to produce responsive documents going back to 2017 that GSUSA specifically identified:  public statements, press releases, internal research, and internal surveys concerning public perceptions of the relevant BSA marks.  This is more than sufficient (including the date, *see supra* n.18), and GSUSA makes no argument to the contrary.  Nothing should be ordered.

3.    <u>GSUSA Document Request No. 38:  Consumer complaints about programs</u>

The Court should reject GSUSA's request as to RFP No. 38 because it seeks wholly irrelevant documents and would impose an undue burden on the BSA if ordered.

GSUSA's request initially sought the following:

DOCUMENT REQUEST NO. 38:  All documents reflecting concerns voiced or complaints raised by consumers, whether directly to BSA, to media organizations, in legal proceedings or otherwise, concerning the quality of BSA programs offered by BSA or via its affiliated councils, troops and leaders, including, but not limited to, with respect to the safety, health and emotional well-being of participants in such programs.

While this request is facially overbroad in every respect, in an effort to compromise and moot this dispute the BSA nonetheless agreed to produce documents co-extensive with its response to RFP 36 – namely, documents reflecting complaints concerning the quality of its services for girls offered under its SCOUT, SCOUTS BSA, SCOUTING, FAMILY SCOUTING and SCOUT ME IN marks since January 1, 2018, again assuming reciprocity.  Other than offering a 2012-onward date restriction, GSUSA refused to compromise, though it claimed it was agreeable to reciprocity. The BSA remains willing to produce the documents it offered in response to RFP No. 36, and expects GSUSA to honor a similar request to produce its own complaints concerning the quality of its services for girls.

<u>RFP 38 calls for irrelevant documents:</u>  At the outset, this request seeks patently irrelevant documents.  It is indisputable that this case is about the BSA's services for girls – not its services for boys – so complaints concerning the quality of the BSA's services for boys are wholly irrelevant.  *See* Complaint.  GSUSA makes no argument to the contrary in this letter.  Indeed, GSUSA offers no specific argument whatsoever in pressing its RFP No. 38.

Further, RFP 38 is not even tied to use of the marks at issue – neither GSUSA's marks nor the BSA's marks are mentioned in this request.  Rather, it asks only about the BSA's "programs." Because an infringement or dilution claim must be tethered to the defendant's use of a mark,[19] and

---

[19]  *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996) (tarnishment arises from negative association through "defendant's use" of the mark); *Kellogg Co.*

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 20

because this RFP seeks complaints about the BSA as an organization generally (irrespective of trademark use), *see Exxon Corp.*, 109 F.3d at 1083, this RFP seeks irrelevant documents.

RFP 38 is overbroad.  GSUSA's 2012-onward time period is also overbroad.  As noted above, GSUSA alleges that the infringement here commenced in May 2018.  GSUSA provides no reasoned basis for its selected date of 2012.

RFP 38 imposes undue burdens:  In addition, forcing the BSA to produce the entirety of the requested documents would be unduly burdensome.  The BSA has been in existence for 109 years, and its family of current and former professionals, volunteers and members is enormous.  For instance, the BSA currently has more than 2.2 million youth participants and nearly one million adult volunteers, and it is estimated that more than 100 million Americans have participated in BSA programs at some time in their lives.  These individuals may contact the BSA from time to time concerning a wide variety of issues, from employee training questions, to facility repair requests, to inquiries regarding requirements for badges and awards, to technical issues with the BSA's website.  Additionally, many members of the general public have contacted the BSA over the years, even those with no formal connection to Scouting, for a wide variety of reasons and concerning a wide variety of subjects.  Thus, the BSA fields thousands of comments and inquiries every month.  *See* Exh. 4 (Declaration of Teresa Condon, ¶¶ 2-4).  The BSA estimates that it would have to search through approximately 90,000  customer care "tickets" dating back to 2012, in order to locate documents that might be responsive to RFP No. 38.  Even after using automated search processes to reduce the need to manually review each ticket, it likely will still require manual review of over 45,000 tickets, which translates to an estimated *four months* of full-time work by a BSA attorney to review these entries for responsiveness (not including any necessary redactions of personal information).  *See* Exh. 3 (Declaration of Sara Jenkins, ¶¶ 10-11).  Given the proportionality requirements of Rule 26(b)(1), where, as here, the burden to the producing party far outweighs the need of the requesting party, GSUSA's request should be denied.

4.    GSUSA Document Request No. 40:  Efforts to improve public perceptions

The Court should reject GSUSA's request for all documents concerning the BSA's internal "efforts … to improve public perceptions" because the BSA's internal assessments and opinions are not probative of the parties' claims or defenses, and the BSA has already agreed to produce any non-privileged public perception survey results or analyses it may have.

GSUSA's request initially sought the following:

DOCUMENT REQUEST NO. 40:  All documents concerning efforts made by BSA to improve public perceptions of BSA or the SCOUTS BSA Marks generated or

_____

*v. Exxon Mobil Corp.*, 192 F. Supp. 2d 790, 807 (W.D. Tenn. 2001) ("junior mark" must be "used in a context that degrades or debases the senior mark").

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 21

received since January 1, 2012, including, but not limited to, media and public relations strategies.

Once again, in its section of its letter, GSUSA has not provided any specific argument in defense of the relevance of RFP No. 40. More specifically, GSUSA fails to explain how the BSA's internal deliberations, plans or efforts are probative of how the public perceives the BSA or its marks, which is (by definition) a matter of public assessment. Thus, whether the BSA has made any "effort" to "improve" public perceptions has nothing to do with whether the BSA tarnished GSUSA's marks. *See, e.g.*, *Smith v. Wal-Mart Stores, Inc.*, 475 F. Supp. 2d 1318, 1324 (N.D. Ga. 2007) (denying motion to compel: "internal assessment of its reputation and responses to criticism are irrelevant" to dilution claim because "[t]he relevant measure of a likelihood of tarnishment is how ***the public*** … perceives Smith's uses of the Wal-Mart trademarks. … The efforts of Wal-Mart to analyze or protect its reputation in the marketplace do not have any relevance as to whether Smith's uses are likely to injure Wal-Mart's reputation or dilute its marks in the minds of consumers.") (emphasis added).[20]

Moreover, as noted above, in response to RFP No. 37, the BSA already has agreed to produce any internal research or surveys concerning the public's perceptions of the BSA and the BSA Marks at issue since January 1, 2017 – this is sufficient to provide GSUSA with any conceivably relevant documents about public perceptions that the BSA may have.

5.    GSUSA Interrogatory No. 15: People knowledgeable about complaints.

This issue appears to be moot: as GSUSA concedes, in its amended responses the BSA named eight individuals with knowledge concerning concerns voiced or complaints raised by consumers regarding the quality of the Cub Scouts and Scouts BSA programs that welcome girls. GSUSA provides no explanation for how the BSA's response is deficient, nor have the parties met and conferred on the substantive sufficiency of that response.

C.    **Other GSUSA Requests**

1.    GSUSA's RFP No. 14:  "Any" documents that mention the Girl Scouts' marks after January 1, 2016.

The BSA should not be compelled to produce "any documents mentioning the GS Marks dated after January 1, 2016" because: (1) this RFP is a classic example of a facially overbroad and unduly burdensome RFP; (2) the BSA has already agreed to produce documents in response to

---

[20]   *Saxon Glass Techs., Inc. v. Apple Inc.*, 2018 U.S. Dist. LEXIS 16810 (W.D.N.Y. Feb. 1, 2018), cited by GSUSA, is inapposite – there, the court ordered the defendant to produce "published media" and "promotional marketing" materials, *id.* at *8, not internal "efforts to improve public perceptions."

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 22

multiple more properly targeted RFPs seeking subsets of that information; and (3) GSUSA has not explained how is overbroad RFP is relevant to the issues presented.

The RFP is overbroad.  This RFP, which seeks "all" documents over a three-year period that mention the Girl Scouts' name or mark, is impermissibly overbroad.  The BSA has already agreed to produce documents referencing both GSUSA and some relevant subject (such as the BSA's SCOUT ME IN campaign, or trademark enforcement efforts).  This RFP, however, goes much farther, seeking every document that mentions the Girl Scouts in any way, shape or form.

The BSA and GSUSA have coexisted, corresponded and interacted for decades, and any search for GSUSA or Girl Scouts in response to this RFP will return numerous irrelevant documents that happen to reference the Girl Scouts but have no bearing on this case – such as documents referencing (1) BSA members, volunteers and professionals who are also involved in Girl Scouting, (2) BSA employees' friends or family members who are involving in Girl Scouting, and (3) the myriad of historically collaborative events between GSUSA and the BSA.  For example:

- Scouting for Food (collecting food for local food banks).

- GSUSA's rental or use of BSA facilities or equipment, including office space, program space, equipment, or similar real or personal property, including trailers, camping equipment, and other program assets.

- Service projects including community cleanup projects.

- Parades.

- Program events, including camporees, regattas, Pinewood Derby races, and similar outings or events.

- Scout day or night at the ballpark, church (Scout Sunday), or other locations such as museums, skiing, etc.

- Red Cross blood drives.

- Recruitment events.

- Scout shows/Scout expos.

- The Vietnamese Scout program.

- Civic flag ceremonies or similar events.

- Joint use of shared resources provided by third parties (*e.g.*, Scout huts or houses provided by churches).

- Joint third-party recognitions or fundraising events, (*e.g.*, Gubernatorial Scout events, "Scout of the Year", "Good Scouts", "Scout Days", etc.).

- Joint Recognition Banquets (*e.g.*, recognizing Eagle Scouts and Gold Award at the same event).

- Activities where BSA representatives perform tasks for the benefit of GSUSA members.

- In-school programs.

Courts have rejected similar RFPs in trademark cases seeking "all" documents concerning or mentioning a trademark because such RFPs, without further narrowing, are overbroad.  *See, e.g., Lights Out Holdings, LLC v. Nike, Inc.*, 2015 WL 11254687, at *2 (S.D. Cal. May 28, 2015) (rejecting RFP seeking "all documents and communications that refer to Nike, including but not limited to any letters, memoranda, emails, or other correspondence in which a third party refers to Nike" because it is "overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence"); *Xenos, Inc. v. Tilly's, Inc.*, 2014 WL 2682345, at *1 (D. Neb. June 12, 2014) (rejecting RFP seeking "all communications, memos, reports or other documents concerning use of the name 'Tilly's', or any derivative, in the Omaha, Nebraska market" as "overbroad").

Complying with GSUSA's demand would impose an undue burden:  The overbreadth and undue burden of forcing the BSA to search for "all" documents that mention the Girl Scouts' marks or name in the past three years is confirmed by the BSA's own investigation to date.  For example, of the documents the BSA has already collected, a search for the Girl Scouts' marks, including "Girl Scouts," "GSUSA" and similar variations, hits on nearly 50,000 documents dated on or after January 1, 2016.  Based upon an "average" document length of eight pages (which is the average length of the documents the BSA has produced to date), this amounts to about 400,000 pages of documents that would have to be reviewed.  And of course, given the pending litigation and other matters, numerous of these documents would be privileged.  Assuming a document review rate of 55 documents per hour, eight hours a day (*i.e.*, about 3,520 pages a day), five days a week, until finished, it would take more than *five and a half months* to review the documents in response to this single RFP alone.  *See* Exh. 3 (Declaration of Sara Jenkins), ¶ 5.  In short, GSUSA's request for any documents mentioning the GS Marks dated after January 1, 2016 is a fishing expedition and would enormously burden the BSA with little, if any, benefit to GSUSA.  Any such documents that would be potentially relevant to this case will already be captured by the documents referencing the GS Marks that were, or will be, produced in connection with RFP Nos. 2, 14, 15, 16, 21, 22, 31, 32, 45, 46, 56, 58, and 59.

The BSA agreed to produce documents in response to more targeted RFPs:  The GSUSA argues that "there is no basis for BSA's refusal to produce any documents mentioning GSUSA's trademarks dated after January 1, 2016."  However, the BSA is *not* refusing to produce "any" such documents.  In fact, there are at least *12* other RFPs for which the BSA agreed to produce documents that mention GSUSA, Girl Scouts, or the Girl Scouts' asserted trademarks, plus some other relevant, more specific terms or issues, and are already thus subsumed in RFP No. 14:

- Documents where any person comments upon any association between **GSUSA or the Asserted GS Marks** and the BSA or its Marks (RFPs No. 2).

- Documents regarding the BSA's instructions and/or guidance not to use the **Asserted GS Marks** in connection with the BSA's services for girls, since 2016 (RFP Nos. 15 & 16).

- BSA press releases since January 1, 2016 **referring to GSUSA or the Asserted GS Marks** (RFP Nos. 16 & 22).

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 24

- Documents comparing the services for girls offered by the BSA under its Marks and services for girls offered by **GSUSA under the Asserted GS Marks**, since 2016 (RFP No. 21).

- Published BSA brand guidelines referring to **GSUSA and/or the Asserted GS Marks** (RFP No. 22)

- Communications inquiring about or commenting upon any association between **GSUSA or its Asserted GS** and the BSA or its Marks, since 2016 (RFP No. 31).

- Communications concerning actual confusion between the BSA or its Marks when used in connection with services for girls, and **GSUSA or the Asserted GS Marks**, since 2016 (RFP No. 32).

- Documents reflecting **any use by GSUSA** as a trademark of the words "Scout," "Scouts," or "Scouting," unaccompanied by a distinguishing preceding distinguishing term, since 2009 (RFP No. 45).

- Documents demonstrating trademark enforcement efforts undertaken by the BSA relating to particular Marks, **in which GSUSA was involved** as a co-party or otherwise assisted since 1999 (RFP No. 46).

- Documents concerning **local GSUSA representatives** requesting, approving and/or condoning specific materials referenced the BSA's Answer (RFP No. 56).

- Communications between the BSA and the third-party agency referenced in the BSA's Answer regarding the keywords **GIRL SCOUT, GIRL SCOUTS or GIRL SCOUTING, made in response to letters from GSUSA** addressing the same subject (RFP No. 58).

- Documents sufficient to show that **GSUSA** has made various efforts to draw associations between itself and the BSA (RFP No. 59).

*See* Exhs. 5 and 6 (the BSA's operative responses to GSUSA's first and second sets of document requests, respectively).  In response to these RFPs, the BSA has already produced over 7,000 pages of documents mentioning GSUSA's marks, including "Girl Scouts" and "GSUSA," with more to come as the BSA's rolling production continues.  *See* Exh. 3 (Declaration of Sara Jenkins), ¶ 6. GSUSA provides no credible explanation as to why additional documents mentioning GS Marks (but having no relevance to this litigation) need be produced.[21]

---

[21]   GSUSA's only response is that such documents purportedly are relevant to the sixth *Polaroid* factor of a defendant's good or bad faith.  But a bare reference to a party's mark has no such

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 25

2. <u>GSUSA's RFP No. 27: Product packaging.</u>

GSUSA's motion to compel documents responsive to RFP No. 27 is moot because the BSA already agreed to produce the packaging samples requested for the period requested (2016-onward), and GSUSA fails to explain what "creation of" documents are or why they are relevant.

<u>The BSA agreed to produce responsive product packaging</u>:  The BSA already has agreed to produce product packaging for products on which the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark have appeared, and that have depicted girls, since January 1, 2016.  GSUSA has failed to explain why this is not good enough.[22]

<u>GSUSA's revived demand for "creation of" documents lacks merit</u>:  During the parties' meet-and-confer, GSUSA did not discuss or press for documents concerning the "creation of" product packaging, and instead stated that GSUSA's focus was on (1) produce packaging samples, for (2) food-related fundraising products specifically.  While GSUSA now attempts to revive its written request for "creation of" documents here in this motion, it did not fully meet and confer on this issue, and offers no explanation as to what it means by "creation of" documents.  In any event, GSUSA does not explain why such "creation of" documents are relevant or needed, particularly when it is already receiving the packaging samples themselves.  GSUSA's motion should be denied.

## IV. <u>The BSA's Position Regarding Discovery Responses of GSUSA</u>

In furtherance of its defense, the BSA propounded various document requests concerning issues relevant to the case, including GSUSA's claims and the BSA's defenses.[23]  Despite several weeks

---

plausible relevance.  GSUSA's only citation, *Gap, Inc.*, 2011 WL 2946384, at *15, did not even involve a motion to compel.

[22] As for the BSA's reciprocity request, the BSA believes it would be far more efficient to work out such an agreement now rather than potentially having to file another motion to compel.  Reciprocity is not only appropriate for this type of a request (where GSUSA presumably plans to compare each party's fundraising product packaging:  cookies vs. popcorn), it also helps to temper any unreasonable demands for massive quantities of unnecessary documents.  Given GSUSA's refusal to give the BSA a straightforward answer as to whether it will agree to reciprocity as to the precise scope of its own demands, the BSA will proceed with its production of 2016-onward packaging materials, and should GSUSA ultimately refuse to make its own packaging production, the BSA will seek relief from the Court at that time.

[23] The BSA's first set of document requests (which includes defined terms) is attached as Exhibit 7.  GSUSA's objections and responses, dated March 13, are attached as Exhibit 8.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 26

of meet and confer, GSUSA still refuses to produce several important categories of documents, as set forth below.

> **A.** **The Court Should Order GSUSA To Produce Its Branding Guidelines And Related Documents Pertaining To Its Use Of The Trademarks It Is Asserting Against The BSA In This Case (RFP Nos. 40)**

The BSA's Request No. 40 seeks:

- All GSUSA style guides, branding guidelines or campaigns, brand identity guidelines, or other similar materials existing as of January 1, 2004 to the present.

In its response, GSUSA gives a qualified agreement to produce only some documents, and further improperly limits its production to the time period January 1, 2016 to the present. *See* Ex. B (GSUSA RFP Response No. 40). The branding guidelines sought (including from 2004 – 2015) are highly relevant to this case and should be ordered produced, for several reasons.

**First**, these documents are directly relevant to GSUSA's use in commerce of the trademarks at issue. *See, e.g.*, *Great Lakes Transp. Holding LLC v. Yellow Cab Service Corp. of Fla., Inc.*, 2010 WL 5014326, at *3 (S.D. Fla. 2010) (granting motion to compel broad request for "[d]ocuments reflecting the use of the trade mark [at issue]," including in "advertising" where such documents were "relevant to determining whether, and when, Plaintiffs acquired and maintained ownership of the mark"). Such documents are routinely produced by trademark plaintiffs. *See, e.g.*, *ConsumerInfo.com, Inc. v. One Techs. LP*, 2010 WL 11507581, at *5 (C.D. Cal. May 4, 2010) (ordering plaintiff "to produce all marketing plans, guidelines, or strategies to the extent that they relate to" "[Plaintiff's] use and promotion of its marks"). GSUSA's style guides, branding guidelines or campaigns, brand identity guidelines, and other similar materials are critical documents relating to such use.

**Second**, the few branding guidelines GSUSA has produced to date for the 2016-2019 time period squarely support the BSA's trademark abandonment defense.[24] For instance, GSUSA produced a 2018 "Girl Scout Partner Style Sheet," which instructs GSUSA partners to:

---

[24]   *See, e.g.*, GSUSA documents bates numbered GSUSA_00011254-55, GSUSA_00011256-57, GSUSA_00011258-63, GSUSA_00011290-91, GSUSA_00011292-94, GSUSA_00011295-97, GSUSA_00011298-300. GSUSA has marked most of these documents as Confidential under the Protective Order, so the BSA describes them in only general terms here, and attaches one sample document that GSUSA did not mark as confidential. Should the Court wish to view all of these materials, the BSA would be happy to file them under seal.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 27

> "Never use 'Scouting' without 'Girl' in front of it…" as part of the "conventions"
> used "when writing about Girl Scouts to remain consistent and accurate with
> [GSUSA] branding and how [GSUSA] talk[s] about [it]self."

*See* Exh. 9 (GSUSA_00011295).  Similarly, the 2018 "Girl Scout Partner Editorial Style Sheet"
states as follows:

> "Although Girl Scouts is our name, 'Girl Scouting' (never 'Scouting') should be
> used to refer to the experience that Girl Scouts provides its members with."

*See* Exh. 10 (GSUSA_00011258 at 2).

These admissions are critical to the BSA's defense.  It is well-settled that "[a] prolonged cessation
of use can itself justify an inference that there is no intent to resume use of the designation," thereby
demonstrating trademark abandonment.  Restatement (Third) of Unfair Competition § 30 (1995).
And, the longer the period of abandonment, the stronger the abandonment affirmative defense
becomes:  "[t]he strength of the [abandonment] inference increases with the duration of nonuse."
*Id.*

Thus, GSUSA may not limit its production to a three-year lookback, and instead should be
compelled to produce all responsive documents, for the entire 2004-present time period as
requested.  *Cf. WRB, Inc. v. Vision Mktg., LLC*, 2018 WL 3259754, at *4 (E.D. Wash. Feb. 23,
2018) (documents compelled with respect to trademark abandonment claims).  The BSA requested
this 15-year lookback because, according to various publicly available documents from GSUSA
local councils, the BSA has reason to believe that GSUSA's abandonment of the SCOUT Marks
began as early as 2011, and possibly even earlier.  For example, the Girls Scouts of Wisconsin
Badgerland posted what appears to be a 2011 branding document on its website, in which it
instructs others to:

> "*Use 'Girl Scouts' not 'Scouts'* and 'Girl Scout Daisy' not 'Daisies' **and 'Girl
> Scouting not 'Scouting*.'"

*See* Exh. 11 ("Appendix: Logo and Graphic Design Use," Girls Scouts of Wisconsin Badgerland)
(emphasis                        added),                        *available                        at*
http://gsbadgerland.org/Portals/0/Documents/2011%20files/Logo%20Use.pdf).

GSUSA has refused to tell the BSA whether these abandonment admissions by the GSUSA local
councils came from internal GSUSA branding directives, or not.  The BSA has reason to believe
they did, as multiple different GSUSA local councils all used the same or very similar phrasing in
disclaiming the use of SCOUT as a mark.  *See* ECF 19 at 17-18.  The BSA needs to obtain
documents from GSUSA itself containing these same admissions, which are critical to the BSA's
abandonment defense.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 28

**Third**, to the extent these branding guidelines contain admissions concerning the BSA's rights to the SCOUT Marks (*i.e.*, SCOUT, SCOUTS and SCOUTING), they are relevant to the BSA's laches defense as well. *See, e.g.*, *Dryer v. Nat'l Football League*, 2011 WL 13136546, at *2 (D. Minn. Jan. 5, 2011) (compelling production of documents regarding use in right of publicity action because use "in any way … in any context" is relevant based on "Defendant's asserted defenses, including estoppel, laches, waiver, acquiescence and ratification"). Once again, based on publicly available documents from GSUSA local councils, the BSA has reason to believe that GSUSA's internal documents may indeed contain such admissions. For instance, the publicly available "*Girl Scouts - Diamond Style Guide*" posted on a GSUSA council website states as follows:

> "The words Scouts or Scouting should not be used when referring to Girl Scouts. Always say Girl Scouts or Girl Scouting. The word 'Scouting' has been copyrighted by Boy Scouts and can't be used."

*See* Exh. 12 (*Girl Scouts - Diamond Style Guide*, GIRL SCOUTS DIAMONDS OF ARKANSAS, OKLAHOMA, AND TEXAS, www.girlscoutsdiamonds.org/content/dam/girlscouts-girlscoutsdiamonds/documents/content/Volunteer%20Style%20Guide.pdf); *see also* ECF. 20-2 at 4 (similar); ECF. 20-3 at 2 (similar). The BSA is entitled to discovery whether these laches-related admissions are contained in GSUSA documents as well.

Neither of GSUSA's objections to producing these branding guidelines and style sheets dating back to 2004 is well taken.

For instance, GSUSA claims in its meet and confer correspondence that its own branding guidelines for the GSUSA Marks asserted in the Complaint "have no bearing on the matters at issue in this case." This hardly warrants a response, for all of the reasons set forth above – but suffice it to say that GSUSA's branding guidelines and style sheets, governing GSUSA's use of the marks it is asserting in this case, and containing admissions supporting the BSA's affirmative defenses of abandonment and laches, certainly are relevant.

GSUSA also argues in its meet and confer correspondence that producing responsive documents would be burdensome because GSUSA has drafted "many different versions" of these documents, "multiple repositories [] would need to be searched," and there are "no individuals currently employed in GSUSA's marketing department" with whom GSUSA can confer regarding this request. GSUSA also argues that this Request is burdensome because "[t]hese Documents are also not updated on any sort of regular schedule, with some updated as frequently as two or three times annually." But GSUSA has failed to offer any competent details or evidence supporting its burden argument, as it must. "A party raising a burden objection to the production of relevant documents must, with some degree of specificity, illustrate the nature and extent of the burden of production." *Vuona v. Merrill Lynch & Co.*, 2011 WL 5553709, at *6 (S.D.N.Y. Nov. 15, 2011). In *Vuona*, the Court found that Merrill Lynch's explanation of the burden on it, that the documents in question "are 'not maintained in one central location or by one custodian'" to be "insufficient to persuade

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 29

the Court that the burden on Defendants would outweigh the likely benefit"  2011 WL 5553709, at *6.

Moreover, the "burden" that GSUSA describes appears to merely consist of the standard responsibility required of plaintiffs who initiate lawsuits, and thus, is not undue.  The BSA is seeking specific, discrete and highly relevant documents.  These documents should not be difficult to locate, nor voluminous.  Indeed, GSUSA's production of branding guidelines and style sheet documents to date, for the 2016-2019 time period, consists of less than 10 documents totaling less than 30 pages – not a burden at all, let alone an undue burden.  Other similar documents should be simple to identify using targeted search terms, and/or by examining branding and marketing folders. And producing versions of these documents that are updated only 2 or 3 times a year, as GSUSA has represented, certainly is not unreasonable; if anything, it demonstrates the *lack* of burden.  But even if the burden were substantial (which GSUSA has not demonstrated), under the Fed. R. Civ. P 26(b)(1) balancing test, the critical relevance of these materials on multiple grounds going to the heart of this case would still warrant their production.

In sum, the manner in which GSUSA uses and promotes the marks it is suing on in this case is unquestionably relevant, particularly where, as here, they appear to contain critical admissions supporting the BSA's defenses.  Further, GSUSA's relevance and burden arguments are not credible.  The Court should order the GSUSA to produce all responsive documents for the entire 2004-present time period requested.

### B.     Appropriate Time Period to Substantially Complete Document Production In Response To First Sets Of Discovery Requests

In its May 8, 2019 endorsement, the Court advised that the parties "may address an appropriate deadline to complete production of responsive documents for the parties first set of discovery requests."

As for the appropriate deadline, the BSA suggests a target date of June 28, 2019, to substantially complete its document production in response to the parties' first sets of discovery requests, based upon the scope of the discovery sought in this action, and the pace of document review thus far. The BSA is working expeditiously to produce its responsive documents.  To date, the BSA has produced nearly 30,000 pages of documents – more than twice the page count of GSUSA's production as of this writing.  But given the sweeping nature of GSUSA's demands, the lengthy time periods involved, and the sheer volume of collected documents that need to be filtered, searched and reviewed, the BSA's current best estimate is that it will take at least six more weeks to substantially complete its production in response to GSUSA's first set of discovery requests.[25]

---

[25]   In its May 8, 2019 letter to the Court (ECF 33), GSUSA incorrectly represented to this Court that the BSA was not diligently engaged in discovery, or in the parties' discovery meet-and-confer efforts.  Nothing could be further from the truth.  The BSA has exchanged numerous lengthy correspondence concerning the outstanding discovery items, beginning in March and extending

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 30

This target date is well within the current discovery cutoff of September, 25, 2019 (ECF 25-1 at 4), leaving the parties with ample time to complete depositions.

## V.    GSUSA's Response to BSA's Position Regarding GSUSA's Discovery Responses

**Introduction**

BSA's arguments for the production of more documents from GSUSA that fall into only two general categories are less an attempt to argue about the relevance of these materials than they are an effort to advance substantive arguments to the effect that GSUSA owns no rights in the terms SCOUTS or SCOUTING when used in isolation.  These are the same arguments BSA advanced on its motion to dismiss [Dkt. 18-20], which the Court summarily denied [Dkt. 30], because it is not possible to resolve at this stage issues like whether GSUSA's longstanding use of its iconic GIRL SCOUTS trademarks establishes GSUSA's rights in marks like SCOUTS and SCOUTING when used in connection with services offered to girls (it does), or whether, notwithstanding GSUSA's preference at times that its marks be presented in unitary form, a substantial segment of the relevant public associates the terms SCOUTS and SCOUTING exclusively with GSUSA when used in connection with services for girls (they do).  Indeed, BSA has even acknowledged GSUSA's rights in the marks SCOUTS and SCOUTING in its brief submitted to the United States Patent and Trademark Office:

> **The Boy Scouts control use of the marks [SCOUT and SCOUTING] in connection with development programs for boys, while Girl Scouts controls use of the marks in connection with youth development programs for girls. Their joint use of the marks has been expressly recognized by Congress.**

*See* Exhibit 13, Opposer The Boy Scouts of America's Memorandum of Law in Opposition to Applicant's Motion for Judgment on the Pleadings, *Boy Scouts of America v. Wrenn*, Opposition No. 91157313 (Jan. 19, 2004), at 20-21 (emphasis added).

Nothing has changed since the Court denied BSA's motion, and therefore the only issues the Court can or should address now are those concerned with discovery.

### A.    The Production of Another Twelve Years' Worth of Documents

---

through just last week (*i.e.*, May 10).  Additionally, the BSA's lead counsel, the undersigned, has personally participated in approximately five hours' worth of telephonic meet and confer sessions. GSUSA's lead counsel, on the other hand, did not participate in a single minute of such telephonic discussions.  Moreover, as of this writing, the BSA's document production is more than double the size of the GSUSA's production by page count, and the BSA also has identified more witnesses in its Interrogatory Responses than has GSUSA.  The BSA is more than meeting its discovery obligations here.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 31

### Responsive to BSA Request No. 40 Is Disproportional to the Needs of this Case

In its amended responses served on May 15, excerpts of which are attached as Exhibit 14, GSUSA responded as follows to BSA Request No. 40:

> GSUSA objects to this Request because it is unduly burdensome and not proportional to the needs of this action, as it seeks "all" style guides, branding guidelines or campaigns, brand identity guidelines, and other similar materials for a period of fifteen years. GSUSA has drafted many different versions of guides and/or guidelines that may be responsive to this Request since January 1, 2004, making the universe of such Documents variable and unduly burdensome to locate given the multiple repositories that would need to be searched.  Further, there is no single location where all of these Documents are stored, and there are no individuals currently employed in GSUSA's marketing department whose employment has spanned this period that GSUSA can confer with to locate all of these Documents. These Documents are also not updated on any sort of regular schedule, with some updated as frequently as two or three times annually. Subject to the foregoing objections, GSUSA will complete its production of all GSUSA style guides, branding guidelines or campaigns, brand identity guidelines, and other similar materials existing as of January 1, 2016 to the present that can be located with reasonable diligence on May 31, 2019. GSUSA will not produce Documents otherwise responsive to this Request dated before January 1, 2016.

To be clear, GSUSA does not contest BSA's position that a subset of the requested documents *may* contain information relevant to BSA's abandonment and laches defenses, as unfounded as those defenses are.  In fact, this is why GSUSA has agreed to produce non-privileged documents responsive to BSA's Request Nos. 12, 18, 19 and 20, without any additional time limitations,[26] all of which cover the very same issues that BSA highlighted above regarding its abandonment and laches defenses:

> o **BSA Request No. 12**: All Documents and Communications concerning Your 2010 New Brand campaign, including, but not limited to: (i) the "extensive research and development" GSUSA claims it completed in Exhibit A hereto; (ii) the GSUSA's "Core Business Strategy, which was developed under Cloninger's leadership to turn around the organization amid changing demographics and a gradual decline in membership" as referenced in Exhibit A hereto; (iii) all

---

[26]   For BSA Request Nos. 18-20, GSUSA also included the following statement in its each of responses: "GSUSA will also not withhold any non-privileged Documents and Communications falling within the scope of this Request that are identified through such a search, but it cannot represent that it will produce "all" such Documents and Communications given the breadth of the Request and the unlimited time period it covers."  *See* Exh. 14.

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 32

Communications with the "Original Champions of Design" concerning modifications to GSUSA's brand(s); and (iv) all directives, branding guidelines, style guides or similar materials issued to GSUSA councils, troops, members, licensees and/or the press.

o **BSA Request No. 18:** All Documents and Communications concerning Your intent (or lack thereof) to use the terms SCOUT, SCOUTS or SCOUTING alone (without other source-identifying distinguishing leading words) as a trademark in connection with Your goods or services, between 2009 and the present.

o **BSA Request No. 19:** All Documents and Communications concerning any decision, instruction or request by GSUSA not to use SCOUT, SCOUTS or SCOUTING alone (without other source-identifying distinguishing leading words such as GIRL) in reference to GSUSA, its programs, services or members.

o **BSA Request No. 20:** All Documents and Communications concerning GSUSA Guidelines Forbidding Use of SCOUT, SCOUTS or SCOUTING.

Against this backdrop of documents that GSUSA has agreed to produce, which BSA wholly ignores in its presentation above, there is no credible justification for the production of documents responsive to BSA Request No. 40 that date between 2004 and 2015. In other words, BSA claims to need materials documenting the alleged abandonment by GSUSA of the terms SCOUTS and SCOUTING, and to support its laches defense. Those documents are encompassed by the four Requests above, whether reflected in branding guidelines, style guides or otherwise, and will be produced, with no time restriction, to the extent located after a reasonable and diligent search. So why, then, should GSUSA have to produce "All GSUSA style guides, branding guidelines or campaigns, brand identity guidelines, or other similar materials existing as of January 1, 2004 to the present," as BSA Request 40 seeks? BSA offers no answer to this question in its presentation above.

In addition, requiring GSUSA to search for and produce such documents would be disproportional to the needs of this case. As GSUSA's Response to Request No. 40 explains, there are innumerable style guides, branding guidelines or campaigns, brand identity guidelines, and other similar materials generated by GSUSA each year. They cover matters as relevant as the manner in which the GIRL SCOUTS trademark should appear in GSUSA communications and promotional materials, and as irrelevant as the correct color schemes for GIRL SCOUTS uniforms. Far from being "specific" and "discrete," "not difficult to locate, nor voluminous," "simple to identify using targeted search terms, and/or by examining branding and marketing folders," as BSA claims, these materials are, as GSUSA has already stated on multiple occasions, updated regularly but not consistently tracked; scattered among a wide range of custodians and databases; impossible to search for reliably using keywords; and there are no GSUSA marketing personnel whose tenure with the organization dates back to 2004 with whom GSUSA can

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 33

consult.  Moreover, there are multiple campaigns undertaken regularly each year on a range of categories and topics like recruiting, back-to-school, World Thinking Day, cookie sales, National Women of Distinction, the Gold Award and many others that have either no or tangential relevance to this case.  Balancing BSA's claimed "need" for these documents, which is nonexistent in light of what GSUSA has agreed to produce in response to BSA Request Nos. 12, 18, 19 and 20, against the undue burdens GSUSA would bear by having to produce everything responsive to BSA Request 40 over a fifteen-year period, the balance tilts decisively in favor of GSUSA on this issue.[27]

### B.   The Court Should Not Accept BSA's Proposed "Target Date" of June 28, 2019 for the Parties to "Substantially Complete" Their Document Productions

In Section A(1) of its opening presentation above, GSUSA has advocated for a firm deadline of May 31 for the parties to complete their productions of documents responsive to the first requests, with an exception for any additional documents whose production is required from either side as a result of the Court's resolution of the issues set forth in this letter, which would be due on June 14.  GSUSA has already explained above why BSA's proposal of a June 28 production date is not one the Court should adopt, particularly since it is a mere "target date" for "substantial" completion of BSA's production, and therefore not the firm deadline this case requires if the parties are to adhere to the current schedule that calls for fact discovery to be completed by September 25, *see*  Dkt. 28, especially since each side has served a second set of documents requests encompassing multiple disputes that have yet to be addressed.  Indeed, that BSA would advance a proposal with so many obvious gaps in it highlights its strategy of trying to prolong discovery for as long as it can.[28]

---

[27]   BSA has advised GSUSA that, if the Court were to require BSA to review and produce documents responsive to GSUSA Request No. 38 dating back to 2012, it would ask the Court to shift costs to GSUSA.  GSUSA does not believe any shifting of costs in favor of either party is appropriate, but this argument highlights how BSA's repeated invocation of principles of "reciprocity" are in reality a one-way street.  How can BSA argue with a straight face that cost shifting is appropriate for it with respect to GSUSA Request 38, but somehow unnecessary with respect to its own overly broad and unduly burdensome Request No. 40?

[28]   In its presentation above, BSA boasts that it "has produced nearly 30,000 pages of documents -- more than twice the page count of GSUSA's production as of this writing."  However, more than 22,000 pages of these documents were produced only *after* GSUSA raised with the Court BSA's effort to slow walk the progress of discovery by dragging out the meet-and-confer process.  And, there are very few internal BSA emails included within BSA's production to date. That BSA would try to portray itself as trying to expedite the course of discovery in this case, while simultaneously arguing that it needs until June 28 – more than five months after GSUSA's

The Honorable Alvin K. Hellerstein
May 24, 2019
Page 34

Respectfully Submitted,                        Respectfully Submitted,


DORSEY & WHITNEY LLP                  QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP

By: S/: *Bruce R. Ewing*                 By:  S/:  *Rachel Kassabian*
    Bruce R. Ewing (BE-0724)                 Rachel Kassabian (*pro hac vice*)
    Fara S. Sunderji (FS-1208)               555 Twin Dolphin Drive 5th Floor
    51 West 52nd Street                 Redwood Shores, CA 94065
    New York, New York 10019               (650) 801-5005
    (212) 415-9200
                                             Todd Anten
    *Attorneys for Plaintiff*                Jessica A. Rose
    *Girl Scouts of the United States of*    51 Madison Avenue, 22nd Floor
    *America*                                New York, NY 10010
                                             (212) 849-7000

                                             *Attorneys for Defendant*
                                             *Boy Scouts of America*

---

first document requests were served – to "substantially complete" its production, is a
contradiction that cannot be reconciled.