August 2, 2019

<u>**BY ECF**</u>
The Honorable Alvin K. Hellerstein
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York  10007-1312

**Re:**    <u>***Girl Scouts of the United States of America v. Boy Scouts of America***</u>, **No. 18-cv-10287**

Dear Judge Hellerstein:

The parties in the above-captioned proceeding jointly write pursuant to Your Honor's Individual Rule 2.E. to request that the Court resolve the disputes detailed below.  Pursuant to Your Honor's Individual Rule 2.E, and unless otherwise noted below, the parties have met and conferred extensively regarding these issues prior to submitting this letter.  In particular, the parties telephonically met and conferred on these issues on June 28, July 1, July 10, July 18, July 24 and July 26 for over an hour at each meeting.  Rachel Herrick Kassabian, Todd Anten and/or Dylan Scher participated in these discussions on behalf of defendant Boy Scouts of America (the "BSA"), and Fara Sunderji, Jonathan Montcalm, and/or Kimberly Frumkin participated on behalf of plaintiff Girl Scouts of the United States of America ("GSUSA").   The parties also met and conferred in writing on this issue on various dates, including June 11, June 19, June 28, July 1, July 2, July 10, July 12, July 15, July 16, July 17, July 22, July 23, July 24, July 26, and July 28.

This joint letter is organized as follows:

Part I:        The BSA's and GSUSA's respective introductions.

Parts II-III:    The BSA's and GSUSA's respective positions regarding GSUSA's responses to certain of the BSA's discovery demands.

Parts IV-V:    GSUSA's and the BSA's respective positions regarding the BSA's responses to certain of GSUSA's discovery demands.

**I.**    <u>**Introductions**</u>

**A.**    **The BSA's Introduction**

<u>The BSA's Motion</u>

The BSA's discovery issues presented in this motion fall into three main categories:  (1) GSUSA's improper redaction of hundreds of highly relevant documents solely on purported "non-responsiveness" grounds, and its subsequent hedging and flip-flopping in connection with the parties' efforts to resolve that dispute; (2) GSUSA's refusal to answer basic Interrogatories seeking witness identities concerning alleged confusion, and unreasonable delay in amending its Initial Disclosures until the month before fact discovery is set to close; and (3) GSUSA's refusal to

produce critical documents reflecting GSUSA's 2017 efforts to prevent the BSA from expanding its presence in the girls' services space, in which GSUSA claimed in internal documents to have a "monopoly."

*First*, earlier this summer, the BSA discovered that GSUSA had made thousands of unilateral redactions on 254 highly relevant documents, solely on grounds of purported "non-responsiveness."  BSA's investigation revealed that the redacted information did not appear to be "non-responsive" at all, and in any event, it is well-settled that "non-responsiveness" redactions are generally impermissible.  The BSA thus immediately initiated a meet-and-confer.

During the meet-and-confers, GSUSA staunchly refused to budge on this issue, insisting again that the redacted material was indeed factually "non-responsive" and that such "non-responsiveness" redactions were proper.  The BSA then sent GSUSA its motion to compel on this issue (*see infra* Part II.A), which, in addition to its legal arguments, featured snapshots of various inconsistent redactions the BSA had located (amongst the thousands) clearly illustrating for the Court that GSUSA's representations of "non-responsiveness" were untrue.  After seeing the BSA's motion, GSUSA suddenly offered to remove them – but only on certain unacceptable conditions.  And, GSUSA's compromise representations were full of hedging language and internal contradictions.  For instance, on Wednesday, July 31, GSUSA offered to "produce unredacted copies of all documents containing redactions for non-responsiveness."  But, this morning, GSUSA *reneged* on its offer of complete un-redaction of all 254 documents, declaring instead that "the number [of unredacted documents we will be providing] will be less than 254."  And then, just hours ago, GSUSA changed its stance *again*, declaring that it would indeed "produc[e] 254 documents today" – but that some of them would *still be redacted* – though this time, on privilege grounds.  Finally, when pressed for details and assurances that this would not happen again, or if it did, that GSUSA would be subject to sanctions, GSUSA gave a wishy-washy, "yes and no" answer, indicating that it would "interpose" an opposition to any motion for sanctions, and defend its right to make non-responsiveness redactions.

The BSA appreciates that GSUSA is now promising to remove some significant (though currently unspecified) portion of these redactions.  But the BSA cannot accept vague and contradictory promises, nor can it accept anything short of the full relief it seeks.  Depositions are just weeks away, and discovery closes next month.  The BSA has been trying to obtain unobscured copies of these highly relevant documents for many weeks, at great expense and distraction to its efforts to prepare its defense.  None of this should have been necessary.  GSUSA had no possible good faith basis for claiming "non-responsiveness" over portions of its documents that, at least as to some of the instances the BSA has been able to see due to inconsistent redactions, are both responsive and also very helpful to the BSA's defense.  Concealment of damaging evidence is impermissible under any standard.

Thus, a Court Order is needed, to ensure that GSUSA follows through on its promises in a fulsome and unequivocal manner that will be enforceable for the BSA, as follows:  (1) GSUSA shall entirely remove all purported "non-responsiveness" redactions on these 254 documents, (2) to the extent GSUSA intends to maintain any of the individual redactions on any of these 254 documents on other grounds, such as privilege, GSUSA shall submit those documents to the Court for *in camera* review; and (3) GSUSA shall not make any claimed "non-responsiveness" redactions for

the remainder of this case.[1]  Finally, as noted in the BSA's argument below, the BSA requests any further relief under Rule 37 as the Court may deem just and proper.[2]

**Second**, GSUSA's failure to provide the identities of witnesses who were (allegedly) actually confused by the BSA's use of its trademarks, in response to the BSA's duly propounded Interrogatories, is inexcusable.  GSUSA's November 2018 Complaint anonymously references "prospective parents" in Texas "prospective parents" in Texas, "school principals in Henderson, Haywood and Jackson Counties," a "parent" in Central Indiana, a "mother" in South Dakota, "several parents" in Goshen, Indiana, and "many attendees" in North Carolina.  (Compl. ¶¶ 71-72, 77-80).  *Who are these people?*  The BSA is entitled to know these names via GSUSA's Interrogatory responses, yet GSUSA has refused to identify these individuals – for months.  Also unacceptable is GSUSA's indication that it will be amending its initial disclosures later this month, on the eve of the close of discovery.  GSUSA should provide both amended responses and amended initial disclosures immediately, and the BSA should be permitted to depose any newly disclosed witnesses from either source after the September 25 cutoff, if necessary.[3]

**Third**, the BSA seeks an order compelling GSUSA to produce documents relating to a letter that GSUSA's National President sent to the BSA's National President in 2017, demanding that the BSA not welcome girls into its core programs.  Documents relating to this letter are highly relevant to the BSA's defenses and GSUSA's claims, and relate to alleged actions and events alluded to in GSUSA's Complaint.  For instance, Hannan's letter to the BSA explicitly accuses the BSA of a "covert campaign to recruit girls into programs run by the Boy Scouts," stating that the BSA is "undercutting" GSUSA, which mirrors GSUSA's allegations in its Complaint that BSA has been engaged in a "widespread and systematic course of conduct" that "intentionally interfered with" GSUSA's business relationships "by dishonest, unfair, and improper means."  (Compl. ¶ 143).

The BSA respectfully requests that its motion be granted in full.

GSUSA's Motion:  GSUSA's motion to compel, on the other hand, is not well taken.  GSUSA's disputes fall into three general categories.  First, GSUSA moves to compel on several issues for which the parties have not completed their meet-and-confer obligations pertaining to pending Requests for Production of Documents ("RFPs" or "Requests"), including on positions raised by GSUSA only for the first time in this motion.  Second, GSUSA demands categories of documents that the BSA already produced and is not otherwise withholding.  Third, GSUSA demands unreasonably burdensome and unnecessary custodial document collections from multiple new custodians that would require the BSA to collect and review hundreds of thousands of documents,

---

[1]  The BSA's offer to GSUSA to enter into the proposed stipulation and have it so-ordered by the Court, which would fully resolve this dispute, remains open.

[2]  The BSA notes that because its portion of this submission addressing redactions (*infra* Part II.A) was composed before receiving GSUSA's various offers, the facts stated in that section demonstrate why these circumstances call for an order by the Court.

[3]  Because GSUSA is also refusing to make even a single one of its witnesses available for deposition until September 5, forcing the BSA to take all GSUSA depositions in the tight window between September 5 and the close of fact discovery on September 25, this relief will be necessary.

based on nothing more than their appearance on a single document.  GSUSA's demand is both untimely and unwarranted.

The BSA respectfully requests that GSUSA's motion be denied.

### B.   GSUSA's Introduction[4]

To borrow from Charles Dickens, this is a tale of two motions.  One, filed by GSUSA asks the Court to compel the production of documents that BSA is actually withholding and should have turned over months ago.  The second, filed by BSA, asks the Court to compel GSUSA to produce documents that it has agreed to produce and information that it has already provided or has agreed to provide.  That latter motion is purely an exercise in gamesmanship that is an abuse of the meet-and-confer process, as well as a complete waste of the Court's resources.

First to GSUSA's motion.  As the Court is aware, one of the seven non-exclusive factors enumerated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), that governs the analysis of likelihood of confusion in a trademark infringement case is the intent of defendant BSA in adopting the marks at issue, namely SCOUTS BSA, SCOUT ME IN, FAMILY SCOUTING and other designations referred to as the "SCOUTS BSA Marks," for use in connection with services offered to girls.  This factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill . . ."  *See Gap Inc. v. G.A.P. Adventures, Inc.*, 2011 U.S. Dist. LEXIS 71675, at *38 (S.D.N.Y. June 24, 2011) (Hellerstein, J.).  Bad faith is particularly important in trademark cases because "the law presumes that an intended similarity is likely to cause confusion." *See Harlequin Enters. v. Gulf W. Corp.*, 644 F.2d 946, 949 (2d Cir. 1981).  Thus, knowing how BSA came to adopt the SCOUTS BSA Marks, what its motivations were, the timing of BSA's decision and a number of related matters are all important to the issue of intent, and most of the documents concerning this issue would necessarily be in the exclusive possession of BSA.

GSUSA has brought this motion because BSA has largely failed to produce the documents bearing on these issues by taking the position that it does not have to turn them over.  By unilaterally redefining its search efforts, and selectively searching for materials it has picked and chosen, among custodians it prefers to gather from, for abbreviated time periods, BSA is not only attempting to redefine GSUSA's discovery requests, but is thwarting the fundamental purpose of discovery.  Specifically, it is trying to avoid locating relevant and responsive information so BSA doesn't have to turn it over, as opposed to simply disclosing the documents that go to a central issue in this case: to what extent, if any, were GSUSA's longstanding rights in its GIRL SCOUTS marks taken into account or considered when the decision was made to: (i) admit girls into BSA's core programs offered under the marks CUB SCOUTS and SCOUTS BSA (the latter of which was formerly known simply as BOY SCOUTS); and (ii) brand BSA's new girls' initiative under the trademark SCOUT ME IN.  To a great extent, BSA has not turned over documents concerned with these issues, and it has done so primarily by misinterpreting

---

[4] GSUSA assumes the Court's familiarity with the nature of this action and respectfully refers the Court to its Introduction from the parties' first joint letter outlining prior discovery disputes [Dkt. 36] for a brief explanation of the case from GSUSA's perspective.

multiple GSUSA document requests to excise from their scope the documents GSUSA seeks; truncating the time period covered by GSUSA's requests; and omitting certain custodians who are likely to have responsive documents.

As a result of BSA's actions, discovery in this case has been decidedly imbalanced. GSUSA has produced approximately three times as many documents as BSA—with GSUSA producing **28,000** documents, compared to approximately **10,000** produced by BSA, which is paltry relative to the vast number of documents that must have been available for collection. GSUSA has searched the files of over thirty document custodians, as opposed to approximately twenty such custodians whose files have been searched by BSA. By way of its affirmative portion of this joint letter, GSUSA seeks the Court's assistance in correcting that imbalance by requiring the BSA to adhere to its discovery obligations by producing the documents requested by GSUSA that address how the SCOUTS BSA trademarks came to be adopted, what factors BSA considered in adopting them, and to what extent GSUSA and its GSUSA Marks were taken into account or considered as part of that process—central issues in this case.

As for BSA's motion, it has been filed purely to distract the Court from the persistent stonewalling in which BSA has engaged. Its argument section opens by clamoring for the production of 254 documents that GSUSA initially and properly redacted on grounds of non-responsiveness but *that GSUSA will have produced by the time the Court reads this letter*. But rather than be satisfied with this outcome of the meet-and-confer process, BSA has insisted on plowing ahead, demanding that GSUSA stipulate never to redact documents on the ground of non-responsiveness again; demanding that privileged material in these documents be turned over; and even refusing to join a call with the Court in order to avoid burdening Your Honor with a dispute that has been resolved. In the absence of anything to decide on this issue, BSA's arguments are moot and made simply to harass GSUSA and waste resources.

The balance of BSA's motion is along the exact same vein. With respect to GSUSA's answers to BSA Interrogatory Nos. 4-6, the bulk of BSA's argument is that GSUSA has identified *too many* documents under Fed. R. Civ. P. 33(d) in its answers to Interrogatory Nos. 4-5, and *too many* people in response to Interrogatory Nos. 5 and 6. And, even though GSUSA has agreed to supplement its Rule 26 initial disclosures by mid-August in a manner that goes beyond what that Rule requires, BSA's response is entirely predictable. Incredibly, it asks the Court to compel GSUSA to supply such supplementation "immediately" – BSA's favorite word when it comes to things it wants GSUSA to do, but one wholly absent from its vocabulary when it comes to its own discovery obligations. Because GSUSA has done or has already agreed to do more than what the Rules require, this prong of BSA's motion is as groundless, harassing and wasteful as its first.

Finally, with respect to BSA RFP 58, here again, BSA claims to need documents for various pretextual reasons that do not withstand scrutiny, while ignoring the fact that GSUSA has already produced documents in response to other Requests that it falsely claims are now being withheld. So, like its predecessors, there is no basis upon which the Court should grant this last prong of BSA's motion.

The Court should see BSA's effort to manufacture disputes when there are none for what it is: a strategy designed to allow it to withhold crucial documents that GSUSA needs and that only BSA has.  The only party entitled to relief on these motions is GSUSA, and we respectfully ask the Court to grant the relief sought herein.

## II.   THE BSA'S POSITIONS REGARDING GSUSA'S DEFICIENT DISCOVERY RESPONSES

The BSA's discovery concerns fall into three main categories:  (1) GSUSA's improper redaction of hundreds of highly relevant documents solely on purported "non-responsiveness" grounds; (2) GSUSA's refusal to answer basic Interrogatories seeking witness identities, and unreasonable delay in amending its Initial Disclosures until the month before fact discovery is set to close; and (3) GSUSA's withholding of critical documents reflecting GSUSA's 2017 efforts to prevent the BSA from expanding its presence in the girls' services space, ██████████████████████████ ██████████████████████.

### A.   *GSUSA's Unilateral Redaction Of Hundreds Of Highly Relevant, Responsive Documents, on Purported "Non-Responsiveness" Grounds, is Patently Improper*

The BSA's recent review of GSUSA's document production revealed that GSUSA had made extensive redactions to its documents for reasons other than privilege – literally thousands of them – without producing a redaction log, or even identifying the presence of those redactions in document metadata, as the Protective Order requires.  Upon discovering these undisclosed redactions, the BSA immediately requested a redaction log for all non-privilege redactions.  Nearly two weeks later, GSUSA served the BSA with a list of 254 documents from its production, comprising nearly 7,000 total pages, on which GSUSA confirmed it had made thousands of redactions.[5]  *See* Ex. AA.  GSUSA subsequently served an amended version of its redaction list. *See* Ex. BB.  GSUSA's purported basis for all of these redactions was listed as "non-responsiveness."  Despite this claim, GSUSA's redaction list had no subject matter description or other basis for its unilateral assessment of "non-responsiveness."  GSUSA later represented, during meet-and-confer, that redacted information actually *references the BSA* and generally involves information about GSUSA's marketplace competition and membership goals relative to the BSA and its welcoming of girls.[6]  GSUSA also claimed during meet-and-confer that it had not redacted any emails – which is not true. *See, e.g.*, Exs. A & B.[7]

It is well-settled that redactions to otherwise-relevant, responsive documents, on the basis that some portions of those documents are purportedly "non-responsive," is impermissible.  As one

---

[5]   BSA estimates that GSUSA redacted more than *2,600* pages, many of which reflect multiple redactions on a single page.  It is impossible for the BSA to know for sure because GSUSA did not provided metadata for its redactions, as required by the Protective Order.  *See* Dkt. 32, ¶ 27.

[6]   These topics go to core issues in this case, including GSUSA's claims that the BSA engaged in unfair competition (Compl. ¶¶ 101-112), the BSA tortiously interfered with GSUSA's business (*id.* ¶¶ 140-145), and GSUSA should be awarded damages for allegedly lost members (*id.* ¶ 121).

[7]   While GSUSA has offered to consider individual requests to un-redact single redactions on a case-by-case-basis, the BSA should not be forced to individually litigate thousands of discrete (improper) redactions, which would lead to enormous expense and delay.

Court warned, such redactions "breed suspicions" and "deprive the reader of context." *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009). Here, GSUSA's "non-responsiveness' redactions are particularly egregious, as they are both legally unwarranted and factually incorrect. For example, we know from GSUSA's inconsistent redacting that it redacted as "non-responsive": (1) direct references to the BSA; (2)

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████ GSUSA even went so far as to redact 17 documents GSUSA relies upon in its interrogatory responses pursuant to Rule 33(d).

These improperly redacted documents are indisputably responsive to the BSA's discovery requests and are highly relevant to GSUSA's claims and the BSA's defenses. They should be unredacted.

> 1. *Unilateral "Non-Responsiveness" Redactions Are Impermissible Except In Unique Circumstances Not Present Here*

As a threshold matter, it is well-settled that a party is not permitted to unilaterally redact portions of otherwise responsive documents on supposed grounds of "non-responsiveness." As one court in this District explained just last year in addressing this exact question:

> **The weight of authority in this Circuit goes against allowing a party to redact information from admittedly responsive and relevant documents "based on that party's unilateral determinations of relevancy."** *Cyris Jewels v. Casner*, 2016 WL 2962203, at *4 (E.D.N.Y. May 20, 2016) (citing cases rejecting defendants' requests for redaction of irrelevant text within relevant documents); *see also Durling v. Papa John's Int'l, Inc.*, 2018 WL 557915, at *9 (S.D.N.Y. Jan. 24, 2018) ("**Redactions on grounds of non-responsiveness or irrelevance are generally impermissible**, especially where ... a confidentiality stipulation and order ... is in place."); *John Wiley & Sons. Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("**[R]edactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege.**"); *In re State St. Bank & Tr. Co.*, 2009 WL 1026013, at *1 (directing parties not to "redact any portion of a document on the ground that the portion is non-responsive and irrelevant" because **such redactions "breed suspicions" and "may deprive the reader of context"**); *In re Restasis (Cyclosporins Opthalmic Emulsion) Antitrust Litig.*, 2018 WL 3007926, at *1 (E.D.N.Y. June 4, 2018) (**a party [**"**]should not be permitted to unilaterally decide to redact portions of a responsive document** because it determines that they are competitively sensitive and not relevant[**"**]).

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 327 F.R.D. 52, 54 (S.D.N.Y. 2018) (emphasis added).[8] The BSA need not belabor such an elementary point – it is a hallmark of discovery that

---

[8]   *See also, e.g., Johnson v. City of N.Y.*, 2018 WL 276349, at *3 (E.D.N.Y. Jan. 3, 2018) ("New York federal courts generally frown upon the practice of redacting unresponsive or irrelevant information"); *Howell v. City of N.Y.*, 2007 WL 2815738, at *2 (E.D.N.Y. Sept. 25, 2007) (similar); *United States v. Davis*, 1988 WL 96843, at *3 (S.D.N.Y. Sept. 13, 1988) (similar). The

a party may not conceal information within relevant documents, as GSUSA did here.  This alone warrants granting the BSA's motion to compel.[9]

### 2. *The Information GSUSA Redacted Is Not "Non-Responsive" In Any Event*

We know from the context of GSUSA's redactions, as well as from GSUSA's inconsistent redacting, that it improperly redacted as "non-responsive" many directly responsive passages from these relevant documents.  For example:

- **GSUSA redacted references** ███████████████████████████████████████████
  GSUSA produced a powerpoint titled ███████████████████████████████████████
  ██████████████████████████████████████████████████████████ One slide
  reads, ██████████████████████████████  GSUSA then redacted the
  remainder of the presentation ████████████████████████████████████████████
  ████████████████████ *See* Ex. C at GSUSA_00077323-29.

- **GSUSA redacted its analysis** █████████████████████████████████████████
  ████████████████████ GSUSA produced a powerpoint titled ███████████ dated
  September 26, 2018 (just weeks before it filed the Complaint), ██████████████
  ████████████████████████████████████████████████████████████████████████

---

same holds outside of New York.  *E.g.*, *Aff. Foods Midwest Coop., Inc. v. SuperValu Inc.*, 2018 WL 6177074, at *6 (D. Neb. Nov. 27, 2018); *IDC Fin. Publ'g, Inc. v. Bonddesk Grp., LLC*, 2017 WL 4863202, at *2 (E.D. Wis. Oct. 26, 2017); *Stewart v. Credit One Bank, N.A.*, 2017 WL 3453569, at *3 (D. Kan. Aug. 11, 2017); *Live Nation Merch., Inc. v. Miller*, 2014 WL 1877912, at *3 (N.D. Cal. May 9, 2014); *Islander Grp., Inc. v. Swimways Corp.*, 2014 WL 12573995, at *3 (D. Haw. Jan. 28, 2014) ; *Melchior v. Hilite Int'l, Inc.*, 2013 WL 2238754, at *3 (E.D. Mich. May 21, 2013); *Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 451 (D. Minn. 2011).

[9]  In its meet-and-confer correspondence, GSUSA directed the BSA to a few outlier cases which it claims support its redactions here – but all of them are distinguishable because they involved unique circumstances not present here.  *See Schiller v. City of N.Y.*, 2006 WL 3592547, at *7 (S.D.N.Y. Dec. 7, 2006) (permitting narrow redactions to protest group's board minutes because: (1) producing the information implicated the group's First Amendment rights; (2) the plaintiffs established it was "clearly irrelevant"; and (3) an attorneys'-eyes only designation was "insufficient" because of the plaintiffs' legitimate concerns about reprisals by government attorneys); *Topps Co., Inc. v. Koko's Confectionary & Novelty*, 2018 WL 4440502, *3, *9 (S.D.N.Y. Sept. 17, 2018) (party challenging the designations did "not make citation to any authority" challenging the redactions, and the redactions were only of "pricing lists" for products having nothing to do with the case); *Texas Brine Co., LLC v. Dow Chem. Co.*, 2018 WL 655692, at *8 (E.D. La. Feb. 1, 2018) (permitting limited redactions where "the Court has ***already*** ruled [that the redacted information] does not have to be produced") (emphasis added); *Cohlmia v. Ardent Health Servs., LLC*, 2008 WL 4925764, at *4-7 (N.D. Okla. Nov. 14, 2008) (redactions, submitted for *in camera* review, were of part of hospital's Board of Trustees minutes having nothing to do with plaintiff or his case).

███████████████████████████████████████████ Nonetheless, GSUSA redacted entire pages as "non-responsive" in obviously responsive sections titled: ████████████████████████████████████████████████████████ ████████████████████ *See* <u>Ex. D</u> (GSUSA_00071182).

- **GSUSA redacted its** ████████████████████████████████████████ ████████████████ GSUSA produced a script of a presentation titled ██████ █████" dated August 30, 2017.  GSUSA redacted certain sections of one copy of this presentation for non-responsiveness, but a duplicate copy GSUSA produced in more complete form reveals that the redacted passage relates to ████████████████ ██████████████████████ *Compare* <u>Ex. E</u> at GSUSA_00071913-20 (redacted) *with* <u>Ex. F</u> at GSUSA_00077954-61 (unredacted and below):



- **GSUSA redacted its analysis asking whether** █████████████████████████ ██████████████████████████ GSUSA repeatedly redacted a slide as "non-responsive" but also produced a more complete version, which shows that the redacted portion is responsive, as it concerns ████████████████████████████████████████████████ ███████████████████████████ due to the BSA's program changes referenced in the Complaint.  *Compare* <u>Ex. G</u> at GSUSA_00071099 (redacted) *with* <u>Ex. H</u> at GSUSA_00074247 (unredacted).

- **GSUSA redacted stunning admissions** █████████████████████████████ GSUSA redacted the below slide in an October 30, 2018 powerpoint as "non-responsive" in certain versions, but not in other versions.  The improperly redacted portion describes ████████████████████████ including the following stunning GSUSA admission: ██████████████████████<u>  J</u> at GSUSA_00076678. ██████████████ the central thesis of the GSUSA's Complaint filed against the BSA just one week later – that the BSA purportedly "caus[ed] significant harm to GSUSA's prospective business relationships" with potential members (¶ 143).  *Compare* <u>Ex. I</u> at GSUSA_00068356 (redacted) *with* <u>Ex. J</u> at GSUSA_00076678 (unredacted and below):



Another document, dated September 26, 2018, that GSUSA also redacted in certain versions but not others, includes multiple slides _____. *Compare* Ex. K at GSUSA_00068854-57 (redacted) *with* Ex. L at GSUSA_00069888-91 (unredacted).  This is confirmed in an email that – once again – GSUSA redacted as "non-responsive" in some versions but not others.  *Compare* Ex. A at GSUSA_00070403 (redacted) *with* Ex. B at GSUSA_00069515-16 (unredacted and below):



These are just some of the many examples of GSUSA's inaccurate representations that the passages it unilaterally chose to redact are "non-responsive" when in fact, the passages that are indeed responsive – and extremely helpful to the BSA's defense.[10]  Other examples are attached.

_____

[10]  GSUSA agreed to produce documents and communications on these subjects, including those "concerning the relationship, ***whether competitive or otherwise***, between [the BSA's] services for girls … and services offered or sponsored by GSUSA."  Ex. CC  (GSUSA's Responses to BSA Request Nos. 46-48) (emphasis added); *see also id.* (Nos. 21-22) (documents and communications

*E.g.*, <u>Ex. M</u> (GSUSA_00062127) & <u>Ex. N</u> (GSUSA_00078796); *see also* <u>Ex. O</u> (GSUSA_00076743) (redacting entire document except for cover and word "Appendix").

   3.  *GSUSA's Claimed Concerns About "Sensitivity" Are Unavailing, Given The Two-Tier Protective Order Governing This Action.*

As for GSUSA's claimed concerns that these documents are "sensitive," courts recognize that a protective order renders any "sensitivity" redactions unnecessary and inappropriate.  *See, e.g.*, *Christine Asia*, 327 F.R.D. at 55 (protective order "addresses any concerns that Defendants may have regarding the confidential or sensitive nature of the information redacted from documents").[11] Sensitivity redactions are thus unnecessary here because the Stipulated Protective Order already provides any necessary protections.  *See* Dkt. 32, ¶ 5.b (permitting the designation of material as "Highly Confidential" if it contains "highly confidential business or financial information.").

Moreover, GSUSA may not be heard to complain that the Protective Order does not offer adequate protection, as: (1) it never raised this issue with the BSA in the first place; and (2) it was GSUSA that proposed that each party be permitted to include three in-house counsel (identified by name), plus its CEO, in the "Highly Confidential" tier.  *See id.* ¶ 9.b.

                    *       *       *

GSUSA's "non-responsiveness" redactions are both categorically impermissible, and factually incorrect.  The BSA respectfully requests that the Court: (1) order GSUSA to remove all "non-responsiveness" redactions and re-produce complete, unobscured versions of all such documents within three business days; and (2) order any further relief to the BSA that it may deem proper under Rule 37.

   **B.    *GSUSA's Responses To The BSA's Interrogatories 4-6, Concerning Identification of Actual Confusion, Association and Tortious Interference Witnesses, Are Deficient.***

GSUSA has refused to respond to the BSA's interrogatories as written, concerning the identification of persons who personally inquired or commented about a relationship or association between GSUSA and the BSA or their marks , or who exhibited or expressed actual confusion (Nos. 5 & 6)  GSUSA also has misused Rule 33(d) by directing the BSA to hundreds of documents

---

concerning BSA marks in connection with services for girls).  And, GSUSA itself served nearly identical document requests pertaining to marketplace competition between the BSA and GSUSA. (*E.g.*, GSUSA Request No. 21.)

   [11] *See also, e.g., Durling*, 2018 WL 557915, at *9 (similar); .*Am. Manufacturers Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 2009 WL 10701187, at *7 (E.D.N.Y. Nov. 18, 2009) (similar); *In re State Street*, 2009 WL 1026013, at *1 ("the stipulated protective order makes it unnecessary to redact any portion of a document on the ground that the portion is non-responsive"); *Neonatal Prod. Grp., Inc., v. Shields*, 2015 WL 7078796, at *5 (D. Kan. Nov. 13, 2015) (similar).

by Bates range, where the particular person(s) GSUSA may be intending to identify is unclear (Nos. 4 & 5).

GSUSA's November 2018 Complaint alleges that certain specific, unidentified people were actually confused by the BSA's use of certain branding in connection with its offering of services for girls (¶¶ 76-82), or made mistaken associations between the BSA and GSUSA (¶¶ 87, 93). Accordingly, the BSA served Interrogatory Nos. 4-6, which request:

- <u>INTERROGATORY NO. 4</u>:  Identify all persons with knowledge concerning any facts or circumstances underlying GSUSA's allegations of tortious interference with prospective economic advantage in this Action (Claim VII), including the persons who were parties to any such prospective business relationships at issue under this Claim.

- <u>INTERROGATORY NO. 5</u>:  Identify all persons who, since January 1, 2015 (whether in person, by phone, in writing, or in any other way) inquired about or commented upon: (i) any relationship between the BSA and either GSUSA or the Asserted GSUSA Marks; and/or (ii) any license, sponsorship or other association between GSUSA and the BSA Marks when used in connection with services for girls.

- <u>INTERROGATORY NO. 6</u>:  Identify all persons who exhibited or expressed actual confusion (including but not limited to parents, children, church officials, school officials, members of the public, potential recruits, or others), as to the source, origin, connection, affiliation, sponsorship or association between the BSA or the BSA Marks when used in connection with goods or services for girls on the one hand, and GSUSA or the Asserted GSUSA Marks on the other.

In response to each, GSUSA agreed it "will produce documents containing the requested information" pursuant to Fed. R. Civ. P. 33(d).  *See* <u>Ex. P</u> (GSUSA's Responses to Interrogatory Nos. 4-6).[12]  GSUSA did not object to the scope of the Interrogatories as written.

On May 16, May 31 and June 28, 2019, GSUSA amended its responses in the following ways:

- <u>BSA INTERROGATORY NO. 4</u>:  Rather than identify people, GSUSA directed the BSA to 526 documents in their entirety, providing only the Bates numbers and without any indication of which names on those documents are responsive.

- <u>BSA INTERROGATORY NO. 5</u>:  Instead of "identify[ing] all persons who … inquired about or commented upon" a relationship, license, sponsorship, or other association between GSUSA and the BSA or their respective marks, GSUSA only identified "persons with knowledge of the subject matter."  Moreover, GSUSA simply directed the BSA to a

---

[12] In addition, in response to No. 4, GSUSA identified three people by name: ███████████████████████████████████

total of 139 documents, providing only the Bates numbers and without any indication of which names on those documents are responsive.[13]

- BSA INTERROGATORY NO. 6:  Instead of "identify[ing] all persons who exhibited or expressed actual confusion" as requested, GSUSA only identified a total of 47 "persons with knowledge of the subject matter."

Exs. Q, R, S (GSUSA's amended responses to Interrogatory Nos. 4-6).  GSUSA's responses to these Interrogatories are deficient in two respects:  (1) GSUSA rewrote the BSA's Interrogatory Nos. 5 & 6; and (2) GSUSA's identification of documents pursuant to Rule 33(d) is insufficient.

1. *GSUSA Has Not Provided the Witness Identification Information Called for By Interrogatory Nos. 5 & 6.*

GSUSA improperly rewrote Interrogatory Nos. 5 and 6, which requested that GSUSA "identify all persons" who personally either inquired or commented about a relationship or association (No. 5), or exhibited or expressed actual confusion (No. 6).  Instead, GSUSA chose to identify "persons ***with knowledge***" of persons who were actually confused.  These responses are deficient because they fail to provide the information actually requested.  For example, as to Rog No. 6, GSUSA identifies numerous GSUSA personnel who obviously have not experienced actual confusion themselves.  The BSA asked for the identification of people who were actually confused, not those "with knowledge" of others allegedly being confused.  Similarly, in Rog No. 5, the BSA asked for the identification of people who "inquired about or commented on" certain subjects, not about people (such as GSUSA employees) "with knowledge" of other people's inquiries or comments.

GSUSA's failure to dutifully answer these Interrogatories is unacceptable.  The touchstone of any trademark case is confusion, and GSUSA's refusal to identify its actual confusion witnesses via duly propounded Interrogatories is inexcusable, including because it deprives the BSA of a meaningful opportunity to take discovery concerning those witnesses.[14]

The BSA respectfully requests that GSUSA be ordered to provide a fulsome and complete response to the BSA's Interrogatory Nos. 5 and 6 as written, and order GSUSA to "identify all persons" who personally either: (1) inquired or commented about a relationship, sponsorship, license or association (No. 5); or (2) exhibited or expressed actual confusion (No. 6).

---

[13] In response to Interrogatory No. 5, GSUSA also incorporated by reference the entirety of its response to Interrogatory No. 6.

[14] In its meet-and-confer correspondence, GSUSA argued that Local Rule 33.3(a) restricts interrogatories to the names of "witnesses with knowledge of information relevant to the subject matter."  That Local Rule, however, only applies to the "commencement" of an action; in this case, discovery is nearly complete.  Moreover, GSUSA never objected to the BSA's Interrogatories on this ground – it accepted the Interrogatories as written.  And in any event, the BSA ***does*** seek the identification of persons with certain knowledge:  Rog No. 6, for example, asks for the identify of those who have knowledge of their own actual confusion – *i.e.*, the subject.  GSUSA's rewriting of Rog. No. 6 changes the prompt to those with knowledge about ***someone else's*** actual confusion.

### 2.   *GSUSA's Responses to Interrogatory Nos. 4 & 5 Contravene Rule 33(d)*

In response to Interrogatory Nos. 4 and 5, GSUSA chose to invoke Rule 33(d) by directing the BSA to hundreds of documents by Bates range.  These responses are insufficient to provide the BSA with the information requested.  For example:

- In response to Rog No. 4, GSUSA directed the BSA to the entirety of ***526 documents***, many of which are dozens of pages long, without directing the BSA to the specific identities of the individuals, as requested.   For example, where is the particular name(s) in GSUSA_00072731 that GSUSA relies upon as responsive? (*See* Ex. T).

- Similarly, in response to Rog No. 5, GSUSA directed the BSA to the entirety of ***141 documents***, many of which are dozens of pages long, without directing the BSA to the particular names of people who it contends inquired about or commented upon the specific subject matter, as requested.   For example, who are the particular people in GSUSA_00062159 that GSUSA relies upon as responsive? (*See* Ex. U).  Other documents cited by GSUSA in response to this Interrogatory obliquely reference identifiable individuals (such as "principals" or "a long time funder" or "a school district representative") but GSUSA has not provided their specific names, as demanded. (*See* Ex. V at GSUSA_00003038 & Ex. W at GSUSA_00007496).  GSUSA, however, was "under a duty to make a reasonable inquiry concerning the information sought in interrogatories," *Zanowic v. Reno*, 2000 WL 1376251, at *3 n.1 (S.D.N.Y. Sept. 25, 2000), and its failure to do so renders its response deficient.

GSUSA must know the names of the individuals it claims are responsive; otherwise GSUSA could not have cited the documents.

Rule 33(d) permits a response via specification of a party's business records, but only if "the burden of deriving or ascertaining the answer will be substantially the same for either party."  But GSUSA's responses to Interrogatory Nos. 4 and 5 – directing the BSA to the entirety of hundreds documents without any indication of ***which*** names are responsive to the Interrogatory at issue – clearly provide a far greater burden to the BSA than to GSUSA, as only GSUSA knows which names it is relying upon as responsive to the Interrogatories. *See, e.g.*, *Thai v. AMCO Ins. Co.*, 2017 WL 8180584, at *2 (C.D. Cal. July 12, 2017) (rejecting Rule 33(d) response because "the burden of abstracting these records is not substantially the same for either party, because Plaintiffs have knowledge beyond the information in the records").

The BSA respectfully requests that GSUSA be ordered to provide the names of the persons called for by the BSA's Interrogatories as written, or direct the BSA to the particular page and line of the documents cited where the specific responsive name(s) can be unequivocally determined.

### C.   ***The Court Should Order GSUSA To Immediately Amend Its Initial Disclosures***

On July 24, GSUSA announced for the first time that it was planning to amend its January 9, 2019 Initial Disclosures at some point in "mid-August" to identify new, previously-undisclosed witnesses.  The BSA responded that GSUSA should do so immediately, given the impending close

of fact discovery on September 25.  GSUSA refused, claiming, among other things, that it was still determining "scheduling" issues for these witnesses.  Such a delay is unacceptable, as it deprives the BSA of a meaningful opportunity to contact and depose them.  GSUSA's refusal to provide timely (amended) Initial Disclosures well in advance of the discovery cutoff unfairly prejudices the BSA's ability to fairly defend itself.  (Indeed, under Rule 26(e), GSUSA should have supplemented its Initial Disclosures *months* ago, not just a matter of weeks before discovery closes.)

Accordingly, the BSA respectfully requests that GSUSA be ordered to immediately serve its amended Initial Disclosures.  Given the untimeliness of these amendments, the BSA further requests that it be permitted to complete the depositions of any newly-disclosed witnesses after the September 25 cutoff, if needed.

> **D.** **_The Court Should Order GSUSA To Produce Its Documents And Communications Concerning Its Efforts To Pressure The BSA Not To Welcome Girls Into Its Cub Scouts And Scouts BSA Programs, Because Such Documents Are Relevant To GSUSA's Tortious Interference Claims And The BSA's Unclean Hands Defense (RFP No. 58)_**

Discovery has shown that in 2017, GSUSA engaged in an elaborate, nationwide effort to discourage the BSA from welcoming girls into its Cub Scouts and Scouts BSA programs.  Notably, GSUSA also had described itself ███████████████████████  *See* Ex. X at GSUSA_00049618 (GSUSA email: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

One  significant event associated with GSUSA's effort to prevent the BSA from welcoming girls into its Cub Scouts and Boy Scouts (now renamed Scouts BSA) programs occurred on August 21, 2017, when GSUSA's National President sent a harshly worded letter to then-National President of the BSA, accusing the BSA of a "covert campaign to recruit girls into programs run by the Boy Scouts," and "formally request[ing]" that the BSA not welcome girls into the two programs.  Ex. Y (GSUSA_00054497).

The BSA therefore propounded the following RFP No. 58, which seeks:

- All non-privileged Documents and Communications concerning the letter sent from then-GSUSA National President Kathy Hopinkah Hannan to then-National President of the BSA Randall Stephenson, dated August 21, 2017 [attached as Ex. Y] including internal and external correspondence related to that letter.

GSUSA has refused to produce any documents in response to these Requests, on relevance grounds.  *See* Ex. Z (GSUSA's Response to BSA Request No. 58).  The BSA disagrees.

*First*, these documents are directly relevant to GSUSA's allegations of tortious interference. GSUSA's tortious interference claim alleges that the BSA has been engaged in a "widespread and systematic course of conduct" that "intentionally interfered with" GSUSA's business relationships

"by dishonest, unfair, and improper means." (Compl. ¶ 143). Relatedly, Hannan's letter to the BSA explicitly accuses the BSA of a "covert campaign to recruit girls into programs run by the Boy Scouts," stating that the BSA is "undercutting" GSUSA. Ex. Y. Hannan also cites reports of the BSA's alleged "aggressive posturing" at local meetings, including claimed "disparaging and untrue remarks about Girl Scouts programming" and "subtle implications about the weakness of Girl Scouts' long term market strength." *Id.* GSUSA's internal documents regarding this letter – including any factual support, or lack thereof, for its claims and accusations – are directly related to GSUSA's pending claim tortious interference claim. Indeed, it is difficult to imagine how a letter from GSUSA's President to the BSA's President accusing the BSA of operating a "covert campaign to recruit girls" could not be considered relevant to this action.

**Second**, these documents are relevant to the core of GSUSA's Complaint more generally. GSUSA's accusations concerning the BSA's decision to welcome girls into its Cub Scouts and Boy Scouts (now known as Scouts BSA) programs are prominently featured in GSUSA's own Complaint. *See, e.g.*, Compl. ¶¶ 6, 49, 55, 84, 143, 145.

GSUSA also has conceded that documents concerning competition between the parties are relevant to this lawsuit by serving a document request for "all documents concerning the relationship, whether competitive or otherwise, between services for girls offered or sponsored by BSA under the SCOUTS BSA Marks, and services for girls offered or sponsored by GSUSA under the GS Marks." (GSUSA Request No. 21.)

**Third**, these documents are relevant to the BSA's affirmative defenses, such as unclean hands and trademark misuse. Specifically, these documents suggest that GSUSA's true concern, as reflected in pre-litigation documents, may have been with (legitimate) competition, as opposed to trademark issues. *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (describing unclean hands doctrine) (citations omitted).[15] Hannan's letter does not mention trademark issues at all, but instead "formally request[s]" that the BSA "not consider expanding to recruit girls." Ex. Y. To the extent GSUSA took any improper or anticompetitive steps to carry out this effort, the BSA is entitled to take discovery on it. And, if in fact GSUSA is using trademark law to keep the BSA out of the market space over which GSUSA claims it has a "monopoly," such facts are highly relevant to the BSA's unclean hands and trademark misuse defenses. Other facts suggest this may be the case—such as the fact that GSUSA has built its case around its assertion of purported trademark rights in the SCOUT mark (*i.e.*, SCOUT alone, without GIRL in front of it), despite overwhelming pre-litigation evidence that GSUSA expressly disclaimed and abandoned that mark decades ago.

The BSA respectfully requests that GSUSA be ordered to produce documents in response to the BSA's RFP No. 58.

---

[15] Courts routinely compel discovery based on these defenses. *See, e.g.*, *N. Am. Rescue, Inc. v. Bound Tree Med., LLC*, 2010 WL 1258113, *4 (S.D. Ohio Mar. 25, 2010) (compelling discovery for unclean hands defense); *CytoSport, Inc. v. Nature's Best, Inc.*, 2007 WL 1040993, *4, *4 n.1 (E.D. Cal. Apr. 4, 2007) (granting motion to compel and noting that Defendant is "entitled to gather discovery relevant to" an unclean hands defense).

**III.    GSUSA's Response to BSA's Position Regarding GSUSA's
Prior Redactions for Non-Responsiveness, Answers to BSA Interrogatory Nos. 4-6,
GSUSA's Initial Disclosures and GSUSA's Response to BSA RFP 58**

**A.    There is No Dispute Regarding GSUSA's Prior Redactions for Non-
Responsiveness, and BSA's Insistence on Raising this Non-Issue with the
Court Wastes Judicial Resources**

As noted in GSUSA's Introduction, there is no longer a reasonable dispute regarding
GSUSA's prior redactions for non-responsiveness, so BSA's continued pursuit of "relief" related
to this non-issue is a complete waste of the Court's time and resources.  By the time the Court
reads this joint letter, GSUSA will have produced the documents at issue, with all redactions for
non-responsiveness removed.  GSUSA explained this in writing to BSA, but BSA repeatedly
responded by mischaracterizing GSUSA's representations, all in an apparent effort to
manufacture a dispute that no longer exists.  Rather than accept having obtained the documents
its seeks, BSA would rather the Court paw through multiple exhibits to assess redactions that no
longer exist.  There is no need for the Court to do so, because there is no further relief on this
non-issue that can or should be granted.[16]

**B.    There is Nothing Deficient About GSUSA's Interrogatory Responses,
and GSUSA Has Offered to Do More Than Rule 26 Requires
with Respect to Its Initial Disclosures**

BSA's complaints regarding GSUSA's Responses to BSA Interrogatory Nos. 4-6, along
with its arguments concerning BSA's Fed. R. Civ. P. 26 initial disclosures: (i) entirely overlook
its months-long delay in raising these issues; (ii) are premised on an incorrect analysis of how the
*Polaroid* factor concerned with actual confusion is proven in the Second Circuit; and (iii) ignore
the specific provisions of Local Civil Rule 33.3, Fed. R. Civ. P. 33(d) and Rule 26 that confirm
the propriety of GSUSA's discovery responses.  For these reasons, there is no valid basis upon
which to grant this prong of BSA's motion to compel.

1.    BSA's Continued Dilatory Behavior

BSA's modus operandi in this matter is to delay extensively and then demand urgent
responses or extensions.  Its current protestations with respect to GSUSA's responses to
interrogatories and initial disclosures are another example.

---

[16] Although GSUSA agreed to remove the prior redactions for non-responsiveness in an effort to
move the case forward, such redactions were entirely proper under the circumstances.  *See*, *e.g.*,
*Topps Co., Inc. v. Koko's Confectionary & Novelty*, 2018 U.S. Dist. LEXIS 158261, at *30
(S.D.N.Y. Sept. 17, 2018); *Tex. Brine Co., LLC v. Dow Chem. Co.*, 2018 U.S. Dist. LEXIS
16167, *28 (E.D. La. Feb. 1, 2018); *Cohlmia v. Ardent Health Servs., LLC*, 2008 U.S. Dist.
LEXIS 92831*, at *14-15 (N.D. Okla. Nov. 14, 2008).

GSUSA served its original answers to interrogatories on March 13.  Exh. P.  On March 31, counsel for BSA demanded that GSUSA amend its answers to Interrogatory Nos. 4-6 to detail the knowledge of each witness identified in response to Interrogatory No. 4, and to identify the documents containing the information sought in Interrogatory Nos. 5 and 6 by bates number.  The latter complaint ignored the fact that GSUSA had stated in its answers that it could not yet identify documents by bates number because the documents had not yet been produced, but that it would do so when its document production was transmitted.  *Id.*

On April 26 (approximately three weeks earlier than BSA acknowledges in Section II of this letter, which is a fact of some importance, as detailed below in note 19), GSUSA provided BSA with the names and/or contact information of 42 individuals with information responsive to Interrogatory No. 6.  *See* Exh. GG.  Then, on May 16, GSUSA served its amended interrogatory answers to identify: three individual GSUSA employees in response to Interrogatory No. 4; 44 documents by bates number containing information sought in Interrogatory No. 5; and, in the answer to Interrogatory No. 6, largely the same list of individuals provided on April 26, with one more name added.  Exh. Q.[17]  On May 31, GSUSA supplemented its response to Interrogatory No. 4 by identifying more documents containing the information sought, by bates number.  Exh. R.  And, on June 28, GSUSA, after making a substantial additional production of documents, further supplemented its responses to Interrogatory Nos. 4 and 5 by citing to additional documents, by bates number, and added four additional names to its response to Interrogatory No. 6.  Exh. S.  This chronology demonstrates that GSUSA satisfied its discovery obligations and did so in a timely way.

In contrast, BSA waited ***until July 22*** to raise its present objections, as shown in Exhibit HH.  This was nearly three months after GSUSA supplied the majority of names responsive to Interrogatory No. 6, which it identified as persons "with knowledge" concerning the subject matter of that Interrogatory, Exh. GG, and approximately two months after the bulk of the information supplied in response to Interrogatory Nos. 4 and 5 was provided.  Exh. Q.  After waiting months to raise these issues with GSUSA – and consistent with its pattern of delay-and-wait-and-demand litigation approach – BSA's July 22 letter demanded that all three interrogatory responses be supplemented in three days, on July 25.  Exh. HH.[18]  Nowhere in Section II of this joint letter does BSA acknowledge its failure to raise any of these issues until ten days ago, nor does it advise the Court that it could have raised at least some of these issues well before the

---

[17] GSUSA's amended answer to Interrogatory No. 5 also incorporated by reference all of the individuals named in its amended answer to Interrogatory No. 6.

[18] Further illustrating BSA's unilateral approach to urgency, GSUSA served notices of deposition pursuant to Fed. R. Civ. P. 30(b)(1) and 30(b)(6) on June 14 calling for depositions to begin in early August.  It took BSA almost a month, until July 13, to supply GSUSA with objections to GSUSA's Rule 30(b)(6) Notice, and until July 24 to supply GSUSA proposed dates for only ***some*** BSA witnesses.  As of this writing, BSA has been unable or unwilling to supply proposed dates for the depositions of four BSA witnesses whose depositions were noticed in June.

prior joint letter was submitted on May 24 [Dkt. 36], but failed to do so.[19]   BSA's inexplicable delay in raising these concerns contradicts the false claims of urgency and alarm it presents above.

2.      In Light of How Actual Confusion Is Proven Under *Polaroid*, BSA Can Hardly Complain About Being Provided With Too Much Information on the Many Instances of Confusion That Its Misconduct Has Caused

With respect to Interrogatory Nos. 5 and 6, BSA first takes issue with the fact that GSUSA has identified "persons with knowledge" concerning instances of actual confusion or mistaken affiliation, instead of limiting the response to the names of actually confused individuals.  However, GSUSA's answers to those two Interrogatories are perfectly appropriate and consistent with applicable Second Circuit jurisprudence on the factors to be evaluated for a trademark infringement case.

In Section II(B)(1) above, BSA argues that GSUSA has "refus[ed] to identify its actual confusion witnesses," which it assumes can be only those individuals who "personally either: (1) inquired about or commented about a relationship, sponsorship, license or association [between the parties]; or (2) exhibited or expressed actual confusion," and it specifically states that GSUSA employees with knowledge of "other people's inquiries or comments" cannot be "actual confusion witnesses."

BSA's contention is completely wrong, as a host of decisions issued by the Second Circuit and various district courts have recognized.  Testimony concerning actual confusion can be offered not just through the confused individuals themselves, but through other witnesses, including a party's employees, who have witnessed or encountered such confusion experienced by customers or others.  *See Virgin Enters. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (after noting that evidence of actual confusion is "particularly relevant" to the issue of likely confusion, affirming admission of testimony from former employee of defendant that he regularly encountered confusion experienced by customers); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003-04 (2d Cir. 1997) (testimony from national sales manager of plaintiff concerning confusion experienced by retail customers was properly admitted and considered as evidence of actual confusion); *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 187-188 (S.D.N.Y. 2008) (admitting on summary judgment testimony from multiple employees concerning confusion among customers and others they had encountered in the marketplace, as well as emails and other documents evidencing actual confusion); *Fruit-Ices Corp. v. CoolBrands Int'l, Inc.*, 335 F. Supp. 2d 412, 426-27 (S.D.N.Y. 2004) (employee declaration recounting experiences with confused telephone callers and other testimony concerning instances of confusion on the part of others were all admissible as evidence of actual confusion); *Conn.*

---

[19] It is telling that BSA's submission omits any mention of GSUSA's April 26 letter, Exh. GG, in which GSUSA provided the bulk of the information responsive to Interrogatory No. 6 that BSA now claims is deficient.  Mentioning that letter would have raised the question why BSA never thought to raise its present concerns as part of the lengthy meet-and-confer process that preceded the submission of the May 24 joint letter.

*Cmty. Bank Nat'l Ass'n v. Bank of Greenwich*, 2008 U.S. Dist. LEXIS 9726, at *2-7 (D. Conn. Feb. 11, 2008) (admitting logs of instances of confusion experienced by customers that were prepared by plaintiff's employees).

The idea that GSUSA should be faulted for identifying **too many** witnesses with knowledge of the frequent instances of mistaken affiliation or customer confusion that have occurred since BSA launched its new initiative to admit girls to its core programs under confusingly similar terms to Girl Scouts rings hollow and cannot be squared with the relevant case law pertaining to actual confusion.[20]  It is clear that BSA's main complaint is not with GSUSA's discovery responses, but its unhappiness about the large number of instances of actual confusion documented in materials that GSUSA has produced from which BSA can clearly identify the relevant individuals, such as the following:

- August 24, 2018; Report From Indiana GSUSA Council; GSUSA_00003746:

> You may have already seen this, but wanted to share in case you haven't. The green fliers are causing quite a bit of confusion in our marketplace.
>
> On a seemingly related note, we've now had our first email from a mother who thought she signed her daughter up for Girl Scouts, but later discovered it was with Boy Scouts. She's asking us if we know how to transfer the fees from Boy Scouts to us.

- Jan. 3, 2019; Exchange Between North Carolina GSUSA Employee and Local School Principal; GSUSA_00011338-39:

> I'm writing to ask if I might come to Carolina Beach School for an hour and hold three short assemblies for your girls (K-1st, 2nd - 3rd, and 4th-5th grades) between January 8th - 11th, whenever it is most convenient for you. I would like to bring flyers with me that have been approved by ████, a copy is attached. We're going to hold a really fun financial literacy event at our Wilmington Service Center in Barclay Commons on January 12th and I'd like to tell the girls all about it! I've attached the info for you, just as an FYI. I'd really like to invite the whole community to attend!
>
> Would you reply or give me a call to schedule the best time for Blair students and administration?
>
> Thank you for your continued support!
>
> Sincerely,
>
> ████████████████████
>
> From: ████████████████
>
> **Sent:** Thursday, January 3, 2019 10:20 PM

---

[20]  Indeed, had GSUSA not disclosed the names of individuals at GSUSA, its councils, or elsewhere with knowledge of these repeated instances of confusion, there can be little doubt as to how quickly and how stridently BSA would claim to have been prejudiced.



To: ██████████████████████

Subject: Re: Girl Scout Round Up at Carolina Beach Elementary School

██████████

We had a scout group that presented to both our boys and girls prior to the break. Is this a different organization? I just hesitate to interrupt more instructional time, given the time that we already missed due to the storm.

- 2019 Social Media Post; GSUSA_00011378:



████████████████████ was at one of GS stores and 3 parents came in while I was there to buy their daughter' uniforms. They were all shocked when they were re-directed to the BSA store across the hall. They had no idea they hadn't signed up their daughters for Girl Scouts.

- November 8, 2018 Email Sent to Indiana GSUSA Council; GSUSA_00011402:

From: ████████████████████████

Sent: Wednesday, November 7, 2018 9:43 AM

To: ████████████████████████

Subject:

I recently signed my daughter up for what I thought was girlscouts only to find out that what I signed her up for and paid for was actually boy scouts! It makes total sense now why I was so confused at the initial sign up. I'm pretty sure they even used the name girlscouts for the older children which caused further confusion.

Based on these and the dozens of similar documents supplied by GSUSA, BSA should not be heard to complain that it has been deprived of information in response to Interrogatory Nos. 5 and 6 that it needs to defend itself.  Indeed, the information provided is entirely consistent with Local Civil Rule 33.3, which limits interrogatories at the outset of discovery to, among other discrete subjects, the "names of witnesses **with knowledge** of information relevant to the subject matter of the action."  (Emphasis added.)  That is what GSUSA provided in its answers to these two Interrogatories by identifying witnesses by name or in reference to specific documents.  BSA claims without any support that this limitation imposed by the Local Rule is inapplicable, because discovery in this action is supposedly "nearly complete."  As this lengthy letter demonstrates, there is nothing about discovery in this action that is "nearly complete," as no depositions have been taken, the parties have only just this week produced documents responsive to their respective second sets of document requests, and documents responsive to the parties' third sets of document requests are not due for several weeks.  More importantly, the Local Rule provides that other interrogatories seeking more specific information may only be served later in discovery "if ordered by the Court" or if they "are a more practical method of obtaining the information sought than a request for production or a deposition."  BSA does not invoke any of these exceptions here.   Accordingly, the Court should deny BSA's motion to compel further amended answers to its Interrogatory Nos. 5 and 6.

3.      GSUSA Has Not Violated Fed. R. Civ. P. 33(d)
        in its Answers to Interrogatory Nos. 4 and 5

BSA next argues that GSUSA has violated Fed. R. Civ. P. 33(d) in responding to Interrogatory No. 4 (which does ask for the names of "**all** persons with knowledge concerning **any facts or circumstances**" underlying GSUSA's tortious interference claims (emphasis added)), as well as Interrogatory No. 5, by citing to a series of documents. But GSUSA's answers are entirely consistent with Rule 33(d), and the source of BSA's displeasure is not how GSUSA has responded, but, again, the fact that there are so many documents bearing on the subject matter of these Interrogatories.

Rule 33(d) allows a party to answer interrogatories by referring to specific documents produced in discovery. The purpose of the Rule is to "shift[] the burden of compiling the information and ascertaining the answer to an Interrogatory from the producing party to the interrogating party." *Ice Cube Bldg., LLC v. Scottsdale Ins. Co.*, 2019 U.S. Dist. LEXIS 59604, at *2 (D. Conn. Apr. 8, 2019) (*citing Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 44 (S.D.N.Y. 1984)). In relevant part, Rule 33(d) provides that:

> If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by: *(1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could[.]*

Fed. R. Civ. P. 33(d) (emphasis supplied).

That is exactly what has occurred here. BSA can just as readily as GSUSA determine the relevant individual who commented upon the relationship between GSUSA and BSA (Interrogatory No. 5) when it reviews the identified documents that state, for example:

- January 12, 2018; Letter from Boy Scout; GSUSA_00004089:

    My name is ▮▮▮▮▮▮▮, and I am a resident of Rockford, Michigan. I am writing to offer a suggestion. As a current Boy Scout in the rank of First Class, I am very happy to see the Girl Scouts are teaming with the younger Cub Scouts. My suggestion is, now that the Scouts are working together, you let Boy Scouts partake in the selling of your cookies.

- April 13, 2018; Email from Survey Respondent; GSUSA_00004558:

From: ████████████████████████████

Sent: Friday, April 13, 2018 1:34 PM

To: GSVoicesCount

Subject: Re: Reminder - Girl Scouts' annual *GIRL SURVEY* is open!

Hi
I was wondering how does a girl scout troop become eligible for Eagle Scout status for its members.
Do we need to convert our group to Boy Scouts or do Girl Scouts also become eligible?
Thank you,
████████████████

These excerpts are taken from the documents identified by GSUSA between May 16 and June 28 – months ago – as containing the information sought in either Interrogatory Nos. 4 or 5. Those few hundred documents were selected and identified by GSUSA from the approximately 25,000 documents produced by GSUSA through June 28. These efforts more than satisfy the requirements of Rule 33(d). *See, e.g.*, *Sadofsky v. Fiesta Prods., LLC*, 252 F.R.D. 143, 147 (E.D.N.Y. 2008) (provision of range of Bates numbers in response to interrogatory sufficient to satisfy Rule 33(d)).

That BSA has to search through these records to find information does not mean that the burden on BSA is greater than it would be for GSUSA. BSA can review the documents just as easily as can GSUSA, particularly because they were produced in searchable format, and thus their content is equally accessible to both parties. *Ice Cube Bldg.*, 2019 U.S. Dist. LEXIX 59604, at *3. Furthermore, to the extent BSA complains that GSUSA identified too many documents, that is a problem of BSA's own making because Interrogatory Nos. 4 and 5 are extremely broad. *See id.*, at *2 ("Here, the Plaintiff's Interrogatories are extremely broad, so it should come as no surprise that the documents which contain the responsive information are located within a trove of documents. However, the Defendant has identified with specificity the range of documents at issue by Bates Number. This is sufficient."). BSA cannot save its argument by identifying a few documents that purportedly contain no responsive names or some responsive and some non-responsive names. As is required by Rule 33(d), BSA must review these documents and use context to identify the responsive individuals; GSUSA already has provided additional context by identifying specific individuals in response to Interrogatory Nos. 4 and 5. Metadata has also been provided to assist with the identification of relevant individuals.

Finally, GSUSA has advised BSA that it will be supplementing its initial disclosures in mid-August to provide additional information about witnesses it intends to call at trial on these topics, which should also assist BSA in culling through the large number of individuals with knowledge of confusion and interference. Accordingly, the Court should deny BSA's motion to compel further amended answers to BSA Interrogatory Nos. 4 and 5.

4. GSUSA's Planned Supplementation of
   Its Initial Disclosures More Than Satisfies Fed. R. Civ. P. 26

BSA's demand that GSUSA "immediately" serve supplemental initial disclosures to "identify new, previously undisclosed witnesses" should be rejected out of hand because GSUSA

has already agreed to provide information that goes well beyond what Fed. R. Civ. P. 26(a)(1) and 26(e) require.

Rule 26(a)(1) (A)(i) requires a party to disclose initially the name and, if known, contact information of each individual likely to have discoverable information, along with the subjects of that information, that the disclosing party "***may use*** to support its claims or defenses." (Emphasis added.)  Rule 26(e) requires a party to supplement those disclosures "in a timely manner if the party learns in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

GSUSA advised BSA last week that it will supplement its initial disclosures by mid-August to provide more information about witnesses that GSUSA may call at trial. BSA then demanded "immediate" supplementation of the initial disclosures so that it could depose anyone listed and now baselessly claims that GSUSA is somehow hiding the existence of "new, previously undisclosed witnesses."

BSA's position is wholly wrong.  GSUSA has already provided information about the individuals with relevant knowledge in this case – in lengthy lists of people in response to interrogatories and by reference to numerous documents.  So much so that BSA has complained that it has received the names of ***too many individuals*** with relevant knowledge of GSUSA's claims.  Under the Rules, it would be very easy for GSUSA to supplement its initial disclosures "immediately" to identify the dozens of potential witnesses with knowledge of actual confusion, mistaken affiliation or wrongful interference by BSA or its agents by adding the names of all of the individuals identified in GSUSA's interrogatory responses to them.  That type of supplementation is not required by the Rules, because GSUSA has already disclosed in its interrogatory responses the names, contact information (if known) and the subjects of information each witness possesses, or identified by bates number documents in which this information can be found.  *See Banxcorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 323 (S.D.N.Y. 2013) ("the obligation to supplement a Rule 26 initial disclosure is 'only necessary when the omitted or after-acquired information has not otherwise been made known to the other parties during the discovery process.' . . . Thus, 'there is no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in a deposition or otherwise through formal discovery.'") (citing 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2049.1 (3d ed. 2010)); *Universe Antiques, Inc. v. Vareika*, 2011 U.S. Dist. LEXIS 124501, at *11-12 (S.D.N.Y. Oct. 21, 2011) (allowing testimony by witnesses not mentioned in initial disclosures when their names and subject matters within their knowledge were known to adverse party); *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011), *aff'd in part, vacated in part on other grounds sub nom. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013).

Rather than add so many names to its initial disclosures, GSUSA has proposed to try to make more informed decisions ***now*** about who it is more likely to call at trial from this broad range of names, in order to expedite discovery and spare both parties the burden and expense of taking multiple depositions.  No provision of Rule 26 compels GSUSA to go through this more

rigorous decision-making process so long before trial.  Indeed, BSA has not done so, nor has it supplemented its initial disclosures at all.    So what GSUSA relayed to BSA last week is that it would serve supplemental initial disclosures by mid-August, and even supply the names of likely potential witnesses on a rolling basis beforehand if possible.[21]  It is wholly unclear why this proposal, which goes beyond what the Federal Rules require, could possibly be objectionable to BSA.  Accordingly, the Court should deny BSA's motion to compel "immediate" supplementation of GSUSA's initial disclosures.

* * * * *

In closing, BSA's suggestion that it should be allowed to take multiple depositions after the September 25 fact discovery cutoff of is not one the Court should accept.  As noted, BSA has had the names and contact information of many of these individuals *since April 26*, Exh. GG, but it made no effort to seek depositions of any of these witnesses until July 22 (or even complain about the adequacy of GSUSA's disclosures).  Having had months to depose these individuals and done nothing, BSA should not be heard to complain about a problem wholly of its own making.

**B.    The Court Should Deny BSA's Motion to Compel the Production of Documents Responsive to BSA RFP 58**

None of BSA's arguments to compel the production of documents responsive to BSA RFP 58 is persuasive.

*First*, with respect to BSA's claim that documents responsive to this Request are relevant to GSUSA's tortious interference claim, any document responsive to RFP 58 that is related to GSUSA's claim for tortious interference would already have been produced in response to other Requests, such as BSA RFPs 9-11, which would seek:

**BSA RFP 9**: All Documents concerning Your cause of action in the Complaint for tortious interference with prospective economic advantage (Count VII).

**BSA RFP 10**: All Documents and Communications concerning each and every instance of the BSA's alleged tortious interference with GSUSA's prospective economic advantage, including but not limited to Your allegations in Paragraphs 56-83 and 140-145 of the Complaint.

---

[21] The vast majority of individuals that GSUSA will identify through supplemental initial disclosures have previously been identified in GSUSA's interrogatory responses or through its documents, but there are some who have only surfaced in the last several weeks, and it may require GSUSA additional time past mid-August to determine whether such persons are likely trial witnesses or not.  The same would hold true for individuals who have proven difficult to contact.  In either event, consistent with the Rules, GSUSA will further supplement its initial disclosures after mid-August, as soon as possible, once it has decided whether such individuals are likely trial witnesses, or not.

**BSA RFP 11**: Documents sufficient to identify: (i) each specific business relationship You allege was tortiously interfered with by the BSA under Count VII of the Complaint (including the name(s) and contact information of each party to each such business relationship, and documentation of the BSA' s alleged knowledge of each such business relationship); and (ii) the nature of such alleged interference (including documentation regarding the nature and length of the relationship, the date, location and circumstances of the alleged interference, and the alleged injury suffered by GSUSA from the alleged interference).

In response to these RFPs, GSUSA has produced all non-privileged documents that it could locate after a reasonably diligent search.

*Second,* BSA's claim that documents responsive to RFP 58 are relevant to the "core" of GSUSA's trademark infringement complaint misleadingly attempts to recast GSUSA's "core" complaint as objecting to BSA opening its primary programs to girls, which is not at all the case. While BSA's decision was indeed the trigger for all of its misconduct that followed, it is BSA's wrongful use of GSUSA's trademarks and the resulting consumer confusion and dilution of GSUSA's famous brand that are "the core" of this action.   In addition, to the extent that GSUSA's letter identified in RFP 58 discusses the parties' competitive relationship, once again, those issues are the subject of multiple other RFPs from BSA to which GSUSA already has responded and produced documents, as described below:

**BSA RFP 46**: All Documents and Communications concerning the relationship, whether competitive or otherwise, between services for girls offered or sponsored by the BSA under the mark SCOUT ME IN, and services for girls offered or sponsored by GSUSA under the Asserted GSUSA Marks, existing as of January 1, 2017 to the present.

**GSUSA Response**: . . . GSUSA will complete its production of all non-privileged Documents and Communications responsive to this Request that can be located with reasonable diligence . . . .[22]

Thus, to the extent any documents responsive to RFP 58 contained information about the parties' competitive relationship, they would have been turned over in response to other BSA RFPs.

*Third*, documents responsive to RFP 58 have nothing to do with BSA's affirmative defense of unclean hands.  The conduct underlying an unclean hands defense must be "egregious" or "clear, unequivocal and convincing," *Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011), and it must also be directly related to the acquisition or use of the trademarks asserted by the party against whom the defense is asserted.  *See, e.g.*, *Liz Claiborne, Inc. v. Mademoiselle Knitwear*, 13 F. Supp. 2d 430, 445 (S.D.N.Y. 1998) (when "unclean hands is raised as a purported defense to a claim of

---

[22] BSA's RFPs 47 and 48 seek similar information as BSA RFP 46, and GSUSA provided similar responses.

trademark infringement, what is material is . . . that [plaintiff] dirtied them in acquiring the right he now asserts." (citations and quotation marks omitted)). There is no case of which GSUSA is aware, and BSA has cited none,[23] in which writing a letter to a competitor objecting to how its business is conducted could possibly amount to unclean hands.

BSA tries to skirt the deficiencies in its unclean hands argument by summarily declaring – without any legal or factual basis – that GSUSA somehow has unclean hands because it brought a trademark infringement lawsuit against BSA. Putting aside BSA's unfounded and nonsensical notion that "GSUSA is using trademark law to keep the BSA out of the market space . . . . ," BSA's disagreement with the merits of GSUSA's trademark lawsuit does not amount to an unclean hands defense. It is well settled that "[c]ourts and commentators alike have rejected the thesis . . . that alleged bad faith in bringing suit can itself be the basis for an unclean hands defense to a trademark infringement action." *Liz Claiborne*, 13 F. Supp. 2d at 445; *id.* (citing *R & R Recreation Products, Inc. v. Joan Cook Inc.*, 1992 U.S. Dist. LEXIS 5176, *17 (S.D.N.Y. Apr. 14, 1992) (dismissing unclean hands defense in trademark infringement action because, "as alleged by defendant, plaintiffs' 'transgression' was bringing this suit")); *see also Deere & Co. v. MTD Holdings*, 2004 U.S. Dist. LEXIS 15776, at *9 (S.D.N.Y. Aug. 10, 2004) (striking unclean hands affirmative defense in trademark action, stating that: "while Deere may have actively and vigorously threatened and pursued litigation against those it believes to be infringing its marks, such is its right under the trademark laws").

*Finally*, BSA's clam that RFP 58 is relevant to its defense of trademark misuse should be rejected. "[C]ourts are unsettled about whether the defense of 'trademark misuse' even exists . . . ." *Deere & Co.*, 2004 U.S. Dist. LEXIS 15776, at *11. But when the defense has been applied, the defendant was required to "show that a plaintiff has used its marks in violation of the antitrust laws or has made misrepresentations to the public in an attempt to increase the scope of the marks." *Id.* BSA has not identified any such conduct here, and there is nothing in GSUSA's letter to BSA to suggest otherwise.

The Court therefore should deny BSA's motion to compel production of documents responsive to RFP 58.

---

[23] The cases cited by BSA in support of its claim that RFP 58 is relevant to its unclean hand defense are inapposite. In *N. Am. Rescue, Inc. v. Bound Tree Med., LLC*, 2010 U.S. Dist. LEXIS 39695, at *9-11 (S.D. Ohio Mar. 25, 2010), the court compelled the disclosure of documents relating to the plaintiff's use of "representations similar to those it is challenging[,]" because in false advertising cases such evidence is potentially relevant to an unclean hands defense. This is not a false advertising case, and BSA is not claiming that GSUSA took actions similar to BSA. In *Cytosport, Inc. v. Nature's Best, Inc.*, 2007 U.S. Dist. LEXIS 29039 (E.D. Cal. Apr. 4, 2007), the court permitted discovery into the defendant's unclean hands defense, which the court perceived to relate to alleged "inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public . . . ." *Id.* at *11 n.1 (citations and quotation marks omitted). The statements made in the GSUSA letter to BSA have nothing to do with any misuse by GSUSA of its own trademarks, much less misuse that could harm the public, so *Cytosport* also fails to further BSA's cause.

## IV.   GSUSA'S Position Regarding BSA's Document Production

### A.   BSA's Failure to Conduct a Reasonably Diligent Search and to Produce Sufficient Responsive Documents Relating to the 2017-19 Rebranding Campaign, Particularly Emails and Related Materials Pre-Dating 2018

1.   The General Lack of Documents Pre-Dating 2018:  A key issue in this case is to what extent, if any, were GSUSA's longstanding rights in its GIRL SCOUT marks taken into account or considered when BSA decided to admit girls into the core BSA programs for the first time, and when the branding and marketing of the SCOUT ME IN campaign was developed.  BSA first announced publicly its decision to welcome girls into the Cub Scout program and to deliver a Scouting program for older girls in October 2017.  Around the same time, BSA issued a request for proposal (the "Proposal") seeking a business partner for part of the rebranding campaign that would market its new services to girls.  The decision to welcome girls into these rebranded programs was an historic departure for BSA, and therefore it could not possibly have been a decision implemented without a great deal of research and careful planning, in terms of both the programming to be offered and the manner in which it would be marketed, for a long time prior to its public announcement and its issuance of the Proposal.  All of the documents for the planning of this program, its competitive relationship to GSUSA's programs, and how the marketing was conceived, created and implemented therefore have to be dated largely before 2018.  Nevertheless, BSA's document production includes very few documents from this time period, including, in particular, ***fewer than 25 emails that pre-date 2018***.[24]  The only plausible explanation for the paucity of such documents is that BSA has failed to comply with its discovery obligations.

GSUSA raised the specific issue of the lack of emails pre-dating 2018 with BSA during the meet-and-confer process, and then by letters dated July 15 and 22, noting that documents produced in response to multiple GSUSA RFPs should have included emails and additional documents going back at least to 2017.  Those RFPs include Nos. 1, 3 and 17:[25]

**GSUSA Request No. 1:** *All documents concerning BSA's adoption of the SCOUTS BSA trademark or "Scout Me In" slogan, including, but not limited to, any trademark search reports, marketing plans, strategic analyses, branding guidelines or advice of counsel received or generated in connection with the adoption of such trademark and slogan.*

---

[24] In addition, BSA's document production contains only approximately 900 non-email documents with a date prior to 2018 (excluding documents that are nothing more than processing artifacts).  Many of these documents are not relevant to the BSA's decision to admit girls or the subsequent re-branding campaign undertaken as a consequence of that decision.  Moreover, the relatively few pre-2018 documents that do pertain to BSA's decision to offer services to girls demonstrate the relevance of such documents and further call into question the lack of emails relating to those documents, specific examples of which are discussed in Section IV.A.2, *infra*.

[25] In its July 15 letter, GSUSA also identified RFP Nos. 2, 12, 14, 15, 19-21, and 41, the complete text of which, along with the BSA's amended responses thereto, are attached as Exhibit DD.

**BSA's Amended Response:** [26] *The BSA will produce non-privileged documents regarding the adoption of the SCOUTS BSA Mark and/or SCOUT ME IN Mark for use in connection with services offered to girls, that may be located after a reasonable and diligent search.*

**GSUSA Request No. 3:** *All documents concerning the decision to use the SCOUTS BSA Marks in connection with services offered to girls.*

**BSA's Amended Response:** *The BSA will produce non-privileged documents regarding the adoption of the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark for use in connection with services offered to girls, that may be located after a reasonable and diligent search.*

**GSUSA Request No. 17:** *All documents concerning BSA's plans for any and all use of the SCOUTS BSA Marks in connection with services for girls.*

**BSA's Amended Response:** *The BSA will produce non-privileged documents concerning the BSA's adoption and launch of the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark for use in connection with services offered to girls, that may be located after a reasonable and diligent search.*

These RFPs are not limited as to time, nor are any of BSA's written responses. And BSA confirmed on July 26 that it did not limit by date its search, review and production of documents in response to the above requests. But if that is the case, it begs the question: "Where are the pre-2018 documents?" BSA's response to this question is that: "It is no surprise that there are not a large number of responsive emails pre-dating 2018, considering that this is a case based on the BSA's branding of specific programs for girls, which branding was launched in May 2018." This response confirms that the BSA is improperly drawing a line at its decision to adopt and launch the specific branding for the SCOUT ME IN campaign, while ignoring the highly relevant documents and communications regarding the planning of that campaign and how it was developed, crafted and implemented.[27] After all, the re-branding campaign did not arrive, fully formed, out of thin air. It involved significant effort by BSA going back at least until 2017 (and more likely 2015; *see* Section IV(A)(3), *infra*), when the formal decision to admit girls was

---

[26] For the Court's convenience, GSUSA has not reproduced in the text of this letter BSA's lengthy objections to GSUSA's RFPs or BSA's statements indicating that its responses are subject to, and without waiver of, those objections. The complete text of BSA's written objections are reflected in Exhibit EE.

[27] Further evidence that BSA has too narrowly construed what documents are relevant here can be found in the relatively low number of responsive emails it produced leading up to the launch of the re-branding campaign in May 2018, which again should have generated many responsive emails due to its significance. The BSA only produced 146 emails from April 2018, 144 emails from March 2018, 78 emails from February 2018, and 63 emails from January 2018.

announced and efforts to market the expansion were being undertaken.[28]   Documents reflecting those efforts are responsive and should be produced.

To the extent BSA claims that such documents are not encompassed within GSUSA's document requests, it is plainly wrong.  GSUSA's requests seek, among other things, documents concerning the adoption of the SCOUTS BSA trademark or "Scout Me In" slogan; the decision to use the SCOUTS BSA Marks in connection with services for girls; and the plans for using those marks in connection with services for girls.  *See*, *e.g.*, GSUSA RFPs Nos. 1, 3 and 17. Responsive documents clearly would encompass the deliberations and development efforts that led to the decision to admit girls, and the selection and launch of the SCOUTS BSA Marks in connection with services for girls. To conclude otherwise requires the deliberate mis-interpretation of those Requests so as to avoid the production of responsive documents, which has been BSA's approach to date.  BSA could not have undertaken this sea change to its entire membership and the bulk of its programming without considering the potential effects on GSUSA and its rights, and the majority of these activities (and thus the documents evidencing them) had to occur prior to 2018.  GSUSA has requested these documents, which are highly relevant, and BSA should be required to produce them.

2.     Specific Pre-2018 Documents:  BSA's own documents demonstrate its failure to produce the majority of responsive documents pre-dating 2018.  Most notably, BSA issued the Proposal in October 2017 seeking a business partner to, in part, launch Cub Scouting to girls, but it has failed to produce any contemporary internal communications relating to the creation of that Proposal, the decision to issue the Proposal, or the reactions to the response to the Proposal—all of which are relevant and responsive to GSUSA's RFPs.  GSUSA informed BSA in writing of the lack of documents concerning the Proposal, noted that such documents were responsive to GSUSA RFP Nos. 1 and 3, and requested production of documents related to the Proposal, *including internal communications*.  In response, BSA stated that it had produced a response to the Proposal from a branding agency with which it partnered, and then claimed incorrectly that GSUSA had "provide[d] no explanation as to what types of documents it is requesting or how they would be responsive to these RFPs."  BSA then sought such additional information, claiming they would "consider the request."

This is not how discovery should be conducted, and this interaction illustrates BSA's efforts to complicate unnecessarily the discovery process, avoid its discovery obligations, and delay these proceedings.  BSA requires no further explanation from GSUSA regarding these documents.  GSUSA requested documents pertaining to the re-branding campaign in its RFP Nos. 1 and 3, and BSA agreed to produce them.  Indeed, BSA acknowledged the relevance of the

---

[28] Counsel to BSA is fond of repeating GSUSA's statements that this case is not about BSA's decision to admit girls.  That is correct insofar as GSUSA is not asserting that the decision to admit girls by itself violates GSUSA's trademark rights.  However, that does not mean that BSA's decision to admit girls is irrelevant to this case; in fact quite the opposite: the decision to admit girls is inextricably intertwined with the re-branding at the heart of this action, which was a natural consequence of that decision.  So, any documents from the time the decision to admit girls and to market that decision was first made are relevant and responsive if they pertain to any consideration of GSUSA or its GIRL SCOUT marks.

Proposal by producing it, but produced no related communications or other documents with two minor exceptions. Upon learning that no such communications had been produced, GSUSA reiterated its request in writing, stating expressly that it was requesting communications pertaining to the Proposal. BSA then responded that GSUSA had not explained what documents it was seeking, despite GSUSA having stated that it was seeking internal communications pertaining to the Proposal. BSA then requested a further explanation, saying it would "consider it[,]" thus attempting to create an illusory basis for arguing that this dispute is not ripe for consideration by the Court. Documents pertaining to the very Proposal that led to the engagement of a third party that helped create the re-branding campaign at the heart of this litigation are highly relevant and responsive and should be produced; BSA needs no additional information from GSUSA before doing so.

Along similar lines, GSUSA identified a 2017 document produced by BSA titled "Family Program Notes" that references the marketing and public relations aspects of the decision to allow girls into Cub Scouting. No contemporary communications were produced related to this "Family Program," which clearly relates to the decision to permit girls into at least one of the BSA's core programs. On July 15, GSUSA requested documents related to this "Family Program," including internal communications. BSA responded on July 26 by stating that it produced many marketing documents, did not limit its search as to time, and by identifying a two-page document from later in 2017 that discusses 2018 initiatives, including the launch of "Full Family of Scouting." BSA then requested that GSUSA identify the RFP to which it believed such documents would be responsive and which documents GSUSA believes have not yet been produced, and offered to consider its response upon being provided such information. Here again, BSA does not need any additional information, nor can GSUSA itemize a list of responsive documents that BSA has failed to turn over, if not outright concealed. The "Family Program" and the "Full Family of Scouting" relate to the decision to start offering certain BSA programs to girls and the marketing thereof, which eventually was executed through the SCOUT ME IN campaign. GSUSA has requested internal communications relating to these initiatives, which are relevant and responsive, including to RFPs Nos. 1, 3, 17, and 20,[29] so these documents should be produced.

        3.    The 2015 BSA Initiative: Related to the issues discussed above, there also should be responsive documents that have not been produced going back to at least 2015 regarding the offering of core BSA services to girls. BSA produced a 30-page document from 2015 titled "Appealing to the {Whole} Family" discussing the question of whether it should explore a program dedicated to the development of girls (the "Whole Family Proposal"), Exh. FF. This document demonstrates that BSA has been considering opening its Cub Scout and Boy

---

[29]    **GSUSA Request No. 20:** *All documents concerning BSA's strategies and plans to recruit girls as participants in programs offered under the SCOUTS BSA Marks.*
**BSA's Amended Response:** *The BSA will produce, for the time period January 1, 1971 to the present, non-privileged documents concerning the BSA's plans for the recruitment of girls as participants in programs offered under the SCOUT ME IN, FAMILY SCOUTING, SCOUTS BSA, SCOUT and SCOUTING Marks, that may be located after a reasonable and diligent search*

Scout programs to girls since at least 2015, and it specifically refers to multiple additional documents that are relevant in this action.

Upon reviewing BSA's document production, GSUSA discovered that there was only one other document produced by BSA relating to the Whole Family Proposal, the specific documents referenced therein, or BSA's general efforts in 2015 to explore offering its core services to girls. GSUSA informed BSA of the absence of such documents in writing on July 15, and requested the production of a "Competitive Analysis" referenced in the Whole Family Proposal and any communications relating to that document. During a meet-and-confer call on July 18, BSA stated inexplicably that the 2015 initiative was unrelated to the 2017-19 rebranding. On July 22, GSUSA explained how the content of the Whole Family Proposal demonstrated that the 2015 initiative and the 2017-19 rebranding campaigns were related, including that: (1) they both cited to similar arguments for opening the Cub Scouts and Boy Scouts programs to girls; (2) the proposed structures of both programs are similar; and (3) they both discuss similar concerns regarding the name of the Boy Scouts program. GSUSA also identified additional documents referenced in the Whole Family Proposal and requested their production, along with related documents and communications. On July 26, BSA reiterated its position that the 2015 initiative described in the Whole Family Proposal is not relevant because it "was a separate initiative from the 2017 proposal, and did not proceed to the development or branding stage[,]" and argued that the 2015 proposal was not the subject of the complaint in this action. BSA also stated that it would take up GSUSA's requests for specific documents identified in the Whole Family Proposal—which GSUSA also had included in its Third Set of RFPs—by the August 21, 2019 response deadline.

With such a short time left in discovery, it is obvious that BSA is simply trying to run out the clock by withholding documents that should have been produced already. There can be little doubt that when BSA responds to GSUSA's Third Set of RFPs it will continue to assert that the 2015 initiative is irrelevant. BSA has made its position clear on this issue, so there is no reason for it not to be decided now. The mere fact that GSUSA served a specific document request based on a document produced in discovery like the Whole Family Proposal does not mean that everything pertaining to that document or the subsequent document request was outside the scope of prior requests. Indeed, in many instances (including this one), GSUSA only served specific additional document requests to move past BSA's repeated, groundless claims that specific types of documents were not encompassed within prior GSUSA RFPs—a tactic repeated consistently by the BSA, which at times even refused to discuss particular documents during meet-and-confer calls that it unilaterally deemed had not been requested by GSUSA.

The documents and communications pertaining to, and referenced in, the Whole Family Proposal provide a perfect example. These documents involve multiple relevant subjects including, *e.g.*: a competitive analysis; market research, segmentation, key objectives, and problems; program positioning; and product scope. All of these documents are responsive to prior RFPs made by GSUSA, including RFP Nos. 1, 3, 17, 21, and 51. RFPs 1, 3, and 17 were discussed above in connection with BSA's failure in general to produce documents about its decision to admit girls and the subsequent marketing thereof. Given the similarities between the program discussed in the Whole Family Proposal and the eventual rebranding campaign that went into effect in 2017-19, the documents and communications relating to the 2015 initiative

are responsive for the same reasons as the documents  and communications that pre-dated the formal launch in May 2018 of the SCOUT ME IN campaign.  Indeed, it strains credulity for BSA to contend that because the 2015 initiative was not formally adopted, the work that went into that initiative played no role in, nor is related in any way to, the 2017-19 rebranding campaign.

These 2015 documents are also responsive to RFPs Nos. 21 and 51, which, together with the relevant portions of BSA's written responses, are produced below:

**GSUSA Request No. 21:**  *All documents concerning the relationship, whether competitive or otherwise, between services for girls offered or sponsored by BSA under the SCOUTS BSA Marks, and services for girls offered or sponsored by GSUSA under the GS Marks.*

**BSA's Amended Response:** *The BSA will produce non-privileged documents comparing the services for girls offered by the BSA under the SCOUTS BSA Mark, SCOUT ME IN Mark, FAMILY SCOUTING Mark, SCOUT Mark, and/or SCOUTING Mark, and services for girls offered by GSUSA under the Asserted GS Marks, existing as of January 1, 2016 to the present, that may be located after a reasonable and diligent search.*

**GSUSA Request No. 51**: *Documents sufficient to identify when and why BSA changed its beliefs, as stated in paragraph 37 of the Answer.*[30]

---

[30] Paragraph 37 of the Complaint states:

GSUSA has always offered and rendered its services to girls. Defendant historically targeted its core programming to boys, has represented that its congressional charter restricted its BOY SCOUTS and CUB SCOUTS programs to boys,[FN1] and has used its marks in connection with such boy programming.

[FN1] *See, e.g.,* Long Island Girl Crusades for Right to Join Boy Scouts, Southampton Patch (Aug. 10, 2016, 1:41 PM, updated Aug. 11, 2016, 8:03 AM), https://patch.com/newyork/southampton/bridgehampton-girl-crusades-right-to-join-boy-scouts (quoting BSA spokesperson providing reason for denying a girl admission to Boy Scouts: "[T]he Boy Scouts of America was chartered by Congress in 1916 to serve boys and young men across the nation through the Cub Scouts and Boy Scouts programs, which are year-round programs for boys in the first grade through age 18. We have since developed alternative programs that are co-ed, such as Venturing, but to change the Cub or Boy Scouting programs would go outside the bounds of our charter"; 15-Year-Old Girl Denied Permission To Join Boy Scouts Because Of Gender, CBS New York (Aug. 10, 2016, 5:46 PM), http://newyork.cbslocal.com/2016/08/10/girl-wants-to-join-boy-scouts/ (same); Petition for Writ of Certiorari, Boy Scouts of America v. Dale, 530 U.S. 640 (2000) (No. 99-699), 1999 WL 35238158, at *18 ("Boy Scouting is an expressive organization with the purpose of instilling in boys and young men certain ideals of what it means to be a man. Youth membership is therefore confined to males…."). Paragraph 37 of the Answer states:

**BSA's Response**: *The BSA will produce non-privileged documents sufficient to show when and why the BSA decided to welcome girls into its Cub Scouts and Boy Scouts (now known as Scouts BSA) programs.*

For RFP 21, the services offered by BSA under the BSA Marks are, in many instances, similar to those that were being contemplated during the 2015 initiative, so at least some of these documents are also responsive to RFP 21.[31]  As to RFP 51, BSA stated that it would produce documents about BSA's decision to welcome girls into the Cub Scouts and Boy Scouts programs.  Documents mentioned in, concerning or deriving from the Whole Family Proposal are within the scope of what BSA agreed to provide in its Response to RFP 51 because that 2015 initiative appears to mark the first time that BSA seriously considered opening up the Cub Scouts and Boy Scouts programs to girls.

**************************

In sum, based on GSUSA RFPs 1, 3, 17, 20, 21, and 51, GSUSA seeks an order compelling BSA to produce all documents dating from January 1, 2015, the year in which it first considered opening up its core boys programs to girls, through the filing of GSUSA's complaint, that concern: (i) the adoption and decision to use the SCOUTS BSA trademark in connection with services for girls; (ii) the planned use of the SCOUTS BSA Marks (*i.e.* SCOUTS BSA, FAMILY SCOUTING, SCOUT ME IN, SCOUT and SCOUTING) in connection with services for girls; (iii) BSA's strategies and plans to recruit girls to participate in programs offered under the SCOUTS BSA Marks; and (iv) the relationship, whether competitive or otherwise, between the services for girls offered by BSA under the SCOUTS BSA Marks and by GSUSA under the GS Marks. Such an order would encompass, but not be limited to, all documents concerning the Proposal (pp. 30-31, *supra*), the "Family Program" and "Full Family of Scouting" (p. 31, *supra*), and the Whole Family Proposal (pp. 32-34, *supra*).

---

The BSA admits that GSUSA has always offered its services to girls, that the BSA has offered services to boys since 1910, and that the BSA has offered services to both boys and girls since 1971 in connection with its trademarks. The BSA admits that the statements in the two websites referenced in the footnote to Paragraph 37 were made by the BSA or its representatives in 2016 and that the statements in the Petition for Writ of Certiorari referenced in the footnote to Paragraph 37 were made by the BSA or its representatives in 1999, but denies that the BSA holds these beliefs today. The BSA otherwise denies the allegations of Paragraph 37 of the Complaint.

[31] BSA narrowed its written response to RFP 21 to documents dated on or after January 1, 2016. In light of the Whole Family Proposal dating from 2015, this narrowing was improper. Nevertheless, these documents are responsive to multiple other RFPs, so the date restriction in RFP 21 provides no valid basis from withholding production.

**B.    BSA's Failure to Search for the Documents of Certain Custodians**

1.    <u>The Whole Family Proposal Team</u>: There is a significant discrepancy between the number of custodians whose documents and communications have been collected, reviewed and produced by each side, *i.e.* fewer than 20 for BSA and more than 30 for GSUSA. One area in which that discrepancy is of particular importance pertains to the Whole Family Proposal, which identified a seven-person team that was tasked to work on that 2015 initiative. Exh. FF at pp. 27-29.  After receiving the bulk of BSA's documents on June 28, GSUSA confirmed that only one of these seven persons was a custodian whose files were searched for responsive documents, and GSUSA was unaware of the existence of the other six members of this team until the Whole Family Proposal was produced.

GSUSA promptly raised this issue with BSA on July 15 and asked for an explanation. BSA responded that those six persons were only involved with the 2015 initiative, and not the 2017-19 rebranding campaign, so they were not proper document custodians.  GSUSA replied by providing examples of the interrelationship between the 2015 initiative and the 2017-19 campaign, and requested again that those six individuals be added as custodians and that their documents and emails be searched.  In response, BSA made a different argument, namely that GSUSA delayed raising this issue because BSA's custodians were allegedly identified on May 15 in its interrogatory responses, and the Whole Family Proposal was produced the day before; BSA also repeated its assertion that the 2015 initiative was unrelated to the 2017-19 rebranding campaign.

BSA's accusations of delay are not well-taken and are irrelevant to GSUSA's request that documents concerning the Whole Family Proposal team members be searched.  By its own admission, BSA's identification of its document custodians on May 15 in response to GSUSA's Interrogatory No. 18 was incomplete because at least two custodians not identified in that response were, in fact, selected by the BSA as document custodians, as confirmed by BSA during a July 1 meet-and-confer call.  BSA never further amended that interrogatory response, so the absence of a particular witness from that response is determinative of nothing and cannot be evidence of delay on the part of GSUSA.

More importantly, the Whole Family Proposal team members are proper custodians because they were tasked to implement the 2015 initiative that contains many similarities to the 2017-19 rebranding campaign at the heart of this action.  Accordingly, discovery from these custodians is appropriate.  *See*, *e.g.*, *Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 269 F.R.D. 609, 617 (S.D. W. Va. 2010) (ordering production of documents from nine additional document custodians where requesting party demonstrated that those custodians would have "additional, highly relevant materials" concerning the issues in the case).

2.    <u>Teresa Condon</u>.   GSUSA's Interrogatory No. 13 sought the identities of persons with knowledge concerning complaints about the quality of services offered by BSA under the SCOUTS BSA Marks to girls.  After asserting a series of objections, BSA identified eight individuals as having the relevant knowledge, including Teresa Condon, who was identified as an Operations Supervisor.  Ms. Condon was the only one of these eight individuals

who was not one of BSA's document custodians.  In response to GSUSA's inquiry as to why she was not so listed, BSA responded that Ms. Condon played no significant role in the rebranding campaign, and thus was not a relevant custodian, and referred GSUSA to a declaration in this action submitted by Ms. Condon.  In that declaration, Ms. Condon, the Team Lead for the Member Care Center for the BSA, stated that she oversees "the team that interacts with members of the BSA, and members of the public, who may contact the BSA."  Dkt. 36-4 ¶ 1.  She also noted that "the BSA fields thousands of comments and inquiries every month."  *Id.* ¶ 4.

Based on these statements, GSUSA asked certain follow-up questions about Ms. Condon, including whether she would be responsible for escalating complaints received through the Member Care Center to others at the BSA, and if not, who would be responsible.  BSA stated in writing that she would not have any complaints from consumers or the public in her emails, but failed to provide the name of any other BSA employee who would play this gatekeeping role.

Although Ms. Condon may not be responsible for escalating complaints internally at BSA, she is still a relevant custodian because—by virtue of her position at BSA overseeing the team that interacts with members of the BSA and the public—she would have knowledge of instances of Girl Scout-related communications that BSA has received.  As such, it does not matter that Ms. Condon was not involved in the rebranding campaign, or that she would not have additional documents about complaints received by BSA outside of the Member Care Center log searched by BSA for documents about complaints.  She still is a relevant and important custodian for documents related to confusion, particularly because it does not appear that other documents about "Girl Scouts" contained within that same Member Care Center log—including those that may pertain to confusion—were searched for or produced.  Simply put, Ms. Condon was identified in BSA's interrogatory responses as a person with knowledge about complaints.  Her declaration confirms her integral role in BSA's interactions with the consuming public, which also makes her an important custodian for evidence of confusion.  Accordingly, her documents should be searched.

## C.    Other Disputes Regarding BSA's Document Production

BSA produced a document from March 2018 titled "Family Scouting Marketing/ Communications Update" that refers to additional responsive documents concerning volunteer and professional panels that evidently met in April 2018, *i.e.*, meetings of the "Boy Scout Committee" and "Marketing Panel."  GSUSA could not locate these documents in BSA's production, so it requested on July 15 that they be turned over.  BSA responded on July 26 by asking GSUA to identify the RFP to which such documents would be responsive and explain their relevance so GSUSA could "consider this request."

But yet again, BSA is asking for additional information it does not require to determine the responsiveness of documents requested by GSUSA.  As before, this March 2018 document discusses issues that are highly relevant to the case, including marketing initiatives and/or tasks related to branding the older youth program that is now offered to girls under the SCOUTS BSA trademark.  The development of the branding campaign and intellectual property is central to this case and is encompassed by numerous GSUSA document requests, including RFP Nos. 1, 3, 17,

20 and 21 discussed above.  BSA cannot selectively choose which relevant documents it would like to produce and which to withhold.  Indeed, BSA must have believed this document was relevant, as it was produced, meaning that the attendant panel and committee discussions referenced in it that pertained to what became the SCOUTS BSA program are also relevant and responsive.  GSUSA therefore respectfully requests that BSA turn over these responsive documents.

## V.    BSA'S RESPONSE TO GSUSA'S POSITION REGARDING BSA'S DISCOVERY RESPONSES

At the outset, several of the issues raised by GSUSA, *supra*, involve matters for which GSUSA has not yet satisfied its meet-and-confer obligation.  *See* Judge Hellerstein's Individual Rule 2.E; Dkt. 37 at 1.  The BSA objects to GSUSA's premature inclusion of these issues in the instant motion, including Parts IV.A.1, IV.A.2, IV.A.3, IV.B.2, and IV.C.

More specifically, on July 22, GSUSA served a third set of Requests covering several of the issues GSUSA raises in this motion.  The BSA has not yet even had the opportunity to respond to them, and its response is not due until August 21.  These include:  (1) Part IV.A.1 ("general lack" of pre-2018 documents); and (2) Part IV.A.3 ("2015 BSA Initiative").  The BSA will serve timely responses, and should there be any disputes, would be happy to promptly meet and confer with GSUSA at that time.

Additionally, as to other items, the parties have not yet completed their discussions to determine if they are even at an impasse, as they were raised by GSUSA for the first time in this very motion, or discussions are ongoing.  These include:  (1) Part IV.A.2 (pre-2018 "proposal" documents and "Family Program Notes"); (2) Part IV.B.2 (Ms. Condon); and (3) Part IV.C ("other disputes").

The BSA respectfully requests that GSUSA's motion as to all of these issues be denied for this reason.

### A.    *The BSA Has Indeed Conducted A Reasonably Diligent Search, And Produced Responsive Documents Relating To Its 2018 Rebranding Campaign*

1. *GSUSA Is Incorrect That There Is A "General Lack" of Documents" Pre-Dating 2018 In The BSA's Production, Nor Are the Requests At Issue Even Directed To That Time Period (Request Nos. 1, 3 & 17)*

GSUSA first complains, generally, that the BSA's production must be deficient because it produced "very few documents from [the pre-2018]" time period in response to three specific RFPs: Nos. 1, 3 and 17.  This is wrong for three reasons.

**First,** GSUSA's assertion that there are "very few" pre-2018 documents in the BSA's production as a general matter is factually incorrect.  The BSA produced more than 1,000 documents, comprising  over 12,000 pages of pre-2018 materials.  Declaration of Sara E. Jenkins, ¶ 4 (Ex. NN).

**Second,** as for documents specifically responsive to the three RFPs in question, Nos. 1, 3 and 17, it is no surprise that the BSA produced relatively few pre-2018 emails on those subjects, because

those RFPs focus on a major 2018 event: the "adoption and use" of the SCOUTS BSA and SCOUT ME IN Marks.   That BSA branding campaign was announced in May 2018.   Prior to its announcement, the BSA has issued a Request for Proposal to various ad agencies, dated October 31, 2017.   *See* Ex. II (BSA00012294).   The BSA's Request for Proposal set a schedule where agency proposals were due in December 2017, and agency presentation and selection would follow afterwards, just before the winter holidays.   *See id.* at BSA00012303.   The "Family Scouting Agency Kickoff Meeting" with selected agencies occurred on January 8, 2018.   *See* Ex. JJ (BSA00026932).   Those agencies worked with the BSA in early 2018 on branding ideas, culminating in the May 2018 announcement of the renaming of the Boy Scouts program to Scouts BSA, and the launch of the SCOUT ME IN branding campaign.   *See, e.g.*, Dkt. 1-9 (Ex. I) (May 2 press release where the BSA "unveiled" the name Scouts BSA and launched the "Scout Me In" campaign).

GSUSA's argument that "documents for the planning of" and "deliberations ... that led to" the decision to welcome girls into Cub Scouts and Scouts BSA would necessarily have been dated in 2017 is entirely beside the point – GSUSA's instant motion concerns RFP Nos. 1, 3 and 17, and those RFPs ***do not seek*** documents concerning the BSA's 2017 decision to welcome girls into these two programs.   GSUSA served ***different*** RFPS concerning that issue, to which the BSA responded.   Tellingly, is not moving to compel on those RFPs.   *See* GSUSA RFP No. 50 ("All Documents concerning financial or other benefits that BSA believed it would or might obtain from opening its programs to girls"); RFP No. 51 (accepting the BSA's production of "documents sufficient to show when and why the BSA decided to welcome girls into its Cub Scouts and Boy Scouts (now known as Scouts BSA) programs") (attached as Ex. KK).   In any event, the BSA's production is ongoing on those issues, and the BSA is not withholding documents responsive to those Requests on the basis of some date restriction, as those requests do not have date restrictions.

**Third**, GSUSA's motion is premature, as referenced above, because it has just served a third set of RFPs asking for older documents.   Specifically, less than two weeks ago, on July 22, 2019, GSUSA served a third set of document requests ***specifically seeking*** documents pre-dating 2018, including: (1) documents "concerning when BSA first considered offering its Cub Scouts and Boy Scouts (now Scouts BSA) programs to girls," (RFP No. 66); and (2) documents and communications concerning a proposal created in 2015 (RFP No. 67) (attached as Ex. LL).   The BSA will provide a timely response to these new RFPs on their August 21 due date.   Thus, any motion practice concerning "pre-2018 documents" generally is premature until after the BSA has had an opportunity to respond to these new Requests, and the parties have had an opportunity to meet and confer on those responses.

***

In sum, the BSA placed no date restrictions on its searches for documents responsive to the Requests at issue (Nos. 1, 3 and 17), and no documents are being withheld based upon their date. The formal adoption and announcement of the SCOUTS BSA and SCOUT ME IN Marks occurred in mid-2018, thus explaining why the bulk of the BSA's production concerning RFP Nos. 1, 3 and 17 are 2018 and later documents.

### 2. *The BSA's Production As To Specific Pre-2018 Documents Is Not Deficient*

GSUSA's reference to "specific" pre-2018 documents based on the same RFPs fail for the same reasons, including because the BSA has ***agreed*** to search for and produce responsive documents.

- <u>Pre-2018 "Proposal" documents:</u>   GSUSA complains about the alleged absence of documents concerning the BSA's Request for Proposal to marketing agencies, discussed in the preceding section.   GSUSA's motion fails for the same reasons stated in the preceding section.,

   Additionally,  the parties' meet-and-confer on this particular issue was never completed. The parties were in the midst of discussions about the Request for Proposal when GSUSA ceased responding and simply filed this motion.[32]  GSUSA's motion should be denied for this reason alone.

   Further,  the BSA has already produced responsive documents concerning this Request for Proposal.   *See, e.g.*, BSA00012165; BSA00012283; BSA00012294; BSA00012309; BSA00012311;  BSA00018583;  BSA00018589;  BSA00054264;  BSA00054540.    The BSA's production is ongoing, and the BSA expects to be producing additional documents in the next few weeks.

- <u>"Family Program Notes"</u>:  The "Family Program Notes" document referenced by GSUSA, *see* Ex. MM (BSA00016361), was produced on May 14, 2019.  The BSA is not withholding documents related to this one-page document, if they were otherwise responsive. Documents referencing or related to the "Family Program" document would have been produced to the extent they exist and are responsive to any of GSUSA's other RFPs.[33] However, not every document that mentions a "Family Program" is automatically responsive, such as if it does not deal with any of the issues in this case.  Nor does "Family Program Notes" mention any other documents.  In other words, the BSA agreed to produce documents responsive to the RFPs issued – if there are any documents that relate to the "Family Planning" document, and are themselves responsive, they either have been or will be produced.  Again, the BSA is not resisting production related to this document.

   In any event, the parties have not fully met and conferred on this issue, as the parties were in the midst of their discussions when GSUSA stopped responding, and instead filed this motion.  GSUSA's motion should be denied.

---

[32] GSUSA's suggestion that the BSA unnecessarily "complicat[ed] the discovery process" by asking GSUSA to explain what kinds of documents it is requesting and how they are responsive is not well taken.  Such discussions are the hallmark of the meet-and-confer process.

[33] GSUSA mischaracterizes the BSA's statement regarding the document titled "Full Family of Scouting."  That document was cited merely as another example of another document discussing a family program.

3. *"The 2015 BSA Initiative"*

GSUSA's request that the Court compel the BSA to produce documents regarding what it calls the "2015 BSA Initiative" or "Whole Family Proposal" is both premature and misguided.

**First**, GSUSA's motion is premature because GSUSA served specific document requests on these subjects on July 22. seeking the production of ***the exact documents*** it now asks the Court to compel. *See supra*, 31; Ex. LL (RFP No. 66: documents "concerning when BSA first considered offering its Cub Scouts and Boy Scouts (now Scouts BSA) programs to girls"; and RFP No. 67: documents and communications concerning the proposal created in 2015).  The BSA will provide a timely response to these new RFPs by the August 21 deadline.  By serving these new RFPs, GSUSA implicitly acknowledges that documents pertaining to the "2015 BSA Initiative" and "Whole Family Proposal" are not responsive to the RFPs it moves to compel on here.  GSUSA's motion should be denied as premature.

**Second**, GSUSA's assumptions about the "2015 BSA Initiative" are incorrect:  As the BSA informed GSUSA during meet and confer, the 2015 BSA Initiative never proceeded to the development or branding stage, and is a different initiative than the one launched in 2017. It was the 2017 initiative that led to the 2018 rebranding campaign that is at issue in this case. [34]

## B.   ***BSA's Selection Of Document Custodians Was Proper***

GSUSA moves to compel the BSA to collect the entire custodial files of seven new witnesses.  For six of those witnesses, GSUSA identifies just a single document referencing them, claiming that is enough to warrant an entire custodial pull.  It is not.  As to the seventh witness (Theresa Condon), the BSA has collected and searched thousands of files related to her, and nothing more should be required.  Moreover, GSUSA apparently has not collected the custodial documents from its employee who fills a similar role within GSUSA, so GSUSA cannot be heard to complain.

In response to GSUSA's first and second sets of discovery requests, the BSA conducted a diligent search, review and production of documents, beginning with its collection of more than ***2.5 million documents*** starting in December 2018.  Declaration of Sara E. Jenkins, ¶ 3 (Ex. NN).  As part of this collection, the BSA collected documents from more than twenty custodial sources, including the key custodians who are responsible for the BSA's branding decisions and marketing efforts that are at issue in this case.  In addition, the BSA searched for and collected documents from central repositories of documents, containing documents such as advertisements and licenses.  Moreover, the BSA manually searched for and identified responsive documents to be collected from its vast archive of paper documents, going back many decades.  This, by any account, is a diligent search.  And over the course of this action, the BSA has already produced nearly 75,000 pages of documents.  *Id.* ¶ 4.  In other words, the BSA's collection and production efforts have been more than reasonable.  GSUSA's eleventh hour demand that the BSA should have to go back to the drawing board and collect from many more custodians should be rejected.  Indeed, GSUSA's significant delay in raising purported issues related to the BSA's custodians fatally undermines its

---

[34]  GSUSA's accusations of delay are wholly unfounded, and do nothing to advance the ability of the Court to decide pertinent issues in this litigation.

motion.  GSUSA never asked the parties to exchange custodian lists.  If GSUSA had any legitimate concerns with the BSA's custodians, it should have raised the issue earlier.  Now, with document discovery almost complete and depositions on the near horizon, GSUSA should not be permitted to demand a re-do of the parties' collection process.  Enough is enough.

1. _GSUSA's Demand That The BSA Collect The Entire Custodial Files Of Six New Custodians, Because They Are Mentioned In A Single 2015 Document Unrelated To The 2018 Rebranding Campaign At Issue Here, Should Be Rejected_

GSUSA argues that the BSA should have identified and collected documents from six former/current BSA personnel – Amy Hutcherson, Janice Downey, Jessica Ayala-Janscha, Wendy Kurten, Abbie Arellano, and David Roberts – whose names appeared on the "2015 BSA Initiative" document referenced above (*see supra*, 31).  GSUSA's demand is based solely on the fact that their names happen to appear on this single document the BSA produced.  GSUSA has no valid basis to demand the BSA take on the significant burden of adding six new document custodians at this late stage in the discovery process.

*First*, GSUSA does not even attempt to justify the relevance of these individuals to *any* issues in this case other than the creation of this one document.

*Second*, collecting and searching the files of these six individuals would place an unfair and disproportionate burden on the BSA.  To accommodate GSUSA's eleventh hour request, the BSA would have to collect and review an enormous amount of documents and data from these six additional custodians.  Jenkins Decl., ¶ 3.  Together, these six new individuals have more than **790,000** electronic items (such as emails and calendar entries) associated with their Outlook accounts that would have to be collected.   Jenkins Decl., ¶ 5.   GSUSA's demand does not satisfy the parameters of Rule 26(b)(1); demanding wholesale collection and review of their files on such a tenuous basis is not proportional to the needs of the case.  Further, the BSA already collected and produced responsive emails from the two *existing* BSA custodians who were also associated with the 2015 BSA Initiative document – Pat Wellen and Michael Surbaugh.

*Third*, the BSA's existing custodians are appropriate and sufficient.  The BSA selected its custodians based on an investigation of who was centrally involved in the events underlying the Complaint, and thus would be likely to have relevant, responsive and non-duplicative documents. And in any event, if GSUSA wished to negotiate and agree on custodians, the time to do so would have been in January, at the very start of discovery – not August, the month before discovery is set to close.[35]

---

[35]  GSUSA argues that it has offered documents from more custodians than the BSA, as if that somehow proves its point.  It does not.  The mere number of custodians alone is not an informative way to measure if a party has met its discovery obligations.  For example, five of GSUSA's custodians produced fewer than *10* documents, and eleven of GSUSA's custodians produced fewer than *100* documents.

2. *GSUSA Has Never Met And Conferred On Its New Demand That The BSA Search Teresa Condon's Custodial Documents For Alleged Confusion Materials*

The parties have not fully met-and-conferred on Ms. Condon's files. In particular, GSUSA raises **for the first time in this motion** that she should be a custodian because she might have "documents related to confusion."[36]  Because the parties never met-and-conferred on that position, the Court should deny this motion as premature. In any event, the BSA has no conceptual objection to searching Ms. Condon's files for documents relating to confusion, and is happy to meet-and-confer with GSUSA to discuss the timing of a search and production of such documents from Ms. Condon's files.

## C.     *There Are No "Other Disputes" Regarding BSA's Document Production*

As a final matter, GSUSA complains that the BSA has not produced documents that are "referenced" in a March 2018 document regarding "meetings of the 'Boy Scout Committee' and 'Marketing Panel.'"  This is yet another issue on which the parties were engaged in ongoing meet and confer, and then GSUSA stopped responding and instead filed this motion. It should be denied as premature.

In any event, the BSA **did** produce documents related to what GSUSA claims it seeks. *See, e.g.*, BSA00030048, BSA00015402, BSA00030767, BSA00030019, BSA00030034, BSA00030387, BSA00028549. In addition, the BSA produced additional responsive documents on July 31, 2019. *See, e.g.*, BSA00074481; BSA00074482; BSA00074484; BSA00074486; BSA00074477; BSA00074477; BSA00074479; BSA00074480. GSUSA's motion to compel should be denied for this additional reason.

## D.     *GSUSA's Accusations Of Document "Concealment" Are Unfounded, And Lack All Credibility*

In its motion, GSUSA accuses the BSA of discovery misconduct, claiming that the BSA: "outright concealed" documents (*supra*, 31); engaged in "deliberate mis-interpretation" of discovery requests (*supra*, 30); is "simply trying to run out the clock by withholding documents that should have been produced" (*supra*, 32); has "no plausible explanation" for its discovery efforts other than "fail[ing] to comply with its discovery obligations," (*supra*, 28); and has engaged in "efforts to complicate unnecessarily the discovery process, avoid its discovery obligations, and delay these proceedings" (*supra*, 30).

None of this is true. The BSA has faithfully honored its discovery obligations, as set forth above.

The same, unfortunately, cannot be said for GSUSA.

---

[36]  GSUSA misstates the BSA's correspondence that Ms. Condon would not have **any** complaints from consumers or the public in her email – the BSA only stated that none of the incidents produced in this case were escalated to Ms. Condon's email.

As reflected in the BSA's motion (*see supra* Part II.A), GSUSA was caught withholding and concealing key evidence helpful to the BSA's defense of this case, by obscuring various highly relevant passages (such as damaging GSUSA admissions) under purported "non-responsiveness" redactions.  This has been going on for months.  Despite the BSA's extensive efforts to persuade GSUSA to remove these improper redactions, it was not until the BSA finally sought this Court's assistance by sending GSUSA its moving papers – with snapshots reflecting inconsistent redactions showing that GSUSA's "non-responsiveness" redactions were in fact highly relevant statements and admissions – that GSUSA finally showed some willingness to cease this improper conduct.  But even then, GSUSA's positions and offers fluctuated—right up until mere hours before this motion was filed—leaving the BSA with no alternative but to seek the Court's assistance to obtain the full relief it needs.

Nor is this an isolated incident.  GSUSA's refusal to even timely identify its own witnesses (even those referenced on the face of the 2018 Complaint), or amend its initial disclosures, until just weeks before fact discovery closes, paints an accurate picture of how GSUSA has chosen to conduct itself in this litigation. Indeed, GSUSA has refused to proffer even a single one of its witnesses for deposition until September 5 – ***just 20 days before discovery closes*** – unfairly forcing the BSA to depose all GSUSA witnesses in the space of just 15 business days.  As disappointed as the BSA is with GSUSA's baseless accusations, it is even more disappointed in GSUSA's own regrettable conduct.


Respectfully Submitted,

DORSEY & WHITNEY LLP


By: /s/: *Bruce R. Ewing*
    Bruce R. Ewing (BE-0724)
    Fara S. Sunderji (FS-1208)
    Jonathan Montcalm (JM-8866)
    51 West 52nd Street
    New York, New York 10019
    (212) 415-9200

    *Attorneys for Plaintiff*
    *Girl Scouts of the United States of*
    *America*


Respectfully Submitted,

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP


By:  /s/: *Rachel Kassabian*
    Rachel Kassabian (*pro hac vice*)
    555 Twin Dolphin Drive 5th Floor
    Redwood Shores, CA 94065
    (650) 801-5005

    Todd Anten
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    (212) 849-7000

    *Attorneys for Defendant*
    *Boy Scouts of America*