DORSEY & WHITNEY LLP
Bruce R. Ewing
Fara S. Sunderji
Jonathan Montcalm
Kimberly Frumkin
51 West 52nd Street
New York, New York 10019
(212) 415-9200

Attorneys for Plaintiff
Girl Scouts of the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

GIRL SCOUTS OF THE UNITED STATES     :
OF AMERICA,     :
     :     18-CV-10287 (AKH)
     Plaintiff,     :
     :
     - against -     :
     :
BOY SCOUTS OF AMERICA,     :
     :
     Defendant.     :
--------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS ......................................................................................6

    A.    Girl Scouts and Its Mission....................................................................6

    B.    The Fame and Recognition of the GIRL SCOUTS Trademark............................8

    C.    Girl Scouts' Rights in the Terms SCOUT, SCOUTS and SCOUTING for Use in Connection with Girls' Leadership and Development Services................10

    D.    Boy Scouts' Limited Offering of Coeducational "Specialty" Programs As of 1971 and Its Repeated Assurances to Girl Scouts Over Time That Its Core Programs Would Not Be Expanded to Include Girls ...................................14

    E.    Boy Scouts' "Historic" 2017 Decision to Redirect Its Program Offerings by Expanding Its Core Programs to Include Girls, and Its Effort to Conceal Its Expansion Plans From Girl Scouts .....................................17

    F.    Boy Scouts' Decision to Adopt The Terms SCOUT, SCOUTS and SCOUTING, SCOUT ME IN and SCOUTS BSA, Among Others, in Connection With Its New Girl Members and the Services Offered to Them........21

    G.    The Rampant Confusion Caused by the Designations Used by Boy Scouts in Marketing Its Services to Girls and Their Families, the Unauthorized Use of Girl Scouts Intellectual Property, and the Interference With Girl Scouts Efforts to Market Its Own Services............................................24

        1.    Wrongful Use of Girl Scouts' Intellectual Property .................................. 25

        2.    Boy Scouts' Infringement Resulted in Parents Mistakenly Enrolling Girls in Boy Scouts.................................................. 26

        3.    Children, Parents, Schools and Religious Organizations Express Confusion............................................................ 27

        4.    Members of the Public Are Confused...................................... 29

        5.    Boy Scouts Purposefully Interfered with Girl Scouts' Recruiting and Other Efforts................................................ 30

        6.    There Is Survey Evidence of Confusion as Well ...................................... 32

    H.    The Damage Girl Scouts Has Suffered as a Result of Boy Scouts' Misconduct............................................................33

ARGUMENT ............................................................................................................34

    POINT I BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT ON
    ITS AFFIRMATIVE DEFENSE OF LACHES ....................................................35

    POINT II BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT
    ON GIRL SCOUTS' FEDERAL AND NEW YORK STATE CLAIMS FOR
    TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION.............................41

    A.     Girl Scouts Owns Trademark Rights in SCOUT, SCOUTS and
          SCOUTING, Independent of the Word "Girl" ......................................43

    B.     There Is a Substantial Likelihood of Confusion Between the Parties'
          Marks ....................................................................................................48

         1.     Boy Scouts Is Vicariously Liable for the Infringing Acts of Its
               Councils, Troops and Leaders....................................................... 50

         2.     The GIRL SCOUTS Trademark Is Not Just Strong, but Famous,
               and the Trademarks SCOUT, SCOUTS and SCOUTING Possess a
               Strong Secondary Meaning With Girl Scouts for Girls Youth
               Leadership and Development Services ........................................... 55

         3.     The Parties' Marks Are Obviously Similar ................................. 58

         4.     The Parties' Services Are Now Directly Competitive, and There Is
               No Gap to Bridge .......................................................................... 65

         5.     Substantial Actual Confusion Has Already Occurred, and There Is
               Also Survey Evidence Showing That Such Confusion Is Likely ............. 69

         6.     Boy Scouts Acted in Bad Faith................................................. 79

         7.     The *Polaroid* Factors Concerned With the Quality of the Products
               and the Sophistication of The Parties' Target Audiences Favor Girl
               Scouts ...................................................................................... 82

    POINT III BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT
    ON GIRL SCOUTS' FEDERAL AND NEW YORK STATE TRADEMARK
    DILUTION CLAIMS .......................................................................................88

    POINT IV BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT
    ON GIRL SCOUTS' CLAIM FOR TORTIOUS INTERFERENCE WITH
    PROSPECTIVE ECONOMIC ADVANTAGE................................................95

    POINT V BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT
    ON GIRL SCOUTS' CLAIMS FOR MONETARY RELIEF...........................99

A.    There is Ample Evidence to Support the Disgorgement of Boy Scouts' Wrongful Profits ....................................................................................99

B.    Boy Scouts Has Failed to Show As a Matter of Law That Corrective Advertising Damages Are Not Recoverable........................................................101

CONCLUSION...........................................................................................................104

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
   537 F.2d 4 (2d Cir. 1976)..........................................................................................58

*adidas-America, Inc. v. Payless Shoesource, Inc.*,
   546 F. Supp. 2d 1029 (D. Or. 2008) .......................................................................91

*Adolph Kastor & Bros., Inc. v. Federal Trade Comm'n*,
   138 F.2d 824 (2d Cir. 1943)...................................................................................57

*Ahluwalia v. St. George's Univ., LLC*,
   63 F. Supp. 3d 251 (E.D.N.Y. 2014) ......................................................................98

*Alpo Petfoods, Inc. v. Ralston Purina Co.*,
   997 F.2d 949 (D.C. Cir. 1993) ................................................................101, 102, 103

*Anheuser-Busch, Inc. v. Power City Brewery, Inc.*,
   28 F. Supp. 740 (W.D. N.Y. 1939) .........................................................................43

*Arrow Fastener Co. v. Stanley Works*,
   59 F.3d 384 (2d Cir. 1995).....................................................................................68

*Banff Ltd. v. Fed. Dep't Stores, Inc.*,
   841 F.2d 486 (2d Cir. 1988)...................................................................................87

*Berkshire Fashions, Inc. v. Sara Lee Corp.*,
   725 F. Supp. 790 (S.D.N.Y. 1989) .........................................................................71

*Berkshire Fashions, Inc. v. Sara Lee Corp.*,
   729 F. Supp. 21 (S.D.N.Y. 1990) ...........................................................................59

*Boy Scouts of America v. Dale*,
   Case No. 99-699, 530 U.S. 640 (2000)...................................................................16

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) .................................................................101, 103

*Branch v. Ogilvy & Mather, Inc.*,
   Case No. 89 Civ. 2440 (LLS), 1990 U.S. Dist. LEXIS 6551 (S.D.N.Y. May
   30, 1990) ...............................................................................................................50

*Burton v. LABEL, LLC*,
   344 F. Supp. 3d 680 (S.D.N.Y. 2018).....................................................................98

*C.L.A.S.S. Promotions, Inc. v. D.PS. Magazines, Inc.*,
  753 F.2d 14 (2d Cir. 1985)..................................................................69

*C=Holdings B.V. v. Asiarim Corp.*,
  992 F. Supp. 2d 223 (S.D.N.Y. 2013)..............................................98, 99

*Cache, Inc. v. M.Z. Berger & Co.*,
  99 CIV. 12320 (JGK), 2001 WL 38283 (S.D.N.Y. Jan. 16, 2001)........................78

*Cadbury Beverages, Inc. v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996)...........................................................35, 65, 79

*Car-Freshner Corp. v. Am. Covers, LLC*,
  980 F.3d 314 (2d Cir. Nov. 19, 2020)..................................................35, 73

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
  348 F. Supp. 217 (S.D.N.Y. 2004) ........................................................79

*Cartier v. Symbolix Inc.*,
  454 F. Supp. 2d 175 (S.D.N.Y. 2006).....................................................49

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).......................................................................50

*Centaur Comms., Ltd. v. A/S/M Comms., Inc.*,
  830 F.2d 1217 (2d Cir. 1987).............................................................55

*Century 21 Real Estate Corp. v. Century Life of Am.*,
  970 F.2d 874 (Fed. Cir. 1992)............................................................60

*Champagne Louis Roederer v. J. Garcia Carrion, S.A.*,
  569 F.3d 855 (8th Cir. 2009) ............................................................41

*Coca-Cola Co. v. Busch*,
  44 F. Supp. 405 (E.D. Pa. 1942) .........................................................43

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017).................................................42, 48, 77

*Daniel v. Am. Bd. of Emerg. Med.*,
  237 F. Supp. 2d 336 (W.D.N.Y. 2002) ....................................................78

*Daniels v Kostreva*,
  Case No. 16 Civ. 3076 (LGS), 2017 U.S. Dist. LEXIS 5534 (E.D.N.Y. Jan.
  12, 2017) ...............................................................................97

*Denimafia Inc. v New Balance Ath. Shoe, Inc.*,
    Case No. 12 Civ. 4112 (AJP), 2014 US Dist LEXIS 27541 (S.D.N.Y. Mar. 3,
    2014) ...................................................................................................................65

*Dentsply Int'l Inc. v. Dental Brands for Less LLC*,
    Case No. 15 Civ. 8775 (LGS), 2016 U.S. Dist. LEXIS 87345 (S.D.N.Y. July
    5, 2016) ................................................................................................................97

*Dish Network L.L.C. v. Siddiqi*, No. 18 CV 4397 (VB), 2019 U.S. Dist. LEXIS
    193095 (S.D.N.Y. Nov. 6, 2019) ...............................................................51, 53

*Diversified Mktg. v. Estee Lauder, Inc.*,
    705 F. Supp. 128 (S.D.N.Y. 1988) ......................................................................90

*Elvis Presley Enters. v. Capece*,
    141 F.3d 188 (2d Cir. 1998)..................................................................................41

*Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*,
    897 F.3d 413 (2d Cir. 2018)..................................................................................37

*Experience Hendrix, L.L.C. v. Pitsicalis*,
    Case No. 17 Civ. 1927 (PAE), 2020 U.S. Dist. LEXIS 115075 (S.D.N.Y. July
    1, 2020) ..............................................................................................................100

*First Nat'l Bank of Omaha, Inc., v. MasterCard Int'l Inc.*,
    Case No. 03 Civ. 707 (DLC), 2004 U.S. Dist. LEXIS 13162 (S.D.N.Y. July
    15, 2004) ..............................................................................................................65

*Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*,
    104 F. Supp. 3d 371 (S.D.N.Y. 2015)..................................................................78

*Ford Motor Co. v. Summit Motor Prods.*,
    930 F.2d 277 (3d Cir. 1991).............................................................................85, 86

*Fourth Toro Family Ltd. Pshp. v. PV Bakery, Inc.*,
    88 F. Supp. 2d 188 (S.D.N.Y. 2000)....................................................................39

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*,
    228 F. Supp. 2d 399 (S.D.N.Y. 2002)..............................................................82, 93

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*,
    111 F.3d 993 (2d Cir. 1997)..............................................................................64, 78

*Fusco Grp., Inc. v. Loss Consultants Int'l, Inc.*,
    462 F. Supp. 2d 321 (N.D.N.Y. 2006)..................................................................40

*Gap, Inc. v. G.A.P. Adventures Inc.*,
No. 07-cv-9614 (AKH), 2011 U.S. Dist. LEXIS 71675 (S.D.N.Y. June 24,
2011) ........................................................................................49, 64, 68, 70, 86, 92

*General Foods Corp. v. Ito Yokado Corp.*,
219 U.S.P.Q. 822 (T.T.A.B. 1976) ...................................................................47

*Girl Scouts of the United States of America v. Alfred Sternjakob*,
212 U.S.P.Q. 388 (T.T.A.B. 1981) .........................................................11, 44, 60

*Girl Scouts of the United States of America v. Hollingsworth*,
188 F. Supp. 707 (E.D.N.Y. 1960) ...................................................................45

*Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc.*,
683 F. Supp. 50 (S.D.N.Y.), *aff'd*, 859 F.2d 148 (2d Cir. 1988).........1, 5, 7, 59, 61, 66, 67, 89

*Glenmore Distilleries Co. v. Nat'l Distillers Prod. Corp.*,
23 F. Supp. 928 (E.D. Va. 1938) ...............................................................60, 61

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
523 F.2d 1331 (2d Cir. 1975)......................................................................48, 87

*Guthrie Healthcare System v. ContextMedia, Inc.*,
826 F.3d 27 (2d Cir. 2016).................................................................................73

*Hannex Corp. v. GMI, Inc.*,
140 F.3d 194 (2d Cir. 1998)...............................................................................95

*Harlequin Enters. v. Gulf & W. Corp.*,
644 F.2d 946 (2d Cir. 1981)...............................................................................44

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
858 F.2d 70 (2d Cir. 1988).................................................................................66

*Hearts on Fire Co., LLC v. LC Int'l Corp.*,
Case No. 04 Civ. 2536 (LTS), 2004 U.S. Dist. LEXIS 14828 (S.D.N.Y. Jul.
30, 2004) ...........................................................................................................89

*Heartsprings, Inc. v. Heartspring, Inc.*,
949 F. Supp. 1539 (D. Kan. 1996).....................................................................83

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
219 F.3d 104 (2d Cir. 2000)...............................................................................41

*Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*,
245 Fed. Appx. 456 (6th Cir. 2007)...................................................................83

*IISSCC v. Security University*,
   823 F.3d 153 (2d Cir. 2016).................................................................................48

*Inc. Pub. Corp. v. Manhattan Mag., Inc.*,
   616 F. Supp. 370 (S.D.N.Y. 1985), *aff'd sub nom. Inc. Pub. Corp. v.*
   *Manhattan Mag.*, 788 F.2d 3 (2d Cir. 1986).......................................................74, 79

*Insurent Agency Corp. v. Hanover Ins. Co.*,
   2018 U.S. Dist. LEXIS 140922 (S.D.N.Y. Aug. 20, 2018)....................................97

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
   146 F.3d 66 (2d Cir. 1998).................................................................................100

*J.T. Colby & Co. v Apple Inc.*,
   Case No. 11 Civ. 4060 (DLC), 2013 U.S. Dist. LEXIS 65959 (S.D.N.Y. May
   8, 2013) ................................................................................................................65

*Jahr USA Publ'g v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993)..............................................................................65

*Johanna Farms, Inc. v. Citrus Bowl, Inc.*,
   468 F. Supp. 866 (E.D.N.Y. 1978) ......................................................................38

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*,
   188 F.3d 427 (7th Cir. 1999) ..............................................................................43

*Jordache Enters. v. Levi Strauss & Co.*,
   841 F. Supp. 506 (S.D.N.Y. 1993) ......................................................................90

*Joules Ltd. v. Macy's Merch. Grp., Inc.*,
   Case No. 15 Civ. 3645 (KMW), 2016 U.S. Dist. LEXIS 101151 (S.D.N.Y.
   Aug. 2, 2016) .......................................................................................................60

*Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*,
   Case No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6,
   2007) ..................................................................................................................101

*Kelly-Brown v. Winfrey*,
   717 F.3d 295 (2d Cir. 2013)................................................................................51

*Kenner Parker Toys, Inc. v. Rose Art Indus.*,
   963 F.2d 350 (Fed. Cir. 1992).........................................................................56, 57

*Lane Capital Mgmt. v. Lane Capital Mgmt.*,
   192 F.3d 337 (2d Cir. 1999)................................................................................42

*Lang v. Retired Living Publishing Co., Inc.*,
   949 F.2d 576 (2d Cir. 1991)................................................................................48

*Lesesne v. Brimecome*,
   918 F. Supp. 2d 221 (S.D.N.Y. 2013)........................................................................97

*Lesnik v. Lincoln Fin. Advisors Corp.*,
   Case No. 18 Civ. 3656 (LJL), 2020 U.S. Dist. LEXIS 100795 (S.D.N.Y. June
   9, 2020) .....................................................................................................................97

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986).................................................................................55, 56

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   454 F.3d 108 (2d Cir. 2006).....................................................................................42

*Malaco Leaf, AB v. Promotion In Motion, Inc.*,
   287 F. Supp. 2d 355 (S.D.N.Y. 2003)......................................................................69

*Malletier v. Hyundai Motor Am.*,
   Case No. 10 Civ. 1611 (PKC), 2012 U.S. Dist. LEXIS 42795 (S.D.N.Y. Mar.
   22, 2012) ...................................................................................................................88

*Mankes v. Boy Scouts of America, Inc.*,
   137 F.R.D. 409 (S.D. Fl. 1991).................................................................................16

*Margaret Wendt Found. Holdings, Inc. v. Roycroft Assocs.*,
   Case No. 01-CV-74C(SR), 2007 U.S. Dist. LEXIS 76429 (W.D.N.Y. Oct. 12,
   2007) .........................................................................................................................36

*Maxwell Shoe Co. v. Edelman Shoe Co., LLC*,
   Case No. 04 Civ. 10694 (RCL), 2004 U.S. Dist. LEXIS 31846 (D. Mass. Aug.
   5, 2004) .....................................................................................................................60

*Mc-Cabe Powers Auto Body Co. v. Am. Truck Equip Co.*,
   150 F. Supp. 194 (D. Or. 1957) ................................................................................47

*McDonald's Corp. v. McBagel's, Inc.*,
   649 F. Supp. 1268 (S.D.N.Y. 1986)..........................................................................72

*Metro. Opera Ass'n v. Metro Artists, Inc.*,
   27 Misc.2d 572, 212 N.Y.S.2d 435 (Sup. Ct. N.Y. Cnty. 1961), *aff'd*, 13
   A.D.2d 480, 214 N.Y.S.2d 648 (1st Dep't 1961) ....................................................44

*Metro. Opera Ass'n v. Metro Opera Ass'n of Chicago*,
   81 F. Supp. 127 (N.D. Ill. 1948) ..............................................................................44

*Metro Pub., Ltd. v. San Jose Mercury News, Inc.*,
   861 F. Supp. 870 (N.D. Cal. 1994) ...........................................................................93

*Meyers v. ASICS Corp.*,
   974 F.2d 1304 (Fed. Cir. 1992)...................................................................41

*Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*,
   685 F.3d 1046 (Fed. Cir. 2012).................................................................59

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir. 1987)...............................................49, 56, 86, 87

*Mobius Management Sys. v. Fourth Dimension Software*,
   880 F. Supp. 1005 (S.D.N.Y. March 27, 1994) .................................102

*Monsieur Henri Wines, Ltd. v. Duran*,
   204 U.S.P.Q. 601 (T.T.A.B. 1979) .............................................................47

*Morningside Group Ltd. v. Morningside Capital Group, LLC*,
   182 F. 3d 133 (2d Cir. 1999)...............................................69, 70, 82, 87

*Mrs. U.S. Nat'l Pageant, Inc. v. Miss U.S.A. Org., LLC*,
   875 F. Supp. 2d 211 (W.D.N.Y. 2012) ....................................................86

*MVB Collision, Inc. v. Progressive Ins. Co.*,
   129 A.D. 3d 1040, 13 N.Y.S.3d 139 (2d Dep't 2015) .........................98

*Nat'l Cable TV Ass'n v. Am. Cinema Editors, Inc.*,
   937 F.2d 1572 (Fed. Cir. 1991)..................................................................43

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
   628 N.Y.S.2d 408 (3d Dep't 1995) ..........................................................98

*Nestle Co. v. Chester's Mkt., Inc.*,
   571 F. Supp. 763 (D. Conn. 1983) ............................................................45

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   590 F. Supp. 2d 500 (S.D.N.Y. 2008).......................................................65

*Olay Co. v. Cococare Prods.*,
   No. 81 Civ. 4102, 1983 U.S. Dist. LEXIS 17613 (S.D.N.Y. Apr. 19, 1983) ...................39, 57

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
   451 F.2d 1190 (2d Cir. 1971)......................................................................85

*In re Oppedahl & Larson LLP*,
   373 F.3d 1171 (Fed. Cir. 2004)..................................................................45

*Parrot Jungle, Inc. v. Parrot Jungle, Inc.*,
   512 F. Supp. 266 (S.D.N.Y. 1981) .............................................................39

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
    317 F.3d 209 (2d Cir. 2003)....................................................................................39

*Patsy's Italian Rest., Inc. v. Banas*,
    575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011)......................38, 39

*Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*,
    857 F.2d 80 (2d Cir. 1988).....................................................................................35

*Piccoli A/S v. Calvin Klein Jeanswear Co.*,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998).....................................................................51, 53

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    80 F. Supp. 2d 600 (N.D. Tex. 2000), *rev'd on other grounds*, 227 F.3d 489
    (5th Cir. 2000)....................................................................................................102

*Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*,
    692 F.2d 1272 (9th Cir.1982) ................................................................................103

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961).................................................... 34, 35, 41-88, 93, 94

*PRL USA Holdings, Inc. v. M&A Mktg. Corp.*,
    99 Civ. 10199, 2004 U.S. Dist. LEXIS 14916 (S.D.N.Y. Aug. 2, 2004) ...............................41

*Profitness Physical Therapy Ctr. v. Pro-Fit Ortho. & Sports Phys. Therapy P.C.*,
    314 F.3d 62 (2d Cir. 2002).....................................................................................38

*Quia Corp. v. Mattel, Inc.*,
    Case No. C 10–1902 JF (HRL), 2010 WL 2486364 (N.D. Cal. June 15, 2010) ...................83

*Rexall Sundown, Inc. v. Perrigo Co.*,
    707 F. Supp. 2d 357 (E.D.N.Y. 2010) ......................................................................100

*RFP LLC v. SCVNGR, Inc.*,
    788 F. Supp. 2d 191 (S.D.N.Y. 2011)........................................................................98

*RJR Foods, Inc. v. White Rock Corp.*,
    Case No. 77 Civ. 2329, 1978 U.S. Dist. LEXIS 15080, *aff'd*, 603 F.2d 1058
    (2d Cir. 1979).....................................................................................................60

*Robinson v. Delicious Vinyl Records, Inc.*,
    Case No. CV 13-4111-CAS, 2013 U.S. Dist. LEXIS 109279 (C.D. Cal. Aug.
    1, 2013) ............................................................................................................54

*Romag Fasteners, Inc. v. Fossil Grp., Inc.*,
    140 S. Ct. 1492 (2020)..........................................................................................102

*S&L Vitamins, Inc. v. Australian Gold, Inc.*,
  521 F. Supp. 2d 188 (E.D.N.Y. 2007) ..................................................................98

*Schwenk v. Boy Scouts of America*,
  551 P.2d 465 (Or. 1976) ...................................................................................16

*Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*,
  Case No. 86-CV-1142, 1989 U.S. Dist. LEXIS5862 (S.D.N.Y. 1989) ...............................58

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
  Case No. 03 Civ. 3120 (LTS), 2009 U.S. Dist. LEXIS 44748 (S.D.N.Y. May
  27, 2009) ...................................................................................................98

*SMJ Group, Inc. v 417 Lafayette Rest. LLC*,
  Case No. Civ. 1774, 2006 U.S. Dist. LEXIS 61645 (S.D.N.Y. Aug. 30, 2006)...............96, 98

*The Sports Authority, Inc. v. Prime Hospitality Corp.*,
  89 F.3d 955 (2d Cir. 1996)........................................................................34, 35, 69, 70

*Star Indus., Inc. v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005).........................................................................65, 69, 83

*Starbuck's Corp. v. Wolfe's Borough Coffee, Inc.*,
  736 F.3d 198 (2d Cir. 2013)...............................................................................89

*Strange Music, Inc. v. Strange Music, Inc.*,
  326 F. Supp. 2d 481 (S.D.N.Y. 2004)..................................................................68

*Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*,
  851 F.3d 440 (5th Cir. 2017) .......................................................................74, 78

*Thompson Med. Co. v. Pfizer, Inc.*,
  753 F.2d 208 (2d Cir. 1985)..............................................................................58

*TRB Acquisitions LLC v. Seduka*,
  LLC, Case No. 15 Civ. 4401 (GBD), 2016 U.S. Dist. LEXIS 64846 (S.D.N.Y.
  May 10, 2016).............................................................................................51

*Tri-Star Pictures, Inc. v. Unger*,
  14 F. Supp. 2d 339 (S.D.N.Y. 1998)....................................................................46

*Tri-Star Pictures v. Leisure Time Prods. B.V.*,
  17 F.3d 38 (2d Cir. 1994)............................................................................35, 36

*U.S. Polo Ass'n v. PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011).................................................................79

*Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*,
  634 F. Supp. 1468 (S.D.N.Y. 1986)............................................................................72

*Virgin Enters. v. Nawab*,
  335 F.3d 141 (2d Cir. 2003)..........................................................................58, 66, 67

*Visa International Service Association v. JSL Corporation*,
  610 F.3d 1088 (9th Cir. 2010) ...................................................................................90

*Vitarroz v. Borden Inc.*,
  644 F.2d 960 (2d Cir. 1981)........................................................................................69

*Wrenn v. Boy Scouts of the United States of America*,
  Case No. C 03-04057 (JSW), 2008 U.S. Dist. LEXIS 91913 (N.D. Cal. Oct.
  28, 2008) ..........................................................................................57, 58, 59, 60, 66

*Yeaw v. Boy Scouts of America*,
  55 Cal. App. 4th 607 (1997) .......................................................................................16

*Yong Ki Hong v. KBS Am., Inc.*,
  951 F. Supp. 2d 402 (E.D.N.Y. 2013) ........................................................................98

*Zerorez Franchising Sys. v. Distinctive Cleaning, Inc.*,
  Case No. 13-2326 (ADM), 2016 U.S. Dist. LEXIS 60644 (D. Minn. May 6,
  2016) ..........................................................................................................................101

*Zippo Mfg. Co. v. Rogers Imps., Inc.*,
  216 F. Supp. 670 (S.D.N.Y. 1963) .............................................................................46

**Statutes**

15 U.S.C. § 1114(1) ...........................................................................................................41

15 U.S.C. § 1117(a) .........................................................................................................100

15 U.S.C. § 1125(a) ...........................................................................................................41

15 U.S.C. § 1125(c) ....................................................................................................89, 94

36 U.S.C. § 30902 ................................................................................................................7

36 U.S.C. § 30905 ................................................................................................................8

36 U.S.C. § 80302 ................................................................................................................7

36 U.S.C. § 80305 ................................................................................................................8

**Rules**

Fed. R. Evid. 803(3) ............................................................................................................78

**Other Authorities**

Federal Trademark Dilution Act: Hearing before the Subcomm. on the Courts, the
    Internet, and Intellectual Property, 107 Cong. 53 (2002) (Statement of Ethan
    Horwitz) ..............................................................................................................................88

3 *McCarthy on Trademarks and Unfair Competition* ............................................................92, 94

2 *Gilson on Trademarks*..........................................................................................................101, 102

## INTRODUCTION

This is a trademark dispute brought by Girl Scouts to halt ongoing marketplace confusion caused by Boy Scouts throughout the United States, and to prevent further harm to the famous GIRL SCOUTS brand.  The level of confusion resulting from Boy Scouts' use of terms like GIRL SCOUTS, SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN to market its core programs to girls is both extraordinary and highly damaging to Girl Scouts.

On its motion, Boy Scouts asks the Court to ignore all of this and hold, as a matter of law, that confusion and dilution are unlikely, even though the GIRL SCOUTS trademark is concededly famous, the parties' marks are obviously similar, and the services they offer are, since 2017, directly competitive.  This proposition is untenable, and based on a wholly misleading factual presentation that sidesteps or ignores the mountain of evidence of confusion and dilution that is central to this case.  Most fundamentally, Boy Scouts repeatedly downplays the momentous change in its business that was announced in 2017, when it decided to abandon its historic identity as an organization that only served boys by expanding to girls its two core programs:  CUB SCOUTS and the program now known as SCOUTS BSA, formerly known as BOY SCOUTS.  That major change brought the parties squarely into the same market.

Beyond this, there are a multitude of other facts that Boy Scouts never mentions in its filing, but that bear heavily on this case, including the following:

- Boy Scouts' Congressional Charter expressly specifies that its purpose is "to promote, through organization, and cooperation with other agencies, the ability of ***boys*** to do things for themselves and others . . . ."  (Emphasis added.) Accordingly, Boy Scouts spent decades successfully defending lawsuits in order to keep girls out of its two core programs.  *See* Plaintiff's Response to Defendant's Local Civil Rule 56.1 Statement and Statement of Additional Facts as to Which There Is a Genuine Issue to Be Tried ("GS 56.1 St."), ¶¶ 2, 132-34, 159.

- Boy Scouts' central focus on boys as mandated by Congress was mirrored in Girl Scouts' own Congressional Charter, which specifies that its purpose is to serve girls through Scouting services.  *Id.*, ¶¶ 2, 132-34, 159.

- Under their respective Charters, both parties were granted exclusive rights with respect to their trademarks.  In Boy Scouts' words:

  > "Congress granted exclusive rights to BSA for its marks in relation to its services, namely 'membership in an organization for boys to promote moral, physical and spiritual development.'  Meanwhile, the Girl Scouts enjoyed exclusive rights in its marks in connection with its services, which are distinguishable, and mutually exclusive, in that they are for female youth."  *Id.*, ¶ 134 (Emphasis in original.)

  > "the Boy Scouts controls use of the marks [SCOUT and SCOUTING] in connection with development programs for boys, while Girl Scouts controls use of the marks in connection with development programs for girls. Their joint use of the marks has been expressly recognized by Congress."

  *Id.*

- Boy Scouts' portrayal of itself as a longstanding coeducational organization is simply false.  As of the end of 2017, girls and young women were only allowed to join "specialty," niche programs whose members represented only about 4% of Boy Scouts' total membership, with *female* members of those programs amounting to roughly 2.4% of total Boy Scouts members.  *Id.*, ¶¶ 156-157.

- Beginning in 1971, after Boy Scouts had persuaded Girl Scouts to accede to the limited participation of girls in one Boy Scouts program (but whose participants were not referred to as SCOUTS), and after reneging on the agreement it had reached with Girl Scouts in order to secure its assent to such female participation, Boy Scouts reassured Girl Scouts, both then and for decades thereafter, that it would remain a boys organization.  *Id.*, ¶¶ 149-154.

- In the 1970s, when Girl Scouts first raised concerns about Boy Scouts' use of ambiguous terms like SCOUTING in public communications where the organizational sponsor was unclear, and about the potential for confusion such uses were likely to cause, Boy Scouts repeatedly assured Girl Scouts that it would use its name or a gender-specific modifier like BOY whenever terms like SCOUTING appeared, in order to prevent confusion.  *Id.*, ¶¶ 146-147.

- In early 2017, after years of persistent membership declines, and confronting the prospect of even steeper drops in the near term, Boy Scouts decided to revisit an idea it had previously considered but rejected: admitting girls to its core programs.  Boy Scouts understood at the time that this decision would bring the parties into direct competition in a way they had not been before, and it organized a "GSUSA Retaliation Sub-Team" to consider how to deal with Girl Scouts, since it was understood that "We will essentially be raiding their youngest members

2

who the GSUSA regards as the base of their organization. . . . This move would be a direct assault on their foundation." *Id.*, ¶¶ 160-166.

-   After making its announcement in October 2017 that girls would be allowed to join the CUB SCOUTS program in 2018, as well as the program ultimately renamed SCOUTS BSA in 2019, Boy Scouts launched an advertising campaign under the trademark SCOUT ME IN, using terms like SCOUTS and SCOUTING to refer to its new female members and programs offered to them. *Id.*, ¶¶ 176-183.

-   Even though Boy Scouts and Girl Scouts would now be squarely competing in the same marketplace, Boy Scouts made no effort to prevent confusion, but chose instead to create and benefit from such confusion by deliberately using marks that belonged to Girl Scouts with respect to girls services, or that violated Girl Scouts' trademark rights. Boy Scouts knew for decades that the use by it of terms like SCOUTS or SCOUTING would be confusing unless it clearly identified the sponsor of services offered under those marks, but it went ahead and used these terms anyway. The rampant confusion and damage to the GIRL SCOUTS brand was the predicted, and intended, result. *Id.*, ¶¶ 146-47, 167-68, 183-249.

The facts summarized above are only a limited selection from the great quantum of evidence that Boy Scouts would have the Court ignore, but Boy Scouts goes even farther by ignoring multiple prongs of the claims Girl Scouts has actually pleaded. To be absolutely clear at the outset, the trademark infringement and unfair competition claims Girl Scouts asserts are premised both on its GIRL SCOUTS trademark, the fame of which Boy Scouts concedes, ***and*** Girl Scouts' rights in the terms SCOUT, SCOUTS and SCOUTING for use in connection with girls leadership and development services. Boy Scouts denies that Girl Scouts owns any rights in the latter three terms standing alone, arguing that Girl Scouts has not used them as trademarks without the word GIRL. This assertion is not correct, and it also ignores legal principles dating back nearly as far as the parties' existence, holding that public association of these terms with Girl Scouts is sufficient to establish enforceable trademark rights. Here, based on internal and public admissions by Boy Scouts, dictionary definitions, news coverage, survey results and other evidence, there is clear public association of the terms SCOUT, SCOUTS and SCOUTING with Girl Scouts in connection with girls leadership and development services. This association gives

Girl Scouts rights in those terms for such services that are superior to those of Boy Scouts. And even if this were not the case, the likelihood of confusion between the designations used by Boy Scouts and the GIRL SCOUTS trademark is manifest.

Just as there are two distinct bases for Girl Scouts' trademark infringement and unfair competition claims, there are two distinct types of wrongful conduct by Boy Scouts that are at issue. The first is direct infringement by Boy Scouts through its use of terms like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN in connection with its offering of girls leadership and development services. The second is secondary infringement by Boy Scouts through the use of the GIRL SCOUTS trademark and related intellectual property by Boy Scouts' councils, troops and volunteers around the United States. Boy Scouts is vicariously liable for these types of violations of Girl Scouts' intellectual property rights, based on its ability to control the manner in which its affiliates market and promote Boy Scouts programs. Nowhere in Boy Scouts' submission does it acknowledge the issue of vicarious infringement that is specifically pleaded in Girl Scouts' Amended Complaint. *See* Dkt. 89, ¶¶ 7, 10, 94-95, 106, 116.

Perhaps the most insidious aspect of Boy Scouts' motion is its attempt to divert attention from its wrongdoing by contending – based on a single presentation slide prepared by an outside public relations firm – that Girl Scouts brought this lawsuit "not to right any wrong, but for an improper purpose," *i.e.* to prevent or discourage girls from participating in Boy Scouts programs through groundless litigation, and that Girl Scouts has pursued a "trademark angle" to achieve its desired end. *See* Boy Scouts Memorandum of Law in Support of Motion for Summary Judgment ("Mov. Br."), Dkt. 105, 112, 121, at 2. Not only does the slide say nothing of the sort, but this incredible contention ignores the substantial evidence of trademark infringement and dilution, as well as tortious interference with Girl Scouts' recruiting efforts, all causing great economic harm

4

to Girl Scouts and damage to the goodwill inherent its trademarks, warranting the grant of

injunctive relief and damages.  The Court need only look at the catalog of confusion,

interference, infringement and other misconduct documented in paragraphs 185 to 251 of Girl

Scouts' Rule 56.1 Statement to see what prompted the filing of this proceeding.

       Stopping Boy Scouts from engaging in wrongdoing that represents a direct assault on

Girl Scouts' trademark and other rights is what this case is about, and it is the sort of behavior

this District has seen before in similar circumstances.  In 1988, after decades of coexistence, the

Boys Clubs of America, whose membership at that time had been limited to boys, decided to

admit girls and announced plans to change its name to Boys and Girls Clubs of America.  The

Girls Clubs of America objected to this name change, filed suit, and obtained a preliminary

injunction after the Court found that the proposed new name – Boys and Girls Clubs of America

– would falsely communicate to the public that the two organizations had merged, given the new

overlap of markets.  *See Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc.*, 683 F. Supp. 50, 52

(S.D.N.Y. 1988), *aff'd*, 859 F.2d 148 (2d Cir. 1988).  This same type of harm, among others, is

what Girl Scouts seeks to prevent.  For generations, Girl Scouts has become known as ***the***

provider of SCOUTING services for girls.  If Boy Scouts wishes to depart from its historic

commitment to boys by expanding its core programs to girls, irrespective of what its

Congressional Charter says, Girl Scouts does not seek to stop it.  But if expansion is the path Boy

Scouts has chosen to take, the law requires that it pursue its new mission in a way that respects

Girl Scouts' trademark rights and avoids causing confusion in the marketplace, dilution of the

GIRL SCOUTS mark, and wrongful interference with Girl Scouts activities.  Because Boy

Scouts has not fulfilled its legal obligations – and, in fact, has exhibited flagrant disregard for

Girl Scouts' trademark rights – the Court should put a halt to Boy Scouts' misconduct so as to

protect the public and Girl Scouts, and compensate Girl Scouts for the harm it has suffered.  This case should proceed to trial as expeditiously as possible, and the Court should deny Boy Scouts' motion.

## STATEMENT OF FACTS

### A.   Girl Scouts and Its Mission

Girl Scouts is a non-profit organization whose mission for over a century has been to provide leadership and development services to girls throughout the United States.  GS 56.1 St., ¶¶ 125-126.  Since 1912, the Girl Scout Movement has been organized and run by women and focuses on empowering girls to attain their full potential, develop a strong sense of self, and learn positive values that will aid them throughout their lives.  *Id.*, ¶ 128.  Throughout its history, many millions of American women have been part of Girl Scouts' programs.  *Id.*, ¶ 125.

As the Girl Scouts Movement grew in its earliest years, Boy Scouts initially claimed that Girl Scouts "sissified" the word SCOUT, and it raised the possibility of legal action to halt the use that name, but backed away when it became clear that it would not succeed.  *Id.*, ¶¶ 129-130 (quoting then Chief Boy Scout Executive as believing that "scouting was only for men and boys," and that Girl Scouts "'trivialized' and 'sissified' the name of 'scout'").  By 1936, Boy Scouts had acknowledged Girl Scouts' rights in the term SCOUT, stating:

> In all such matters with which we have had to deal our contention has been that in every day use the most common significance of the word 'Scout' today is in connection with the Movement for youth known by that name.  It seems obvious that where use in connection with projects or articles of merchandise most commonly related to boys, "Scout" would thus be construed as the equivalent of "Boy Scout", and with this contention the authorities have appeared to agree.  ***It would seem likewise, where the word 'Scout' was employed for a purpose distinctively related to girls and girls wear, the obvious connotation would be to "Girl Scouts".***

*See* the accompanying Declaration of Page Harrington ("Harrington Dec."), Exh. 17 at GSUSA_00112737 (emphasis added.).

In recognition of both SCOUTING organizations, Congress granted Charters to both Boy Scouts and Girl Scouts.  Boy Scouts received a Congressional Charter in 1916 that was amended in 1998 and that states, *inter alia*, that the organization's purposes "are to promote, through organization, and cooperation with other agencies, the ability of ***boys*** to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods that were in common use by boy scouts on June 15, 1916." *See* 36 U.S.C. § 30902 (emphasis added); GS 56.1 St., ¶ 132.  As recently as 2016, Boy Scouts' view was that the "boys only" provisions of its Charter precluded the admission of girls into its core programs: CUB SCOUTS and BOY SCOUTS.  *See* the accompanying Declaration of Bruce. R. Ewing ("Ewing Dec."), Exh. 171 at pg. 4 (emphasis added) (2016 news article quoting Boy Scouts spokesperson as to why girl was denied admission to BOY SCOUTS program: "[T]he Boy Scouts of America was chartered by Congress in 1916 to serve boys and young men across the nation through the Cub Scouts and Boy Scouts programs, which are year-round programs for boys in the first grade through age 18.  We have since developed alternative programs that are co-ed, such as Venturing, **but to change the Cub or Boy Scouting programs would go outside the bounds of our charter**.") (emphasis added).[1]

Likewise, Girl Scouts received a Congressional Charter in 1950 that was amended in 1998. GS 56.1 St., ¶ 133.  Girl Scouts' charter states, *inter alia*, that its purposes are "to promote the qualities of truth, loyalty, helpfulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among ***girls***. . . .*See* 36 U.S.C. § 80302 (emphasis added).  Girl Scouts' Charter further states that "[t]he corporation has the exclusive right to use

---

[1]    Boy Scouts' focus on boys at the time the organization was originally established is exemplified by the *Scouting* magazine tagline appearing in the image shown on page 6 of its Moving Brief: "For Scout Officials and Others Interested in Work for Boys."

all emblems and badges, descriptive or designating marks, and words or phrases the corporation

adopts . . . ." *See* 36 U.S.C. § 80305.[2]

      Just as Boy Scouts has historically acknowledged Girl Scouts' rights in the terms

SCOUT, SCOUTS and SCOUTING for girls services, it has also acknowledged that the parties'

rights in those terms are mutually exclusive based on their respective Congressional Charters.  In

a filing made with the Trademark Trial and Appeal Board (the "TTAB") of the U.S. Patent &

Trademark Office (the "PTO") on March 27, 2006, Boy Scouts stated that:

> When Congress passed the statute relating to the Girl Scouts, it explicitly
> acknowledged that the Girl Scouts and Boy Scouts were receiving similar
> recognition for their respective services.  House of Representatives Report No.
> 266 to H.R. 3020, 82nd Congress, 1st Session (March 14, 1951).  Congress granted
> exclusive rights to BSA for its marks in relation to its services, namely
> "membership in an organization for boys to promote moral, physical and spiritual
> development."  Meanwhile, the Girl Scouts enjoyed exclusive rights in its marks
> in connection with its services, which are distinguishable, and mutually exclusive,
> in that they are for female youth.

GS 56.1 St., ¶ 134 (emphasis in original).  In that same filing, Boy Scouts stated that "the Boy

Scouts controls use of the marks [SCOUT and SCOUTING] in connection with development

programs for boys, while Girl Scouts controls use of the marks in connection with development

programs for girls. Their joint use of the marks has been expressly recognized by Congress." *Id.*

**B.**      <u>**The Fame and Recognition of the GIRL SCOUTS Trademark**</u>

      The GIRL SCOUTS trademark has been used continuously for more than a century since

Girl Scouts' founding, *id.*, ¶ 127, and it is strong, famous and widely known by the American

public.  *Id.*, ¶¶ 135-136.  Among the best known aspects of Girl Scouts offerings since 1936 is its

---

2    Boy Scouts' Charter contains a similar provision: "The corporation has the exclusive right to
use emblems, badges, descriptive or designating marks, and words or phrases the corporation
adopts."  *See* 36 U.S.C. § 30905.

cookie program, an important fundraising tool that also teaches girls entrepreneurial skills like goal setting, decision making, money management, people skills and business ethics.  *Id.*, ¶ 137.

The PTO has recognized the Congressional protections afforded to Girl Scouts that grant it the exclusive right to use and register the GIRL SCOUTS trademark in every class of goods and services recognized by the PTO, under Serial No. 89/000,078.  *Id.*, ¶ 138.  Girl Scouts also owns multiple trademark registrations for its GIRL SCOUTS trademark accompanied by its Profile Design logo for certain goods and services, as well as variations of that mark like GIRL SCOUT GOLD AWARD.  *Id.*, ¶ 139.  Girl Scouts has licensed its valuable GIRL SCOUTS trademarks to third parties for use in connection with a wide array of goods, including apparel, accessories, jewelry, coffee, earbuds, beverage containers and others.  *Id.*, ¶ 140.

For its part, while Boy Scouts also owns many trademark registrations, to respect the rights of Girl Scouts, a number contain express limitations restricting the services for which the marks at issue have been registered to boys or young men, including registrations for SCOUTING, EAGLE SCOUT & Design, SCOUT SHOP BOY SCOUTS OF AMERICA, SCOUTMASTER, CUB SCOUTS and SCOUTING FOR ADVENTURE.  GS 56.1 St., ¶ 13.  In at least two instances, the restrictions in these registrations were added at the request of the PTO in order to avoid confusion with Girl Scouts, with a PTO Examining Attorney stating in one such instance: "the term SCOUT, 'BOY SCOUT' and Girl Scouts are legal equivalents so that the terms 'SCOUT' and 'GIRL SCOUT' would engender the same commercial impression."  *Id.*; *see also* Ewing Dec., Exh. 146 at GSUSA_00132113 (quoting Boy Scouts as stating "Various trademark examining attorneys through the years felt that a disclaimer was necessary so as not to exclude Girl Scouts from the right to use the terms

"SCOUTS" and "SCOUTING." . . . The Boy Scouts understood and accommodated the need to

respect the rights of Girl Scouts.").

**C.      Girl Scouts' Rights in the Terms SCOUT, SCOUTS and SCOUTING**
         **for Use in Connection with Girls' Leadership and Development Services**

Over many decades, the terms SCOUT, SCOUTS and SCOUTING, not preceded or

accompanied by the word "Girl" or another gender-specific modifier, have become associated

with Girl Scouts and its leadership and development programs for girls, as evidenced by:

(i)     Dictionary definitions of the words "Scout" and "Scouting" that demonstrate the
        dual association of those words with both Boy Scouts and Girl Scouts. *See, e.g.*,
        *Pocket Oxford American Dictionary*, pub. 2008, Scout: "a member of the Boy
        Scouts or Girl Scouts, organizations that aim to develop character through outdoor
        and other activities"; *Webster's New World Dictionary*, pub. 2016, Scouting: "the
        activities of the Boy Scouts or Girl Scouts." GS Rule 56.1 St., ¶ 141(a).

(ii)    News articles in which the words SCOUT, SCOUTS and/or SCOUTING have
        been used to refer to Girl Scouts and/or members of the Girl Scout Movement.
        *See, e.g.*, "Scout Provides Comfort to Foster Care Children"; "Scouting in Their
        Mosque Scout Troops Learn for Each Other." *Id.*, ¶ 141(b).

(iii)   Deposition testimony from multiple employees of Girl Scouts councils in
        different parts of the United States confirming that both Girl Scouts employees,
        volunteers and members of the public regularly use SCOUT, SCOUTS and/or
        SCOUTING to refer to Girl Scouts, its programs and its members. *Id.*, ¶ 141(c).

(iv)    Third-party organizations like sports teams and zoos have hosted SCOUT
        NIGHTS to refer to members of both Girl Scouts and Boy Scouts. *Id.*, ¶ 141(d).

(v)     In addition, the U.S. Postal Service, in 2012, issued the stamp shown below to
        honor Girl Scouts' Centennial bearing the phrase "CELEBRATE SCOUTING."
        Ewing Dec., Exh. 16 at GSUSA_00060946; *id.*, ¶ 141(d).

10



(vi)   References in documents produced by Boy Scouts that use the term SCOUTING to refer to both Boy Scouts and Girl Scouts.  *Id.*, ¶ 141(e).

(vii)  Additional admissions by Boy Scouts that Girl Scouts owns rights in SCOUT, SCOUTS and/or SCOUTING for girls' leadership and development services.

    a. August 28, 2003 letter from Boy Scouts Chief Scout Executive to Girl Scouts Interim CEO stating: "As you know, our organizations heretofore have enjoyed exclusive use of the word 'scouts' in connection with youth organizations pursuant to our respective federal charters."

    b. Excerpts from January 19, 2004 Memorandum of Law in Opposition to Applicant's Motion for Judgment on the Pleadings filed by Boy Scouts on January 19, 2004, *Boy Scouts of America v. Gregory J. Wrenn*, TTAB Opp. No.: 91/157313, stating, *inter alia*, that "The Terms 'SCOUTS' and 'SCOUTING' Do Not Connote Youth Development Programs in General, But Only the Programs Of the Boy Scouts and Girl Scouts in Particular."

    *Id.*, ¶ 141(f).

(viii) Girl Scouts' enforcement efforts against third parties using, without Girl Scouts' authorization, designations containing the terms SCOUT, SCOUTS and/or SCOUTING without gender-specific or source identifying words. *Id.*, ¶ 141(g). *See also Girl Scouts of the United States of America v. Alfred Sternjakob KG*, 212 U.S.P.Q. 388 (T.T.A.B. 1981) (sustaining opposition filed by Girl Scouts to registration of SCOUT and Design trademark for certain goods).

(ix)   A survey conducted by Dr. Eugene P. Ericksen in this litigation showing that the percentage of respondents who associate the term SCOUTS, standing alone, with

Girl Scouts in some way as used with group leadership and development programs offered **<u>only</u>** to young females, is 36.5% to 48.9%. *Id.*, ¶ 141(h).[3]

Girl Scouts has also used the trademarks SCOUT, SCOUTS and SCOUTING, unaccompanied by the word GIRL or another gender-specific modifier, in a number of ways: (i) in its earliest years, on or in connection with badges, program names, publications, posters and other communicative materials; (ii) for many years prior to 1994, and since 2018, as part of the registered SCOUT COOKIES trademark; (iii) as part of "Scouts' Own," a term that refers to a Girl Scouts ceremony; and (iv) on products like patches and t-shirts sold by Girl Scouts councils through Girl Scouts official online store. *Id.*, ¶¶ 142-145.

Girl Scouts also reinforced its rights and policed the term SCOUT, SCOUTS, SCOUTING with respect to Boy Scouts even when Boy Scouts' market did not overlap with Girl Scouts. Beginning by at least the mid-1970s, Boy Scouts and Girl Scouts had discussions about Boy Scouts' use of SCOUT, SCOUTS, SCOUTING and the trademark SCOUTING/USA without the word BOY. For example, Girl Scouts' Interim Executive Director sent a letter on March 9, 1976 to Boy Scouts' Chief Scout Executive to express concerns about the way Boy Scouts was making use of the word SCOUTING in connection with fundraising and promotional

---

[3]   In its moving papers, Boy Scouts devotes an inordinate amount of space to discussing efforts Girl Scouts made in 2017 to bolster its digital rights in domain names and social media handles containing SCOUT, SCOUTS or SCOUTING. GS 56.1 St., ¶¶ 87-94. According to Boy Scouts, these efforts represent some sort of improper effort by Girl Scouts to create associations with Boy Scouts, but this is not so. With a new direct competitor entering the marketplace offering girls leadership services under the terms SCOUTS and SCOUTING that the two organizations share, Girl Scouts had little choice other than to defend its own digital presence by supplementing its inventory of assets that it has every right to use and own in order to distinguish its services from those of Boy Scouts. *Id.* Boy Scouts myopic focus on Girl Scouts' 2017 efforts to ensure that Wikipedia entries for SCOUTING are accurate and consistent with dictionary definitions of that term, *id.*, ¶¶ 95-98, is similarly misplaced because, once again, SCOUTING is a term the public understands and associates with both parties.

activities, where the sponsor of the communications did not distinguish between the two

SCOUTING organizations:

> The current and prospective usage by Boy Scouts of America of the term "Scouting" is giving us increasing concern and I need to write you about it.
>
> Girl Scouting and Boy Scouting are "Scouting." "Scouting" is Boy Scouting and Girl Scouting. You know what it is. We know what it is. What concerns us is the concept the general public has of the term. If the way the term "Scouting" is used conveys the thought that it encompasses both organizations located in North Brunswick, N.J. [where Boy Scouts was then located], then we must protest such usage.

GS 56.1 St., ¶ 146.  Boy Scouts' President responded thereafter, stating that Boy Scouts'

advertising using the term SCOUTING was developed several years before by "a volunteer

advertising agency," and that Boy Scouts had "taken the necessary steps to correct copy

whenever possible to identify us as Boy Scouts of America and hopefully this will correct the

problem.  We are sorry that this verbiage appeared the way it did and we hope you understand

that we are moving to eliminate this conflict at the earliest possible time."  *Id.*

Later in 1978, and for a number of years thereafter, Girl Scouts received repeated

reassurances from Boy Scouts that, if it used terms like SCOUTING or SCOUTING/USA in its

communications, Boy Scouts would take steps to make sure that there was no confusion as to the

source of those communications.

> April 26, 1978: "all our nationally-produced printed materials and equipment prominently feature our continuing corporate and well-known name – Boy Scouts of America."
>
> January 1979: "While 'Scouting' has been used as a generic term for the program of the Boy Scouts of America, the name of the national movement, 'Boy Scouts of America,' should be used in connection with the term. 'Cub Scouting,' 'Boy Scouting' and 'Exploring' may be used to identify a particular phase of the 'Scouting' program."

GS 56.1 St., ¶ 147(a)-(b).  Perhaps most significantly, Boy Scouts instructed its councils and

leaders in November 1981 as follows:

Councils are reminded that the terms 'Scouts' and 'Scouting' are common to the Girl Scouts of the United States of America as well as the Boy Scouts.  When 'Scouting' is used in advertising or publications it should not be used in any context that will imply that the term applies only to the Boy Scouts.  Here are some typical examples of incorrect usage, followed by proper form:

|  |  |
|---|---|
| Join Scouting today! | Join the Boy Scouts today! |
| Support Scouting | Support the Boy Scouts (of America) |

*Id.*, ¶ 147(c).

**D.    Boy Scouts' Limited Offering of Coeducational "Specialty" Programs As of 1971 and Its Repeated Assurances to Girl Scouts Over Time That Its Core Programs Would Not Be Expanded to Include Girls**

In June 1968, after restricting membership in its programs to boys for more than fifty years, Boy Scouts advised Girl Scouts that it was considering admitting girls ages 14 and older to its EXPLORING program, and that it wanted to discuss whether such expansion could be undertaken cooperatively with Girl Scouts and Camp Fire Girls.  GS 56.1 St., ¶¶ 149-50.  The three organizations met and eventually reached an agreement in principle through which girls of high school age would join "special interest Explorer Posts," provided the girls were members of a recognized girls' organization like Girl Scouts or the Camp Fire Girls.  *Id.*, ¶ 150.  Explorer Posts were described by Girl Scouts at the time as being "sponsored by a professional or business group [that] provides young people with an opportunity for vocational exploration related to the interest of the sponsoring group, such as science, journalism or aviation."  *Id.*

However, in February 1971, Boy Scouts unilaterally announced that it would "no longer be necessary for [female EXPLORERS] to belong to a girls' organization in order to join an Explorer unit."  *Id.*, ¶ 151.  That same month, given Boy Scouts' decision to upend the terms of the parties' understanding, Girl Scouts ceased participating in this formerly cooperative arrangement.  *Id.*  A template press release for local use prepared by Boy Scouts announcing the

decision to expand membership in the EXPLORING program to girls 15 years and older without restriction included a "Note to Editors" stating that:

> Girls are <u>not</u> becoming <u>Scouts</u> . . . they will be Explorers. Members of Explorer Posts are not Explorer "Scouts", by the way. Explorers bristle when referred to as "Scouts". *Id.*, ¶ 152.

Notwithstanding the admission of high-school-age girls to the Exploring program, Boy Scouts repeatedly assured Girl Scouts for many years that it would not accept girls younger than the age of 14 as members. GS 56.1 St., ¶¶ 153-154. In addition, in 1998, Boy Scouts restructured EXPLORING and spun off the program offered under that name into a separate non-profit entity called Learning for Life. Since then, Boy Scouts itself has not offered the EXPLORING program, and it is not a SCOUTING program, in Boy Scouts view, because EXPLORING is not governed by the Scout Oath and Law. *Id.*, ¶ 155.

As of 2017, Boy Scouts offered only three other niche "specialty" programs that allowed girls to join: (i) VENTURING, a "youth-led and youth inspired" program open to males and females ages 14-21 in which participants join "crews" and participate in group activities determined by the crew in consultation with its advisors; (ii) SEA SCOUTS, a "youth-led and adult mentored" program open to males and females ages 14-21 in which participants join "ships" established on oceans, bays, rivers and lakes; and (iii) STEM SCOUTS, a "pilot program of the Boy Scouts of America, currently available only in select pilot areas," that is open to girls and boys in grades 3 through 12 in a handful of Boy Scouts councils in which participants join "labs" and participate in activities related to science and technology. *Id.*, ¶ 19, 156.

Throughout its submissions, Boy Scouts falsely suggests that the participation of young women in these "specialty" programs before 2017 means that its decision in 2017 to expand its core programs – CUB SCOUTS and BOY SCOUTS – to girls and young women was unremarkable. *See, e.g.,* Mov. Br. at pg. 8 ("As of 2017, the Cub Scouts and Boy Scouts

15

programs were the only remaining single-gender programs."). This claim is preposterous. As of December 31, 2017, participants in the "specialty" programs then being offered by Boy Scouts – not Learning for Life, boys and girls combined – amounted to only approximately 4% of Boy Scouts' total membership, and the girls in these programs accounted for only 2.4% of that total. GS 56.1 St., ¶¶ 156-157. Meanwhile, prior to 2017, Boy Scouts had spent decades squarely asserting that it was a boy serving organization and successfully defending against multiple lawsuits brought by girls seeking to gain admission to the CUB SCOUTS and BOY SCOUTS programs. *See, e.g.*, *Yeaw v. Boy Scouts of America*, 55 Cal. App. 4th 607 (1997); *Mankes v. Boy Scouts of America*, *Inc.*, 137 F.R.D. 409 (S.D. Fl. 1991); *Schwenk v. Boy Scouts of America*, 551 P.2d 465 (Or. 1976); *see also* Ewing Dec., Exh. 172 at pg. 13 (Boy Scouts Petition for Writ of Certiorari filed in *Boy Scouts of America v. Dale*, Case No. 99-699, 530 U.S. 640 (2000), stating "Boy Scouting is an expressive organization with the purpose of instilling in boys and young men certain ideals of what it means to be a man. Youth membership is therefore confined to males….").

Even more significantly, Girl Scouts is unaware of any confusion attributable to the participation of girls in any of the "specialty" co-educational programs offered by Boy Scouts over time. GS 56.1 St., ¶ 158. Likewise, Girl Scouts is unaware of any instances of confusion between it or its programs and those of other competitive youth services organizations whose membership is limited to girls, like Girls, Inc. or American Heritage Girls. *Id.* However, as discussed at pp. 24-32, *infra*, Girl Scouts has experienced an extraordinary degree of confusion between its trademark and programs and those of Boy Scouts since 2017, when it entered the Girl Scouts market and its core programs were expanded to girls using the terms SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN.

**E.    Boy Scouts' "Historic" 2017 Decision to Redirect Its Program
       Offerings by Expanding Its Core Programs to Include Girls,
       and Its Effort to Conceal Its Expansion Plans From Girl Scouts**

As of early 2017, Boy Scouts was confronting a number of serious problems.  Its

membership had declined by approximately 20% over seven years, and its historic relationship

with the Church of Jesus Christ of Latter-Day Saints was coming to an end.  GS 56.1 St., ¶¶ 160-

61.  Boy Scouts researchers estimated that only 15-25% of the hundreds of thousands of Church

youth then participating in Boy Scouts programs would remain with the organization after the

relationship ended.  *Id.*

Given the situation Boy Scouts was then confronting, its then Chief Scout Executive,

Michael Surbaugh, raised an idea that had been discussed in prior years of implementing a

"'family program' that serves the full family, including girls.  This would be a significant change

to the way BSA delivers programs." *Id.*, ¶ 162.  An April 2017 "value analysis" of a potential

family program that included girls forecast new-member growth potential of 277,137 over three

years, along with more than $6.6 million in potential fee revenue and $20.7 million in potential

retail revenue over the same period.  *Id.*

From the very beginning, Boy Scouts executives working on a potential family program

including girls expressly understood and stated that Girl Scouts "leaders will see this at minimum

as outright competition and more likely as an overt attack on the value of the Girl Scout

program," so they sought to avoid "tipping off the Girl Scouts" as their work progressed.  *Id.*,

¶ 163.  Indeed, as part of the planning for the possible admission of girls to Boy Scouts' core

programs, Boy Scouts formed a "GSUSA Retaliation Sub-Team" in April 2017 to consider how

Girl Scouts would react to the admission of girls into the BOY SCOUTS and CUB SCOUTS

programs, and to formulate possible Boy Scouts' responses.  *Id.*, ¶ 164.  Drafts of an analysis

circulated in April and May 2017 among Sub-Team members stated, *inter alia*, that:

- Girl Scouts "reputation is impeccable" and that Boy Scouts would "[n]eed to be cautious of attacking an organization that will be viewed as being unfairly targeted."

- "[T]he GSUSA's Daisy, Brownie and Junior aged girls make up the 'foundation' of the organization.  If this foundation is threatened than [sic] the entire organization is at risk."

- "Targeting Daisy, Brownie and Junior aged girls to participate in the Cub Scouts would <u>significantly</u> weaken the GSUSA's competitive position." (Emphasis in original.)

- "We will essentially be raiding their youngest members who the GSUSA regards as the base of their organization. . . . This move would be a direct assault on their foundation."

*Id.*  Boy Scouts therefore clearly understood that its planned expansion to admit girls to its core programs would be squarely a movement into Girl Scouts' market, unlike any of the earlier niche programs.[4]

As part of the planning for this new program, Boy Scouts examined Girl Scouts closely. Boy Scouts' Research Department created a "competitive analysis deck," most of which was specific to Girl Scouts, *id.*, ¶ 165, and Boy Scouts commissioned a series of focus groups in various cities in April and May 2017 to "[u]nderstand the target segment of families with girls ages 5 to 11 and their involvement with youth organizations," and also to "[g]et a reality check on the credibility and appeal of GSUSA offering a family program that invites boys into that program" and to review such a program "from the perspective of Boy Scouts and Girl Scouts."

---

[4]    Boy Scouts professes to be shocked that Girl Scouts, following Boy Scouts' announcement, took steps like requiring its vendors not to work with Boy Scouts in order to protect its trade secrets, and asked its councils to think twice about renting its camps to Boy Scouts, GS 56.1 St., ¶¶ 29-31, but this is precisely the reaction that Boy Scouts expected, because it knew just how damaging what it was planning would be to Girl Scouts.  Boy Scouts arguments on this point are also inconsistent though, castigating Girl Scouts both for limiting or ending local collaborations between Girl Scouts and Boy Scouts councils, while accusing Girl Scouts of perpetuating the connection between the parties by allowing some local events to occur.  *Compare* GS 56.1 St., ¶¶ 29-31 *with* ¶¶ 71-72(a).

*Id.*, ¶ 166.  Accordingly, a description of Girl Scouts' programs was supplied to focus group participants to assess their reactions to it, and images taken from Girl Scouts advertising were shown for the same reason.  *Id.*  No descriptions of the programs of other third-party youth serving organizations were shown to focus group participants, nor were descriptions of their programs supplied.  *Id.*

By May 2017, the plan to admit girls to Boy Scouts' core programs had advanced to the point that a special meeting of Boy Scouts' regional Scout Executives was convened to consider whether the plan should proceed.  *Id.*, ¶ 167.  The strong consensus of the group was to proceed, although a number of Executives raised the prospect of conflict with Girl Scouts if girls were to be admitted to all Boy Scouts programs, and they either expressed concerns about that prospect, or a desire to proceed regardless, with one noting: "***Be aggressive, move faster and give a lot of serious thought to Girl Scout actions and be prepared to take them out***."  *Id.* (Emphasis added.) Afterward, one Scout Executive sent Surbaugh his thoughts, in which he expressed concern that the plan represented a "Radical change to brand" and asked "Is there an ethical consideration on what this means to the Girl Scouts of America?  Are we better of [sic] developing a partnership, rather than a hostile takeover?"  *Id.*, ¶ 168.  This same Executive stated "I strongly believe we owe Girl Scouts USA a discussion before we do anything . . . ."  *Id.*

The view that Girl Scouts deserved a transparent dialogue was shared by Girl Scouts itself, but no such collaborative discussions took place.  Just before the May meeting, Girl Scouts Vice President of Communications reached out to his counterpart at Boy Scouts to ask what the meeting was about and was told "we are meeting this week to discuss how to make Scouting more accessible to today's families.  As you and I have discussed before, we greatly value single-gender programs, and as such, we reiterated that to him [an NBC news reporter] today to

avoid any confusion that there may be consideration of co-ed Scouting." *Id.*, ¶ 169.  In fact, "consideration of co-ed Scouting" was ***precisely*** why the meeting had been called.  *Id.*, ¶ 167.  After the May meeting, Girl Scouts then CEO, Sylvia Acevedo, reached out to Surbaugh, and they spoke a few days later.  *Id.*, ¶ 170.  Acevedo reported back that during the call Surbaugh represented that Boy Scouts "remain committed to being a single gender organization" and that Surbaugh had told her "the most toxic thing for BSA would be to offer Co-Ed Boy Scouts." *Id.*

But contrary to its communications with Girl Scouts, Boy Scouts continued to move forward.  *Id.*, ¶ 171.  In early July, Surbaugh wrote back to Acevedo to propose a video conference in mid-August between the two executives and their respective National Board Chairs.  Admitting that he had not been forthright with Girl Scouts, Surbaugh conceded that when "[w]hen we spoke on the phone in May, I shared what I felt I was able to at the time." *Id.*

In mid-August 2017, the parties' four leaders finally spoke.  *Id.*, ¶ 172.  During that call, it was made clear to Girl Scouts that Boy Scouts was moving ahead with its plans to expand its core programs to girls in whatever manner it wished, regardless of Girl Scouts' views or input. *Id.*  The Girl Scouts' representatives in attendance were surprised at the lack of collaboration and communication, and Girl Scouts National Board Chair wrote a letter to her counterpart at Boy Scouts voicing Girl Scouts' deep concerns, not just about the lack of transparency from Boy Scouts, but Boy Scouts' decision to expand its program offerings so significantly to a new market segment – girls – with which Boy Scouts had little to no expertise or experience.[5] *Id.*

---

[5]     In its Moving Brief, Boy Scouts refers to this letter as "scathing," *id.* at pg. 12, and attacks Girl Scouts for sharing it with the press.  GS 56.1 St., ¶¶ 26, 27.  But the letter's contents were accurate, and given Boy Scouts' lack of candor in the preceding months, the public had a right to know Girl Scouts' views.  Moreover, Boy Scouts is in no position to profess surprise at Girl Scouts' reaction, which it fully anticipated.  *Id.*, ¶¶ 167, 168.  Boy Scouts also refers at various points to efforts Girl Scouts made, before Boy Scouts' announcement concerning the expansion of its core programs to girls, to persuade Boy Scouts not to proceed with such a departure from

On October 11, 2017, Boy Scouts' Board "unanimously approved to welcome girls into its iconic Cub Scout program and to deliver a Scouting program for older girls." *Id.*, ¶ 174.  As part of this "historic decision," Boy Scouts announced that CUB SCOUTS would expand to include girls in 2018 and that a program for older girls would launch in 2019.  *Id.*  Girls began joining CUB SCOUTS on a limited basis in January 2018 and more fully in June 2018.  *Id.*, ¶ 175.  Girls began joining the program now known as SCOUTS BSA (then known as BOY SCOUTS) in February 2019.  *Id.*

**F.  Boy Scouts' Decision to Adopt The Terms SCOUT, SCOUTS and SCOUTING, SCOUT ME IN and SCOUTS BSA, Among Others, in Connection With Its New Girl Members and the Services Offered to Them**

Weeks later, Boy Scouts sent out a Request for Proposal ("RFP") to various advertising agencies to help "launch Cub Scouting (a BSA core brand) to new market segments (girls age 6-10 and their moms) and reintroduce it to existing segments (boys age 6-10 and their moms)" and described this as a "landmark shift" for Boy Scouts.  GS 56.1 St., ¶ 176.

The primary agency selected by Boy Scouts proposed an advertising campaign posited on the premise that "the key to opening up Cub Scouts to both genders relies on making moms believe that they are not giving up anything, but gaining everything, by enrolling their daughters in this historically 'boys only' organization." *Id.*, ¶ 177.  Noting that "the Boy Scouts of America has undergone a similar historic moment as they have crossed gender divides by opening up Scouting to all Youth and their Families," the agency proposed the use of SCOUT ME IN as Boy Scouts' new "organizational tagline." *Id.*  There is no evidence that Boy Scouts

---

its historic mission, including through this letter.  GS 56.1 St., ¶ 28.  While the characterization of those efforts and the reasons for them in Boy Scouts' submissions are false, Girl Scouts felt then and feels even more strongly now that an organization like Boy Scouts that has no expertise in serving girls and is not augmenting their standard boy programming is not the best choice for girls.

took into account the concerns Girl Scouts had previously expressed about the use of terms like

SCOUT, SCOUTS and SCOUTING in communications contexts where the organization offering

such services was unclear, before adopting this organizational tagline lacking a gender-specific

word for use in connection with services offered, for the first time, to girls via the CUB

SCOUTS program and the program later renamed SCOUTS BSA.

The SCOUT ME IN campaign centered on the admission of girls to Boy Scouts' core

programs was so significant that Boy Scouts convinced *Advertising* Age to run a story about how

"[f]or the first time ever, girls will be featured in BSA advertising."  GS 56.1 St., ¶ 178.  The

article ran under the headline "Boy Scouts Rolls Out First Campaign to Recruit Girls." *Id.*

Boy Scouts claims for purposes of this litigation that, prior to 2017, it had featured

"SCOUT-formative branding and images of girls and young women, in connection with

advertising and promoting its programs for many decades," *id.*, ¶ 17, but that's not what it

told *Advertising Age*, and not what it believed internally.  Indeed, as girls joined Boy Scouts'

core programs for the first time, Boy Scouts recognized that many of its marketing and recruiting

materials featuring or referring to boys alone would need to be revised to include girls and omit

language like "**Boys**: the boy is the main reason the rest of the organization exists.  Programs are

designed to meet his need at the appropriate age and grade level."  GS 56.1 St., ¶ 179 (emphasis

in original).  One need only compare Boy Scouts' November 2015 Brand Guidelines, which are

dominated by images of boys, with its July 2019 Brand Guidelines, in which images of girls have

a nearly equal presence, to see the falsity of Boy Scouts' claim.  Ewing Dec., Exh. 76 (Dep. Exh.

68) *with* Exh. 66 (Dep. Exh. 69).

At the time the launch of the SCOUT ME IN campaign was being readied in early 2018,

Boy Scouts was also considering renaming its core program for older youth – BOY SCOUTS.

GS 56.1 St., ¶180.  After extensive internal discussions, the consensus name that emerged was

SCOUTS, *id.*, but a number of local Scout Executives voiced concern that the selection of

SCOUTS "will likely lead to disruptions with GSUSA."  *Id.*, ¶ 181.  So, the replacement selected

for the BOY SCOUTS program name was SCOUTS BSA, *id.*, ¶ 182, and when questions were

asked about why the BSA acronym was added to the program name, Boy Scouts drafted talking

points stating that "We kept BSA in the program name to make sure there wouldn't be confusion

with any other organization's programs."  *Id*.  Indeed, in a video statement issued by Boy Scouts

shortly after this suit was filed, Surbaugh stated that "Avoiding confusion was the exact reason

we selected Scouts BSA to replace the program name, Boy Scouts.  We reviewed lots of

different options and many of our members told us, 'Just call them scouts,' but we opted for

Scouts BSA.  Some thought it sounded awkward, but it was very intentional."  *Id*.  Of course, the

"other organizations" – plural – that Boy Scouts allegedly wanted to avoid being confused with

was plainly Girl Scouts – singular – because there are only two youth-serving organizations

entitled to use the term SCOUTS under the parties' respective Congressional Charters.

     As it turned out, the inclusion of BSA in the SCOUTS BSA program name was just

window dressing, because from the get-go Boy Scouts referred to female participants in that

program as SCOUTS, and the program as part of SCOUTING.  Ewing Dec., Exh. 210 at

GSUSA_00188932 ("Both male and female participants in the Scouts BSA program will be

referred to as 'Scouts,' just as boys now in the Boy Scout program are often referred to as

'Scouts'"); *Id*., Exh. 211 (touting the SCOUT ME IN campaign as a celebration of "BSA's

expansion to serve families and welcome girls and boys into ***Scouting*** across the country")

(emphasis added).  The relative importance, or lack thereof, between the two elements of Boy

Scouts' new co-ed program name is highlighted by the program logo Boy Scouts created, reproduced below.



GS 56.1 St., ¶ 183.  To be sure, that logo and many of Boy Scouts' marketing materials include the fleur de lis symbol shown above, but there is no evidence produced by Boy Scouts showing the extent to which the public recognizes that symbol, if at all, or the degree of frequency with which it has any history of use with services offered to girls.  Indeed, a review of Boy Scouts' 2015 Brand Guidelines shows that, prior to 2017, that symbol was designated for use only with the BOY SCOUTS program, not the "specialty" programs that were the only ones serving girls at that time.  Ewing Dec., Exh. 76 (Dep. Exh. 68) at BSA00043931.  Thus, to the extent Boy Scouts thinks its fleur de lis has some sort of magic power to dispel confusion, there is no evidence of this, and the extraordinary amount of confusion that has flourished in the marketplace since 2017 compels the opposite conclusion.

**G.      The Rampant Confusion Caused by the Designations Used
         by Boy Scouts in Marketing Its Services to Girls and Their Families, the
         Unauthorized Use of Girl Scouts Intellectual Property, and the
         <u>Interference With Girl Scouts Efforts to Market Its Own Services</u>**

Since expanding its core programs to girls, Boy Scouts has targeted girls and their parents with marketing and recruiting communications in ways it never has before, because the parties' programs, which have many similarities, are now directly competitive.  GS 56.1 St., ¶¶ 185, 263-

274.  This targeted advertising, coupled with use of terms such as SCOUT, SCOUTS, SCOUTING, SCOUT ME IN and SCOUTS BSA, has resulted in rampant instances of confusion and mistaken instances of association between Boy Scouts and Girl Scouts.  *Id.*, ¶¶ 185-251.  It is also clear that, in many instances, Boy Scouts has taken advantage of that confusion to interfere with efforts made by parents to sign their daughters up for Girl Scouts programs.  *Id.*

**1.      Wrongful Use of Girl Scouts' Intellectual Property**

After Boy Scouts' announcement that it was accepting girls into its core programs, Boy Scouts councils and volunteers began using Girl Scouts' intellectual property to recruit girls.[6] This unauthorized use began at least as early as 2018 and continues through the present.  For example, the El Capitan District Scouts of Boy Scouts Orange Council confusingly used the phrase "Girl Scouting" to describe its programing for girls.  *Id*., ¶ 187.  Boy Scouts councils in Illinois used Girl Scouts' slogan in CUB SCOUT recruiting materials and used pictures of Girl Scouts to promote a Boy Scouts "Scouts Sign-Up Night!"  *Id.*, ¶¶ 189, 190.  After protests by Girl Scouts, the respective Illinois councils acknowledged the infringement.  *Id*.

There are numerous other examples of Boy Scouts' improper use of Girl Scouts' intellectual property.  *See id.*, ¶ 192 (Boy Scouts disseminated a national marketing toolkit that included a famous quotation from Girl Scouts' founder, Juliette Gordon Low); ¶ 193 (Boy Scouts Spirit of Adventure Council in Massachusetts used the GIRL SCOUTS and Design trademark on its website to advertise a camp); ¶ 194 (Boy Scouts' online Scout Shop sold an "Eagle or Gold Award Recognition Ribbon"); ¶ 195 (Boy Scouts Western Massachusetts Council posted a recruiting flyer on Facebook including a photograph of a girl depicted in her

---

[6]    As explained in Section II(A), *infra*, Boy Scouts is vicariously liable for the actions of its councils, troops, packs and volunteers.

Girl Scouts Brownie uniform); ¶ 198 (Boy Scouts Lincoln Heritage Council disseminated a flyer about a Boy Scouts camp entitled "GIRL Scout Achievement" that listed "what a GIRL Scout may have earned at Day Camp," and identifying Girl Scouts badges); ¶ 199 (Boy Scouts Great Southwestern Council used the phrase "Boy and Girl Scouts" on a sign outside their headquarters; Boy Scouts blamed a local church for the sign); ¶ 203 (Ohio Boy Scouts pitched an article to a local newspaper using the GIRL SCOUTS trademark.  The storyline was entitled "Boy and Girl Scouts Looking for Members," even though the story was about Boy Scouts recruiting only); ¶ 208 (Boy Scouts' Seattle-area Council used the GIRL SCOUTS trademark in social media recruiting materials); ¶ 211 (Boy Scouts Hawkeye Area Council used the GIRL SCOUTS trademark on a flyer distributed to a school promoting recruiting for Boy Scouts); *see also id.*, ¶¶ 216, 217, 243, 251 (detailing additional incidents of such unauthorized use).

**2.      Boy Scouts' Infringement Resulted
in Parents Mistakenly Enrolling Girls in Boy Scouts**

As a result of Boy Scouts' infringement, parents have mistakenly enrolled their daughters in Boy Scouts thinking it was Girl Scouts.  For example, in the summer of 2018, a parent called Cynthia Davis, Membership Services Specialist for Girl Scouts of Central & Western Massachusetts, and stated that she had registered her daughter in Girl Scouts.  *Id.*, at ¶ 197. Davis was unable to locate the girl in Girl Scouts' system, and only then did the parent realize she had registered her daughter for Boy Scouts by mistake.  *Id*.  Boy Scouts Circle Ten Council has produced evidence that it refunded two parents their registration fees because they had thought they were registering their daughters for Girl Scouts.  *Id.*, ¶¶ 65(c), 65(d), 214.  Other Boy Scouts councils have produced similar documents.  *Id.*, ¶¶ 215, 235.

Another parent emailed Whitney Parker, a Recruitment Manager for Girl Scouts of Central Indiana, about transferring her registration fee from Boy Scouts to Girl Scouts because

26

she had enrolled her daughter in "scouts thinking it was girl scouts." *Id.*, ¶ 201.  In November

2018, a woman emailed the Girl Scouts North Carolina Coastal Pines council about mistakenly

signing her daughter up for Boy Scouts. *Id.*, ¶ 219.  She stated that she "recently signed my

daughter up for what I thought was girls scouts only to find out that what I signed her up for and

paid for was actually boy scouts!" *Id.*  This parent further stated that "it makes total sense now

why I was so confused at the initial sign up," as she was "pretty sure they even used the name

girls scouts for the older children which caused further confusion." *Id.*

      Apart from the above incidents of mistaken enrollment, Boy Scouts' own surveys of

parents whose children have signed up for the CUB SCOUTS and SCOUTS BSA programs

demonstrate that parents keep accidentally enrolling their daughters in Boy Scouts. *See id.*,

¶¶ 246-249 (explaining Boy Scouts "joiner" surveys and providing results for 2018 and 2019

demonstrating that a certain percentage of parents have actually admitted enrolling their

daughters in Boy Scouts' programs thinking they were signing up for Girl Scouts' programs).

## 3.    Children, Parents, Schools and Religious Organizations Express Confusion

      After Boy Scouts' announcement, confusion among parents skyrocketed.  In August

2018, a mother accidentally attended a "Cub Scout" recruiting night at an elementary school

thinking it was a Girl Scout recruiting event. *Id.*, ¶ 200.  When Mary Anne Servian, the Chief

Executive Officer of Girl Scouts of Gulfcoast Florida, called the school to figure out the cause of

the parent's confusion, the school's office secretary told Servian that the person she spoke to

regarding the "Cub Scout" recruitment night said "they were recruiting for Girl Scouts and Boy

Scouts." *Id.*  Also in August 2018, Boy Scouts Southwest Florida Council responded to a

confused parent who thought he had been speaking to a Girl Scout office and stated that his

daughter did ***not*** want to be a Cub Scout, but wanted to be a Girl Scout. *Id.*, ¶ 204.  Further, at a

recruiting event in September 2018, a father approached a Girl Scouts representative and asked

"are the Boy Scouts and the Girl Scouts the same thing? I thought they were." *Id.*, ¶ 212.  In May 2019, Sandra DeTora, a Girl Scout Volunteer and also an employee of a Boy Scouts chartering organization, had to deal with confusion from parents over whether a local food drive put on by a Boy Scouts' all-girl troop was a Girl Scout food drive. *Id.* ¶ 227.  DeTora attempted to explain the difference between an all-girl SCOUTS BSA troop and a GIRL SCOUT troop to one woman, who responded to DeTora's explanation with the statement that she "d[id]n't understand, but you keep doing your good work with your girls." *Id.*

Churches and schools are also confused.  For example, in the fall of 2018, June Sisk, Outside Recruitment Manager for Girl Scouts of Carolina Peaks to Piedmont, reached out to the office of the superintendent for Gaston County Schools in order to schedule a time for her local Girl Scouts council to go into the schools to recruit new members. *Id.*, ¶ 206.  But the office secretary informed her that the superintendent had already scheduled with Boy Scouts, and they were "good to go." *Id.*  When Sisk tried to clarify whether that schedule applied to Girl Scouts as well, the secretary was confused, and indicated she thought they were one organization. *Id.* Sisk had worked with the same superintendent's office for the prior five recruiting seasons, and she had never before experienced such confusion. *Id.*  Sisk had similar experiences at three other elementary schools during the fall 2018 recruitment season. *Id.*, ¶ 219.  Further, in November 2018, Sisk reached out to the Methodist Church in Bessemer City, North Carolina to inquire about a new location to host a new Girl Scout troop, and the Church's secretary informed Sisk that it had recently dismissed the local Boy Scout pack and was no longer interested in Scouting. *Id.*  When Sisk informed the secretary that she was "with the Girls Scouts," the secretary asked "isn't that the same thing?" *Id.*

28

In January 2019, in response to a Girl Scouts council's request to host an information night at Carolina Beach Elementary School, the principal asked if the Girl Scouts representative was representing a different organization from the "scout group" (*i.e.*, Boy Scouts) that presented to "both our boys and girls prior to the break." *Id.*, ¶ 223.  In August 2019, Nena Ellis-Stagger, the membership director for Girl Scouts of North Carolina Coastal Pines, called the First Presbyterian Church in Greenville, North Carolina to request to form a Girl Scouts troop there, only to be met with confusion.  *Id.*, ¶ 233.  The Church's secretary said someone called the week before and requested to form a "Girl Scouts troop," and that it was the same people who represented the "Boy Scouts troop."  *Id.*  Ellis-Stagger had to explain that Boy Scouts and Girl Scouts are different organizations.  *Id.*; *see also* ¶¶ 207, 213

Not only did parents, schools, and churches express confusion, but also children were confused after Boy Scouts' announcement regarding accepting girls into its historically boys-only programs.  In the fall of 2017, a Girl Scout approached Kristen Stevens, Field Assistant with Girl Scouts Council for the National's Capital, in tears saying that she was told Girl Scouts was merging with Boy Scouts, and that Girl Scouts would have to take boys.  *Id.*, ¶ 186.  In January 2018, a Boy Scout from Rockford Michigan, wrote to Kathy Hannan, National President of Girl Scouts, and suggested that because Girl Scouts was "teaming up with Cub Scouts," Boy Scouts should be allowed to sell GIRL SCOUTS COOKIES.  *Id.*, ¶ 188.

## 4.    Members of the Public Are Confused

The confusion Boy Scouts has caused extends into the general public.  For example, in the summer of 2019, the television journalist Nancy Grace made a guest appearance on a segment of the television program, The Hub Today.  *Id.*, ¶ 228.  She told the host of the show that there are no more Boy Scouts and Girl Scouts and that they are all "Scouts" now.  *Id.*  In June 2020, the *Honolulu Star-Advertiser* misidentified female members of Boy Scout Troop 616

as members of "Girl Scout Troop 616" in a photo caption.  *Id.*, ¶ 243.  In April 2019, a plumbing equipment manufacturer tweeted about an event it hosted for Boy Scouts, but mistakenly called the girl participants in that event "Girl Scouts."  *Id.*, ¶ 225.  In Garland County, Arkansas, Girl Scouts' recruiters received questions about Boy Scouts and Girl Scouts "merging" and questions like "are they wearing the same uniform" that demonstrated misinformation in the marketplace. *Id.*, ¶ 244.

### 5.      Boy Scouts Purposefully Interfered with Girl Scouts' Recruiting and Other Efforts

Since 2017, Boy Scouts has routinely interfered with Girls Scouts' relationships with the communities it serves and impeded Girl Scouts ability to recruit new members.  For example, in August 2018, a Boys Scouts' representative at a recruiting event repeatedly advised parents that Boy Scouts was "now accepting Girl Scouts."  *Id.*, ¶ 202.  On September 12, 2018, Girl Scouts wrote to Boy Scouts North Florida Council after one of the Boy Scouts council's employees told parents at a school information night that "Girl Scouts don't start until February" and encouraged the parents to register their daughters with Boy Scouts.  *Id.*, ¶ 209.  In November 2018, the Boy Scouts Pacific Skyline Council sent an email newsletter erroneously announcing that "Beginning February 1, 2019, the BSA will welcome girl Scouts Troops to [its] program."  *Id.*, ¶ 220.

Boy Scouts councils have repeatedly responded to inquiries regarding Girl Scouts with information about Boy Scouts, and often failing to correct the confusion.  In August 2019, a parent emailed the Northern Star Boy Scouts Council requesting "the day/time the Lake Minnetonka Girl Scout group meets" and stating that her "daughter is interested but I want to ensure it doesn't conflict with other activities."  *Id.* ¶ 231.  Instead of responding by pointing the confused parent who said she was seeking to sign her daughter up for Girl Scouts to the appropriate Girl Scouts council, the Northern Star Council employee responded by asking what

grade the woman's daughter was in, recommended "Pack 3285," and gave her the contact information for the "Cubmaster" for that pack.  *Id*.

In August 2019, Boy Scouts' Piedmont Council received multiple inquiries from confused parents.  *Id.*, ¶¶ 232, 234, 235.  One parent emailed Adam McCarrison of Boy Scouts' Piedmont Council, stating that her daughter was "interested in girl scouts," and wanted more information about getting her enrolled.  *Id.*, ¶ 232.  Instead of clarifying that he was not a representative of Girl Scouts, McCarrison changed the subject line of the email to "Cub Scouting" and stated, "Excellent! What school does your daughter attend?"  *Id*.  He then provided information about additional sign-in nights.  *Id.*  McCarrison responded to several other "Girl Scouts" inquiries from parents in this fashion, making no attempt to clarify he did not represent Girl Scouts or to direct them to the appropriate Girl Scouts council.  *Id.*, ¶¶ 234, 235, 241.

This behavior was not limited to the Piedmont Council.  In September 2019, a parent emailed Doug Band, an employee of Boy Scouts East Carolina council, about how her daughter wanted to "attend a Girl Scout meeting."  *Id.*, ¶ 237.  The subject line read "Richlands Girl Scout."  The council did not direct the parent to a Girl Scouts council or clarify that Boy Scouts and Girl Scouts were different organizations, but instead responded by simply stating that Cub Scouts now accepts girls as part of the CUB SCOUT program.  *Id.*; *see also* ¶ 238.  In January 2020, a parent emailed Boy Scouts' Old North State Council about getting his two sons enrolled and enrolling his daughter in Girl Scouts.  *Id.*, ¶ 242.  The council responded by requesting more information about the school the children attended and where they lived, but did not clarify that

Boy Scouts was different from Girl Scouts.  *Id.*[7]; *see also* GS 56.1 St., ¶ 191 (interference with Girl Scouts fundraising), ¶¶ 205, 228.

**6.      There Is Survey Evidence of Confusion as Well**

Finally, a survey conducted for purposes of this case by Dr. Eugene Ericksen shows that a net 26.9% of respondents surveyed are "likely to be confused by BSA's use of SCOUTS and SCOUTING in connection with programs and activities for girls."  *Id.*, ¶ 250.  The details of the Ericksen confusion survey are discussed in his Declaration and the accompanying submissions from Girl Scouts in opposition to Boy Scouts' motion to exclude Dr. Ericksen's survey and opinions from evidence in this case.  *See* Dkt. 95-96.

* * * * *

After sending Boy Scouts and its councils letter after letter in 2017 and 2018 documenting the many instances of confusion, interference and wrongful conduct that were causing great harm to Girl Scouts across the country – correspondence Boy Scouts now mocks as a "letter writing campaign," Mov. Br. at 13 – Girl Scouts received no satisfactory response; in many cases, the responses were wholly inadequate.  GS 56.1 St., ¶¶ 193, 195, 198, 203, 210, 243.  In its moving papers, Boy Scouts points to guidance it supplied to its councils, troops and volunteers advising them that they need to respect Girl Scouts' trademark rights, but that guidance, some of which issued only after Girl Scouts filed this proceeding in early November 2018, has been wholly ineffective.  *Id.*, ¶ 50; Mov. Br. at 16.  Frustrated to no end by Boy Scouts persistent unwillingness to take meaningful action to prevent confusion from occurring,

---

[7]     Boy Scouts has over 250 local councils, but only 19 councils produced documents in this case, and then only from select email custodians.  GS 56.1 St., ¶ 245.  Thus, the Boy Scouts council emails documenting the repeated instances of confusion and interference at the local level that are offered by Girl Scouts on this motion represent a tiny fraction of such events occurring nationwide.

Acevedo, Girl Scouts' then CEO, wrote to Surbaugh, Boy Scouts' then Chief Scout Executive, at the end of October 2018 to "request that Boy Scouts clearly state its name and brand in its communications, and stop using Girl Scouts' name or references to Scouts in a manner that is leading people to confuse our organizations." *Id.*, ¶¶ 37, 184. Surbaugh did not respond to this communication prior to the filing of this lawsuit, leaving Girl Scouts no practical choice other than to initiate litigation. *Id.*

H.      **The Damage Girl Scouts Has Suffered as a Result of Boy Scouts' Misconduct**

The substantial amount of marketplace confusion caused by Boy Scouts that is documented above required a response from Girl Scouts, and in 2018 it undertook a marketplace positioning initiative to respond to Boy Scouts' decision to market its core leadership and development programs for girls under terms such as SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN. GS 56.1 St., ¶ 275. This initiative required a significant amount of resources, so, in April 2018, Girl Scouts initially allocated a budget of $16.85 million to cover, among other things, intelligence gathering about Boy Scouts, expenses related to defending Girl Scouts' intellectual property, national and local coordinated advertising and promotional campaigns, and various initiatives to spark membership growth. *Id.*, ¶ 276. By this time, Girl Scouts was experiencing confusion in the marketplace, which was evident in traditional media reports, on social media, among school administrators, and via word of mouth from Girl Scouts members and staff. *Id.*, ¶ 277.

A significant portion of the allocated budget was expended to combat confusion attributable to Boy Scouts' wrongful conduct, including misleading recruiting efforts and confusing advertising and promotion. *Id.*, ¶ 278. Girl Scouts undertook an unprecedented national effort to promote its brand and services with the primary goal of distinguishing itself from Boy Scouts to address and correct the rampant confusion in the marketplace. *Id.*

Specifically, Girl Scouts spent at least $6,761,833.82 on these corrective advertising and marketing efforts from May 2018 to January 2019.  *Id.*, ¶ 279.  That sum was expended on: (i) a digital marketing campaign without precedent in Girl Scouts' history that focused in large part on geographic and demographic markets most impacted or likely to be impacted by confusion in the marketplace; (ii) a call center established in connection with that campaign whose work was targeted to the geographic locations in which Girl Scouts had identified most of the confusion occurring; (iii) the engagement of regional directors for those same geographic locations who were enlisted to assist with recruiting efforts and prevent Boy Scouts-related confusion from interfering with them; (iv) school and family engagement efforts aimed at elevating Girl Scouts' presence in the classroom as a direct response to the confusion and interference created by Boy Scouts in the context of school recruitment efforts; and (v) overseeing and administering all of the above.  Girl Scouts seeks the recovery of these sums that would not have been expended but for Boy Scouts' actions as damages in this action.  *Id.*[8]

## ARGUMENT

Throughout its Moving Brief, Boy Scouts downplays the heavy burden imposed on a party seeking summary judgment on the issue of confusion in a trademark case.  Such relief is only "appropriate where 'the undisputed evidence would lead only to one conclusion' under the *Polaroid* test."  *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996)).  Thus, "[t]he bottom line on a motion for summary judgment is not how many [*Polaroid*] factors favor each side but whether a reasonable trier of fact might differ as to likelihood of confusion."

---

[8]   Girl Scouts also seeks an accounting of Boy Scouts' profits attributable to its acts of infringement.  GS 56.1 St., ¶¶ 280-282; *see* Point V, *infra.*

*Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 85 (2d Cir.

1988).  "If a factual inference must be drawn to arrive at a particular finding on a *Polaroid*

factor, and if a reasonable trier of fact could reach a different conclusion, the district court may

not properly resolve that issue on summary judgment." *Cadbury*, 73 F.3d at 478.[9]  Accordingly,

if a reasonable trier of fact *could* find that confusion between the Girl Scouts' and Boy Scouts'

marks is likely based on the balancing of the *Polaroid* factors, which is plainly the case,

summary judgment should not issue.  *Sports Authority*, 89 F.3d at 965 (vacating grant of

summary judgment in favor of defendant because reasonable trier of fact could draw inferences

on *Polaroid* factors in favor of non-movant plaintiff).

## POINT I

### BOY SCOUTS IS NOT ENTITLED TO
### SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF LACHES

Because it wants to avoid the substantive infringement issues in this case, Boy Scouts

invokes a laches defense and claims that Girl Scouts should have sued Boy Scouts long ago.  In

order to obtain summary judgment on its affirmative defense of laches, Boy Scouts must

demonstrate as a matter of law that Girl Scouts had knowledge of Boy Scouts' infringing

activities; that Girl Scouts inexcusably delayed taking action against them; and that Boy Scouts

would be prejudiced by Girl Scouts' supposedly belated assertion of its rights.  *See Tri-Star

Pictures v. Leisure Time Prods. B.V.*, 17 F.3d 38, 44 (2d Cir. 1994).  Because the inquiry

---

[9]    The Second Circuit recently confirmed that likelihood of confusion is a question of law.  *See
Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314 (2d Cir. Nov. 19, 2020).  However, it
also once again cautioned that prior "cases should not be read to suggest that a district court
deciding a motion for summary judgment in a trademark infringement case has . . . greater
discretion than it would have in a non-trademark case to resolve disputed issues of fact or draw
inferences against the non-moving party."  *Id.*, at n.11 (internal citations and quotation omitted).
"Indeed, in the summary judgment context, if a genuine dispute existed as to a material fact, the
case would normally not be appropriate for summary judgment."  *Id.*

concerning laches is primarily factual and "requires that the resolution be based on the circumstances peculiar to each case," *id.*, this defense is "not typically amenable to summary judgment."  *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 420 (S.D.N.Y. 2012), *opinion clarified*, 2012 U.S. Dist. LEXIS 21598 (S.D.N.Y. Feb. 21, 2012).  Laches is a 'fundamental threshold matter' that must be resolved before reaching the merits of the plaintiff's trademark claims." *See Margaret Wendt Found. Holdings, Inc. v. Roycroft Assocs.*, Case No. 01-CV-74C(SR), 2007 U.S. Dist. LEXIS 76429, at *20 (W.D.N.Y. Oct. 12, 2007) (quoting *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216 (2d Cir. 2003)).

There is no basis whatsoever for Boy Scouts' laches defense, let alone anything warranting a grant of summary judgment.  The entire premise of Boy Scouts' argument with respect to the first two elements of knowledge and delay is that because Girl Scouts knew as far back as 1971 that Boy Scouts was offering programs to girls and young women, and also knew that Boy Scouts had long used terms like SCOUTS and SCOUTING in connection with its programs, but took no action, those first two elements are established.  Mov. Br. at 43-46.  This is pure sophistry on every level.  What the facts show is that:

i.   The young women Boy Scouts admitted to its EXPLORING program in 1971 were called EXPLORERS, not SCOUTS. GS 56.1 St., ¶¶ 149-152.

ii.  For decades afterward, Boy Scouts repeatedly reassured Girl Scouts that it would not admit girls younger than high school age to its programs and would not become co-educational, thereby staying in a separate market.  *Id.*, ¶¶ 153-154.

iii. During that same period, Boy Scouts repeatedly assured Girl Scouts that it would not use ambiguous terms like SCOUTS or SCOUTING in its marketing and advertising communications without making clear that the sponsor of those communications was Boy Scouts.  *Id.*, ¶¶ 146-147.

iv.  Over time since 1998, Boy Scouts has offered three other co-educational niche, "specialty" programs that, as of December 31, 2017, amounted to approximately 4% of Boy Scouts total membership, with girls or young women involved in those programs amounting to approximately 2.4% of Boy Scouts' total membership.  *Id.*, ¶¶ 155-157.

36

v.      Girl Scouts is unaware of any confusion in the marketplace caused by these specialty programs, which is the opposite of what has transpired since October 2017, when Boy Scouts expanded its core CUB SCOUTS program and the program now known as SCOUTS BSA to girls.  *Id.*, ¶¶ 158, 185-251.

vi.     Boy Scouts successfully defended at least three lawsuits seeking the admission of girls to the CUB SCOUTS and BOY SCOUTS programs, arguing that its Congressional Charter did not allow for female participation.  *Id.*, ¶ 159.

vii.    Then, in 2017, after years of membership declines and confronting the prospect of more losses in the near term, Boy Scouts reversed course and announced in October 2017 that girls would be permitted to join the CUB SCOUTS and the program now known as SCOUTS BSA.  *Id.*, ¶¶ 160-173.  Boy Scouts trumpeted the "historic" nature of this decision, which was described internally as putting Boy Scouts into a "New market – girls in Scouting."  *Id.*, ¶ 174.

viii.   Boy Scouts' decision to expand its core programs to encompass girls was such a "radical" change to the Boy Scouts' brand that Boy Scouts and one of its agencies successfully pitched the publication *Advertising Age* to cover the expansion, because "[f]or the first time ever, girls will be featured in BSA advertising, a newsworthy story."  *Id.*, ¶¶ 168, 178.

These facts, abundantly supported by documentary evidence, tell the Court two things:

(1) Boy Scouts' effort to portray its 2017 decision to expand its core programs to girls for the first time as "more of the same," *i.e.*, not qualitatively different either from what it had offered previously with respect to girls programs, or as to the use of terms like SCOUTS and SCOUTING, is entirely false; and (2) any delay on Girl Scouts' part for purposes of laches – and to be clear, there was none[10] – is excused under the doctrine of progressive encroachment.

---

[10]   For purposes of laches, there is a rebuttable presumption of laches if a plaintiff delays filing suit for more than six years, but for suits filed within six years of the commencement of activities that would give rise to a provable infringement claim, there is no presumption of laches.  In that event, the burden remains on the infringer to prove the defense.  *Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018) (denying summary judgment on defense of laches).  Here, Boy Scouts did not announce its decision to expand its core programs to girls until October 2017 and did not introduce its SCOUT ME IN slogan and SCOUTS BSA program name until May 2018.  GS 56.1 St., ¶¶ 40, 174.  This suit was filed on November 6, 2018, Dkt. 1, meaning there is no presumption of delay.

The Second Circuit has long recognized that "[a]lthough a plaintiff cannot simply sleep on his rights, he has no obligation to sue until the likelihood of confusion looms large and his right to protection has clearly ripened." *Profitness Physical Therapy Ctr. v. Pro-Fit Ortho. & Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002) (citations and quotations omitted). Thus, under the doctrine of progressive encroachment, the inquiry is focused "on the question of whether defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks," such that any delay in bringing suit is excused. *Id.* at 70.  This is precisely what Boy Scouts did in 2017 – redirect its business by abandoning more than 100 years of its history and deciding to admit girls and young women to core programs from which they had been excluded historically, and to refer to them as SCOUTS participating in SCOUTING programs, one of which was renamed SCOUTS BSA, and all of which were now marketed under the newly adopted organizational tagline SCOUT ME IN.  GS 56.1 St., ¶¶ 146-147, 149-183.  It was only after that redirection occurred, and after so much actual confusion was caused, that Girl Scouts had a provable infringement claim, such that there has been no delay on its part.  *See Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 881 (E.D.N.Y. 1978) ("one cannot be guilty of laches until his right ripens into one entitled to protection . . . .").

There are many decisions in this Circuit, including from this Court, applying principles of progressive encroachment to analogous facts.  For example, in *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011), the court rejected a laches defense to trademark infringement claims, finding that, while plaintiff knew of some of defendant's licensed PATSY'S pizzerias for six years, the defendants had progressively encroached on plaintiff's rights when the PATSY'S trademarks were used in connection with

restaurants that were "materially different" from the prior licensed locations in terms of both their culinary offerings and branding. *Id.*, 575 F. Supp. 2d at 458-60.[11]  Likewise, in *Fourth Toro Family Ltd. Pshp. v. PV Bakery, Inc.*, 88 F. Supp. 2d 188 (S.D.N.Y. 2000), this Court rejected a laches defense on claims involving the well-known H&H BAGELS trademark and related marks.  The defendant in that case argued that it had used the trade name "H&H East" for twelve years before plaintiff filed suit, such that laches barred plaintiff's trademark claims.  *Id.* at 195-98.  This Court disagreed, finding that defendant had more recently "increased the aggressiveness and the scope of its advertising, mimicking plaintiff's successful use of the H&H name in the process and creating instances of actual confusion," all of which has happened here too.  *Id.* at 197 (holding that defendant's "change in marketing focus" and "its change in the manner of use of the H&H name" weighed against the application of a laches defense).  *See also Olay Co. v. Cococare Prods.*, No. 81 Civ. 4102, 1983 U.S. Dist. LEXIS 17613, at *52-53 (S.D.N.Y. Apr. 19, 1983) (no laches defense existed where defendant's historical sales were local and limited); *Parrot Jungle*, *Inc. v. Parrot Jungle, Inc.*, 512 F. Supp. 266, 270 (S.D.N.Y. 1981) ("A modest encroachment is one thing, a sudden proposed national exploitation of plaintiff's name is quite another").

Thus, this is a case where there has been "slow encroachment upon plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff."  *Fourth Toro Family Ltd. Pshp.*, 88 F. Supp. 2d at 198 (quoting *Miss Universe, Inc. v. Patricelli*, 271 F. Supp. 104, 110 (D. Conn. 1967), *aff'd*, 386 F.2d 997 (2d

---

[11]   The *Patsy's* court also held that even if there had been no valid excuse for plaintiff's delay, the public interest in preventing "obvious consumer confusion" weighed against the application of a laches defense. *Id.*, 575 F. Supp. 2d at 460.  Here, given the plethora of actual confusion evidence marshalled by Girl Scouts, no laches defense should apply here, even if that defense had any validity (which it does not).  *See* Point II(B)(5), *infra*.

Cir. 1967)).  In circumstances such as this, Boy Scouts does not even have a valid laches

defense, let alone one that warrants a grant of summary judgment.

And as if all of the above were not enough, there is more.  With respect to the third

element of a laches defense – prejudice to Boy Scouts attributable to Girl Scouts delay – there is

none that the law deems sufficient.  A portion of what Boy Scouts claims as prejudice – funds it

has expended on the marketing of its VENTURING, SEA SCOUTS and STEM SCOUTS

programs that it claims it will lose; Mov. Br. at 45-46 – does not qualify because Girl Scouts is

not seeking an injunction requiring those programs to be rebranded, so Boy Scouts will suffer no

loss of that kind.  As for funds Boy Scouts claims to have expended on the creation of marketing

and advertising for its new, co-educational programs that use terms like SCOUT, SCOUTS,

SCOUTING, SCOUTS BSA and SCOUT ME IN since 2017, the loss of those expenditures is

entirely of Boy Scouts' own making.  Boy Scouts knew for decades that the public, the PTO,

Girl Scouts, and even itself, associated SCOUTS with Girl Scouts for girls leadership and

development programs *and* that Girl Scouts objected to the use of ambiguous terms like

SCOUTING in advertising and communications materials where the source of those

communications was not made clear.  GS 56.1 St., ¶¶ 146-147.  Notwithstanding its prior

assurances that it would only use terms like SCOUTING accompanied by Boy Scouts of

America branding, *id.*, Boy Scouts disregarded that shared understanding and used terms that it

knew would create far more confusion than when the respective organizations were in separate

markets. *Id.*, ¶¶ 162-174.

When a party like Boy Scouts takes a "calculated risk" by using a trademark

notwithstanding another party's claim of rights, there is no prejudice for purposes of a laches

defense.  S*ee Fusco Grp., Inc. v. Loss Consultants Int'l, Inc.*, 462 F. Supp. 2d 321, 329-30

(N.D.N.Y. 2006); *see also Champagne Louis Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855,

859 (8th Cir. 2009) ("courts tend to reject a defendant's assertion of the laches defense when the

defendant knew that the plaintiff objected to the use of the mark"); *Elvis Presley Enters. v.*

*Capece*, 141 F.3d 188, 205 (2d Cir. 1998) (a defendant acts at its own risk for purposes of laches

once it has notice of plaintiff's claim of rights).[12]

    Finally, where a party acts in bad faith in adopting a trademark, a laches defense does not

preclude a grant of injunctive relief, at a bare minimum.  *See Hermes Int'l v. Lederer de Paris*

*Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d Cir. 2000); *see also PRL USA Holdings, Inc. v. M&A*

*Mktg. Corp.*, 99 Civ. 10199, 2004 U.S. Dist. LEXIS 14916, at \*36 (S.D.N.Y. Aug. 2, 2004) ("a

party that is asserting a laches defense must show that it is coming before the court with clean

hands").  Here, as explained further in Section II(B)(6), *infra*, there is, at the least, a genuine

dispute of fact on the issue of Boy Scouts' intent, supplying yet another reason why the entry of

summary judgment in Boy Scouts' favor on its defense of laches would be inappropriate.

## POINT II

### BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT ON GIRL SCOUTS' FEDERAL AND NEW YORK STATE CLAIMS <u>FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION</u>

    To prevail on its claims for trademark infringement and unfair competition under

Sections 32(1) and 43(a) of the U.S. Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C.

§§ 1114(1), 1125(a), Girl Scouts must establish that: (i) it possesses valid, legally protectible

---

[12]  In footnote 23 of its Moving Brief, Boy Scouts argues that it has also suffered evidentiary prejudice sufficient to support a laches defense based on its contention that "evidentiary materials are no longer available and witnesses have died, left the BSA, or memories have faded."  However, these entirely conclusory statements are insufficient to carry Boy Scouts' burden of establishing this type of prejudice.  *See Meyers v. ASICS Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992) ("Conclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient.").

marks; and that (ii) Boy Scouts' subsequent use of a similar mark is likely to create confusion as to the origin of the services at issue. *See Lane Capital Mgmt. v. Lane Capital Mgmt.*, 192 F.3d 337, 344 (2d Cir. 1999); *see also Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 440 (S.D.N.Y. 2017) (citing "'familiar two-prong test'" for federal trademark infringement and unfair competition claims, and that such test also applies to claims for trademark infringement and unfair competition under New York law, with the exception that a New York unfair competition claim also requires a showing of bad faith) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012)).[13]

Here, Boy Scouts' Moving Brief contains no allegation that the GIRL SCOUTS trademark is invalid or not protectible, but it asserts that Girl Scouts "has no valid rights in SCOUTS alone" based on Girl Scouts' alleged failure to use that mark independently of the word GIRL, as evidenced by Girl Scouts' guidelines specifying that the term SCOUTS by itself should not be used to refer to Girl Scouts members, the organization or its programs. Mov. Br. at 21-22. Likewise, Boy Scouts asserts that Girl Scouts cannot raise a triable issue of fact on the issue of likely confusion, such that summary judgment in Boy Scouts' favor on Girl Scouts' federal and New York claims for trademark infringement and unfair competition is appropriate. Mov. Br. at 19-34. Neither of these two contentions is correct, and therefore the Court should deny summary judgment to Boy Scouts on the issue of trademark validity with respect to Girl Scouts' rights in the terms SCOUT, SCOUTS and SCOUTING, and as to likely confusion.

---

[13]   Section 32(1) of the Lanham Act applies to claims premised on registered trademarks, while relief under Section 43(a) is available to the owners of both registered and unregistered (common law) trademarks. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006). Here, the GIRL SCOUTS trademark is registered, GS 56.1 St., ¶¶ 138-139, but Girl Scouts does not own registrations for the terms SCOUT, SCOUTS and SCOUTING. Notwithstanding, the analysis under both statutory provisions is the same. *Louis Vuitton Malletier*, 454 F.3d at 114.

A.    **Girl Scouts Owns Trademark Rights in**
      **SCOUT, SCOUTS and SCOUTING, Independent of the Word "Girl"**

Boy Scouts' contention that Girl Scouts owns no protectible rights in the terms SCOUT,

SCOUTS and SCOUTING is entirely premised on the contention that there can be no trademark

rights in a term like SCOUTS unless that term is used in commerce as a trademark, and that

because Girl Scouts has supposedly made no such use, it owns no such rights.  Mov. Br. at 21-

22.  But while trademark rights often flow from use by a party, that is not the only way in which

they come into being.  Courts and the TTAB have long recognized that:

> Even without use directly by the claimant of the rights, the courts and the Board
> generally have recognized that abbreviations and nicknames of trademarks or
> names used *only* by the public give rise to protectable rights in the owners of the
> trade name or mark which the public modified.  Such public use by others inures
> to the claimant's benefit and, where this occurs, public use can reasonably be
> deemed use 'by' that party in the sense of a use on its behalf.

*Nat'l Cable TV Ass'n v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1577-78 (Fed. Cir. 1991)

(emphasis in original); *see also Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d

427, 434 (7th Cir. 1999) (announcement of move of LOS ANGELES RAMS football team to St.

Louis and attendant publicity surrounding announcement conferred trademark rights on

defendant, even absent evidence of use by it of ST. LOUIS RAMS).

Thus, for example, courts recognized decades ago that the word "Coke," even though it

was not then in use by the Coca-Cola Co. as a trademark, was a term in which that company

owned trademark rights because that was how the public often referred to COCA-COLA.  *See*

*Coca-Cola Co. v. Busch*, 44 F. Supp. 405, 407-08 (E.D. Pa. 1942).  Likewise, another court in

this Circuit recognized decades ago that the term "Bud" was a term in which Anheuser-Busch

had acquired trademark rights because its BUDWEISER beer was often referred to that way.  *See*

*Anheuser-Busch, Inc. v. Power City Brewery, Inc.*, 28 F. Supp. 740, 742-43 (W.D. N.Y. 1939)

("'Bud' has long been used as an abbreviation or nick-name of 'Budweiser' and as such is

ordinarily associated with the plaintiff's product.  It has acquired a secondary meaning and

plaintiff is entitled to the same protection in its use as it is regarding the parent word.").  Multiple

cases confirm that the New York Metropolitan Opera Association owns trademark rights in the

trademarks "Metropolitan" and "The Met" because those terms, when used in connection with

opera, are perceived by the public to designate the services of that renowned cultural institution.

*See Metro. Opera Ass'n v. Metro Opera Ass'n of Chicago*, 81 F. Supp. 127, 129, 133 (N.D. Ill.

1948); *Metro. Opera Ass'n v. Metro Artists, Inc.*, 27 Misc.2d 572, 573, 212 N.Y.S.2d 435, 436

(Sup. Ct. N.Y. Cnty. 1961), *aff'd*, 13 A.D.2d 480, 214 N.Y.S.2d 648 (1st Dep't 1961).

Thus, the question is not just whether Girl Scouts has used SCOUT, SCOUTS and

SCOUTING without the word GIRL as trademarks – although it has in the past and continues to

do so in a limited way[14] – but whether those terms have acquired secondary meaning through

public association of those words with Girl Scouts and its girls youth leadership and

development services.  *See Harlequin Enters. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir.

1981) (secondary meaning inquiry focused on whether relevant consumer segment associates

alleged trademark with a particular source).  There is substantial evidence of such public

association, and more than enough to create a triable issue of fact on this issue, namely: (1) news

articles in which the words SCOUT, SCOUTS and/or SCOUTING have been used to refer to

Girl Scouts or its members; (2) deposition testimony from multiple employees of Girl Scouts

---

[14]   Specifically, in its earliest years and into the early 1960s in some cases, Girl Scouts used
terms like JUNIOR SCOUTS and MARINER SCOUTS to denote various programs it offered,
and it awarded badges with names like "Scout Aide," "Scout Naturalist" and "Scout Neighbor"
to qualifying members.  GS 56.1 St., ¶ 142; *see also Girl Scouts of the United States of America*,
212 U.S.P.Q. at 389 (referencing use of designations like WING SCOUT and BROWNIE
SCOUT by Girl Scouts).  For many years, Girl Scouts used the trademark SCOUT COOKIES in
connection with cookies, and, currently, various Girl Scouts councils use terms like SCOUT
MOM, SCOUTING and SCOUT THE VOTE on patches and apparel, as well as the term
"Scouts' Own" to designate a Girl Scouts' ceremony.  GS 56.1 St., ¶¶ 143-145.

councils in different parts of the United States confirming that Girl Scouts employees, volunteers and members of the public regularly use the SCOUT, SCOUTS and/or SCOUTING designations to refer to Girl Scouts, its members and its programs; (3) the use by third-party organizations like sports teams and zoos of terms like SCOUT NIGHT in connection with events for members of both Girl Scouts and Boy Scouts, as well as the use of SCOUTING by the U.S. Post Office on a 2012 stamp commemorating Girl Scouts' centennial; and (4) references in documents produced by Boy Scouts that use the term SCOUTING to refer to both Boy Scouts and Girl Scouts; and (5) enforcement efforts undertaken by Girl Scouts against third parties using, without Girl Scouts' authorization, designations containing the terms SCOUT, SCOUTS and/or SCOUTING without gender-specific or source identifying words. GS 56.1 St., ¶ 141.[15]

On top of this, "[t]he presence of a term in the dictionary is often treated by courts as persuasive evidence of how a term is understood and used by the consuming public." *Nestle Co. v. Chester's Mkt., Inc.*, 571 F. Supp. 763, 777 (D. Conn. 1983). Often, dictionary definitions of words alleged to be trademarks support the proposition that the words are generic, and therefore unprotectable, because the alleged marks are defined to be ***types*** of products or services and not the ***sources*** of products or services. *Id.* (relying on dictionary definitions in support of conclusion that "toll house" is understood to be a type of cookie, and therefore generic); *see also In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1176 (Fed. Cir. 2004) (dictionary definitions supported conclusion that ".com" was a generic term indicating any commercial entity). But here, multiple dictionary definitions confirm that the terms SCOUTS and SCOUTING are understood by the public to connote the two sources of youth education and development

---

[15]   Girl Scouts and Boy Scouts have, at times, sought to enforce their shared rights in the terms SCOUTS and SCOUTING against third parties. *See Girl Scouts of the United States of America v. Hollingsworth*, 188 F. Supp. 707 (E.D.N.Y. 1960).

services using those terms – Girl Scouts and Boy Scouts, both ***equally.***  Ewing Dec., Exh. 152

(definitions of "Scout" and/or "Scouting" from *Oxford*, *Merriam-Webster*, *Webster's* and

*American Heritage*, dating from 2001-2019 defining those terms in relation to both parties); Exh.

75 at GSUSA_00189223  (PTO Examining Attorney opining that, based on dictionary

definitions, "the term SCOUT, 'BOY SCOUT' and Girl Scouts are legal equivalents so that

the terms 'SCOUT' and 'GIRL SCOUT' would engender the same commercial

impression").

　　　　This is consistent with admissions from Boy Scouts over time in correspondence and

litigation confirming its understanding that Girl Scouts owns equivalent, but "mutually

exclusive," rights in SCOUTS and SCOUTING.  GS 56.1 St., ¶¶ 134, 141(f); Ewing Dec., Exh.

146 at GSUSA_00132101-103, GSUSA_00132109-111 (quoting Boy Scouts litigation filing as

stating that "The Terms 'SCOUTS' and 'SCOUTING' Do Not Connote Youth Development

Programs in General, But Only the Programs Of the Boy Scouts and Girl Scouts in Particular" at

GSUSA_00132101).

　　　　Finally, there is survey evidence confirming that the percentage of respondents surveyed

who associate the term SCOUTS, standing alone, with Girl Scouts in some way as used with

group leadership and development programs offered **_only_** to young females, is 36.5% to 48.9%.

*See* the accompanying Declaration of Eugene Ericksen ("Ericksen Dec."), Exh. 2 at pp. 1-10,

Tables 1-10.  Such levels of association disclosed through survey research are probative on the

issue of secondary meaning.  *See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 349

(S.D.N.Y. 1998) (secondary meaning survey results between 42-51% were probative on issue of

secondary meaning); *Zippo Mfg. Co. v. Rogers Imps., Inc.*, 216 F. Supp. 670, 686 (S.D.N.Y.

1963) (with respect to secondary meaning survey results, "42.6 per cent is a significant

percentage, indicating that a substantial number of people identify the shape and appearance of

the lighter with [plaintiff]"); *Monsieur Henri Wines, Ltd. v. Duran*, 204 U.S.P.Q. 601, 605

(T.T.A.B. 1979) (survey results showing that 37% of respondents associated a particular bull-

and-matador design with a particular brand of wine were evidence of secondary meaning).

Against all of this, Boy Scouts argues that because Girl Scouts has discouraged the use of

SCOUTS and SCOUTING without the word GIRL preceding them in its brand guidelines, Girl

Scouts can have no rights in those terms standing alone.  Mov. Br. at 21-22.  That lone fact is not

dispositive of anything, in part because Girl Scouts is plainly using the terms SCOUTS and

SCOUTING as part of its GIRL SCOUTS trademark,[16] and in part because Girl Scouts issued

those guidelines in order to communicate that SCOUTING services for girls are offered

exclusively by Girl Scouts.  Ewing Dec., Exh. 92 (C. Butler) at 21:11-22:7, 166:23-168:16.

Moreover, a party can own trademark rights in a term even when it does not use that term and

has no interest in doing so.  Thus, for example, in *New York Yankees P'ship v. Evil Enterprises,*

*Inc.*, Opp. No. 91192764, 2013 T.T.A.B. LEXIS 72 (T.T.A.B. Feb. 8, 2013), the New York

Yankees successfully opposed registration of BASEBALL'S EVIL EMPIRE not because the

Yankees were using that mark, or had any plans to use that mark, or encouraged others to use

that mark, but because there was so much evidence that the public associated EVIL EMPIRE

---

[16]   To the extent Boy Scouts contends that the use of GIRL SCOUTS and GIRL SCOUTING is
an abandonment of rights in SCOUTS and SCOUTING alone, that argument would be incorrect.
*See General Foods Corp. v. Ito Yokado Co. Ltd.*, 219 U.S.P.Q. 822 (T.T.A.B. 1976) ("whether
opposer has or has not used the bird design by itself is irrelevant to the abandonment issue in
view of the fact – uncontested by applicant – that it has extensively and continuously used the
design mark in association with the word mark 'BIRDS EYE' as a composite mark . . . ."); *see
also WSM, Inc. Bailey*, 297 F. Supp. 870, 873 (M.D. Tenn. 1969) (plaintiff's mark GRAND OLE
OPRY was understood by the public to designate the services of plaintiff, such that defendant's
use of OPRY was infringing); *Mc-Cabe Powers Auto Body Co. v. Am. Truck Equip Co.*, 150 F.
Supp. 194, 199 (D. Or. 1957) (no abandonment of common law trademark AMERICAN through
incorporation of that term into name POWERS-AMERICAN).

with the Yankees. *Id.* at \*10-15. Here, at best from Boy Scouts' perspective, all Girl Scouts brand guidelines can do is create a factual dispute on the issue of whether Girl Scouts owns trademark rights in the terms SCOUT, SCOUTS and SCOUTING standing alone. Of course, this falls well short of what Boy Scouts needs to establish in order to obtain summary judgment on this issue.

**B.      There Is a Substantial Likelihood of Confusion Between the Parties' Marks**

The test for likelihood of confusion is set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), and the non-exclusive list of factors that courts routinely consider is set forth on page 20 of Boy Scouts' Moving Brief. Application of the *Polaroid* factors is not meant to be a mechanical exercise, but instead focuses on whether, considering the entire context, consumers are likely to be confused. *See Coty*, 277 F. Supp. 3d at 442.

In conducting this inquiry into likely confusion, the Court should bear in mind that "the Act's protection against infringement is not limited to any particular type of consumer confusion, much less exclusively to confusion as to source." *IISSCC v. Security University*, LLC, 823 F.3d 153, 161 (2d Cir. 2016). Instead, the Lanham Act protects against numerous types of confusion, including confusion as to affiliation, connection, sponsorship, endorsement, or approval. *Id*. at 161-62. Notably absent from Boy Scouts' Moving Brief is any mention of another type of confusion the Lanham Act makes actionable: initial interest confusion. In fact, Boy Scouts attempts to obfuscate this actionable type of confusion by quoting the Second Circuit's 1991 decision in *Lang v. Retired Living Publishing Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991), for the proposition that "[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." Mov. Br. at 30. For more than forty years, however, the Second Circuit has recognized the theory of initial interest confusion. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975) (finding

that where potential purchasers of Steinway pianos were initially interested in Grotrian-Steinweg pianos because of the name, the value of STEINWAY trademark could be harmed); *see also Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987) ("[I]nitial confusion works a sufficient trademark injury."); *Gap, Inc. v. G.A.P. Adventures Inc.*, No. 07-cv-9614 (AKH), 2011 U.S. Dist. LEXIS 71675, at \*38 (S.D.N.Y. June 24, 2011) ("the evidence suggests a likelihood that, due to use of the word "gap. G.A.P Adventures gains 'credibility during the initial phases' of its interaction with a potential customer" (quoting *Mobil Oil*)). "This type of confusion occurs where potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Cartier v. Symbolix Inc.*, 454 F. Supp. 2d 175, 185 (S.D.N.Y. 2006) (citations and quotations omitted).

Also absent from Boy Scouts' Moving Brief is any discussion of the distinctions between its own direct liability for infringement through its own use of the SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN designations in connection with girls services, and its vicarious liability for the acts of its councils, troops and volunteers in making unauthorized use of the GIRL SCOUTS trademark and related intellectual property.

As Girl Scouts will show, when considering ***all*** actionable types of confusion, including as to source, affiliation, connection, sponsorship, endorsement, approval and initial interest, and the issues of primary and secondary liability on the part of Boy Scouts, the record is clear that a reasonable trier of fact could, and should, conclude that confusion is likely, and that Boy Scouts is liable for such confusion.  Summary judgement is therefore improper.

1.   **Boy Scouts Is Vicariously Liable for the**
      **Infringing Acts of Its Councils, Troops and Leaders**

"A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).   There can be no doubt

that Boy Scouts has not met its burden with respect to Girl Scouts' claims for vicarious liability

for the actions of its councils, troops and volunteers.   Girl Scouts' First Amended Complaint

includes claims for vicarious liability for trademark infringement, federal unfair competition and

false designation of origin, and dilution.   Dkt. 89 at ¶¶ 94, 106, 116 (Counts I, II and III).   And

while Boy Scouts purports to move for summary judgement on Girl Scouts' *entire* First

Amended Complaint, Mov. Br. at 1, the word "vicarious" does not even appear in its moving

papers.[17]   The Court can end its inquiry here and simply deny Boy Scouts' effort to avoid being

held vicariously liable.   *See Branch v. Ogilvy & Mather, Inc.*, Case No. 89 Civ. 2440 (LLS),

1990 U.S. Dist. LEXIS 6551, at *29 (S.D.N.Y. May 30, 1990) (denying defendant's motion for

summary judgment on dilution because it was "insufficiently addressed to support a ruling").

But should the Court elect to consider the substance of the issue, the result is the same: denial of

Boy Scouts' motion on the issue of vicarious liability.

---

[17]   The lone allegation in Boy Scouts' Rule 56.1 Statement bearing on claims of vicarious liability – one of law, not fact – is that "[l]ocal councils have no authority to bind the BSA National Council." GS 56.1 St., ¶ 6.   This allegation is not repeated in Boy Scouts' Moving Brief, but even if it were, it provides no basis for a grant of summary judgment on the issue of vicarious liability.

"Vicarious liability in the federal trademark context is essentially the same as in the tort context: liability of one party based on its relationship with an infringing third party." *Dish Network L.L.C. v. Siddiqi*, No. 18 CV 4397 (VB), 2019 U.S. Dist. LEXIS 193095, at *14 (S.D.N.Y. Nov. 6, 2019).  Vicarious trademark infringement requires that "the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 314 (2d Cir. 2013); *see TRB Acquisitions LLC v. Seduka, LLC*, Case No. 15 Civ. 4401 (GBD), 2016 U.S. Dist. LEXIS 64846, at *9 (S.D.N.Y. May 10, 2016) (same); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 173 (S.D.N.Y. 1998) (joint liability in trademark infringement context means that "[a]ll those who, in pursuance of a common plan to commit an act which is tortious, actively take part in it, or further it by cooperation or request, or lend aid or encouragement, or ratify and adopt the acts done, are as equally liable as the person who performs the tortious act itself") (citing 3 *McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") § 25:23).

As shown in Girl Scouts' Rule 56.1 Statement, there is plentiful evidence upon which a trier of fact could and should conclude that Boy Scouts is vicariously liable for the actions of its councils, troops and packs alleged here.  GS 56.1 St., ¶¶ 6, 252-262.  Regardless of whether Boy Scouts' councils have authority to bind Boy Scouts, the evidence shows that Boy Scouts works as a partner with its local councils, troops and packs in pursuing a common plan – recruiting boys and (now) girls to join its SCOUTING programs – and that Boy Scouts exercises control over the infringements that have occurred around the country, as evidenced by the manner in which Boy Scouts governs the use of its intellectual property and the fact that, on multiple

51

occasions, when it has chosen to do so, Boy Scouts has halted such infringements of Girl Scouts' trademarks and related intellectual property.  *Id.*, ¶¶ 187, 189, 190, 256-258.

The relationship between Boy Scouts and its local councils, troops and packs goes far beyond that of a typical trademark licensor and licensee, in that Boy Scouts fully partners with those affiliates in marketing the CUB SCOUTS and SCOUTS BSA programs to American youth and their parents.  Boy Scouts charters its local councils on an annual basis, and pursuant to those charters, it maintains a high degree of control over them and their units with respect to marketing and recruiting matters through extensive rules and regulations.  GS 56.1 St., ¶¶ 252-255.  In the normal course of business, the local councils oversee Boy Scouts' branded SCOUTING programs in their geographic areas and organize SCOUTING units, consisting of troops and packs.  *Id.*, ¶ 4.  The programs themselves, their members and their members' dues belong to Boy Scouts, as does all of the intellectual property used to market those programs, not just by the councils, but also by the troops and packs.  *Id.*, ¶¶ 6, 256, 274.  Boy Scouts maintains total control, in its "sole discretion," to constrain use of its trademarks.  *Id.*  Similarly, the marketing assets in Boy Scouts' online Brand Center are also the property of Boy Scouts and can only be used under strict conditions by local councils, troops and packs.  *Id.*, ¶ 6.  Without the consent and authorization of Boy Scouts, local councils, troops and packs cannot promote, market or oversee the CUB SCOUTS and SCOUTS BSA programs through which Girl Scouts' trademarks and related intellectual property are being and have been infringed.  *Id.*, ¶¶ 256-258.

Local councils receive more than just authorization from their partner Boy Scouts, but also many different types of support services when it comes to marketing and recruiting.  *Id.*, ¶¶ 259-262.  Indeed, Boy Scouts has stated that its "#1 goal is to help councils recruit more new members."  *Id.*, ¶ 259.  Based on the structure and relationship between Boy Scouts and its local

councils, it is also clear that there would be no troops or packs for girls to join without the participation of the local councils.  GS 56.1 St., ¶ 4.  Hence, both Boy Scouts, its local councils and their units are partners in the programs that are being promoted, without authorization, under terms like "Girl Scouts," including, but not limited to, the GIRL SCOUTS trademark itself, such that vicarious liability should attach.  *See Dish Network,* 2019 U.S. Dist. LEXIS 193095, at *15 (concluding that defendant and its third party callers who contacted customers partnered to facilitate the infringement); *Piccoli A/S*, 19 F. Supp. 2d at 173.

Boy Scouts' volunteers are also active participants in recruiting and the marketing of the CUB SCOUTS and SCOUTS BSA programs over whom Boy Scouts maintains a high degree of control when it comes to marketing matters.  GS 56.1 St., ¶¶ 254, 256-257.  They too are partners of Boy Scouts and the local councils who "carry out the BSA's mission." *Id.*, ¶ 3.  In many cases, these volunteers are responsible for creating and distributing marketing materials advertising Boy Scouts' programs under trademarks owned by Boy Scouts.  *Id.*, ¶ 39.  Boy Scouts' councils, troops and volunteers have repeatedly circulated customized flyers and other materials using Boy Scouts marketing collateral containing terms like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN alongside images of girls that have caused confusion in the marketplace reported to Girl Scouts. *Id.*, ¶ 58.  Other such materials have used the GIRL SCOUTS trademark and related intellectual property without authorization.  *Id.*, ¶¶ 39, 193, 195, 198, 199, 208, 211.

Putting partnership aside, Boy Scouts can also be held vicariously liable for the actions of its local councils, troops, packs and volunteers because it admittedly has the right and ability to directly control their infringing products/services and means of advertising, to the point that Boy Scouts has the authority to monitor what they put out and prevent infringement from occurring.

Boy Scouts' Chief Operating Officer, Patrick Sterrett, has testified that "we have brand guidelines that we push out to local councils and to units, and we work with them when we see they're outside the lanes of using those, to take immediate corrective behaviors on those." *Id.*, ¶ 256.  Boy Scouts also has "a longstanding quality control process [where it] diligently oversee[s] the use of others' intellectual property on and in connection with BSA products." *Id.*, ¶ 6.  In this case, on multiple occasions, when it has chosen to do so, Boy Scouts has directed its councils and volunteers to take down social media posts, signs and other materials that violate Girl Scouts' trademark rights or that have caused confusion.  *See e.g.*, ¶¶ 187, 193.

These facts are all analogous to those of *Robinson v. Delicious Vinyl Records, Inc.*, Case No. CV 13-4111-CAS (PLAx), 2013 U.S. Dist. LEXIS 109279, at *17-18 (C.D. Cal. Aug. 1, 2013), where the defendants relied on third-parties to promote their services through print and digital advertising.  Given that defendants "appear[ed] to have complete control over the content of all promotional materials," the court found for purposes of a preliminary injunction that they were likely to be vicariously liable for the infringing acts of these third parties with respect to such materials, even though the third parties had no legal authority to bind defendants.  *Id.*  Further, even though the defendants argued that they had "'rapidly' addressed these alleged instances of infringement whenever they arose, the fact that these confusing and misleading advertisements continued to appear in a variety of media lends substantial merit to plaintiffs' claim."  *Id.*  Thus, Boy Scouts' authority – when it chooses to act – to direct the removal of materials that violate Girl Scouts' trademark and related intellectual property rights that have been disseminated by councils, troops, packs and volunteers strongly supports liability on a vicarious liability theory.

What this means is that, for purposes of the *Polaroid* analysis that follows, there are two types of infringing conduct for which Boy Scouts should be held liable: (i) its own acts of direct infringement by marketing, advertising and promoting its CUB SCOUTS and SCOUTS BSA programs using terms like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN; and (ii) the unauthorized use by Boy Scouts' councils, troops, packs and volunteers of Girl Scouts' trademarks, including, most notably, the GIRL SCOUTS mark.

**2.     The GIRL SCOUTS Trademark Is Not Just Strong, but Famous, and the Trademarks SCOUT, SCOUTS and SCOUTING Possess a Strong Secondary Meaning With Girl Scouts for Girls Youth Leadership and Development Services**

The first *Polaroid* factor is concerned with the strength of the Girl Scouts' pleaded marks, both the registered GIRL SCOUTS trademark and the unregistered trademarks SCOUT, SCOUTS and SCOUTING, all as used in connection with girls leadership and development services.  For purposes of the *Polaroid* analysis, strength is defined as a mark's "'tendency to identify the goods sold under the mark as emanating from a particular source.'" *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986) (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1132 (2d Cir. 1979)).  The inquiry into a mark's strength considers whether it is distinctive, both inherently and from a commercial perspective; a mark that is commercially stronger generally receives a wide scope of protection.  *See Centaur Comms., Ltd. v. A/S/M Comms., Inc.*, 830 F.2d 1217, 1225-26 (2d Cir. 1987).

Here, as to the GIRL SCOUTS trademark, Boy Scouts concedes that the mark is famous from a marketing perspective, as its own survey expert admitted during his deposition.  Mov. Br. at 21; Ewing Dec., Exh. 131 (R. Dhar) at 61:21-25.  Yet, rather than acknowledge that this *Polaroid* factor favors Girl Scouts, Boy Scouts argues that the strength of the GIRL SCOUTS trademark weighs ***against*** a finding of likely confusion because the mark's strength is limited to

use as a composite, which Boy Scouts proclaims it is not using.  Mov. Br. at 21.[18]  This argument

cannot be credited because it is at odds with both controlling law and the relevant facts,

including Boy Scouts' own prior enforcement of its rights in the BOY SCOUTS trademark.

A trademark's strength is, along with the factors concerned with similarity and

competitive proximity, one of the three most important *Polaroid* factors.  *Mobil Oil*, 818 F.2d at

258.  When a mark like GIRL SCOUTS possesses "unparalleled strength," as is plainly the case

here given its use for more than a century, the tens of millions of girls and women who have

participated in its programs over time, and the extraordinary degree of public recognition it

commands, GS 56.1 St., ¶¶ 125, 135-140, such strength "demands that it be given broad

protection against infringers."  *See also Lois Sportswear*, 799 F.2d at 873 (characterizing the

strength of a "very strong mark" as "crucial to the likelihood of confusion analysis" because it

makes confusion "much more likely").  Thus, there is no legal basis for Boy Scouts' argument

that the fame of the GIRL SCOUTS trademark somehow weighs in Boy Scouts' favor.

Indeed, various courts have rejected the same argument Boy Scouts proffers here.  For

example, in *Kenner Parker Toys, Inc. v. Rose Art Indus.*, 963 F.2d 350 (Fed. Cir. 1992), the

appellee seller of a modeling compound called FUNDOUGH argued that because the appellant's

PLAY-DOH trademark, also used with a modeling compound, was so well known, consumers

would more readily recognize the differences between the parties' marks.  *Id.* at 353.  The

Federal Circuit disagreed, holding that "[a] strong mark . . . casts a long shadow which

competitors must avoid."  *Id.* ("the driving designs and origins of the Lanham Act demand the

---

[18]   This argument from Boy Scouts consciously ignores the many instances in which its
councils, troops and volunteers have used the GIRL SCOUTS trademark and related intellectual
property in promoting Boy Scouts' programs, for which Boy Scouts is vicariously liable.  *See*
Point II (B)(1), *supra*; GS 56.1 St., ¶¶ 187, 189, 190, 193, 195, 198, 199, 202, 208, 211, 217,
218, 221, 222, 241, 243.

standard consistently applied by this Court – namely more protection against confusion for famous marks.").  It made no difference in *Kenner Parker Toys* that PLAY-DOH was a composite mark whose elements differed from those of FUNDOUGH, because "the Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark. As a mark's fame increases, the Act's tolerance for similarities in competing marks falls." *Id.*  Here, the similarities between GIRL SCOUTS and terms like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN are obvious, and such designations are well within the "long shadow" cast by the GIRL SCOUTS mark that Boy Scouts should have avoided, but deliberately did not.  *See Olay Co.*, 1983 U.S. Dist. LEXIS 17613, at *42-44 (composite mark OIL OF OLAY was strong and likely to be confused with defendant's OILS & ALOE mark).

Apart from the legal insufficiency of Boy Scouts' argument, it wholly ignores that the supposedly critical distinction between the parties' marks on which it relies – the presence of GIRL in GIRL SCOUTS – is erased in the context of the offering of SCOUTING services ***to girls*** in which both parties are (now) engaged.  Boy Scouts has long argued successfully that third parties do not have the right to use other SCOUT/SCOUTS trademarks in connection with competitive goods or services because such uses create a likelihood of confusion with its BOY SCOUTS trademark and variations thereof like CUB SCOUTS. *See Wrenn v. Boy Scouts of the United States of America*, Case No. C 03-04057 (JSW), 2008 U.S. Dist. LEXIS 91913, at *19-21 (N.D. Cal. Oct. 28, 2008) (successful enforcement action against third-party use of YOUTHSCOUTS); *Adolph Kastor & Bros., Inc. v. Federal Trade Comm'n*, 138 F.2d 824 (2d Cir. 1943) (successful enforcement action against third-party use of SCOUTS).  Given these past

positions, Boy Scouts can hardly argue credibly that the great fame of the GIRL SCOUTS

trademark weighs against Girl Scouts in the *Polaroid* analysis.

As to the other trademarks upon which Girl Scouts' infringement claims are premised –

SCOUT, SCOUTS and SCOUTING for leadership and development services offered to girls –

those terms are inherently distinctive because they are suggestive under the framework

articulated in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976), in

that thought and imagination are required to connect the word "scout" to a leadership and

development organization for girls.  *See Wrenn*, 2008 U.S. Dist. LEXIS 91913, at *13-15

(SCOUTS deemed suggestive, not generic, as used by Boy Scouts).  And, as discussed in Section

II(A), *supra*, those marks are strongly associated by the consuming public with Girl Scouts in

connection with girls' leadership and development programs, and therefore possess secondary

meaning.  *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 215-16 (2d Cir. 1985) ("If a

mark has secondary meaning, a purchaser will associate it with a certain producer, and will be

likely to make that same association when an identical mark (or a confusingly similar mark), is

used on another producer's product.").  Since "proof of secondary meaning demonstrates the

strength of a particular mark," *see Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*,

Case No. 86-CV-1142, 1989 U.S. Dist. LEXIS 5862, at *10 (S.D.N.Y. May 25, 1989), this first

*Polaroid* factor also weighs in Girl Scouts' favor on the second prong of its infringement and

unfair competition claims premised on Girl Scouts' rights in SCOUT, SCOUTS and

SCOUTING.

### 3.      The Parties' Marks Are Obviously Similar

The second *Polaroid* factor is concerned with the similarities between the parties' marks,

and whether those similarities are likely to cause confusion.  *See, e.g.*, *Virgin Enters. v. Nawab*,

335 F.3d 141, 149 (2d Cir. 2003).  By calling its girl members SCOUTS, using SCOUT,

SCOUTS and SCOUTING in advertising and promotional materials containing images of girls that are ambiguous with respect to the identification of their source, renaming the BOY SCOUTS program as SCOUTS BSA, and promoting the entire sea change with a campaign called SCOUT ME IN, *see* GS 56.1 St., ¶¶ 160-184, Boy Scouts is employing confusingly similar terms that create a likelihood of confusion (and actual confusion) regarding both: (i) the GIRL SCOUTS trademark; and (ii) Girl Scouts' rights in the terms SCOUT, SCOUTS and SCOUTING for use in connection with leadership and development services for girls.[19]

Boy Scouts' wrongful uses all incorporate SCOUT, which is one of the words comprising the GIRL SCOUTS trademark, and courts often find similarity in such cases.  *See, e.g.*, *Wrenn*, 2008 U.S. Dist. LEXIS 91913, at *19-21 (YOUTHSCOUTS similar to BOY SCOUTS, CUB SCOUTS and EAGLE SCOUT); *Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046 (Fed. Cir. 2012) (BEGGIN' STRIPS similar to WAGGIN' STRIPS); *Berkshire Fashions, Inc. v. Sara Lee Corp.*, 729 F. Supp. 21 (S.D.N.Y. 1990) (SHEER ENERGY similar to ENERGIZER).  The similarities and resulting likelihood of confusion are exacerbated here because SCOUT is uniquely associated with Girl Scouts when used in connection with leadership and development services for girls.  As explained by the T.T.A.B.:

> [T]he term "SCOUT", as applied to products that can be utilized by girls, would mistakenly lead individuals long familiar with [Girl Scouts'] activities under the mark "GIRL SCOUT" or "GIRL SCOUTS" to believe that applicant's goods are sponsored by or are in some way associated with [Girl Scouts].

---

[19]   As to Girl Scouts' claims based on its rights in SCOUT, SCOUTS and SCOUTING, which Boy Scouts fails even to mention, the similarity is patent and undeniable because Boy Scouts' has appropriated these marks to promote proximate services. *See* Point II(A), *supra*; *Girls Clubs of Am., Inc.*, 683 F. Supp. at 53 (similarity established where Boys Clubs of America sought to include GIRLS CLUBS within its name)

*Girl Scouts of the United States of America*, 1981 T.T.A.B. LEXIS 101 at *13-14.  Furthermore, where, as here, the parties are now direct competitors, *see* Point II(B)(3), *infra*, the degree of similarity required to find a likelihood of confusion is reduced.  *RJR Foods, Inc. v. White Rock Corp.*, Case No. 77 Civ. 2329, 1978 U.S. Dist. LEXIS 15080, at *7, (S.D.N.Y. Oct. 6, 1978), *aff'd,* 603 F.2d 1058 (2d Cir. 1979); *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992).

Boy Scouts first tries to avoid these obvious similarities by claiming incorrectly that the lead component GIRL distinguishes the marks because GIRL is "conceptually significant." Mov. Br. at 22-23 (citing *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, Opp. No. 74,797 1988 1998 WL 252340, at *3 (T.T.A.B. Sept. 14, 1988)).  Boy Scouts is wrong, however, because GIRL is not the type of dominant lead component that can distinguish these marks because the public has long associated the other component of the mark – SCOUT – with Girl Scouts for leadership and development services for girls.  *See* pp. 10-14, *supra*; *Wrenn*, 2008 U.S. Dist. LEXIS 91913, at *19-21 (Boy Scouts successfully and correctly argued that YOUTHSCOUTS was similar to BOY SCOUTS, CUB SCOUT and EAGLE SCOUT; the marks "employ[ed] the same root term 'scout' in the same context and for competing services in generally the same youth market.").[20]

---

[20]  The cases relied upon by Boy Scouts do not suggest otherwise.  *See generally* Mov. Br. at 23 n.8.  In *Joules Ltd. v. Macy's Merch. Grp., Inc.*, Case No. 15 Civ. 3645 (KMW), 2016 U.S. Dist. LEXIS 101151, at *7 (S.D.N.Y. Aug. 2, 2016), JOULES was found to be dissimilar to MAISON JULES, based in part upon the lack of evidence that defendant ever used or was known by JULES without MAISON.  By contrast, Girl Scouts has long-established rights in SCOUTS alone in the context of leadership and development services for girls.  *See* Section II(A), *supra*. *Maxwell Shoe Co. v. Edelman Shoe Co., LLC*, Case No. 04 Civ. 10694 (RCL), 2004 U.S. Dist. LEXIS 31846, at *6-7 (D. Mass. Aug. 5, 2004), merely stands for (but does not apply) the unremarkable proposition that the first word in some composite trademarks can be dominant, such that its use is more likely to cause confusion.  In *Glenmore Distilleries Co. v. Nat'l Distillers Prod. Corp.*, 23 F. Supp. 928, 932 (E.D. Va. 1938), the court held that competing two-

Boy Scouts next argues that the marks are dissimilar because of the way in which they are presented in the marketplace. *See* Mov. Br. at 23-26. As the evidence demonstrates, however, this is also wrong because Boy Scouts' uses of the SCOUT marks to market its leadership and development services to girls have made confusion more likely, not less likely. Since 2017, many of the flyers, posters and other recruiting and marketing materials created by Boy Scouts for dissemination by its councils, troops and volunteers contain images of girls unaccompanied by text making clear that the sponsoring organization is "Boy Scouts of America" and/or downplaying the very elements that Boy Scouts now argues distinguish the marks such as the CUB SCOUTS logo, the fleur-de-lis logo, the BSA acronym, or the CUB SCOUTS and SCOUTS BSA colors. *See* GS 56.1 St., ¶ 58.[21] Below are just two examples:

---

word marks with different first words and identical second words were distinguishable, but the marks at here are not two-word marks with identical second words, and the second word in the marks at issue in *Glenmore Distilleries* – TAVERN – was not in any way by itself associated with the plaintiff in the minds of the consuming public.

[21]   Neither the fleur-de-lis nor the term BSA are "iconic" or distinguishing when used in the context of offering leadership and development services to girls. GS 56.1 St., ¶ 10; *see also Girls Clubs of Am., Inc.*, 683 F. Supp. at 53 n.3 (presence of alleged distinct logo for Boys Clubs of America "does nothing to discourage the type of confusion likely to occur in this case. . . At best, the logo will indicate that GCA is affiliated with the Boys Club of America and not some other organization. That gives little comfort to GCA.").

 

*See id.* (citing Declaration of Michael Ramsey, Exhibits T and U).

Similarly, popcorn products licensed by Boy Scouts for sale by local councils and troops for fundraising purposes feature girls on the packaging, trumpet that "Over 73% Goes to Scouting" as a fundraising pitch, or thank the purchaser for "Supporting Scouts," but only acknowledge "Boy Scouts of America" as the sponsor in small print on the side of the box or back of the cylinder:





Ewing Dec., Exh. 118 (Dep. Exhs. 29 and 35); *see also* Ewing Exh. 117 (M. Gerard) at 8:18-9:10, 63:5-64:16, 117:15-120:6, 133:8-134:9.  Evidencing actual confusion, and not just likely confusion, purchasers of this popcorn have wrongly believed they were buying it from Girl Scouts, Ewing Dec., Exh. 119, further contradicting Boy Scouts' claim that the context in which its marks appear distinguishes them from the GIRL SCOUTS mark.

To make matters worse, Boy Scouts' councils, troops and volunteers have repeatedly circulated customized flyers, social media posts and other materials using Boy Scouts marketing and advertising collateral with terms like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN alongside images of girls that have caused confusion in the marketplace reported to Girl Scouts, including the below examples:





Horowitz Dec., ¶ 35, Exh. 53 at GSUSA_00085473; Ewing Dec., Exh. 206 at

GSUSA_00132054 (Depo Exh. 224); *see also* Ewing Dec., Exh. 206 (collecting examples);

Ewing Dec., Exh. 86 (T. Rugh) at 184:16-186:16 (confirming creation of "customized creative"

by councils), Exh. 121 (Dep. Exh. 153).  These recruiting and promotional materials are

accompanied by more than just the logos and words reproduced next to each other on page 24 of

Boy Scouts' Moving Brief.  The above examples are therefore more probative of the similarity of

the marks and their resultant propensity to cause confusion because they show how the marks are

actually used in the marketplace, which is the relevant inquiry.  *See*, *e.g.*, *Gap, Inc.*, 2011 U.S.

Dist. LEXIS 71675, at *14.[22]

Finally, that Boy Scouts' own website includes what it describes as "extensive BSA

branding" does not render the marks at issue any less similar.  As discussed above, Boy Scouts

and Girl Scouts recruit in many different ways.  To the extent that Boy Scouts' web page, which

is just one channel for its promotion of girls leadership and development services using SCOUT,

SCOUTS, SCOUTING, SCOUTS BSA, and SCOUT ME IN, may be less ambiguous because,

for example, the full name "Boy Scouts of America" is included at the top of each page, is

immaterial.  Indeed, it only underscores the ambiguity and confusing nature of its other efforts to

---

[22]   Notably, this is not a standard trademark case involving the comparison of two trademarks,
how they appear on packaging, and how those packages may appear on store shelves or in online
marketplaces.  Boy Scouts provides many images and other marketing collateral for use by its
local councils. GS 56.1 St., ¶ 58.  That collateral is then used by the councils in many different
ways and in multiple marketing channels during recruiting, so there is no one context in which
the marks in question appear.  Simply taking some of the marks and the parties' respective logos
out of this context and placing them next to each other therefore is improper and adds nothing to
the inquiry into similarity.  *See*, *e.g.*, *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111
F.3d 993, 1004 (2d Cir. 1997) (side-by-side comparison improper when the products "are not
sold side-by-side on a shelf.").

market to school-aged girls in contexts that do not clearly show that "Boy Scouts of America" is the sponsoring organization.  *See* pg. 21-24 *supra.*

The cases relied upon by Boy Scouts to support its argument for dissimilarity based on marketplace context, Mov. Br. at 23 n.9, 26 n.10, are all distinguishable because they involved findings of dissimilarity based in part on uses of the disputed marks in conjunction with other brand indicia.  Regardless of what other brand indicia may be used by Girl Scouts or Boy Scouts, the SCOUT portion of the marks wrongfully used by Boy Scouts has an independent association with Girl Scouts in the context of leadership and development services for girls, a factor that is notably absent from the cases relied upon by Boy Scouts. [23]

**4.      The Parties' Services Are Now Directly Competitive, and There Is No Gap to Bridge**

The *Polaroid* factor concerned with the parties' competitive proximity addresses "whether and to what extent the two [services] compete with each other," looking to "the nature of the [services] themselves and the structure of the relevant market."  *Cadbury*, 73 F.3d at 480 (quoting *Vitarroz Corp. v. Borden Inc.*, 644 F.2d 960, 967 (2d Cir. 1981)).  When Boy Scouts

---

[23]    *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 386 (2d Cir. 2005) (packaging of the parties' alcoholic beverages was different, as was the prominent featuring of the brand logos along with the challenged marks); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993) (typeface and accompanying legends on magazine cover were different; also, the common word PARENTS does not carry the same public association as SCOUT); *Denimafia Inc. v New Balance Ath. Shoe, Inc.*, Case No. 12 Civ. 4112 (AJP), 2014 US Dist LEXIS 27541, at *62-64 (S.D.N.Y. Mar. 3, 2014) (use of house marks in conjunction with <== mark rendered them dissimilar); *J.T. Colby & Co. v Apple Inc.*, Case No. 11 Civ. 4060 (DLC), 2013 U.S. Dist. LEXIS 65959, at *53-54 (S.D.N.Y. May 8, 2013) (marketplace context differed because plaintiff's marks appeared on physical and electronic books, while Apple's mark appeared in Apple environment with Apple logo); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 521 (S.D.N.Y. 2008) (no similarity between MY CARD. MY WORK and MY LIFE. MY CARD where, among other things, products sold under these marks differed greatly); *First Nat'l Bank of Omaha, Inc., v. MasterCard Int'l Inc.*, Case No. 03 Civ. 707 (DLC), 2004 U.S. Dist. LEXIS 13162, at *26-27 (S.D.N.Y. July 15, 2004) (similarity of SMARTONE and ONESMART undercut by use with famous VISA and MASTERCARD logos).

decided to admit girls to its core programs in 2017, it put the parties into direct competition in the market for leadership and development services for girls, as recognized by both organizations.  *See* GS 56.1 St., ¶¶ 30-31, 53, 59, 164-168; *see also* Ewing Dec., Exh. 100 (Depo Exh. 226) (describing as a "success story" the transition of a Girl Scout troop to the Cub Scouts); *id.* Exh. 183 (Depo Exh. 101) ("Competitive Analysis" document identifying and analyzing Girl Scouts as a competitor if girls were admitted to Boy Scouts' core programs); *id.* at BSA00167345 (Boy Scouts document circulated among members of "GSUSA Retaliation Sub-Team" stating that "Targeting Daisy, Brownie and Junior aged girls to participate in the Cub Scouts would <u>significantly</u> weaken the GSUSA's competitive position." (Emphasis in original.)).

Because Boy Scouts and Girl Scouts are direct competitors, the degree of competitive proximity here is high, and this factor weighs heavily in favor of a finding of likely confusion. *See*, *e.g.*, *Virgin Enters. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003) (confusion more likely the closer the products are to each other in commerce); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988) ("Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity."); *Girls Clubs of Am., Inc.*, 683 F. Supp. at 54 (offerings of co-educational Boys Clubs of America and girls-only Girls Clubs of America were competitively proximate); *cf. Wrenn*, 2008 U.S. Dist. LEXIS 91913, at *19 (proximity conceded by founder of National Council of Youthscouts, a co-ed scouting organization, because it directly competed with Boy Scouts).

Boy Scouts relies on the distinction that Girl Scouts' offerings are exclusively for girls, while Boy Scouts' programs have "no such emphasis," Mov. Br. at 26, which is irrelevant to the proximity analysis.  When faced with a very similar question, the court in *Girls Clubs of Am., Inc.*, characterized as "immaterial" the fact that The Boys Clubs of America's after-school

66

programs had become co-ed and the Girls Clubs of America's after-school programs were girls-only. *Id.* at 54; *see also Virgin Enters*., 335 F.3d at 150-51 (products need not be identical to be proximate; proximity exists between sales of audio equipment and telephone equipment).

Boy Scouts cannot avoid the competitive proximity of the parties' programs.  Both SCOUTING programs promote character traits such as honesty, friendliness, helpfulness and respect among SCOUTS, and they both emphasize outdoor activities.  GS 56.1 St., ¶¶ 263-274. Their respective members typically meet as a group of girls about the same age, organized and led by adult volunteers, and also participate in events held by their local councils and go to camp. *Id.* ¶ 266.  Members of both organizations advance through named ranks or levels based at least in part on their ages; earn badges for mastering various skills or achieving various accomplishments; wear uniforms that contain elements in shades of green, blue or brown to which those badges can be affixed; participate in fundraising activities that involve selling food; and offer a highest and most prestigious award (Gold Award for Girl Scouts and Eagle Scout for Boy Scouts) that require, among other things, significant accomplishments in service or leadership.  *Id.* ¶¶ 267-270.  In light of these similarities, the fact that Girl Scouts' services are, and always have been, targeted specifically to girls, does not defeat a finding of proximity.  *Girls Clubs of Am., Inc.*, 683 F. Supp. at 54 ("Indeed it is because defendant's services may be somewhat different, and possibly (but not necessarily) inferior to those offered by the plaintiff, that protection from likely confusion is available.") (citation omitted).

Boy Scouts also argues that Girl Scouts has admitted in documents and deposition testimony that, because of Girl Scouts' girls-only history, development and focus, the parties serve different markets.  *See* Mov. Br. at 26-27.  Boy Scouts even goes so far as to coin a name for Girl Scouts' purportedly distinct market segment: "'girls only' adherents."  *Id.* at 27.

However, the evidence cited by Boy Scouts on pages 26-27 of its Moving Brief does not establish a distinct "girls only adherents" market segment; it merely underscores Girl Scouts' view that its programming is superior and distinctive, in part because of the generations of girls it has successfully served, and the fact that it has always been girl-led.  *See* GS 56.1 St., ¶¶ 59-62.

When analyzing marketplace structure for the proximity inquiry, courts look at several factors, including "the class of customers to whom the goods [and services] are sold, the manner in which the products are advertised, and the channels through which the goods  [and services] are sold."  *Gap, Inc.*, 2011 U.S. Dist. LEXIS 71675 at *36.  Here there is substantial overlap in those factors.  Both Boy Scouts and Girl Scouts offer their programs to school-age girls and their parents throughout the entire country.  GS 56.1 St., ¶¶ 263-274.  Their local councils are primarily responsible for both recruiting and retaining members, as well as administering the parties' respective programs and related services.  GS 56.1 St., ¶¶ 252-274.  These substantial similarities demonstrate the proximity in the parties' markets.  *See*, *e.g.*, *Gap, Inc.*, 2011 U.S. Dist. LEXIS 71675 at *36 (some overlap between class of consumers for defendant's outdoor activities and plaintiff's apparel was sufficient to support finding of proximity).

The cases relied upon by Boy Scouts, Mov. Br. at 26-27, are inapposite because none involved services or markets with nearly as many commonalities as those at issue here.  For example, *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 388, 396 (2d Cir. 1995), involved plaintiff's hand-operated staplers for home use and defendant's pneumatic staplers for commercial use.  These products served different markets, were not competitive, and therefore there was little proximity between them.  Boy Scouts' other cases are similarly distinguishable.  *See Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 485-86 (S.D.N.Y. 2004) (hip hop and contemporary concert music labels appealed to very different audiences, and

recordings were sold in different trade channels); *Malaco Leaf, AB v. Promotion In Motion, Inc.*,
287 F. Supp. 2d 355, 373 (S.D.N.Y. 2003) (parties agreed that products in question would not be
sold together); *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.
1985) (one of two magazines specifically emphasized "third world and West Indian cultures,"
and magazines also differed in appearance, size and geographic distribution); *Vitarroz Corp.*,
644 F.2d at 967 (plaintiff targeted a distinct group of consumers who shop for crackers at
specialty stores, many of which did not even carry defendant's product).

As for the fourth *Polaroid* factor it "inquires whether a plaintiff is likely to enter a
defendant's market, or 'bridge the gap.'" *Morningside Group Ltd. v. Morningside Capital
Group, LLC*, 182 F. 3d 133, 141 (2d Cir. 1999).  As discussed above, the parties are in direct
competition in the market for leadership and development services for girls, *see* pp. 17-21, *supra*,
so there is no gap to bridge, making this factor irrelevant, *Morningside Group*, 182 F.3d at 141;
*see also Star Indus. v Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (when goods or services
are competitively proximate, "there is really no gap to bridge, and this factor is irrelevant to the
*Polaroid* analysis").  Boy Scouts argues incorrectly that this factor favors it because Girl Scouts
does not intend to begin offering leadership and development services for boys.  Mov. Br. at 27.
This argument focuses on the wrong question; the relevant market in this case is leadership and
development services for girls, in which both parties now directly compete, as repeatedly
acknowledged by Boy Scouts.  *See* pp. 17-21, *supra*.

**5.     Substantial Actual Confusion Has Already Occurred, and
        There Is Also Survey Evidence Showing That Such Confusion Is Likely**

Eager to press infirm legal theories, Boy Scouts skips over the role of actual confusion
evidence in the Court's assessment of the *Polaroid* factors.  *See* Mov. Br. at 27.  But just after
the passage Boy Scouts quotes from *Sports Authority*, the court explained that "[f]or purposes of

the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *Id.* at 963 (internal quotations omitted) (reversing summary judgment for defendant because of fact issues on likelihood of confusion). Actual confusion is shown by evidence that the infringement "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id.* (internal quotations omitted). Actual confusion is thus not limited to diversion of sales alone. *See id.*

Ignoring most of the extensive evidence of actual confusion, Boy Scouts focuses on seven individuals as to whom Boy Scouts claims there is insufficient evidence of mistaken enrollment. Mov. Br. at 28. Boy Scouts suggests that only proven instances of girls mistakenly enrolling in Boy Scouts, thinking they were enrolling in Girl Scouts, would be sufficient evidence of actual confusion. *See id. Sports Authority* rebuts this argument:

> [Appellant's] claim in this action is not that [Appellee's] use of the words 'the sports authority' will drive down its clothing sales in a direct manner; instead, [Appellant] is contending that [Appellee's] use will lead consumers to be confused as to whether [Appellant] sponsors [Appellee's] activities, with a resulting loss of control by [Appellant] over how the public perceives [its] stores and the services that they provide. Such a claim is cognizable under the Lanham Act.

89 F.3d at 964. Indeed, "evidence of actual confusion need not be limited to evidence of mistaken *completed* transactions." *Morningside Group*, 182 F.3d at 141 (emphasis in original). "[E]vidence of actual confusion regarding affiliation or sponsorship is also entirely relevant to the ultimate likelihood-of-confusion inquiry." *Id.* Girl Scouts also has a "sufficient trademark injury" based on initial interest confusion, in that Boy Scouts' use of branding similar to Girl Scouts lent Boy Scouts "credibility during the initial phases of its interaction with a potential customer." *See Gap, Inc.*, 2011 U.S. Dist. LEXIS 71675, at *38 (quoting *Mobil Oil*, 818 F.2d at 259) (internal quotations omitted). As explained below, there is significantly more evidence of

mistaken purchasing decisions than Boy Scouts admits, ***but even if there were none***, these additional forms of actual confusion are actionable.

The record is replete with evidence of mistaken purchasing decisions, erroneous perception of sponsorship or affiliation, and initial interest confusion. *See* GS 56.1 St., ¶¶ 185-251.  The incidents of confusion include:

- Parents' and school officials' confusion about whether Girl Scouts would hold (or even whether Girl Scouts should be allowed to hold) recruiting events, following Boy Scouts' re-branding, based on the mistaken perception that the two organizations were now the same. *See, e.g.*, GS 56.1 St., ¶¶ 200, 204, 206-07, 213, 223, 239.

- Widespread erroneous public perception, such as at churches,[24] that Boy Scouts and Girl Scouts merged or were otherwise working together. *See, e.g.*, GS 56.1 St., ¶¶ 186, 188, 191, 196-97, 210, 212, 213, 223, 225, 229, 233, 239, 244.

- Boy Scouts councils, businesses, the media, and community members using Girl Scouts' trademarks, images of Girl Scouts uniforms, or its curriculum to describe or promote Boy Scouts activities. *See, e.g.*, GS 56.1 St., ¶¶ 187, 189, 190, 192-95, 198-99, 203, 208, 211, 211-18, 221-22, 243.

- Boy Scouts' fomenting confusion through aggressive recruiting tactics, like positioning Boy Scout tables near Girl Scout tables at community events, and advising parents that Boy Scouts was "now accepting Girl Scouts." *See, e.g.*, GS 56.1 St., ¶¶ 202, 205, 209, 229.

- Boy Scouts councils receiving inquiries from parents about "girl scouts" and responding with information about Boy Scouts' programs for girls, often without correcting the parents' evident misimpression that they were contacting a Girl Scouts council. *See, e.g.*, GS 56.1 St., ¶¶ 231-32, 234-35, 237-38, 241-42, 245.

There is also more evidence – despite Boy Scouts' denials – of mistaken purchasing decisions.  Boy Scouts does not convincingly refute the seven individuals Boy Scouts addressed

---

[24] The rampant confusion among schools (where significant recruiting occurs) and churches (which often sponsor Girl Scouts troops) confirms parents are likely to be confused. *See Berkshire Fashions, Inc. v. Sara Lee Corp.*, 725 F. Supp. 790, 796-97 (S.D.N.Y. 1989) (trade confusion is highly probative as to the existence of consumer confusion, because wholesalers and retail dealers may be more sophisticated about the origins and sources of products than ordinary consumers).

in its briefing.  *See* GS 56.1 St., ¶ 64.  Boy Scouts also fails to address other evidence of mistaken sign-ups by parents in Massachusetts in 2018, GS 56.1 St., ¶ 197, and in 2019, *id.*, ¶ 236; a parent in Maryland in 2018, *id.* ¶ 205; at least two parents in Texas, *id.* ¶ 214; and a parent in North Carolina in 2019, *id.* ¶ 240.

In addition, Boy Scouts' own "joiner surveys" of new parents whose children have joined CUB SCOUTS and SCOUTS BSA in 2018 and 2019 have disclosed additional instances of mistaken enrollment, in which parents expressly told Boy Scouts that they had enrolled their children into those programs under the mistaken belief that they were signing their children up for Girl Scouts programs.  *See id.*, ¶¶ 246-249.  To be sure, there may not be a lot of such parents reported in this data.  But the joiner surveys are voluntary and only generate a response rate of roughly 10%, so the sample size is small.  *See id.*  And the fact that even a few parents actually admitted that they enrolled their children in Boy Scouts' programs thinking they were signing up with Girl Scouts – and then elected to ***stay*** with Boy Scouts – is remarkable, both for the candor of the respondents and the fact that Girl Scouts is plainly losing recruits because of confusion caused by Boy Scouts.  *See McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1277 (S.D.N.Y. 1986) ("any evidence of actual confusion is, of course, highly persuasive in proving the existence of its likelihood [of confusion]").

Even if the above evidence did not exist, Boy Scouts' legal theory that the supposed "absence of [actual confusion] evidence is proof of the absence of actual confusion" is also wrong.  Mov. Br. at 29 (citing *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*, 634 F. Supp. 1468, 1478 (S.D.N.Y. 1986)).  The cited passage in *Universal City* concerned survey evidence in the context of a preliminary injunction, not incidents of actual confusion, as Boy Scouts claims. *Id.*  Binding authority provides that "although evidence of actual confusion is very helpful to an

infringement claimant, its absence is not fatal."  *Car-Freshner*, 980 F.3d at 332.  After all, "the

absence of evidence of actual confusion does not necessarily prove anything, especially when

there has been neither long nor significant experience of the two trademarks operating side-by-

side in the same market."  *Guthrie Healthcare System v. ContextMedia, Inc.*, 826 F.3d 27, 44 (2d

Cir. 2016).  "Unless evidence of actual confusion falls into the senior user's lap, as where it

receives inquiries from the public about the junior user's products, absence of evidence of actual

confusion does not necessarily support the proposition that there has been no confusion."  *Id.*

"Evidence of actual confusion can be both expensive and difficult to obtain."  *Id.*

　　This case is no different.  The parties have not operated in the same market for long –

Boy Scouts only opened its CUB SCOUTS program to girls nationwide in August 2018, and its

SCOUTS BSA program in February 2019.  GS 56.1 St., ¶¶ 33-34.  Yet confusion has flourished

in this short time.  Boy Scouts has frequently reminded the Court that both parties are non-

profits, and yet now Boy Scouts argues Girl Scouts should have engaged in an even more

expensive and difficult search for actual confusion evidence.  The law does not require Girl

Scouts to have done so; indeed, Boy Scouts objected on the ground of undue burden when Girl

Scouts pressed for the production of more documents from Boy Scouts council employees

involved in marketing and recruiting matters.  Girl Scouts has identified overwhelming evidence

of actual confusion, described, among other places, in the ***eighteen*** depositions Boy Scouts took

of representatives of Girl Scouts councils.  That is more than enough.

　　Turning from this to the centerpiece of Boy Scouts' argument, it boldly asserts, citing to

three paragraphs of its Rule 56.1 Statement, that Girl Scouts "has not substantiated a single

admissible instance of actual confusion attributable to the Marks at issue."  Mov. Br. at 29.  Boy

Scouts makes two mistakes that drive this statement – ignoring evidence of causation and misunderstanding the law of admissibility.

Seeking to avoid responsibility for its actions, Boy Scouts invents a causation requirement that does not exist.  Boy Scouts contends that Girl Scouts cannot prove the existence of any actual confusion because Girl Scouts has no evidence as to why any individual was confused.  *See* Mov. Br. at 28.  Boy Scouts plucks a quote from *Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*, 851 F.3d 440, 457 (5th Cir. 2017) to argue: "'[E]vidence of actual confusion … must show that the confusion was *caused by the trademarks employed*." Mov. Br. at 27 (emphasis added by Boy Scouts).[25] *Streamline* affirmed the finding of actual confusion premised on the display of an infringing name on a product.  *Id.  Streamline* did not hold that a plaintiff must present testimony from a confused person about why he or she was confused.  *See id.*

Only by ignoring the swaths of evidence that Boy Scouts claims is inadmissible is Boy Scouts able to claim there is no evidence it caused any of the confusion.  Boy Scouts' buck-passing is not new.  From the earliest days of Girl Scouts' efforts to stop Boy Scouts' confusion-producing behavior, Boy Scouts has pointed the finger everywhere but at its own actions. Beginning in 2017, Girl Scouts wrote 36 letters to Boy Scouts or Boy Scouts councils objecting to a wide range of trademark infringement and other misconduct.  GS 56.1 St., ¶ 36.  Boy Scouts' responses to these letters blamed "volunteers and non-lawyer employees," "volunteer

---

[25]   Boy Scouts also relies on two cases from this District in which the court was weighing evidence, not ruling on a summary judgment motion.  *See* Mov. Br. at 28-29 (citing *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*, 634 F. Supp. 1468, 1478 (S.D.N.Y. 1986) (denying preliminary injunction); *Inc. Pub. Corp. v. Manhattan Mag., Inc.*, 616 F. Supp. 370, 388 (S.D.N.Y. 1985), *aff'd sub nom. Inc. Pub. Corp. v. Manhattan Mag.*, 788 F.2d 3 (2d Cir. 1986) (findings following bench trial).  These fact-specific cases also do not help Boy Scouts.

leaders," "one of our units in the suburbs," a local church, "BSA unit volunteers," "a well-intentioned volunteer," a newspaper reporter (who supposedly asked a "leading question"), and an unnamed "local organization," among others.  GS 56.1 St., ¶¶ 39, 187, 189-190, 199, 203, 210-11.  According to Boy Scouts, blame for the rampant marketplace confusion lies at everyone's feet but its own.

Moreover, Girl Scouts has identified more than sufficient evidence that Boy Scouts' branding caused actual confusion.  Despite the fact that Boy Scouts and Girl Scouts have existed for more than a century, at no time prior to 2018, as far as Girl Scouts is aware, had any girl or young woman ever signed up or been signed up for a Boy Scouts' program under the mistaken belief that the program in question was sponsored by Girl Scouts (nor has Boy Scouts identified any).  GS 56.1 St., ¶ 158.  Yet, beginning in 2018, and continuing through the present, multiple parents or guardians have advised both Girl Scouts and Boy Scouts that they mistakenly enrolled their daughters in Boy Scouts' programs when they intended to enroll them in Girl Scouts' programs, *see* GS 56.1 St.,  ¶¶ 64, 65, 197, 201, 205, 216, 220, and 236, or otherwise confused the two parties in the many ways Girl Scouts has documented since 2017.  Such confusion, which began to occur only when Boy Scouts adopted the trademarks SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN in connection with girls leadership and development services offered through its core CUB SCOUTS and SCOUTS BSA programs for the first time in its history, can only be attributable to the use of such designations.  Multiple Girl Scouts witnesses testified, based on their long involvement with the Girl Scouts Movement, that they had never encountered members of the public believing Girl Scouts and Boy Scouts were the same organization – until Boy Scouts adopted its new trademarks.  *See, e.g.* ¶¶ 197, 224, 227.

One Girl Scouts witness, Sandra Emmons DeTora, who is both a Girl Scouts volunteer

and an employee of a Boy Scouts chartering organization, has testified that

> In most cases, based on my observations, the confusion I have seen stems from
> Boy Scouts use of the name "Scouts BSA" to designate its program for older
> youth that now includes girls.  In general, I believe that the acronym "BSA" is a
> term that individuals in the youth service field are likely to understand stands for
> "Boy Scouts of America," but most people in the general public, with whom I
> interact, do not know what it stands for.  Because so few prospective parents of
> youth service program participants know what "BSA" means, they tend to focus
> on the term "Scouts."  When "Scouts" or "Scouting" are used by themselves in
> connection with services for girls, my experience is that many people believe
> those services come from Girl Scouts, not Boy Scouts.

*See* the accompanying Declaration of Sandra Emmons DeTora, ¶ 6.  Based on this testimony and

that of other witnesses, there is a clear causal connection between Boy Scouts' uses of its

confusing SCOUTS branding for girls services and the resulting marketplace confusion.

But wait, says Boy Scouts: what about the fact that there is a subset of American

consumers who have long believed the two organizations are connected in some way?  GS 56.1

St., ¶¶ 67-68; Mov. Br. at 1.  According to Boy Scouts, Girl Scouts' own research shows that

nearly half of the public believes the two organizations are related, so the confusion Girl Scouts

has documented, assuming there was any, can't necessarily be attributable to it.  *Id.*  Setting aside

the fact that the research in question has some methodological limitations that make its findings

questionable at best, and that Boy Scouts' own research shows a far lower percentage of

previously mistaken consumers, GS 56.1 St., ¶¶ 67-68, there are three other problems with Boy

Scouts' argument.  First, if a significant percentage of consumers has long believed the two

organizations are connected in some way, there is no excuse for Boy Scouts to have exacerbated

such false perceptions, which is precisely what it has done.  Second, if there were such confusion

to a material degree, it should have manifested well before 2017, but it did not as far as either

organization is aware.  GS 56.1 St., ¶ 158.  The explosion of confusion since 2017 therefore

cannot be attributed to preexisting beliefs held by some consumers, but has to be attributable to Boy Scouts' expansion to girls under designations like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN.

Second, and most importantly, Girl Scouts tested Boy Scouts' proposition in Dr. Ericksen's confusion survey, which showed that a net 26.9% of respondents surveyed are "likely to be confused by BSA's use of SCOUTS and SCOUTING in connection with programs and activities for girls."[26]  Ericksen Dec., ¶ 4.  Dr. Ericksen's control was specifically designed to assess the differences in responses among consumers shown a test stimulus that depicted Boy Scouts' current branding for girls services and a control stimulus that reflected Boy Scouts prior branding – BOY SCOUTS – were it to be used for the same girls services.  *Id.*, ¶¶ 7, 17-23.  The difference in responses is startling and confirms that, to the extent there is a subset of consumers who have long believed Girl Scouts and Boy Scouts are connected in some way, what Boy Scouts is doing now is dramatically increasing confusion in the marketplace.  This is not surprising.  As noted, the words SCOUT, SCOUTS and SCOUTING, when used in connection with youth leadership and development services offered to girls, are exclusively associated with Girl Scouts.  *See* GS 56.1 St., ¶ 141.  Boy Scouts generated significant actual marketplace confusion by adopting these trademarks in connection with girls leadership and development programs.

Finally, as to admissibility, and perhaps waiting for its reply brief, Boy Scouts does not provide much detail about why it believes Girl Scouts' evidence as to actual confusion is

---

[26]   Survey evidence of confusion at such a level is significant.  *See Coty*, 277 F. Supp. 3d at 450 ("Cases have held that 20% constitutes a substantial percentage of consumers") (quoting *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008)).

inadmissible.  Boy Scouts broadly labels the evidence as "hearsay" and "anecdote."[27]  Mov. Br. at 27-31.  But the cases Boys Scouts cites do not support its position.  Just two paragraphs after the quote from *Streamline Production Systems* that Boy Scouts emphasizes in its causation argument, the Fifth Circuit rejected the admissibility argument Boy Scouts advances: "We have previously rejected hearsay objections to indirect testimony about actual confusion, explaining that such evidence is not offered for the truth of the matter asserted but rather to show effect on consumers, namely, confusion."  *Id.*, 851 F.3d at 458.  So too in this District.  *Fun-Damental Too*, 111 F.3d at 1003-04 (testimony from national sales manager concerning his observations of customer confusion not hearsay); *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 378 n.1 (S.D.N.Y. 2015) (holding plaintiff's employees' anecdotes about customers' confusion admissible as evidence to show the customers' states of mind under Fed. R. Evid. 803(3)); *Cache, Inc. v. M.Z. Berger & Co.*, 99 CIV. 12320 (JGK), 2001 WL 38283, at *9 (S.D.N.Y. Jan. 16, 2001) (same).

Boy Scouts further fails to address most of the evidence of confusion and dismisses the evidence it does address as "anecdotal."  *See, e.g.*, Mov. Br. at 28 n.12.  The cases Boy Scouts cites, however, make clear that "[a] plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both."  *See Streamline Production Systems*, 851 F.3d at 457 (cited at page 27 of BSA's brief).  "Even if the anecdotes are minor and isolated, courts may not ignore competent evidence of actual confusion."  *Id.* (quotation marks omitted).  "Generally speaking, an infringement plaintiff undertakes to prove

---

[27]   Other possible evidentiary challenges would also be unfounded.  At this summary judgment stage, Girl Scouts need only show the information submitted in opposition to Boy Scouts' motion is reducible to admissible evidence sufficient to carry Girl Scouts' burden at trial.  *See Daniel v. Am. Bd. of Emerg. Med.*, 237 F. Supp. 2d 336, 352 (W.D.N.Y. 2002).

actual confusion between his and the defendant's product in two ways: anecdotal evidence of particular incidents, and market research surveys." *Inc. Pub. Corp. v. Manhattan Mag., Inc.*, 616 F. Supp. 370, 386 (S.D.N.Y. 1985), *aff'd sub nom. Inc. Pub. Corp. v. Manhattan Mag.*, 788 F.2d 3 (2d Cir. 1986) (cited at pages 28 to 29 of Boy Scouts Moving Brief).  The record in this case has both – extensive anecdotal evidence of incidents of actual confusion and expert testimony substantiating Girl Scouts' trademark injury.

**6.      Boy Scouts Acted in Bad Faith**

In the *Polaroid* analysis, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 536 (S.D.N.Y. 2011); *see also Cadbury*, 73 F.3d at 483. At the same time, courts in the Second Circuit have held that "[w]here we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2nd 217, 248 (S.D.N.Y. 2004) (quoting *Mobil Oil Corp.*, 818 F.2d at 258-59).

In its Moving Brief, Boy Scouts states that Girl Scouts has "zero evidence of bad faith" and describes this factor as a "non-starter," *id.* at 31, but neither of these conclusory assertions bears any resemblance to reality.  According to Boy Scouts, its supposed prior use of SCOUTS BSA,[28] as well as SCOUT, SCOUTS and SCOUTING for over a century, insulates it from any

---

[28]    Separate and apart from the total absence of evidence that Boy Scouts ever used SCOUTS BSA prior to 2017 in connection with girls services, its use of that designation in any way prior to 2018 appears to have been sporadic at best.  Based on its submissions, the only evidence Boy Scouts has been able to muster of use of that term prior to 2018 consists of uniform pocket strips used in the 1970s with SCOUT B.S.A. (singular) on them, and use as a secondary domain name that, between 2001 and 2018, reverted to Boy Scouts' primary URL, scouting.org.  GS 56.1 St.,

claim that it acted in bad faith.  Mov. Br. at 31-32.  But this willfully blind argument should not be credited, for it wholly ignores that Boy Scouts' use of terms like SCOUT, SCOUTS and SCOUTING throughout that century until 2017 focused almost entirely on boys youth and leadership services that were designed for boys, marketed to boys, for the benefit of boys, to the point that, prior to 2017, Boy Scouts described boys as "the main reason the rest of the organization exists.  Programs are designed to meet his need at the appropriate age and grade level."  Ewing Dec., Exh. 77 at BSA00058701.  Had Boy Scouts acted in a manner consistent with its historical branding and used BOY SCOUTS to designate a coeducational program for older youth, and done what it said it would do years ago and only used terms like SCOUT, SCOUTS and SCOUTING when they were accompanied by terms like BOY SCOUTS OF AMERICA, so as to make clear the identity of the organization sponsoring such communications, GS 56.1 St., ¶¶ 146-147, this lawsuit would not have been necessary.

But that is not what Boy Scouts did.  Boy Scouts understood for most of that same last century that "where the word 'Scout' was employed for a purpose distinctively related to girls and girls wear, the obvious connotation would be to 'Girl Scouts.'"  GS 56.1 St., ¶ 131.  In 2018, Boy Scouts also understood that SCOUTS, which was the consensus internal choice for its new, coeducational program for older youth, should not be used as a program name and selected SCOUTS BSA instead.  Why?  "[T]o make sure there wouldn't be confusion with any other organization's programs."  *Id.*, ¶ 182.  Obviously, the "other organization" has to be Girl Scouts.

---

¶¶ 42-43.  And as far as Boy Scouts' documents suggest, there is no indication that these uses played any role in the selection of SCOUTS BSA as the replacement trademark for Boy Scouts' formerly boys-only BOY SCOUT program.  Ewing Dec., Exh. 101 (Dep. Exh. 80) at BSA00165775-76; Exh. 67 (M. Ramsey) at 267:3-270:21.  Boy Scouts also made no effort to register SCOUTS BSA until 2018; Girl Scouts has opposed this pending application.  GS 56.1 St., ¶ 42.

Therefore, Boy Scouts knew full well in 2017, just as it had in the 1930s and 1970s, that SCOUT, SCOUTS and SCOUTING, when used in connection with girls' services, could ***only*** create associations with Girl Scouts unless other distinguishing content referencing Boy Scouts of America appeared in advertising and promotional materials. *Id.*, ¶¶ 131, 147-148. But it did so anyway, and the only plausible inference is that its motive was to free ride off of Girl Scouts "impeccable" reputation and boost its position in a "new market – Girls in Scouting." *Id.*, ¶¶ 164, 174.

Evidence of such an intent is contained in Boy Scouts' internal discussions about how Girl Scouts would react to the expansion of its core programs to girls, which was described as follows: "We will essentially be raiding their youngest members who the GSUSA regards as the base of their organization. . . . This move would be a direct assault on their foundation." *Id.*, ¶ 164. There can be no more effective way to effectuate such a "raid" than by sowing confusion between the parties' programs, exacerbating associations that already existed, and eventually achieving the "hostile takeover" that one Boy Scouts Council Executive expressed concerns about. *Id.*, ¶ 168. And on top of that, after claiming publicly that SCOUTS BSA was chosen to prevent confusion with "other youth-serving organizations," *id.*, ¶ 182, Boy Scouts has repeatedly pressed ahead with emphasizing SCOUTS and deemphasizing BSA, resulting in all-too-predictable marketplace confusion. *Id.*, ¶ 183 ("Both male and female participants in the Scouts BSA program will be referred to as 'Scouts,' just as boys now in the Boy Scout program are often referred to as 'Scouts'").[29] *See Gucci*, 843 F. Supp. 2d at 425 (similarity between

---

[29] There is also no evidence that the BSA acronym has had any mitigating effect on the prevalence of confusion in the marketplace. *See* Section II(B)(4), *supra.* In particular, there is no evidence that this acronym, when used with girls' leadership and development services, is understood by the public to communicate that such services are sponsored by Boy Scouts. DeTora Dec., ¶ 6.

defendant's mark and that of plaintiff created "a reasonable inference that [defendant] had a bad faith intent to deceive consumers by using the mark").

In this Circuit, "the second comer has a duty to so . . . dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 228 F. Supp. 2d 399, 410 (S.D.N.Y. 2002) (quoting *Mobil Oil*, 818 F.2d at 259)). Here, Boy Scouts – as the second comer with respect to SCOUTS for girls services – completely failed to fulfill this duty. Indeed, it did whatever it could to foster confusion, not prevent it, by choosing to use terms like SCOUT ME IN, SCOUTS BSA and SCOUTS in ways that have caused so much confusion among consumers. In light of such evidence that gives rise, at the least, to a reasonable inference of bad faith, there is no proper basis for the entry of summary judgment in Boy Scouts' favor on this issue. *See Friedland Brands*, 228 F. Supp. 2d at 410 ("'subjective issues such as good faith are singularly inappropriate for determination on summary judgment'") (quoting *Cadbury*, 73 F.3d at 483).

**7.     The *Polaroid* Factors Concerned With the Quality of the Products and the Sophistication of The Parties' Target Audiences Favor Girl Scouts**

The penultimate *Polaroid* factor considers "whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Group*, 182 F.3d 133 at 142. Here, Boy Scouts conclusorily asserts that its programs are of high quality, such that this factor favors it. Mov. Br. at 32-33. However, there is, unfortunately, significant contrary evidence. Specifically, almost a hundred thousand former Boy Scouts have come forward with allegations of sexual and other abuse perpetrated against them while they were participants in Boy Scouts programs. Ewing Dec., Exh. 134, ¶¶ 17, 56 (Boy Scouts filing in its ongoing bankruptcy proceeding stating that more than 95,000 abuse claims have been filed in that proceeding). Social media postings have linked the allegations

against Boy Scouts to Girl Scouts.  Ewing Dec., Exh. 282.  In light this, and Boy Scouts'

acknowledgement that "there were times in the past when we failed the very children we were

supposed to protect," *id.*, Exh. 135, and that "decades ago, BSA did, in at least some instances,

allow individuals to return to Scouting even after credible accusations of sexual abuse,"  Ewing

Dec., Exh. 136, there is conflicting evidence as to quality, such that that a grant of summary

judgment would be inappropriate.  *See Nat'l Baseball Hall of Fame & Museum, Inc. v. All sports

Promotions Grp., Inc.*, Case No. 99 Civ. 3635 (KMW), 2001 U.S. Dist. LEXIS 1592, at *28-30

(S.D.N.Y. Feb. 20, 2001) (denying summary judgment on the issue of quality where there was

conflicting evidence about whether negative publicity about defendants' services had tarnished

plaintiff).

       In order to obscure the genuine disputes of fact pertaining to the last *Polaroid* factor – the

sophistication of the relevant purchasers – Boy Scouts cites to the Second Circuit's decision in

*Star Industries, Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005), for the proposition that

"in some cases a court is entitled to reach a conclusion about consumer sophistication based

solely on the nature of the product." *See* Mov. Br. at 33.  This is not one of those cases.  The

Second Circuit in *Star Industries* was "left to rely solely on such indirect indications of

sophistication" because the parties there did "not [submit] any relevant experts opinions." *Id.*[30]

Here, both parties have served expert reports with relevant, and conflicting, opinions about how

---

[30]   The remaining cases cited by the Boy Scouts in its discussion of this *Polaroid* factor are
equally inapposite. On appeal to the Sixth Circuit, the parties in *Ignition Athletic Performance
Grp., LLC v. Hantz Soccer U.S.A., LLC*, 245 Fed. Appx. 456, 459 (6th Cir. 2007), "concede[d]
that [the likely degree of purchaser case] [was] not a significant factor."   *Heartsprings, Inc. v.
Heartspring, Inc.*, 949 F. Supp. 1539, 1544 (D. Kan. 1996), concerned "treatment and education
for severely disabled children," services that are not at issue here.  Finally, *Quia Corp. v. Mattel,
Inc.*, Case No. C 10–1902 JF (HRL), 2010 WL 2486364, at *10 (N.D. Cal. June 15, 2010),
concerned educational technology for children as young as three years of age.

consumers enroll their children in Girl Scouts and Boy Scouts programs, the varying degrees of consumer involvement in those decisions, and how consumers process information in considering youth leadership and development programs.  *See id.* ("Consumer sophistication may be proven by direct evidence such as expert opinions."); *see also* the accompanying Declaration of Erich Joachimsthaler ("Joachimsthaler Dec."), Exh. 13 (Joachimsthaler Report); Joachimsthaler Dec. at ¶¶ 4, 9, 11-22.

Boy Scouts' argument is essentially that confusion is unlikely because: (i) parents and guardians *always* take great care in choosing services to be provided to their children; and (ii) the purchasing process contains many steps with many opportunities to dispel confusion.  Mov. Br. at 33-34.  Boy Scouts' argument misses the mark on both points.  First, while *some* parents and guardians likely take great care in signing their daughters up for a youth leadership development program, the facts show that *others* do not, as evidenced by the multiple instances reported to both Boy Scouts and Girl Scouts of parents mistakenly signing their children up for Boy Scouts programs when they had intended to sign up for Girl Scouts programs.  GS 56.1 St., ¶¶ 64, 197, 205, 220, 236, 246-249.  The fact that some parents have admitted to Boy Scouts that they enrolled their daughters in the CUB SCOUTS and SCOUTS BSA programs under the mistaken belief that these programs were sponsored by Girl Scouts, but decided to remain in Boy Scouts programs, categorically establishes the harm Girl Scouts is suffering in the marketplace because of Boy Scouts wrongful actions and the confusion it has caused.  And the fact that Boy Scouts never even bothers to mention the results of its own joiner survey data on its motion speaks volumes about its unwillingness to be straightforward with the Court.

Girl Scouts' marketing and branding expert, Dr. Joachimsthaler, has opined that "[t]he current absence of material perceived differences between the Girl Scouts and Boy Scouts

programs suggests that some consumers make decisions with relatively little care based on less information than is typical when services offered to children are under consideration, and make the decision to enroll more quickly as well." Declaration of Erich Joachimsthaler ("Joachimsthaler Dec."), Exh. 13 ( Joachimsthaler Report) at ¶ 13(d); Joachimsthaler Dec., ¶ 9. Dr. Joachimsthaler has concluded that "[f]or these consumers, it is very likely that, upon encountering ambiguous terms like "Scouts," "Scouts BSA," or "Scout Me In," used in connection with girls leadership and development services without any clarifying context, they will not engage in complex purchasing behavior and will not exhibit the same degree of care that is typical of complex buying behavior; instead they will engage in dissonance-reducing buying behavior."  Joachimsthaler Dec., Exh. 13 (Joachimsthaler Report) at ¶ 102; Joachimsthaler Dec., ¶ 16. Moreover, Boy Scouts' own joiner survey data indicates that 20.9% of its members joined due to recommendations from family and friends and 21% of members joined because of interactions with the brand at school in 2019.  Joachimsthaler Dec., Exh. 13 (Joachimsthaler Report) at ¶ 104; Joachimsthaler Dec., ¶ 18; GS 56.1 St., ¶¶ 246-249.  It is Dr. Joachimsthaler's opinion that, in these situations, consumers likely use less care and engage in less information searching.  Joachimsthaler Dec., Exh. 13 (Joachimsthaler Report) at ¶ 104; Joachimsthaler Dec., ¶ 18.

Based on these facts, confusion is more likely and this factor should favor Girl Scouts because prior cases have long indicated that "when a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class."  *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991); *see also Omega Importing Corp. v. Petri-Kine Camera Co*., 451 F.2d 1190, 1195 (2d Cir. 1971) ("the standard to be employed is the ordinary purchaser, not the expert" when the

product is sold and used by both experts and novices alike); *Mrs. U.S. Nat'l Pageant, Inc. v. Miss U.S.A. Org., LLC*, 875 F. Supp. 2d 211, 230 (W.D.N.Y. 2012) (adopting the standard for measuring consumer sophistication articulated by the court in *Ford Motor*).

Boy Scouts' second point – that confusion is unlikely because the enrollment processes consists of multiple touchpoints – collides with the reality that many consumers with an interest in Girl Scouts programs are likely being misled initially into believing that SCOUTING programs they encounter for SCOUTS under the trademark SCOUT ME IN are offered by Girl Scouts, even if they later realize that they are enrolling in or have enrolled in a Boy Scouts program.  The reasoning of the Second Circuit in *Mobil Oil* is particularly instructive on this issue, where the court upheld the district court's finding, which focused:

> not in the fact that a third party would do business with [the defendant] Pegasus Petroleum believing it related to [the plaintiff] Mobil, but rather in the likelihood that Pegasus Petroleum would gain crucial credibility during the initial phases of a deal.  For example, an oil trader might listen to a cold phone call from Pegasus Petroleum -- an admittedly oft used procedure in the oil trading business -- when otherwise he might not, because of the possibility that Pegasus Petroleum is related to Mobil.

*Id*., 818 F.2d at 260.  Like the defendant in *Mobil Oil*, Boy Scouts gains the "crucial credibility" of parents during the initial phase of the enrollment process through the use of ambiguous terms like SCOUT, SCOUTS, SCOUTING, SCOUTS BSA, SCOUT ME IN, and through the use of Girl Scouts' intellectual property on flyers and other marketing materials, such that parents could attend a sign-up night when they may not have otherwise attended.  *See id*.; *Gap, Inc.*, 2011 U.S. Dist. LEXIS 71675, at *38 ("the evidence suggests a likelihood that, due to use of the word "gap," G.A.P Adventures gains 'credibility during the initial phases' of its interaction with a potential customer" (quoting *Mobil Oil*)).

In one exemplary instance, a parent did in fact attend a "cub scout night" sponsored by Boy Scouts after her daughter received a sticker about the recruiting event, which did not

indicate it was being sponsored by Boy Scouts.  GS 56.1 St., ¶ 200.  When the parent arrived at the event, she realized it was not a Girl Scouts event, but the legally cognizable damage had already been done.  Likewise, when parents contact Boy Scouts asking to sign up for "Girl Scouts" programs and are either not told Girl Scouts is a separate organization, or are told the two organizations are separate but are pitched Boy Scouts programs anyway, *id.*, ¶¶ 231, 232, 234, 235, 237, 238, 241, 242, Girl Scouts has suffered harm.  *See Mobil Oil*,  818 F.2d at 260 ("[I]nitial confusion works a sufficient trademark injury.").  The factual record also contains a number of other examples of initial interest confusion, in which parents have attended SCOUTING recruiting events with their daughters under the mistaken belief that they could sign up for Girl Scouts, when in fact they could only sign up for Boy Scouts.  *See* GS 56.1 St., ¶¶ 200, 204.  On the basis of initial interest confusion alone, a factfinder could easily find in Girl Scouts' favor on this *Polaroid* factor.

Finally, even if this factor did not favor Girl Scouts in the *Polaroid* analysis, a high degree of purchaser care cannot override a strong finding of confusion based on a weighing of the other factors.  *See Morningside Group*, 182 F.3d at 142-43 ("It is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion" (internal quotation omitted)); *Banff Ltd. v. Fed. Dep't Stores, Inc.*, 841 F.2d 486 (2d Cir. 1988) ("where the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." (internal quotation omitted)); *Grotrian, Helfferich*, 523 F.2d at 1341-42 ("despite the care exercised by purchasers in their selection of pianos, the court's finding of the likelihood of confusion is not clearly erroneous but is supported by substantial evidence.").

* * * * *

87

Based on the foregoing, some of the *Polaroid* factors favor Girl Scouts and none favor Boy Scouts as a matter of law, such that Boy Scouts is not entitled to summary judgment on Girl Scouts' federal and New York State claims for trademark infringement and unfair competition. Likewise, with respect to Girl Scouts' fourth claim for modification or partial cancellation of U.S. Reg. No. 4,865,183 owned by Boy Scouts for SCOUT covering education services, that registration, like so many others owned by Boy Scouts for services, should be restricted to boys educational services because the use of SCOUT by itself with such services is confusing.  GS 56.1 St., ¶ 13.  Since summary judgment is not appropriate on Girl Scouts federal and state infringement and unfair competition claims, it is also inappropriate on this fourth claim as well.

## POINT III

### BOY SCOUTS IS NOT ENTITLED TO SUMMARY JUDGMENT ON GIRL SCOUTS' FEDERAL AND NEW YORK STATE TRADEMARK DILUTION CLAIMS

For federal and New York State claims for dilution-by-blurring, "[b]lurring is 'the whittling away of [the] established trademark's selling power through its unauthorized use by others.'"  *Malletier v. Hyundai Motor Am.*, Case No. 10 Civ. 1611 (PKC), 2012 U.S. Dist. LEXIS 42795, at *16 (S.D.N.Y. Mar. 22, 2012) (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111 (2d Cir. 2010)).  By definition, the harm caused by dilution takes time.  *See* Federal Trademark Dilution Act: Hearing before the Subcomm. on the Courts, the Internet, and Intellectual Property, 107 Cong. 53 (2002) (Statement of Ethan Horwitz) ("Commentators, the courts and the legislative history of the FTDA have uniformly recognized that the harm caused by dilution is a slow, creeping harm which occurs over time and is difficult to measure. . . . dilution is an infection, which if allowed to spread, will inevitably destroy the advertising value of the mark.").  What this means is that Girl Scouts does not have to prove that its GIRL SCOUTS trademark has actually been diluted by Boy Scouts' branding campaign, merely that,

over time, such a loss of distinctiveness is likely. *Starbuck's Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 202-03 (2d Cir. 2013).

Dilution under 15 U.S.C. § 1125(c) requires a showing of the following four elements: (i) the mark is famous; (ii) the defendant is making use of the mark in commerce; (iii) the defendant's use of the mark began after the mark became famous; and (iv) the likelihood of dilution.  15 U.S.C. § 1125(c)(1).  The elements of a New York State dilution claim are similar, except that a trademark need only be distinctive under New York law to be protected against dilution, not famous. *Hearts on Fire Co., LLC v. LC Int'l Corp.*, Case No. 04 Civ. 2536 (LTS), 2004 U.S. Dist. LEXIS 14828, at *9-10 (S.D.N.Y. Jul. 30, 2004).  Unlike Girl Scouts' other trademark claims, its dilution claims are premised only on the GIRL SCOUTS trademark, the fame of which Boy Scouts concedes. GS 56.1 St., ¶ 135; *see* Point II(B)(2), *supra*.  Boy Scouts does not and cannot dispute that it is making use of SCOUTS BSA, SCOUT ME IN, SCOUT, SCOUTS and SCOUTING in commerce in connection with services for girls. GS 56.1 St., ¶¶ 176-185.  The Court is therefore left with the last two elements to consider – whether Boy Scouts' use of its marks began after the GIRL SCOUTS trademark became famous, and the likelihood of dilution by blurring.

Boy Scouts dedicates a single footnote of its Moving Brief to its assertion that its use of the marks at issue began before the GIRL SCOUTS mark became famous.  *Id.* at 38, n.20.  While Girl Scouts does not dispute that Boy Scouts has used SCOUTS and SCOUTING in connection with leadership and development services for ***boys*** for decades, GS 56.1 St., ¶ 3, its dilution claim is not premised on such use, but on the commencement of such use in connection with ***girls*** leadership and development services that began after Boy Scouts decided in 2017 to

expand its two core programs to girls, long after the GIRL SCOUTS trademark became famous. *Id.*, ¶¶ 125-127, 135-140, 160-183.

Thus, the core issue is whether there are genuine disputes of material fact on the likelihood of dilution by blurring. As with so many other issues raised by Boy Scouts' motion, grants of summary judgment on this question, as opposed to whether a trademark qualifies as famous, are infrequent. *U-Neek, Inc. v. Wal-Mart Stores*, Inc., 147 F. Supp. 2d 158, 175 (S.D.N.Y. 2001) ("the Court finds that the question of whether Defendants' use of the mark is likely to dilute the distinctive quality of U-Neek's mark (by blurring) is an issue of fact."); *Jordache Enters. v. Levi Strauss & Co.*, 841 F. Supp. 506, 523 (S.D.N.Y. 1993) ("the Court finds that the question of whether Jordache's use of the '101' mark is likely to dilute the distinctive quality of Levi's '501' mark is an issue of fact."); *Diversified Mktg. v. Estee Lauder, Inc.*, 705 F. Supp. 128, 134 (S.D.N.Y. 1988) (likelihood that plaintiff's use of defendant's name will whittle down distinctive identity of defendant's name was a fact issue). To attempt to surmount this high hurdle, Boy Scouts boldly claims that "GSUSA has no evidence whatsoever that the BSA'S SCOUT Marks are likely to dilute" the GIRL SCOUTS mark. Mov. Br. at 36.

Boy Scouts' assertion that Girl Scouts has no evidence of likely dilution is flat out wrong. Proof of dilution may be shown by direct or circumstantial evidence, including expert opinions, and no survey is required. *See Visa International Service Association v. JSL Corporation*, 610 F.3d 1088, 1091 (9th Cir. 2010). In the *Gucci Am., Inc. v. Guess?, Inc.* case, the court denied Guess' summary judgment motion on Gucci's dilution claims because Gucci's expert raised genuine issues of material fact as to whether the use of the accused marks was likely to dilute Gucci's trademark. *Id.*, 843 F. Supp. 2d at 428. As Boy Scouts did here, Guess repeatedly asserted there was no evidence of likely dilution, but the court disagreed based on Gucci's

marketing expert, who did not conduct a survey, but opined that "Guess's use of the allegedly infringing marks negatively impacted consumer perceptions of the quality of Gucci products bearing the relevant Gucci marks, as well as the ability of the Gucci marks to uniquely identify Gucci products." *Id*. at 248.  The court noted that Gucci's expert "applied his expertise regarding, among other things, 'brand-related associative network[s]' and 'a well-known model of perceived similarity' to his analysis of the parties' marks to reach the conclusion that 'exposure to the [Guess designs] in the marketplace is likely to bring to mind the Gucci brand' and that the Gucci brand would be blurred and diluted." *Id*. at 249.  *See* also *Adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1065 (D. Or. 2008) (branding expert's report sufficient to create genuine issue of material fact as to both actual and likely dilution).

In this case, Girl Scouts has submitted the exact same kind of evidence the court found sufficient in *Gucci*. GS 56.1 St., ¶ 85.  In particular, Girl Scouts' marketing and branding expert, Dr. Joachimsthaler, has concluded that:

> In summary, the use by Boy Scouts of ambiguous terms like "Scout," Scouts," "Scouting," Scouts BSA," and "Scout Me In" in connection with girls' services harms Girl Scouts' ability to leverage the Girl Scouts brand to drive awareness by diminishing the distinctiveness of the brand and by eroding the cohesion of the Girl Scouts' brand image. This damages Girl Scouts' ability to take advantage of its carefully executed marketing efforts and the tremendous goodwill embodied in the GIRL SCOUTS trademark.

Joachimsthaler Dec., Exh. 13 (Joachimsthaler Report) at ¶ 132; Joachimsthaler Dec., ¶ 32.

Practically speaking, Dr. Joachimsthaler also opined that:

> Given that the GIRL SCOUTS trademark is crucial to the Girl Scouts brand, the weakening of that trademark will diminish not only the associations consumers with an interest in youth leadership and development services have with respect to the Girl Scouts brand, but also cause damage to that brand, by causing harm to its strength, favorability, and uniqueness, thereby damaging the Girl Scouts community, eroding brand loyalty and ultimately affecting future membership growth.

Joachimsthaler Dec., Exh. 13 (Joachimsthaler Report) at ¶ 13(viii); Joachimsthaler Dec., ¶ 10; *see also* GS 56.1 St., ¶ 85.[31]  This evidence goes well beyond proof of association and demonstrates a fact issue as to likely dilution, distinguishing this case from the Court's ruling in *Gap Inc.*, which was rendered after a bench trial. *Id.*, 2011 U.S. Dist. LEXIS 71675, at *2.

Notwithstanding the expert opinions bearing on the issue of likely dilution that Boy Scouts ignores, it argues first that summary judgment is warranted because Girl Scouts has produced documents showing an absence of dilution in the form of: (i) Interbrand studies comparing the external strength[32] of the GIRL SCOUTS brand in 2015 and 2019; (ii) an admission from Girl Scouts' former CEO that the brand continues to be very strong; and (iii) testimony from Girl Scouts' corporate designee that she could not think of any evidence contrary to the conclusions of the Interbrand study.  Mov. Br. at 36.  However, the harm that anti-dilution laws seek to prevent does not happen overnight, so these three pieces of evidence are not dispositive of anything. *See McCarthy*, § 24:67 ("Most courts have defined the blurring injury caused by 'dilution' to be a gradual one, not caused at once by this defendant, but by a future succession of similar users of the mark in various different markets and lines of goods or services.  That is, like being stung by a hundred bees or the wood worker slowly whittling away at the famous mark, significant impairment of the distinctiveness of the famous mark could be caused by the cumulative effect of multiple users over time.").  Here, the Interbrand 2019 study

---

[31]   It is telling that Boy Scouts has not sought to exclude Dr. Joachimsthaler's report and the opinions contained in it, as it has for Dr. Ericksen.  Having failed to timely challenge Dr. Joachimsthaler's opinions about harm to the GIRL SCOUTS brand, Boy Scouts is now stuck because "[i]n cases where credible expert reports conflict the case for summary judgment on the disputed issue is very weak." *Gucci*, 843 F. Supp. 2d at 418.

[32]   Contrary to Boy Scouts' factual recitation, the Interbrand studies did not measure distinctiveness, but external strength. GS 56.1 St., ¶¶ 82-83.

occurred too recently – in May of that year – to show evidence of dilution stemming from a branding campaign Boy Scouts had only announced a year before and had not yet fully implemented.  GS 56.1 St., ¶¶ 85, 175-183.  For this same reason, no harm to the GIRL SCOUTS brand could have manifested by the time its two officers were deposed.

As a backstop, Boy Scouts next claims that any harm to befall the GIRL SCOUTS brand was self-inflicted and should therefore be disregarded.  Mov. Br. at 38-41.  However, the acts of which Boy Scouts complains relating to keyword advertising, domain names, social media handles and *Wikipedia* entries, some of which are not accurately summarized in Boy Scouts' submissions and all of which are mischaracterized, are what an organization confronting a new competitor in the marketplace would undertake to defend its position – especially when that new competitor uses a substantially similar name – and were aimed at protecting Girl Scouts' rights in its SCOUT, SCOUTS and SCOUTING marks, not creating associations with Boy Scouts.  GS 56.1 St., ¶¶ 71-72, 87-98.  There is no case cited by Boy Scouts for the proposition that such actions preclude a dilution-by-blurring claim as a matter of law, and the only case it does cite, *Metro Pub., Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 877 (N.D. Cal. 1994), involved a claim for dilution under California law, in which summary judgment was not granted because the mark at issue was not famous.  So, the question of whether Girl Scouts did or did not create associations between the parties (it did not) is at least one of fact.  *See Friedland Brands*, 228 F. Supp. 2d at 410 (subjective issues inappropriate for determination on summary judgment).

Finally, as to the statutory factors that are used to evaluate a dilution-by-blurring claim that are recited in footnote 18 on page 35 of Boy Scouts' Moving Brief, many track the *Polaroid* analysis, and just as summary judgment is inappropriate as to infringement and unfair competition for the reasons stated above, so too is it inappropriate with respect to dilution-by-

blurring.  With respect to one dilution factor that is not part of the *Polaroid* analysis – the extent to which Girl Scouts is engaging in substantially exclusive use of the GIRL SCOUTS mark; 15 U.S.C. § 1125(c)(2)(B)(iii) – Boy Scouts argues that its prior use of SCOUT, SCOUTS and SCOUTING for more than a century cuts against Girl Scouts.  Mov. Br. at 38.  However, once again, Boy Scouts obscures the fact that its use of those terms was in connection with boys services, and that, for girls leadership and development services, Girl Scouts is the SCOUTING organization that offers them, GS 56.1 St., ¶¶ 70, 138, 141, a fact Boy Scouts has admitted on prior occasions.  *Id.*, ¶¶ 134, 141(f).

Blurring occurs when a mark that consumers once perceived to stand for a single source now identifies two sources, *McCarthy*, § 24:90.1, and that is precisely what is likely to happen here.  For the last century, the GIRL SCOUTS trademark has become understood to designate **the** source of SCOUTING services for girls.  Now, because of what Boy Scouts has done, that distinctiveness is being slowly eroded, and the law affords Girl Scouts a remedy to stop such a further loss of distinctiveness.  That such dilution-by-blurring is occurring is demonstrated by the many instances in which children, parents and the public have inquired about or believed that the two organizations were merging.  GS 56.1 St., ¶¶ 55, 71, 112, 186, 191, 196, 210, 230, 244.  In light of this evidence, Boy Scouts cannot credibly argue that there are no material issues of fact with respect to dilution under federal or New York State law.[33]

---

[33]   Boy Scouts also claims that its federal registrations are a complete defense to dilution under New York State law.  Mov. Br. at 41-42.  However, Girl Scouts has not challenged the use of any marks that Boy Scouts has registered for the goods or services covered by those registrations.  Boy Scouts does not own any registrations for SCOUT, SCOUTS, SCOUTING, SCOUTS BSA or SCOUT ME IN covering leadership and development services for girls.  GS 56.1 St., ¶¶ 13, 42.

**POINT IV**

**BOY SCOUTS IS NOT ENTITLED TO
SUMMARY JUDGMENT ON GIRL SCOUTS' CLAIM FOR TORTIOUS
INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

In seeking summary judgment on Girl Scouts' claim for tortious interference with prospective economic advantage, Boy Scouts wrongly claims that Girl Scouts has failed to identify any specific relationships with which Boy Scouts interfered.  In support, Boy Scouts falsely claims that deposition testimony from Girl Scouts' witnesses establishes that it was not aware of a specific contract that was either terminated or not consummated because of Boy Scouts' wrongful conduct.  *See* GS 56.1 St., ¶¶ 110-111.  This is a red herring.  *See*, *e.g.*, *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) ("[I]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract.").  The claim for tortious interference is based on the loss of new members occasioned by Boy Scouts' wrongful conduct, including its acts of trademark infringement and unfair competition.  Such acts fall squarely within the parameters of a claim for tortious interference with prospective economic advantage. *Hannex Corp.*, 140 F.3d at 205 ("Accordingly, the tort encompasses . . . interferences with . . . the opportunity of selling or buying . . . chattels or services, and any other relations leading to potentially profitable contracts.") (internal quotations omitted).

Girl Scouts *has* identified with specificity the interference that occurred and caused it to lose relationships with potential new members including, by way of example only:

- Boy Scouts interfered with the ability of Girl Scouts of Gulfcoast Florida to recruit new members from Pinewood Elementary School by informing the school that the Boy Scouts recruiter was recruiting for Girl Scouts and Boy Scouts, causing the school to inform a parent that an upcoming Boy Scouts recruiting event was a "girl scout night," and distributing stickers about that event that did not say "Boy Scouts of America."  GS 56.1 St., ¶ 200.

- Boy Scouts interfered with the ability of Girl Scouts of Carolina Peaks to Piedmont to recruit new members at multiple local school districts by causing

them to believe that Boy Scouts and Girl Scouts had merged, such that, by providing time for Boy Scouts to recruit at those schools during the day, it did not need to provide additional time for Girl Scouts to do the same. *Id.*, ¶ 206.

- Boy Scouts interfered with the ability of Girl Scouts of North Carolina Coastal Pines to form a troop at the First Presbyterian Church in Greenville, North Carolina by itself requesting to form a "Girl scouts troop" at the church. *Id.*, ¶ 233.

- Boy Scouts interfered with the ability of multiple local Girl Scouts councils to recruit new members by supplying misinformation to their parents at recruiting events, including telling parents that Boy Scouts now accepts Girl Scouts, *id.*, ¶ 202, and telling parents during the important Fall recruiting season that Girl Scouts did not start until February. *Id.*, ¶ 209.

- Boy Scouts fielded multiple inquiries from confused parents seeking to enroll their daughters in Girl Scouts and, instead of correcting that confusion, Boy Scouts compounded it by instead trying to enroll those girls in Boy Scouts programs. *Id.*, ¶¶ 204, 231, 231, 232, 234-235, 241-242.

- Boy Scouts volunteers have attempted to dissuade venues from providing booth space to Girl Scouts, and told such venues that Boy Scouts is now enrolling Girl Scouts. *Id.*, ¶ 191.

Contrary to Boy Scouts' claims, the likelihood of lost recruits is sufficiently specific and concrete to support a claim for tortious interference. Parents or children who would attend recruiting events or otherwise be exposed to recruiting messages are potential customers, as are parents who specifically inquire as to joining Girl Scouts. *See*, *e.g.*, *SMJ Group, Inc. v 417 Lafayette Rest. LLC*, Case No. 06 Civ. 1774, 2006 U.S. Dist. LEXIS 61645, at *19 (S.D.N.Y. Aug. 30, 2006) (passers-by in front of restaurant outside of which defendants were protesting were potential customers, the loss of whom could support tortious interference claim). Moreover, there is ample evidence of parents and children being confused by Boy Scouts' recruiting and promotional activities following its decision to expand its core programs to

include girls and joining Boy Scouts when they had intended to join Girl Scouts.  GS 56.1 St., ¶¶ 186, 188, 196, 197, 200, 201, 205, 212, 214, 215, 224, 227, 229, 235-37, 241-42.[34]

Contrary to its contentions, there is also evidence that Boy Scouts had knowledge of the prospective relationships with recruits and their parents that form the basis for Girl Scouts' tortious interference claim.  *See* Mov. Br. at 47.  Through its partnership with its local councils in the areas of recruiting and marketing, as well as its ownership of its intellectual property which, as used by Boy Scouts councils, has caused prospective members to register mistakenly with Boy Scouts when they intended to register with Girl Scouts, Boy Scouts has demonstrated its encouragement and approval of these acts of tortious interference.  GS 56.1 St., ¶¶ 115, 252-262. And, as outlined above, the Boy Scouts' council employees and volunteers who, using Girl Scouts' name, misinformed school and church employees and parents about the relationship between the parties and the effect of Boy Scouts' admission of girls into its core programs undoubtedly knew about Girl Scouts' recruiting efforts in those schools and churches, since the parties are direct competitors.  *Id.*, ¶¶ 200, 206, 207, 211, 213, 219, 222, 233, 239.  The Boy Scouts' council employees who misleadingly answered emails from parents who were specifically seeking to enroll their daughters in Girl Scouts programs also had knowledge of the

---

[34]   The cases relied upon by Boy Scouts are all distinguishable because, unlike here, the plaintiffs in those cases failed to offer allegations or evidence of lost opportunities or to provide sufficient details about those opportunities.  *See Lesnik v. Lincoln Fin. Advisors Corp.*, Case No. 18 Civ. 3656 (LJL), 2020 U.S. Dist. LEXIS 100795, at *10 (S.D.N.Y. June 9, 2020) (claim based on vague, alleged lost "book of business"); *Insurent Agency Corp. v. Hanover Ins. Co.*, Case No. 16 Civ. 3076 (LGS), 2018 U.S. Dist. LEXIS 140922, at *17 (S.D.N.Y. Aug. 20, 2018) (failure to provide evidence of lost business); *Daniels v Kostreva*, Case No. 15 Civ. 3141 (ARR), 2017 U.S. Dist. LEXIS 5534, at *25 (E.D.N.Y. Jan. 12, 2017) (plaintiff failed to identify specific lost business opportunity); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, Case No. 15 Civ. 8775 (LGS), 2016 U.S. Dist. LEXIS 87345, at *19-20 (S.D.N.Y. July 5, 2016); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013) (plaintiff failed to identify potential customers with any specificity).

relationships those parents sought to initiate with Girl Scouts.  *Id.*, ¶¶ 204, 231-32, 234-35, 237-38, 241-42.  This evidence distinguishes this case from those upon which Boy Scouts relies.[35]

     As to the evidence of the impropriety of its conduct, Boy Scouts is again wrong.  "As a general rule, a defendant's conduct must amount to a crime or an independent tort in order to amount to tortious interference."  *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 246 (S.D.N.Y. 2013) (internal citations and alterations omitted).  Conduct that constitutes trademark infringement and other Lanham Act violations satisfies this element.[36] *Id.*; *see also Burton v. LABEL, LLC*, 344 F. Supp. 3d 680, 704-05 (S.D.N.Y. 2018); *SMJ Group*, 2006 U.S. Dist. LEXIS 61645, at *19-20.  As discussed, *see* pp. 24-31, *supra*, Boy Scouts' conduct, including its secondary liability for the infringing acts of its councils, establishes the independent tort needed to support Girl Scouts' tortious interference claim.  *See*, *e.g.*, *C=Holdings B.V.*, 992 F. Supp. 2d at 246; *SMJ Group, Inc.*, 2006 U.S. Dist. LEXIS 61645, at *20.

---

[35]   *Ahluwalia v. St. George's Univ., LLC*, 63 F. Supp. 3d 251, 266 (E.D.N.Y. 2014) (failure to plead knowledge by defendant); *Sedona Corp. v. Ladenburg Thalmann & Co.*, Case No. 03 Civ. 3120 (LTS), 2009 U.S. Dist. LEXIS 44748, at *9 (S.D.N.Y. May 27, 2009) (same); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 423-24 (E.D.N.Y. 2013) (no evidence defendants had actual knowledge of the relationships with which alleged interference occurred).

[36]   With one exception, the cases relied upon by Boy Scouts are all distinguishable because they involved no allegations of an independent tort, much less trademark infringement as that tort. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 215 A.D.2d 990, 628 N.Y.S.2d 408, 412 (3d Dep't 1995) (no allegations of trademark infringement or other independent tort); *RFP LLC v. SCVNGR, Inc*., 788 F. Supp. 2d 191, 1997 (S.D.N.Y. 2011) (no allegations of independent tort; the alleged wrongful means did not involve trademark infringement, but the alleged sending of cease-and-desist letters); *MVB Collision, Inc. v. Progressive Ins. Co.*, 129 A.D. 3d 1040, 13 N.Y.S.3d 139, 140 (2d Dep't 2015) (no independent tort and no allegations of trademark infringement).  The only case that did involve trademark infringement, *S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d  188, 217 (E.D.N.Y. 2007), is to no avail because the court did not reach the issue of whether a trademark infringement claim represented wrongful means, and the plaintiff did not oppose summary judgment on the tortious interference claim.

Girl Scouts also has shown that, but for Boy Scouts' tortious conduct, it would have entered into the prospective economic relationships, such that it has established the requisite injury.  *See C=Holdings B.V.*, 992 F. Supp. 2d at 246.  Many of the emails from confused parents sent to Boy Scouts indicated that they intended for their daughters to join Girl Scouts.  *See* GS 56.1 St., ¶¶ 204, 231-32, 234-35, 237-38, 214-42.  Also, Boy Scouts' own "Joiner Survey" evidence shows that multiple parents signed their daughters up for Boy Scouts, thinking it was Girl Scouts, but then stayed in Boy Scouts.  *Id.* ¶¶ 246-248.  This evidence creates a triable issue of fact as to whether Girl Scouts has suffered specific injuries resulting from Boy Scouts' tortious interference.

**POINT V**

**BOY SCOUTS IS NOT ENTITLED TO**
**SUMMARY JUDGMENT ON GIRL SCOUTS' CLAIMS FOR MONETARY RELIEF**

Finally, Boy Scouts seeks summary judgment on both prongs of Girl Scouts' monetary claims – disgorgement of Boy Scouts' profits attributable to its wrongful conduct and the recovery of amounts Girl Scouts expended on advertising to correct the confusion Boy Scouts caused in the marketplace.  However, neither set of arguments advanced by Boy Scouts is well-founded, such that no grant of summary judgment should issue.

**A.      There is Ample Evidence to Support**
**        the Disgorgement of Boy Scouts' Wrongful Profits**

Boy Scouts relies primarily on its two *Daubert* motions as purported grounds for obtaining summary judgment on Girl Scouts' disgorgement claims.  Mov. Br. at 50.  Those motions seek to exclude the Ericksen confusion survey and then, by extension, the report of Girl Scouts' damages expert, Lauren Kindler and its calculations of Boy Scouts' wrongful profits.  *Id.* For the reasons set forth in Girl Scouts' opposition memoranda – all of which are incorporated

herein by reference – neither *Daubert* motion should be granted, which moots Boy Scouts'

reliance on those submissions.

    More importantly, Boy Scouts' focus on the expert reports impermissibly attempts to

shift the burden regarding disgorgement damages to Girl Scouts.  Although Kindler undertook to

calculate the number of girls who signed up with Boy Scouts due to confusion, it is not Girl

Scouts' burden to "calculate a reasonable estimate of girls who have been purportedly confused

by the BSA's advertising."  Mov. Br. at 50.  Under 15 U.S.C. § 1117(a), "[i]n assessing profits

the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements

of cost or deduction claimed."  Here, without relying on any confusion survey evidence, Girl

Scouts has provided evidence of the total number of girls who signed up for Boy Scouts' core

programs and the revenues associated with those memberships, and it has therefore satisfied its

burden.  Scher Dec., Exh. OOOOOO (Supplemental Kindler Report), ¶ 22. Table 1; GS 56.1 St.,

¶¶ 280-82.  It is Boy Scouts' burden to prove how many of those girls joined for reasons other

than being confused as a result of Boy Scouts' wrongful conduct.  *See*, *e.g.*, *Int'l Star Class

Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72 (2d Cir. 1998) (citing

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942)) ("a

plaintiff 'is not entitled to profits demonstrably not attributable to the unlawful use of his mark,'

but [] the burden of proving any deduction for sales not based on the infringing mark falls upon

the infringer."); *Experience Hendrix, L.L.C. v. Pitsicalis*, Case No. 17 Civ. 1927 (PAE), 2020

U.S. Dist. LEXIS 115075, at *17 (S.D.N.Y. July 1, 2020) (same); *Rexall Sundown, Inc. v.*

*Perrigo Co.*, 707 F. Supp. 2d 357, 359 (E.D.N.Y. 2010) (defendants must prove any apportionment of profits to non-infringing activity).[37]

### B.      Boy Scouts Has Failed to Show As a Matter of Law That Corrective Advertising Damages are Not Recoverable

Boy Scouts takes an impermissibly narrow view of the scope of corrective advertising expenses that can be recovered in Lanham Act cases. The key question is whether the plaintiff "would not have undertaken the campaign but for the [infringing activity]." *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 952 (D.C. Cir. 1993) (emphasizing that "[r]ecovery is not limited . . . to advertisements that specifically address the false statements made by the defendant"); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 491 (D.N.J. 2009) ("Under § 35(a)(2), a plaintiff may recover costs incurred for corrective advertising and other damage control expenses incurred in response to a defendant's wrongful conduct."); *see also* 2 *Gilson on Trademarks* ("*Gilson*"), § 7.02 (2020) ("[t]he corrective advertising need not expressly correct defendant's deception").[38]

Here, Girl Scouts has presented ample evidence that it undertook a massive effort to correct the confusion caused in the marketplace by Boy Scouts, including a digital advertising campaign and related services, grassroots mobilization, and school and family engagement, to

---

[37]   The only case cited by Boy Scouts, *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, Case No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320, at *5 (S.D.N.Y. Aug. 6, 2007), is inapposite because the claim for disgorgement was abandoned.

[38]   In support of its narrow view of the scope of available corrective advertising damages, Boy Scouts relies heavily upon *Zerorez Franchising Sys. v. Distinctive Cleaning, Inc.*, Case No. 13-2326 (ADM), 2016 U.S. Dist. LEXIS 60644, at *5 (D. Minn. May 6, 2016).  That case is distinguishable in part because the advertising at issue occurred over two years, undercutting the claim that it was placed in response to the defendant's misconduct, and because there was no evidence that the advertisements were targeted to markets where the most confusion was being reported.  Also, the court in *Zerorez* did award the plaintiff 10% of its costs for certain advertisements.  *Id.*, at *5.

address the confusion being caused in schools.  GS 56.1 St., ¶¶ 277-79.  The vast majority of

these expenses were incurred in the latter half of 2018, and Girl Scouts had never undertaken a

similar national advertising campaign, did so only because of the confusion caused by Boy

Scouts, and targeted its efforts to the geographic areas where the most confusion was occurring

and/or expected.  *Id.* ¶¶ 277-78.  The advertising was therefore, by definition, corrective, of the

type for which courts have awarded damages.  *Alpo Petfoods, Inc.*, 997 F.2d at 952.[39]

It is of absolutely no moment that Girl Scouts' advertising did not mention Boy Scouts.

*See, e.g., Alpo Petfoods, Inc.*, 997 F.2d at 952 (if corrective advertising specifically had to

mention the unlawful activity, then "the price of recovery would be to give additional currency to

the false claims").  And the fact that Girl Scouts' was not focused on specifically correcting

statements Boy Scouts made is also not disqualifying.  Indeed, the deposition testimony quoted

by Boy Scouts on page 52 of its Moving Brief omits other testimony on the same page clarifying

that the advertising undertaken by Girl Scouts was intended to differentiate it from Boy Scouts to

dispel marketplace confusion.  GS 56.1 St., ¶ 119.[40]

---

[39]    *See also Mobius Management Sys. v. Fourth Dimension Software*, 880 F. Supp. 1005, 1023
(S.D.N.Y. 1994) (allowing recovery for employee time related to reparative advertising efforts
that "included the preparation of several memorandum to address [defendant's] statements point-
by-point, the assignment of personnel that would normally not have participated in the sales
effort, and the devotion of significantly more follow-up resources to the customer than would
have occurred had [defendant] not made its misrepresentations"); *Pizza Hut, Inc. v. Papa John's
Int'l, Inc.*, 80 F. Supp. 2d 600, 618 (N.D. Tex. 2000) (permitting recovery as corrective
advertising damages plaintiff's incremental increase in its advertising budget to repair its
reputation), *rev'd on other grounds*, 227 F.3d 489, 504 (5th Cir. 2000); *Gilson*, § 7.02
("[advertising] expenses need not be used for a print or broadcast advertising campaign, but
instead could be the cost of hiring staff to write memoranda or speak with customers to correct
misrepresentations.").

[40]    Boy Scouts' argument that Girl Scouts does not qualify for any actual damages, Mov. Br. at
52, is unavailing because even if either actual confusion or intentional misconduct were required
to show actual damages (and it is not clear that they are, in the aftermath of *Romag Fasteners,*

Equally unavailing is the contention that Girl Scouts' corrective advertising expenses were actually just "general advertising." Mov. Br. at 51. Multiple witnesses have testified that Girl Scouts undertook the advertising campaign and related expenditures specifically to combat confusion being caused by Boy Scouts, and that such spending had not occurred in prior years. GS 56.1 St., ¶¶ 119, 122, 278, 279(a). And their testimony is underscored by documentary evidence showing that the advertising was targeted to markets where the most confusion was being reported and/or anticipated. *Id.*, ¶ 278.[41]

There is no requirement as a matter of law that the advertising specifically mention the infringer, *Alpo Petfoods, Inc.*, 997 F.2d at 952, or that the only benefit to be derived from the advertising is correcting the confusion caused by the defendant, *cf. Bracco Diagnostics*, 627 F. Supp. 2d at 491 n.266 (plaintiff is not "required to prove that the false advertisements were the sole reason for its expenditures."). Ultimately, it is the Court's duty to ensure that Lanham Act violations are not profitable to the infringing party. *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 (9th Cir.1982). Taking an unsupported and unreasonably strict view of what can constitute corrective advertising and other damage control expenses would be antithetical to that duty, particularly in light of the significant evidence of actual confusion and bad faith here. *See* pp. 24-32, *supra*.

---

*Inc. v. Fossil Grp., Inc.*, 140 S. Ct. 1492 (2020)), Girl Scouts has provided ample evidence of both. *See* Point II(B)(5)-(6), *supra*.

[41]    On page 3 of its Moving Brief, Boy Scouts quotes from a Girl Scouts document to suggest that the number of girls who have left Girl Scouts to join Boy Scouts is trivial. Of course the number of girls leaving Girl Scouts to join Boy Scouts is not the full measure of the harm Girl Scouts has suffered, and the data to which Boy Scouts refers was generated in 2017, well before the effects of Boy Scouts' misconduct were felt. Ewing Dec., Exh. 108 (A. Archibald) 176:14-177:18; *see also* GS 56.1 St., ¶ 117.

Boy Scouts also argues that Girl Scouts' advertising expenses cannot qualify as corrective because the budget from which those expenses were paid was approved in April 2018, before the SCOUT ME IN advertising campaign launched.  Mov. Br. at 54.  But that budget approval pre-dated any specific advertising expenditures.  GS 56.1 St., ¶ 124.  Indeed, as acknowledged by Boy Scouts, the third-party contract under which Girl Scouts incurred most of the advertising expenses was not signed until June 2018, after the launch of the SCOUT ME IN campaign.  Mov. Br. at 54.[42]  More to the point, however, by April 2018 Girl Scouts already was experiencing confusion in the marketplace, GS 56.1 St., ¶¶ 186-195, so its budget approval was entirely consistent with the rationale behind the entire advertising campaign.  *Id.*

## CONCLUSION

For all of the foregoing reasons, Girl Scouts respectfully requests that the Court deny Boy Scouts' motion for summary judgment in its entirety.

Dated:   New York, New York          DORSEY & WHITNEY LLP
         December 23, 2020


                                     By  *s/ Bruce R. Ewing*
                                         Bruce R. Ewing
                                         Fara S. Sunderji
                                         Jonathan Montcalm
                                         Kimberly Frumkin
                                         51 West 52nd Street
                                         New York, New York 10019
                                         (212) 415-9200

                                         *Attorneys for Plaintiff*
                                         *Girl Scouts of the United States of America*

---

[42]   That the Mercury agreement does not specifically mention Boy Scouts' advertising campaign has no bearing on the corrective nature of the advertising conducted under that agreement.  There is no requirement that a vendor contract must mention the infringer for the advertising expenses to be recoverable as actual damages.  Also, the "competitor" mentioned in the Mercury agreement is Boy Scouts.  GS 56.1 St., ¶ 123.