**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

GIRL SCOUTS OF THE UNITED STATES
OF AMERICA,

                    Plaintiff,
          v.

BOY SCOUTS OF AMERICA,

                    Defendant.

Case No. 1:18-cv-10287 (AKH)

**DEFENDANT BOY SCOUTS OF AMERICA'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND .......................................................................................4

I.     THE PARTIES..................................................................................................4

     A.     The Boy Scouts Of America ................................................................4

     B.     The Girl Scouts Of The United States Of America .................................5

II.     THE PARTIES' TRADEMARKS AND BRANDING.......................................5

     A.     The BSA's Use Of SCOUT Marks Over The Past Century .....................5

     B.     The BSA's Decades Of Use Of SCOUT Marks In Connection With Co-Ed Services For Girls And Boys .................................................8

     C.     GSUSA's Knowledge Of And Failure To Take Action Concerning The BSA's SCOUT-Formative Branding In Connection With Female BSA Members Dating Back Decades................................................10

     D.     GSUSA'S Consistent Use Of "GIRL" Before "SCOUT" In Its Own Branding, And Its Disavowal Of "SCOUT" Alone ..............................10

III.     THE BSA WELCOMES GIRLS INTO CUB SCOUTS AND SCOUTS BSA ...............11

     A.     The BSA Considers Welcoming Girls Into Its Last Two Single-Gender Programs ..............................................................11

     B.     In Response, GSUSA Launches A Self-Proclaimed "Ground War" ....................12

     C.     The BSA Formally Decides To Welcome Girls Into Its Last Two Remaining Single-Gender Programs, Cub Scouts and Scouts BSA.....................13

IV.     THE INSTANT DISPUTE .......................................................................13

     A.     GSUSA Papers Its Ground War Plan With A Letter-Writing Campaign To The BSA...............................................................13

     B.     The BSA's May 2018 SCOUT ME IN Marketing Campaign, SCOUTS BSA Program Name Change, And Updated Brand Guidelines...........................14

     C.     The BSA's 2018 Brand Guidelines Forbidding The Use Of "Girl" Before "Scout"....................................................................16

     D.     GSUSA Retains High-Priced PR Firm Mercury LLC Who Recommends In September 2018 That GSUSA Pursue "Litigation – To Principally Create Uncertainty For Teachers, Administrators And Parents"...........................16

     E.     Two Months Later, In November 2018, GSUSA Sues The BSA.........................17

     F.     GSUSA's Failure To Produce Admissible Evidence Of Actual Confusion ..........18

LEGAL STANDARD ...................................................................................................19

ARGUMENT ..............................................................................................................19

I.     GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE ON ITS CLAIMS
       FOR TRADEMARK INFRINGEMENT ...........................................................19

       A.     The Strength Of The GIRL SCOUTS Does Not Favor A Finding Of
              Confusion ........................................................................................21

       B.     The Parties' Marks Are Not Similar In Their Marketplace Context ................22

       C.     GSUSA Admits That The Parties Exist In Two Different Markets......................26

       D.     GSUSA Admits It Will Not Bridge The Gap .......................................................27

       E.     GSUSA Has No Admissible Evidence Of Actual Confusion...............................27

       F.     Overwhelming Evidence Confirms That The BSA Did Not Intend To
              Trade Off Of GSUSA's Name .......................................................................31

       G.     The BSA's Programs Indisputably Are Of High Quality ....................................32

       H.     Parents And Guardians Take Great Care In Choosing To Whom They Will
              Entrust Their Children ...................................................................................33

       I.     The Weighing Of The *Polaroid* Factors Favors The BSA ...................................34

II.    GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE OF FACT ON ITS
       TRADEMARK DILUTION CLAIMS ...................................................................35

       A.     GSUSA's Federal Dilution Claim Fails..............................................................35

              1.     GSUSA's Own Evidence Forecloses its Dilution Claim..........................36

              2.     GSUSA Cannot Prove The Necessary Elements Of Dilution ..................37

              3.     To The Extent There Is Any Dilution, It Is A Self-Inflicted Harm ..........38

       B.     GSUSA's State-Law Dilution Claim Fails .........................................................41

III.   GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE ON ITS CLAIM FOR
       MODIFICATION OR PARTIAL CANCELLATION OF A REGISTRATION.............42

IV.    THE UNDISPUTED FACTS CONFIRM THAT THE DOCTRINE OF LACHES
       PROTECTS THE BSA'S USE OF ITS SCOUT MARKS ................................43

V.     GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE ON ITS CLAIM FOR
       TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS
       RELATIONS ........................................................................................................46

       A.     GSUSA Has Identified No Specific Relationships, Let Alone Has It
              Demonstrated That The BSA Knew Of Such (Unidentified) Relationships .........47

       B.     GSUSA Has No Evidence Whatsoever That The BSA Acted Solely Out
              Of Malice, Or Used Dishonest, Unfair, or Improper Means .................................48

       C.     GSUSA Has No Evidence Of Injury .......................................................................49

VI.    GSUSA HAS IDENTIFIED NO RECOVERABLE DAMAGES ....................................50

    A.    The BSA Is Entitled To Summary Judgment On GSUSA's Claim For Disgorgement Damages .........................................................................................50

    B.    The BSA Is Entitled To Summary Judgment On GSUSA's So-Called "Corrective Advertising" Damages ........................................................................51

        1.    GSUSA Does Not Qualify For Actual Damages In The First Place .........52

        2.    GSUSA Admits Its Expenses Were Not Focused on Correcting Anything ..................................................................................................52

        3.    On Their Face, GSUSA's Expenses Were Mere General Advertising And Thus Unrecoverable .......................................................53

CONCLUSION .........................................................................................................................55

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Adolph Kastor & Bros. v. FTC*,
138 F.2d 824 (2d Cir. 1943) ................................................................................... 7

*Ahluwalia v. St. George's Univ., LLC*,
63 F. Supp. 3d 251 (E.D.N.Y. 2014) .................................................................... 47

*Allied Interstate LLC v. Kimmel & Silverman P.C.*,
2013 WL 4245987 (S.D.N.Y. Aug. 12, 2013) ...................................................... 41

*Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*,
367 F. Supp. 3d 1072 (N.D. Cal. 2019) ................................................................ 55

*Arrow Fastener Co. v. Stanley Works*,
59 F.3d 384 (2d Cir. 1995) ................................................................................... 26

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015) ............................................................................................. 42

*Berwick v. New World Int'l, Ltd.*,
2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) ....................................................... 46

*Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*,
2007 WL 2914452 (2d Cir. Oct. 5, 2007) ............................................................ 43

*C=Holdings B.V. v. Asiarim Corp.*,
992 F. Supp. 2d 223 (S.D.N.Y. 2013) .................................................................. 51

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*,
753 F.2d 14 (2d Cir. 1985) ............................................................................ 26, 29

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (N.Y. 2004) .................................................................................... 48

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................. 19

*Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*,
2018 WL 3407709 (S.D.N.Y. Jan. 12, 2018) ................................................. 29, 33

*Daniels v. Kostreva*,
2017 WL 823583 (E.D.N.Y. Jan. 12, 2017) ......................................................... 47

*Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*,
568 F. Supp. 2d 329 (S.D.N.Y. 2008) .................................................................. 46

*Deere & Co. v. MTD Holdings Inc.*,
2004 WL 324890 (S.D.N.Y. Feb. 19, 2004) ........................................................ 44

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ..................................................... 23, 29

*Dentsply Int'l Inc. v. Dental Brands for Less LLC*,
2016 WL 3676686 (S.D.N.Y. July 5, 2016) ......................................................... 47

*Disney Enters., Inc. v. Sarelli*,
322 F. Supp. 3d 413 (S.D.N.Y. 2018) .................................................................. 34

*Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*,
   89 F. Supp. 2d 483 (S.D.N.Y. 2000).................................................................. 45

*Eppendorf-Netheler-Hinz GMBH v. Nat'l Sci. Supply Co.*,
   14 F. App'x 102 (2d Cir. 2001) ........................................................................ 44

*Estee Lauder Inc. v. The Gap, Inc.*,
   108 F.3d 1503 (2d Cir. 1997)........................................................................... 20

*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*,
   838 F. Supp. 2d 141 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013)..................... 22

*Gap, Inc. v. G.A.P. Adventures Inc.*,
   2011 WL 2946384 (S.D.N.Y. June 24, 2011) ......................................... 35, 36, 37

*George Basch Co. v. Blue Coral, Inc.*,
   968 F.2d 1532 (2d Cir. 1992).......................................................................... 52

*Giggle, Inc. v. netFocal, Inc.*,
   856 F. Supp. 2d 625 (S.D.N.Y. 2012).............................................................. 34

*Glenmore Distilleries Co. v. Nat'l Distillers Prod. Corp.*,
   23 F. Supp. 928 (E.D. Va. 1938), *aff'd*, 101 F.2d 479 (4th Cir. 1939)................... 23

*Glob. Brand Holdings, LLC v. Church & Dwight Co.*,
   2017 WL 6515419 (S.D.N.Y. Dec. 19, 2017) ................................................ 41, 42

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995)................................................................................ 19

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993)........................................................... 20, 22, 23, 33

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
   331 F. Supp. 3d 221 (S.D.N.Y. 2018),.............................................................. 49

*Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*,
   2008 WL 11412128 (E.D.N.Y. Mar. 11, 2008) ............................................ 44, 45

*Heartsprings, Inc. v. Heartspring, Inc.*,
   949 F. Supp. 1539 (D. Kan. 1996), *aff'd*, 143 F.3d 550 (10th Cir. 1998) ............ 33

*Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*,
   2007 WL 2049005 (E.D. Mich. July 17, 2007) ................................................ 33

*Ikelionwu v. U.S.*,
   150 F.3d 233 (2d Cir. 1998)............................................................................. 43

*Inc. Publ'g Corp. v. Manhattan Magazine, Inc.*,
   616 F. Supp. 370 (S.D.N.Y. 1985), *aff'd*, 788 F.2d 3 (2d Cir. 1986)................ 28, 29

*Insurent Agency Corp. v. Hanover Ins. Co.*,
   2018 WL 3979589 (S.D.N.Y. Aug. 20, 2018) .................................................. 47

*J.T. Colby & Co. v. Apple Inc.*,
   2013 WL 1903883 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014)......... 23, 32

*Joules Ltd. v. Macy's Merch. Grp. Inc.*,
   2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016), *aff'd*, 695 F. App'x 633 (2d Cir. 2017) .......... 23

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
   2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)............................................... 43, 45
   2006 WL 1359955 (S.D.N.Y. May 18, 2006) .................................................. 51

*Kargo Global, Inc. v. Advance Magazine Publ's, Inc.*,
   2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ........................................... 30, 50, 51

*Knowles-Carter v. Feyonce, Inc.*,
   347 F. Supp. 3d 217 (S.D.N.Y. 2018) ....................................................... 38

*Lang v. Ret. Living Pub. Co.*,
   949 F.2d 576 (2d Cir. 1991) .................................................................... 30

*Lesesne v. Brimecome*,
   918 F. Supp. 2d 221 (S.D.N.Y. 2013) ..................................................... 47

*Lesnik v. Lincoln Fin. Advisors Corp.*,
   2020 WL 3057456 (S.D.N.Y. June 9, 2020) ........................................... 57

*Lombard v. Booz-Allen & Hamilton, Inc.*,
   280 F.3d 209 (2d Cir. 2002) .................................................................... 46

*Lombardo v. Dr. Seuss Enters., L.P.*,
   2017 WL 1378413 (S.D.N.Y. Apr. 7, 2017) ....................................... 46, 48

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
   378 F. Supp. 2d 448 (S.D.N.Y. 2005) ..................................................... 34

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   340 F. Supp. 2d 415 (S.D.N.Y. 2004) ..................................................... 34

*LuxSoma LLC v. Leg Res., Inc.*,
   289 F. Supp. 3d 514 (S.D.N.Y. 2018) ..................................................... 46

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) ....................... 30

*Malaco Leaf, AB v. Promotion In Motion, Inc.*,
   287 F. Supp. 2d 355 (S.D.N.Y. 2003) ..................................................... 26

*Malletier v. Dooney & Bourke, Inc.*,
   561 F. Supp. 2d 368 (S.D.N.Y. 2008) ..................................................... 34

*Maxwell Shoe Co. v. Edelman Shoe Co., LLC*,
   2004 WL 6225744 (D. Mass. Aug. 5, 2004) ........................................... 23

*McGill v. Parker*,
   582 N.Y.S.2d 91 (App. Div. 1st Dep't 1992) .......................................... 47

*Merriam-Webster, Inc. v. Random House, Inc.*,
   35 F.3d 65 (2d Cir. 1994) ........................................................................ 30

*Metro Pub., Ltd. v. San Jose Mercury News, Inc.*,
   861 F. Supp. 870 (N.D. Cal. 1994) ......................................................... 41

*Miss Universe, L.P., LLLP v. Villegas*,
   672 F. Supp. 2d 575 (S.D.N.Y. 2009) ..................................................... 36

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
   880 F. Supp. 1005 (S.D.N.Y. 1994) ........................................................ 51

*MVB Collision, Inc. v. Progressive Ins. Co.*,
   13 N.Y.S.3d 139 (App. Div. 2015) .......................................................... 49

*Nabisco, Inc. v. PF Brands, Inc.*,
   191 F.3d 208 (2d Cir. 1999) .................................................................... 29

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp. Inc.*,
   628 N.Y.S.2d 408 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614 (1996) ......................................... 49

*New World Sols., Inc. v. NameMedia Inc.*,
   150 F. Supp. 3d 287 (S.D.N.Y. 2015) .................................................................................. 38

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
   269 F.3d 114 (2d Cir. 2001) ........................................................................................... 28, 29

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   590 F. Supp. 2d 500 (S.D.N.Y. 2008) ............................................................................ 23, 30

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*,
   2004 WL 896952 (E.D.N.Y. Mar. 26, 2004) ........................................................................ 52

*Playtex Prod., Inc. v. Georgia-Pac. Corp.*,
   390 F.3d 158 (2d Cir. 2004) ................................................................................................. 21

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961) .......................................................................................... 20, 21

*Premium Mortg. Corp. v. Equifax, Inc.*,
   583 F.3d 103 (2d Cir. 2009) ................................................................................................. 49

*Presto Prods., Inc. v. Nice-Pak Prods., Inc.*,
   1988 WL 252340 (T.T.A.B. Sept. 14, 1988) .................................................................. 22, 23

*Quia Corp. v. Mattel, Inc.*,
   2010 WL 2486364 (N.D. Cal. June 15, 2010) ..................................................................... 33

*Randa Corp. v. Mulberry Thai Silk, Inc.*,
   2000 WL 1741680 (S.D.N.Y. Nov. 27, 2000) ..................................................................... 52

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*,
   410 F. App'x 362 (2d Cir. 2010) .......................................................................................... 45

*RFP LLC v. SCVNGR, Inc.*,
   788 F. Supp. 2d 191 (S.D.N.Y. 2011) .................................................................................. 49

*S&L Vitamins, Inc. v. Australian Gold, Inc.*,
   521 F. Supp. 2d 188 (E.D.N.Y. 2007) .................................................................................. 49

*Salahuddin v. Goord*,
   467 F.3d 263 (2d Cir. 2006) ................................................................................................. 19

*Saxon Glass Techs., Inc. v. Apple Inc.*,
   393 F. Supp. 3d 270 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020) ............... 33, 34

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
   2009 WL 1492196 (S.D.N.Y. May 27, 2009) ....................................................................... 47

*Star Indus., Inc. v. Bacardi & Co.*,
   412 F.3d 373 (2d Cir. 2005).............................................................................. 23, 28, 31, 33

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009).................................................................................................... 20
   736 F.3d 198 (2d Cir. 2013).................................................................................................. 38

*Stephano Bros. v. Stamatopoulos*,
   238 F. 89 (2d Cir. 1916)........................................................................................................ 22

*Strange Music, Inc. v. Strange Music, Inc.*,
   326 F. Supp. 2d 481 (S.D.N.Y. 2004).................................................................................. 26

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*,
    851 F.3d 440 (5th Cir. 2017) ................................................................ 27, 28, 30

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir. 1998) ........................................................................ 21, 31

*Tarsus Connect, LLC v. Cvent, Inc.*,
    452 F. Supp. 3d 1334 (N.D. Ga. 2020) ............................................................ 42

*The Sports Auth., Inc. v. Prime Hosp. Corp.*,
    89 F.3d 955 (2d Cir. 1996) ................................................................................ 27

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
    221 F. Supp. 2d 410 (S.D.N.Y. 2002) .............................................................. 35

*Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*,
    964 F. Supp. 733 (S.D.N.Y. 1997) ................................................................... 45

*Tucker v. Wyckoff Heights Med. Ctr.*,
    52 F. Supp. 3d 583 (S.D.N.Y. 2014) ................................................................ 40

*Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*,
    634 F. Supp. 1468 (S.D.N.Y. 1986) ................................................................. 29

*Vitarroz Corp. v. Borden, Inc.*,
    644 F.2d 960 (2d Cir. 1981) .............................................................................. 27

*W.W.W. Pharm. Co. v. Gillette Co.*,
    808 F. Supp. 1013 (S.D.N.Y. 1992),
    *amended* (July 14, 1992), *aff'd*, 984 F.2d 567 (2d Cir. 1993) ......................... 21, 52

*WE Media, Inc. v. Gen. Elec. Co.*,
    218 F. Supp. 2d 463 (S.D.N.Y. 2002) ...................................................... 31, 51, 52

*Yong Ki Hong v. KBS Am., Inc.*,
    951 F. Supp. 2d 402 (E.D.N.Y. 2013) .............................................................. 48

*Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*,
    2016 WL 2637801 (D. Minn. May 6, 2016) ................................................ 51, 54

## Statutory Authorities

15 U.S.C. § 1125(c)(1) .................................................................................. 39, 43, 44

15 U.S.C. § 1125(c)(2) ....................................................................................... 39, 40

15 U.S.C. § 1125(c)(6) ............................................................................................. 49

## Rules and Regulations

Fed. R. Civ. P. 56 ..................................................................................................... 1

Fed. R. Civ. P. 56(a) .............................................................................................. 20

## Other Authorities

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION
    § 23:14 ............................................................................................................ 31
    § 24:117 .......................................................................................................... 43
    § 24:120 .......................................................................................................... 40

Pursuant to Fed. R. Civ. P. 56, Defendant the Boy Scouts of America moves for summary judgment on Plaintiff Girl Scouts of the United States of America's ("GSUSA") entire First Amended Complaint and all claims therein, as well as on the BSA's affirmative defense of laches.

## PRELIMINARY STATEMENT

GSUSA's trademark lawsuit against the Boy Scouts of America (the "BSA") arising from the BSA's 2018 "Scout Me In" marketing campaign is utterly meritless, and should never have been filed. The BSA is the senior user of SCOUT-formative branding, having been founded before GSUSA. When GSUSA chose to change its name from Girl Guides to Girl Scouts, it assumed the risk that Americans might assume the parties are related. Not surprisingly, GSUSA's own research confirms that half of Americans indeed held that belief as of 2017—before any of the events in question in this lawsuit. GSUSA also has voluntarily associated itself with the BSA for decades, including by participating in joint events and sharing facilities. And, GSUSA deliberately abandoned the use of SCOUT alone at least 30 years ago, in favor of always using GIRL before SCOUT. GSUSA's present claim that the BSA's 2018 "Scout Me In" marketing slogan suddenly has caused marketplace confusion is bereft of any evidence supporting a causal connection to confusion. The Court should grant summary judgment in the BSA's favor on all claims.

In October 2017, the BSA announced it would welcome girls into its two remaining single-gender programs – Cub Scouts and Boy Scouts – offering girls the opportunity to experience these two programs and eventually, with enough hard work, earn the prestigious Eagle Scout rank. For the BSA it was a milestone, and for thousands of families and girls across America, it presented an exciting opportunity.

Despite claiming to champion girls' rights to pursue any path they want, this was an opportunity GSUSA did *not* want girls to have. Incensed by the loss of its "monopoly," GSUSA launched a self-described "ground war" against the BSA, aimed at pressuring it to reverse course.

GSUSA viewed increased competition from the BSA as an "existential threat," admitting: "With Boy Scouts opening up their doors to girls, this means that girls who are having a bad experience [in Girl Scouts] have options." GSUSA's "ground war" attempted to thwart the BSA's efforts to serve youth, and it deployed an aggressive public relations campaigns aimed at "stopping BSA in individual markets." Unbeknownst to GSUSA's donors, licensing partners and members, GSUSA poured millions of its non-profit dollars toward its efforts to derail the BSA's program changes.

One of GSUSA's "ground war" tactics against the BSA was this lawsuit – filed not to right any wrong, but for an improper purpose: "to principally create uncertainty for teachers, administrators, and parents" in the marketplace. Lacking any legal theory that could achieve its desired anticompetitive outcome of forcing the BSA to reverse its decision and ban the admission of girls into its Cub Scouts and Boy Scouts programs, GSUSA instead pursued a trademark angle. It alleged that somehow, all of a sudden in 2018, the SCOUT-formative branding the BSA had used for decades was infringing and diluting GSUSA's trademarks. Astonishingly, GSUSA (falsely) alleged that the BSA had only recently begun using the term "Scout" alone in reference to its youth members. GSUSA (also falsely) insisted that *it* used and had rights to SCOUT alone as a mark in connection with girl services. And it implausibly alleged that the BSA's May 2018 "Scout Me In" marketing campaign and the renaming of the Boy Scouts program as "Scouts BSA" (with both boy and girl members) gave rise to trademark claims, suddenly causing consumers to confuse the source of the parties' respective services and diluting the "Girl Scouts" brand.

None of these allegations are true. Undisputed evidence confirms that the BSA has been using SCOUT alone for more than 100 years, and in connection with the marketing of its co-ed youth services for nearly 50 years. By contrast, GSUSA has publicly disavowed the use of SCOUT

alone in its branding for more than 40 years, always insisting that GIRL precede SCOUT, and it has internally admitted that the word SCOUT alone identifies the BSA, not GSUSA.

Two years after filing its lawsuit, after exhaustive discovery with hundreds of thousands of pages of documents produced and more than 40 depositions taken, GSUSA's meritless assertions have yielded no proof the BSA engaged in any trademark infringement, dilution, or tortious interference. GSUSA has no material evidence of any consumer confusion caused by the BSA's 2018 marketing campaign, nor has GSUSA identified a single business relationship the BSA supposedly interfered with. As for dilution, GSUSA's own consumer research reflects that its brand is every bit as strong now as it was before the BSA actions at issue.

GSUSA's own documents confirm that it has no evidence that any BSA activity – branding or otherwise – has hurt GSUSA's membership. Despite its exhaustive efforts to show harm by boiling the oceans looking for possible confusion in the marketplace, GSUSA's own internal documents recognized there is no correlation between BSA activity and GSUSA councils experiencing membership decline. As GSUSA's then-Chief Girl and Family Engagement Officer admitted shortly before this lawsuit was filed, "we have totally over rotated towards defending against [what] seems a .01% threat." GSUSA is now asking that the BSA be ordered to pay for the millions it spent on that "over rotation." But monies spent on responding to a perceived competitive threat are not recoverable in a trademark case. GSUSA has no viable damages claim.

GSUSA's lawsuit, designed to combat perceived competition and put political pressure on the BSA at a time when GSUSA felt the BSA was vulnerable to attack, has caused two nonprofit organizations to needlessly spend millions of dollars in legal fees and distract them from their respective missions. But it yielded no triable issue on the merits of any of GSUSA's claims, and no recoverable damages. The BSA *has* never and *will* never use the GIRL SCOUT mark, and is

well within its rights to continue using its SCOUT-formative branding, including for co-ed programs, which is routinely co-brands with BSA house marks to avoid even the potential for confusion.

No further judicial resources should be squandered on this ill-conceived lawsuit.  The BSA's motion for summary judgment should be granted in full.

## FACTUAL BACKGROUND

### I. THE PARTIES

#### A. The Boy Scouts Of America

The BSA is a non-profit organization that aims to "prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law." Defendant Boy Scouts of America's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("SUF") ¶ 1.  In 1910, based upon the success of the Scouting movement in Great Britain, the BSA incorporated under the laws of the District of Columbia.

On June 15, 1916, Congress granted the Boy Scouts of America its federal charter, giving special protection to the organization's name, insignia and designating marks.  SUF ¶ 2; *see* 36 U.S.C § 309 (federal charter).  The BSA launched the Cub Scout program in 1930 to serve younger members.  SUF ¶ 3.  Since then the BSA has continually expanded its programs, including offering various co-ed programs dating back nearly 50 years, while staying true to its original mission of youth development throughout America.  Since its inception in 1910, more than 130 million young men and women have participated in the BSA's youth programs and more than 35 million adult volunteers have helped carry out the BSA's mission.  SUF ¶ 3.

The BSA, the only defendant in this case, is a national organization known as the National Council.  To carry out its mission, the BSA grants charters to thousands of local organizations across the country, including faith-based institutions, clubs, civic associations, educational

institutions, and businesses, which come together to form Scouting units.  SUF ¶ 4.  Each of the

BSA's more than 50,000 Scouting units in the United States is organized, registered, and supported

by one of more than 250 local councils that are chartered by the BSA and oversee the Scouting

program in an assigned geographic area.  SUF ¶ 4.  Each local council is separately incorporated

under the non-profit laws of its respective state, maintains an independent board of directors and

senior management, and is exempt from federal income tax under section 501(c)(3) of the Internal

Revenue Code.  SUF ¶ 5.  Scouting units are led by adult volunteers appointed by the chartered

organization.  Declaration of Patrick Sterrett ("Sterrett Decl.") ¶ 2

### B.      The Girl Scouts Of The United States Of America

GSUSA founder Juliette Gordon Low formed a program in 1912, two years after the

founding of the BSA, that sought to bring to the U.S. a program that would mirror the Girl Guides

programs in the United Kingdom; she called it Girl Guides.  SUF ¶ 7.  In 1913, Ms. Low's

organization renamed itself as the "Girl Scouts," incorporated in 1915, and today is known as the

Girl Scouts of the United States of America.   SUF ¶ 7.

GSUSA has always been, and remains, proudly a "girls only" organization.  SUF ¶ 8.  Its

foundational documents and mission statement – to "build[] girls of courage, confidence, and

character, who make the world a better place" – reflect GSUSA's exclusive focus on single-gender

programs designed for girls.  SUF ¶ 8.

## II.      THE PARTIES' TRADEMARKS AND BRANDING

### A.      The BSA's Use Of SCOUT Marks Over The Past Century

Throughout its history, the BSA has used non-gender-specific SCOUT marks – that is,

"scout" without being preceded by the gender-specific term "boy" – in connection with single-

gender programs for more than a century.  SUF ¶ 9.[1]  For instance, in 1913 the BSA began

publishing a magazine titled *Scouting*, pictured below:



Declaration of Tracy Waters ("Waters Decl.") ¶ 8 & Ex. H.

SCOUT-formative branding is deeply ingrained in everything the BSA is and does, and

has been since its inception.  For example:

- **SCOUTING & SCOUTER**.  Since 1913, the BSA has used the mark SCOUTING as the name and identifier of its magazine for male and female adult SCOUTERS in the BSA. The BSA obtained a trademark registration for the mark SCOUTING in 1982.  *Id.*; SUF ¶ 13.

- **SCOUTING.ORG.**  Since at least 1994, the domain used by the BSA for its flagship website has been, and continues to be, scouting.org.  SUF ¶ 14.  In addition, the BSA has registered and maintained the following domains continuously for the last fifteen years or more: scoutingmagazine.org (since *2000*), bsascouting.org (since *2000*) scoutmasters.com (since *2002*), scoutgear.com (since *2002*), scoutjamboree.com (since *2004*), and beascout.org (since *2007*).  SUF ¶ 14.

- **SCOUT STUFF & SCOUT SHOP**.  Since 2006, the BSA's e-commerce website to promote and sell goods to male and female youth members and adult volunteers involved in BSA's programs has operated under the brand SCOUT STUFF or SCOUT SHOP.  SUF

---

[1]   Historical records confirm that the BSA has used the term "BSA," as well as its fleur-de-lis logo, for more than a century, and its "Cub Scouts" name and logo for more than 80 years.  SUF ¶¶ 10-11.

¶ 15.  The BSA obtained a federal trademark registration for the mark SCOUT SHOP BOY SCOUTS OF AMERICA in 1985.  SUF ¶ 13.  The BSA obtained federal trademark registrations for the mark SCOUT STUFF in 1998.  SUF ¶ 13.

The USPTO has granted the BSA dozens of SCOUT-formative federal trademark registrations, unaccompanied by a gender-specific term, including the below:

| | |
|---|---|
| SCOUT | SCOUTCAST |
| SCOUTING | SCOUTING WORKS |
| CUB SCOUTS | SCOUTWEAR |
| EAGLE SCOUT | SCOUTS IN MOTION |
| SEA SCOUTS | SCOUTINGU |
| STEM SCOUTS | VOICE OF THE SCOUT |
| SCOUTMASTER | THIS IS SCOUTING |
| SCOUT WIRE | CAMP SCOUT! |
| SCOUT STUFF | MY.SCOUTING |
| SCOUTSTUFF.ORG | SCOUTSTRONG |
| NATIONAL SCOUT JAMBOREE | SCOUTFIT |
| VARSITY SCOUT | SCOUTING FOR ADVENTURE |
| FRIENDS OF SCOUTING | SCOUTING FOR FOOD |
| SCOUT COFFEE | NATIONAL SCOUTING MUSEUM |
| SCOUT FOLKS | SCOUTNET |

SUF ¶ 13; *see* Declaration of Dylan I. Scher ("Scher Decl."), Ex. SSSSSSS (examples).  The BSA publishes and maintains a "Language of Scouting" reference tool which serves as the "definitive resource on terms and style specific to Scouting and this organization."  Declaration of Michael Ramsey ("Ramsey Decl.") ¶ 11 & Ex. Y.  These standards have been developed so that the BSA can disseminate resources and other information "in the most professional, consistent, coherent, and uniform manner for all forms of communication."  *Id.*  The Language of Scouting includes many SCOUT-formative terms that have been in use for many years, and in some cases (like "Scout," "Scouter," "Scout Oath," "Scouting Magazine" and the like) for many decades.  *Id.*  The BSA has thus acquired rights in non-gender-specific SCOUT marks.[2]  *See also* 36 U.S.C § 30905

---

[2]    Courts have long recognized the BSA's rights in the marks SCOUT and SCOUTING.  *See, e.g.*, *Adolph Kastor & Bros. v. FTC*, 138 F.2d 824, 825 (2d Cir. 1943) (affirming finding that "even before the incorporation of the Boy Scouts of America, the words 'Scout' and 'Scouting' had acquired a secondary meaning as applying to the Boy Scout movement").

(BSA has "exclusive right" to use "descriptive or designating marks, and words or phrases it adopts).

**B.**   **The BSA's Decades Of Use Of SCOUT Marks In Connection With Co-Ed Services For Girls And Boys**

The BSA began welcoming female youth into co-ed programs beginning with the Exploring program in 1971. SUF ¶ 16. Thereafter, the BSA changed its mission statement to refer to "young people," rather than just boys, and the mission statement has since been: "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law." Sterrett Decl., ¶¶ 2, 15. In 1972, the BSA's Sea Scouts (then known as Sea Exploring) program became co-ed, serving boys and girls aged 14 to 20. *Id.* ¶ 14. In 1998, BSA officially re-named its co-educational Sea Exploring program Sea Scouts and launched its co-ed Venturing program for young men and women aged 14 to 20. *Id.* In 2015, the BSA added another co-ed program, STEM Scouts, for boys and girls aged 8 to 18. *Id.* As of 2017, the Cub Scouts and Boy Scouts programs were the only remaining single-gender BSA programs.

Historical records confirm that the BSA has used its SCOUT-formative branding (including SCOUTING, SCOUTS and SCOUT) in various circumstances in connection with its co-ed programs for girls dating back decades. SUF ¶ 19. The BSA has also featured both SCOUT-formative branding and images of girls in advertising for its co-ed programs dating back several decades. SUF ¶¶ 17-19. That trend has increased over the decades, with the addition of each co-ed BSA program from the 1970s, onward.

Then, and now, the BSA's use of SCOUT or SCOUTING alone is routinely accompanied by other distinctive BSA branding indicia, including program names, the BSA corporate name, BSA program logos, and the fleur-de-lis. SUF ¶¶ 12. While each program and its members can be identified by their unique name (such as Venturers, Sea Scouts and Stem Scouts), all youth in

all of these programs are members of both the BSA and the World Organization of the Scout Movement ("WOSM," the largest international Scouting organization for co-ed Scouting of which the BSA is a member), and all are properly called Scouts.  SUF ¶ 21; Ramsey Decl. ¶ 14.  Examples of the BSA's use of SCOUT-formative branding in connection with female members follows:

| *1973* | *1998* |
|:---:|:---:|
|  |  |
| ***2012*** | ***2000*** |
|  |  |

| *2015* |
|:---:|
|  |

Waters Decl., Exs. J, K, M; Ramsey Decl. Exs. DD, II.

      **C.**     **GSUSA's Knowledge Of And Failure To Take Action Concerning The BSA's SCOUT-Formative Branding In Connection With Female BSA Members Dating Back Decades**

GSUSA has been on notice of the BSA's longstanding use of non-gender-specific SCOUT marks in a variety of contexts, including in connection with co-ed services. Communications between GSUSA and BSA leadership reflected this awareness, including express discussions about the BSA's use of the word "Scout" not preceded by "Boy," and the extent to which the BSA's programs were and would be co-ed. SUF ¶¶99-104. Despite this knowledge, GSUSA took no legal action. SUF ¶¶ 105-107.

For example, when the BSA's Sea Scouts program became co-ed in 1972, GSUSA took no legal action, despite the absence of a gender-specific term before SCOUT. SUF ¶ 106. In 1980 GSUSA's National Executive Director even sent a letter to the BSA, complaining about the BSA's use of Scout branding with respect to female Explorer Scouts, stating that GSUSA preferred to refer to those female members as "young women" rather than "girls" out of concern for possible "confusion caused by the generic use of the term 'Scouting' without an identifier." SUF ¶ 99; *see also id.* ¶ 100 (1985 letter). Despite this stated concern, GSUSA did not take legal action in the 1980s – nor did they in 1998 when Venturers launched as a co-ed program, nor in 2015, when STEM Scouts launched as a co-ed program. SUF ¶ 106. Nor did GSUSA take any legal action concerning the BSA's many trademark registrations for non-gender-specific SCOUT marks over the past four decades. SUF ¶ 107.

      **D.**     **GSUSA'S Consistent Use Of "GIRL" Before "SCOUT" In Its Own Branding, And Its Disavowal Of "SCOUT" Alone**

Since at least 1989, GSUSA's brand guidelines have clearly instructed that "Scout" must always be preceded by "girl"; "Scout" should never be used alone in reference to GSUSA. SUF

¶ 22.  For instance, GSUSA's 2012 brand guidelines instructed that "'Scout' or 'Scouts' should never be used independently."  Scher Decl., Ex. III.  GSUSA's 2010 guidelines even included the following striking graphic:



Scher Decl., Ex. HHH.  Multiple GSUSA local council guidelines revealed the reason for this prohibition: "The word 'Scouting' has been copyrighted [sic] by Boy Scouts and can't be used." SUF ¶ 23.  Likewise, internal GSUSA communications dating back more than 30 years acknowledged that the term "Scout" was "used world-wide by the Boy Scouts, and always has been," and as a result GSUSA "chose[] to be very assertive, consistent, and positive about the use of Girl Scouts."  SUF ¶ 100.  Recent GSUSA internal communications continue to acknowledge that the BSA, not GSUSA, owns the rights to SCOUT alone.  SUF ¶¶ 101-102.  As GSUSA's then-Chief Girl & Family Engagement Officer explained, "we generally don't use the term 'scout' or 'scouts' referring to Girl Scouts.  *'Scout' when used alone refers to Boy Scouts*."  SUF ¶ 101 (emphasis added).[3]

## III.    THE BSA WELCOMES GIRLS INTO CUB SCOUTS AND SCOUTS BSA

### A.    The BSA Considers Welcoming Girls Into Its Last Two Single-Gender Programs

In early 2017, the BSA internally explored the idea of opening its last two single-gender programs, Cub Scouts and Boy Scouts, to female members.  This idea was not new, and had been considered before.  Scher Decl., Ex. CCCCCC.  Recent BSA research indicated there was a strong interest in such a program change: (1) 90% of non-Scouting parents were interested in a program

---

[3]    USPTO records confirm that, as of the date GSUSA filed this suit, it did not own any live trademark registrations for a trademark including the word "scout" not preceded by the word "girl."

like Cub Scouts for their daughters; (2) 87% of non-Scouting parents were interested in a program like Boy Scouts for their daughters; and (3) 90% of non-Scouting girls, ages 11-18, were interested in a program like the Boy Scouts.  Ramsey Decl., ¶ 19.  Parents also wanted such a program option for their daughters because busy modern families needed a one-stop shopping option for their children.  *Id.*

**B.      In Response, GSUSA Launches A Self-Proclaimed "Ground War"**

In early 2017, GSUSA heard through the rumor mill that the BSA was considering welcoming girls into its Cub Scouts and Boy Scouts programs.  Scher Decl., Ex. DDDDDD. GSUSA reacted with anger and alarm.  In a scathing letter GSUSA secretly leaked to the press through its high-profile PR firm Mercury LLC and then falsely denied having leaked, GSUSA accused the BSA in summer 2017 of a "covert campaign to recruit girls."  SUF ¶¶ 26-27.  GSUSA demanded that the BSA not make these program changes giving girls the choice to join Cub Scouts and Boy Scouts if they wished.

Simultaneously,  GSUSA launched a nationwide, self-proscribed "ground war" against the BSA in an effort to pressure the BSA not to welcome girls into its Cub Scouts and Boy Scouts programs.  GSUSA referred to this campaign as "BSA combat" -- an "air war, ground war, and underground war."  Scher Decl., Exs. ZZZ, AAAA.  GSUSA's "BSA Combat" tactics included:

- Directing GSUSA local councils to pressure their BSA local council counterparts to vote down any decision to welcome girls into Cub Scouts or Boy Scouts, SUF ¶ 28;

- Forbidding the BSA from renting GSUSA camps, SUF ¶ 29;

- Blacklisting dual BSA/GSUSA parent volunteers, SUF ¶ 30; and

- Requiring vendors to agree not to work with "any person, organization, or entity providing scouting services," which of course meant the BSA, SUF ¶ 31.

In parallel, GSUSA took numerous steps to *actively associate* itself with the BSA and the BSA's trademarks in the run-up to this litigation, including by:

- Purchasing ad keywords of the BSA's own trademarks so that the GSUSA website would appear in search results for these BSA terms – not only for "Scout" and "Scouting," but also for "Boy Scout" and "Cub Scouts."  SUF ¶¶ 87-89; *infra* Part II.A.3.

- Purchasing over 700 domain names containing the word "scout" not preceded by the word "girl," as well as obtaining similar social media handles, in violation of GSUSA's own style guide – including attempting to acquire domain names with "STEM scouts" ("stemscouts.org," "stemscouts.net") and Webelos ("webelos.com"), which are BSA registered trademarks.  SUF ¶¶ 90-93; [4] *see also* SUF ¶ 94 (then-CEO Acevedo directing: "grab as many social media 'scouters' labels as possible" because "BSA is … us[ing] that phrase"); *infra* Part II.A.3.

- Attempting to edit Wikipedia to insert references to GSUSA to Wikipedia pages about "Scouting."  SUF ¶ 95-97; *infra* Part II.A.3.

## C.   The BSA Formally Decides To Welcome Girls Into Its Last Two Remaining Single-Gender Programs, Cub Scouts and Scouts BSA

A few months later, in October 2017, the BSA announced it would welcome girls into the Cub Scouts and Boy Scouts programs.  SUF ¶ 32.  In January 2018, the BSA welcomed an initial "early adopter" group of young girls into Cub Scouts, with the program formally opening to girls nationwide in August 2018.  SUF ¶ 58.  Cub Scouts had over <u>114,000</u> girl members as of November 13, 2019.  SUF ¶ 33.  The (subsequently renamed) Boy Scouts program began welcoming girls as of February 1, 2019, and by November 13, 2019 over <u>27,000</u> girl members had joined.  SUF ¶ 34.

## IV.   THE INSTANT DISPUTE

### A.   GSUSA Papers Its Ground War Plan With A Letter-Writing Campaign To The BSA

In November 2017, shortly after the BSA's announcement, GSUSA began a letter-writing campaign against the BSA, purporting to complain about misuse of its trademarks, such as in local

---

[4]   "WEBELOS" is a fanciful BSA term for a particular Cub Scout rank and is uniquely associated with the BSA.  SUF ¶ 123.

flyers or on church signs.  SUF ¶ 36.  These letters lacked merit for a host of different reasons.  For example, GSUSA speciously complained about:

- Accurate references to "Boy Scouts" and "Girl Scouts" (*i.e.*, nominative fair uses) by third-party organizations such as churches that hosted BSA and GSUSA meetings;

- Accurate references to GSUSA in BSA volunteer materials, which are nominative fair uses (*e.g.*, "you can be a Girl Scout … and a Cub Scout");

- BSA marketing materials accurately referencing joint events involving "Girl Scouts" that were expressly approved or authorized by GSUSA local councils or volunteers; and

- BSA volunteer uses of an accurate quotation from GSUSA's founder, for which GSUSA admits had no trademark or copyright protection.

SUF ¶ 38.  A few of the letters concerned examples of some well-intentioned volunteers who had placed the word "girl" before the program name "Scouts BSA" when describing the troop, such as a Facebook post describing a "Girl Scouts BSA Troops forming in Kirkland."  SUF ¶ 39.  Once brought to the BSA's attention, the BSA immediately notified the volunteer and the post was altered.  SUF ¶ 39.  None of these letters complained of or threatened the possibility of litigation concerning the SCOUTS BSA program name change nor the SCOUT ME IN slogan.  SUF ¶ 37.

**B.     The BSA's May 2018 SCOUT ME IN Marketing Campaign, SCOUTS BSA Program Name Change, And Updated Brand Guidelines**

 In May 2018, the BSA announced its new SCOUTS BSA program name (replacing the "Boy Scouts" program name), along with its SCOUT ME IN marketing campaign slogan, for use with respect to the BSA's co-ed programs – including the Cub Scouts and Boy Scouts programs.  SUF ¶ 40.

In selecting a new program name for Boy Scouts that would be inclusive of both genders, the BSA engaged in thoughtful, deliberate, months-long process that involved focus group studies and solicitation of feedback from numerous volunteers and professionals at different levels of the organization.  Ramsey Decl., ¶ 20.  Through every conversation the BSA had, the name

14

"Scouts" was mentioned.  *Id.*  The BSA considered several possible variants on that term, such as Honor Scouts and Merit Scouts.  In the end, Scouts BSA was selected.  *Id.*  The Scouts BSA name draws on the long-standing reference to BSA members as "Scouts," the strength and recognition of the "BSA" brand, and the historical nomenclature for other BSA programs, which in the past have been identified on youth uniforms as "Sea Scouts BSA," "Cub Scouts BSA" and "Venturing BSA," for instance.  *Id.*; Waters Decl., ¶¶ 14-19 & Exs G, N-Q (examples).  For instance, below is an image of a SCOUT BSA chest strip used in prior years on uniforms:



Waters Decl., Ex. Q.

"Scouts BSA" is not a new BSA mark.  It has been owned and used by the BSA as a web domain dating back to approximately 2001.  SUF ¶ 43.  It was also used on uniform chest strips dating back to the 1970's, in the singular form.  SUF ¶ 42.

The SCOUT ME IN slogan is a call to action to join in the fun of BSA programming, and highlights the inclusivity of the BSA's welcoming of girls into Cub Scouts and Scouts BSA.  SUF ¶ 44.  The BSA considered a few other options, but Scout Me In was the clear winner amongst the various proposals.  Ramsey Decl., ¶ 22.

In practice, the "Scout Me In" slogan is designed to be used on a program-specific basis. SUF ¶ 46.  The BSA Brand Center offers various branding and logo assets depicting Scout Me In for use by the BSA and its councils, all of which are  "locked up" with either a particular program name, or the BSA corporate logo, for example as follows:

15

"SCOUT ME IN" asset for Cub Scouts:



SUF ¶ 47; Ramsey Decl., Ex. KK.  The BSA brand center does not offer assets depicting the "Scout Me In" slogan for use by itself.  SUF ¶ 47.

### C.   The BSA's 2018 Brand Guidelines Forbidding The Use Of "Girl" Before "Scout"

The BSA's marketing materials do not use the term "Girl Scouts" to identify the BSA's members or programs.  SUF ¶ 48.  To the contrary, the BSA forbids the use of that term in marketing materials.  SUF ¶ 49.  In April 2018, before announcing the Scout Me In Campaign, the BSA reminded Local Council Executives that Local Councils and volunteers should not use the term "Girl Scouts" in reference to BSA members or programs.  SUF ¶ 49.  In September and October 2018, the BSA developed specific branding guidelines which explicitly prohibited use of the word "girl" before "Scout" in marketing materials.  SUF ¶ 50.  This guidance was distributed to the field in November 2018 as a one-page infographic and was followed by more detailed training materials the following month.  SUF ¶ 50.

### D.   GSUSA Retains High-Priced PR Firm Mercury LLC Who Recommends In September 2018 That GSUSA Pursue "Litigation – To Principally Create Uncertainty For Teachers, Administrators And Parents"

In June 2018, GSUSA signed a multi-million dollar contract with high profile PR firm Mercury LLC, for a "High Stakes Public Strategy Campaign" dubbed the "Athena Campaign," aimed at "measurable acceleration of Girl Scout membership acquisition and retention."  SUF ¶ 51.

16

Work under the Mercury agreement included a host of general advertising work, such as lead generation, digital ad buys, a grassroots community organizing campaign for local member acquisition and retention strategies, and the creation of a Latino membership acquisition engine. SUF ¶ 52.  It also included a coyly worded project involving "tactical pushback against competitor local actions."  SUF ¶ 53.  The Mercury agreement contemplated services to be performed in summer/fall 2018.  SUF ¶ 51.

In September 2018, Mercury gave a presentation to GSUSA highlighting its ongoing work for GSUSA in a "Competitive Lightning Response Overview," which outlined Mercury's plan to "check BSA in at-risk markets as they roll-out their new co-ed strategy, protect and grow GSUSA share, and degrade competitor's market power."  SUF ¶ 54.  The presentation also included a "Legal Strategy" section recommending "litigation – to principally create uncertainty for teachers, administrators and parents."  SUF ¶ 54.

### E.    Two Months Later, In November 2018, GSUSA Sues The BSA

On November 6, 2018, two months after Mercury gave its recommendation that the GSUSA should pursue "litigation … to principally create uncertainty" in the marketplace, GSUSA filed this lawsuit.  Its Complaint ostensibly sought to prohibit the BSA from using its long-held SCOUT Marks in connection with its continued efforts to offer youth or leadership programs that include both boys and girls.  *See generally* Dkt. 1 (Compl.).  GSUSA claims that the BSA's uses of marks that incorporate the word "SCOUT" or its variants without being preceded by the word "boy"  in connection with BSA programs offered to both boys and girls infringe or dilute those rights. Dkt. 89 (Am. Compl.) ¶¶ 88-138.  GSUSA also alleges that the BSA tortiously interfered with GSUSA's prospective economic advantage because a BSA local council: (1) allegedly told unidentified parents or girls "that there 'are no more Girl Scouts' or that the organizations have

combined"; and (2) allegedly "attempted to dissuade" a retailer in Red Bluff California "from providing booth space" to GSUSA.  *Id.* ¶¶ 69-72, 139-144.

The parties have been engaged in discovery for the better part of two years.  On November 23, 2020, at the BSA's demand, GSUSA dismissed with prejudice its trademark dilution by tarnishment claims and filed an Amended Complaint deleting those claims.  *See* Dkt. 1 (Compl.); ¶¶ 86-87, 115-120 (federal statute), 136-139 (state statute); Dkt. 89 (Am. Compl.).  Consequently, GSUSA's dilution claims are now limited solely to dilution by blurring.

### F.     GSUSA's Failure To Produce Admissible Evidence Of Actual Confusion

In discovery, GSUSA identified nearly two dozen 30(b)(6) witnesses to testify regarding supposed instances of actual confusion.  However, not a single GSUSA witness testified to having personal, firsthand knowledge of any instance of actual confusion, *i.e.*, a one-on-one conversation with someone who mis-enrolled in the BSA thinking it was GSUSA based on the BSA's use of the SCOUT ME IN slogan or other SCOUT Marks.  SUF ¶ 55.  Rather, they testified largely to multiple layers of hearsay, conveying secondhand or thirdhand conversations with unidentified people about vague and unspecified impressions.  For example:

- GSUSA's 30(b)(6) witness from Girl Scouts of Arkansas, OK and Texas admitted she did not "personally witness[]" or have first-hand knowledge of any instances of confusion.  SUF ¶ 55.

- GSUSA's 30(b)(6) witness from Girl Scouts of Northern California testified that she "wasn't a direct witness to" instances of alleged confusion, and instead only that she would testify about "things that people told [her]."  SUF ¶ 55.

- GSUSA's 30(b)(6) witness from Girl Scouts of Gulfcoast Florida could not identify any specific instance of alleged confusion she witnessed first-hand or had first-hand knowledge of.  SUF ¶ 55.

- Another GSUSA 30(b)(6) witness from Girl Scouts of Gulfcoast Florida could not identify any specific instance of alleged confusion she witnessed first-hand; the only such instance she testified about was at an event she was not at and concerned an individual who told Davis she was not confused.  SUF ¶ 55.

18

- GSUSA's 30(b)(6) witness from Girl Scouts of Minnesota and Wisconsin River Valleys, Inc. could not identify a single instance of confusion she witnessed first-hand or had first-hand knowledge of, and could not even identify any instance of alleged confusion she knew about second or third-hand without "reviewing some of the documents."  SUF ¶ 55.

- GSUSA's 30(b)(6) witness from Girl Scouts of North Carolina and Coastal Pines admitted she "d[id] not personally have any firsthand knowledge of any … instances of alleged confusion."  SUF ¶ 55.

- GSUSA's 30(b)(6) witness from Girl Scouts of Western Oklahoma could not identify a single instance of confusion she witnessed first-hand or had first-hand knowledge of.  SUF ¶ 55.

- GSUSA's 30(b)(6) witness from Girl Scouts of Northeast Texas could not identify any specific instance of alleged confusion she witnessed first-hand or had first-hand knowledge of.  SUF ¶ 55.

## LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  Upon that showing, "the burden shifts to the non-movant to point to record evidence creating a genuine issue of material fact."  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).

## ARGUMENT

## I.   GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE ON ITS CLAIMS FOR TRADEMARK INFRINGEMENT

GSUSA raises no triable issue of fact that would support a reasonable finding that the BSA's use of the marks SCOUTS BSA, SCOUT ME IN, SCOUT, SCOUTS and SCOUTING, or

the term "Family Scouting" (the "SCOUTS Marks")[5] to market its programs for girls and boys is likely to cause confusion.[6]   The Court should therefore grant summary judgment on GSUSA's federal and common-law trademark infringement-based claims (Counts I, II, and V).

Once a plaintiff establishes that it owns a protectable mark, courts analyze federal and common-law trademark infringement, unfair competition, and false-designation claims under the same standard: "the plaintiff must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods."   *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009).   "[L]ikelihood of confusion turns on whether 'numerous ordinar[il]y prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'"   *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997) (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993)).   "Likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely 'possible.'"   *Id.* (quotations omitted).   To assess the likelihood of confusion, courts apply the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).   *See Starbucks*, 588 F.3d at 115.   The eight non-exclusive factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

---

[5]   GSUSA mentions a "Family Scouting" mark only a single time in the Complaint. Dkt. 89 (Am. Compl.) ¶ 50.   The same analysis applies to this term as with the other SCOUT-formative marks.

[6]   It is beyond dispute that the BSA does not, and never has, used the GIRL SCOUT mark to market or describe its services.   SUF ¶ 48.   To the contrary, the BSA forbids it.   SUF ¶ 49. GSUSA's claims concerning misuse of the GIRL SCOUT mark concern third party acts which appear to be innocent mistakes of volunteers.   SUF ¶ 39.

*Id.* "Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Playtex Prod., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 162 (2d Cir. 2004) (affirming summary judgment in favor of defendant).

Here, no reasonable juror could find that confusion is likely to result from the BSA's continued use of its SCOUT, SCOUTS, and SCOUTING marks – words that the BSA has been using for decades. SUF ¶¶9-21. Nor has GSUSA even attempted to present any evidence that the marks SCOUTS BSA (which includes the BSA's *name*) or SCOUT ME IN have caused or would cause confusion with GSUSA.

## A.   The Strength Of The GIRL SCOUTS Does Not Favor A Finding Of Confusion

To gauge a mark's strength, the Court considers two factors: its conceptual (or "inherent") strength and its commercial strength in the marketplace. *See Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

Here, GSUSA has presented evidence that the GIRL SCOUTS mark is commercially famous and strong. In this context, the strength and fame of the GIRL SCOUTS mark favors there being *no* likelihood of confusion because the mark's strength lies entirely in its composite nature – specifically, the prominent and meaningful lead element "Girl" – which is *absent* from the BSA's marketing. SUF ¶ 48. *See, e.g.*, *W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1022 (S.D.N.Y. 1992), *amended* (July 14, 1992), *aff'd*, 984 F.2d 567 (2d Cir. 1993) ("in evaluating the strength of the mark, SPORTSTICK must be viewed as a composite term, rather than as the sum total of the two very general words, 'sport' and 'stick'"). The strength in the GIRL SCOUTS mark is limited to its entire composite form, ***which the BSA is not using.*** SUF ¶ 49. Thus, the strength of the complete GIRL SCOUTS mark does not favor finding a likelihood of confusion.

GSUSA cannot assert any rights against the BSA in SCOUTS alone, because it holds no such rights. GSUSA has no registered trademark in "Scouts" alone. *See* generally Dkt. 89 (Am.

21

Compl.).  It is undisputed that GSUSA's brand guidelines explicitly instruct that the second part of its GIRL SCOUTS mark, "Scouts" *not* be used by itself in any GSUSA marketing materials. *See supra* 13-14; SUF ¶ 22.  GSUSA has admitted that it did not use the terms "Scouts" or "Scouting" alone in commerce in the decade leading up to the filing of its complaint.  SUF ¶ 25; *see also* Scher Decl., Ex. RRRRR (RFA Nos. 71-72) (GSUSA not aware of any GSUSA documents from 1987 to the present instructing or permitting GSUSA councils, troops or leaders to use "Scout," "Scouts," or "Scouting" alone, without the preceding modifier "Girl," in reference to GSUSA, its members or its services.).  Thus, GSUSA has no valid rights in SCOUTS alone.[7]

**B.**  <u>**The Parties' Marks Are Not Similar In Their Marketplace Context**</u>

"In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."  *Gruner + Jahr USA Publ'g.*, 991 F.2d at 1078.  Here, no reasonable juror would find the SCOUTS Marks similar to the GIRL SCOUTS mark in the marketplace context in which they are encountered.

*First*, visually, GSUSA's GIRL SCOUTS mark and the BSA's SCOUTS Marks are distinct because the former contains the conceptually significant lead component "GIRL."  "[I]t is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered."  *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 1988 WL 252340, at *3 (T.T.A.B.

---

[7]   *See, e.g., Stephano Bros. v. Stamatopoulos*, 238 F. 89, 90 (2d Cir. 1916) ("the exclusive right to a trade-mark grew out of its use"); *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 154 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013) ("The right to exclusive use of a trademark derives from the use in commerce of the mark, rather than from the mark's mere adoption.").

Sept. 14, 1988).[8]  This prominence is especially relevant here, where the featured "GIRL" element does the work of distinguishing the services offered under the mark GIRL SCOUTS: that GSUSA's programs are meant for girls *only* and proudly so, as GSUSA represents.  SUF ¶ 22.  In contrast, the BSA has no girl-*only* programs.  SUF ¶ 35.  The accused phrases "Scout Me In," "Scouts BSA" and "Family Scouting" are even more dissimilar.  Each includes terms not found in the GIRL SCOUTS mark, and are further visually and verbally distinct from all of GSUSA's "GIRL SCOUT" variations (especially "Scouts BSA," which incorporates the BSA's own name).

*Second*, the Court does not inspect the marks in a vacuum, but rather "look[s] to the overall impression created by the [marks] and the context in which they are found."  *Gruner + Jahr USA Publ'g*, 991 F.2d at 1078.  "The fact that the marks use the same word is not dispositive if the differences in the ways the marks are presented in the marketplace make confusion less likely." *J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *1, *16 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014) (granting summary judgment to defendant despite two identical word marks, IBOOKS).[9]

---

[8]  *See also, e.g.*, *Joules Ltd. v. Macy's Merch. Grp. Inc.*, 2016 WL 4094913, at *7 (S.D.N.Y. Aug. 2, 2016), *aff'd*, 695 F. App'x 633 (2d Cir. 2017) (MAISON JULES not similar to JOULES "particularly because the dissimilar word is first"); *Maxwell Shoe Co. v. Edelman Shoe Co., LLC*, 2004 WL 6225744, at *2 (D. Mass. Aug. 5, 2004) ("the first word of a mark may be 'dominant' by virtue of its prime placement"); *Glenmore Distilleries Co. v. Nat'l Distillers Prod. Corp.*, 23 F. Supp. 928, 932 (E.D. Va. 1938), *aff'd*, 101 F.2d 479 (4th Cir. 1939) ("When two competing marks each consists of two words, the last words being identical and the first words being different in meaning, sight and sound, the dissimilar words render the trade-marks, viewed in their entirety, clearly distinguishable to the eye and ear.").

[9]  *See also, e.g.*, *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 386 (2d Cir. 2005) (similar); *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *14 (S.D.N.Y. Mar. 3, 2014) ("any similarity between the marks is unlikely to cause confusion because both New Balance and Denimafia use the symbols in conjunction with their respective" brand indicia); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 521 (S.D.N.Y. 2008) (granting summary judgment to defendant even though marks "have several words in common" because "[g]iving due attention to the entire context, it is apparent that the marks are not confusingly similar").

Here, the marketplace context of the marks indisputably distinguishes them: the BSA's SCOUT Marks consistently appear alongside other recognized BSA source indicia, including its iconic fleur-de-lis logo and the BSA name, or, in the case of Cub Scouts, in connection with Cub Scouts' distinctive wolf in the diamond logo and the name "Cub Scouts," which the BSA has used for more than 75 years.   SUF ¶¶ 58, 10-12.   Likewise, the SCOUT Marks are routinely accompanied by Cub Scout colors of blue and gold, or the BSA's colors of blue, white, and red. SUF ¶ 12.   In contrast, GSUSA uses its GIRL SCOUTS mark in connection with its trefoil logo, the Kelly green color, and/or a distinctive, lowercase font.   SUF ¶ 56.   For example, the below presents an array of examples of how the parties actually use their respective marks in the marketplace, including on their respective websites and application materials.

**BSA uses of SCOUT Marks & logos**          **GSUSA uses of GIRL SCOUTS mark & logos**



Ramsey Decl., Ex. R, T; Sterrett Decl., Ex. C; Scher Ex. HHH, LLLL, MMMM, EEEEEE.

The BSA's website includes extensive BSA branding, including the full name "BOY SCOUTS OF AMERICA" and signature logo, that could not plausibly confuse customers into

thinking it is GSUSA's website.  SUF ¶ 57.  As shown below, the Scouts BSA webpage includes

the full organizational name, logo, and references to the BSA's iconic, famous "Eagle Scout" mark:



SUF ¶ 57; *see also* Scher Decl., Ex. NNNN.  The marketplace contexts thus reinforce the lack of similarity.[10]  SUF ¶ 58.  Accordingly, this factor strongly favors the BSA.

## C.   GSUSA Admits That The Parties Exist In Two Different Markets

GSUSA and the BSA offer distinct goods and services to different markets, which further weighs against a likelihood of confusion.  *See, e.g.*, *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 396-97 (2d Cir. 1995).  "[T]he fact that both parties' products exist within the same industry is not enough."  *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) (collecting cases).[11]  For example, the Court must consider "audience appeal."  *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985) (no proximity where "both magazines are directed to black American audiences," but one emphasizes "third world and West Indian cultures, whereas" the other "has no such emphasis").

Here, GSUSA admits that its programs are distinct from the BSA's, including because GSUSA's offerings are *exclusively* for girls, while the BSA has no such emphasis:

- Sylvia Acevedo, then-CEO of GSUSA, testified that the BSA and GSUSA "are ***two different markets***." (emphasis added).  SUF ¶ 59.

- Andrea Bastiani Archibald, GSUSA's former Chief Girl and Family Engagement Officer, admitted that GSUSA believes current parents would not be confused between

---

[10]   *See Gruner + Jahr USA Publ'g*, 991 F.2d at 1078 (marks for PARENTS magazine and PARENT'S DIGEST magazine not similar based on "the context in which they are found," including that they share only one word and the presence of other accompanying indicia); *see also J.T. Colby & Co.*, 2013 WL 1903883, at \*17 (giving weight to "the context in which [the marks] appear" because "the plaintiffs' mark is in close proximity to contextual information indicating that it is associated with" the plaintiff, while the defendant's "Apple iBooks mark, on the other hand, appears in an Apple-branded environment"); *First Nat'l Bank of Omaha, Inc.*, 2004 WL 1575396, at \*9 (any similarity between SMARTONE and ONESMART "is lessened substantially by their commercial presentation," including other brand indicia, and thus "there is an insufficient basis to find that their similarity is likely to cause confusion").

[11]   *See also Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 373 (S.D.N.Y. 2003) (proximity favors defendant:  "While the parties compete in the gummy candy industry, it is undisputed that the parties sell their products to different sectors of the candy market …"); *Arrow Fastener*, 59 F.3d at 396 (lightweight staplers and pneumatic staplers not proximate).

GSUSA and the BSA due to awareness of "the **uniqueness of our separate organizations**." (emphasis added).  SUF ¶ 60.

- Christine Butler, former Deputy Chief Marketing Officer of GSUSA, testified at deposition that she agreed that "the programming of Boy Scouts of America **is not comparable** to the programming of GSUSA." (emphasis added).  SUF ¶ 61.

- GSUSA documents describe its programs as "a **unique, all-girl place** designed to help [girls] reach their full G.I.R.L potential." (emphasis added).  SUF ¶ 62.

- GSUSA views these differences as crucial because "the **girl-only, girl-defined, and girl-led aspects of Girl Scouts are crucial to what we offer**." (emphasis added).  SUF ¶ 62.

Because GSUSA "targets its product at a distinct group of consumers" – "girls only" adherents – the markets are not proximate.  *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981).  Moreover, as GSUSA has acknowledged, the public perceives the programs as offering distinct services – for example, GSUSA concedes that "GSUSA is strongly associated with cookies," while the BSA is strongly associated with outdoor activities and *not* with cookies, supported by GSUSA-commissioned studies.  SUF ¶ 63.

This factor also weighs in the BSA's favor.

### D.   GSUSA Admits It Will Not Bridge The Gap

This factor looks to "the likelihood that [GSUSA] will enter [the BSA's] business or the average customer's perception of the likelihood that [GSUSA] would enter the [BSA's] market." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996).  GSUSA has admitted that it will not bridge the gap by welcoming boys into its females-only, girl-led programs. SUF ¶ 8.  This factor thus favors the BSA.

### E.   GSUSA Has No Admissible Evidence Of Actual Confusion

"[E]vidence of actual confusion … must show that the confusion was *caused by the trademarks employed*." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457

(5th Cir. 2017) (emphasis added, quotations omitted).  GSUSA makes three arguments in support of its claim that actual confusion exists.  None raise a triable issue of fact.

*First*, GSUSA identifies *seven* individuals nationwide who it claims mistakenly enrolled their children in a BSA program due to the BSA's SCOUT Marks at issue at some point over the past nearly-three years.  SUF ¶ 64 (naming ███ PERSON 1 ███, ███ PERSON 2 ███, ███ PERSON 3 ███, ███ PERSON 8 ███, ███ PERSON 6 ███, ███ PERSON 5 ███ and ███ PERSON 7 ███ as actually confused parents).  However, GSUSA proffered no admissible evidence supporting these seven claimed instances, relying instead on layers of hearsay.  SUF ¶ 65.[12]  And, this case is a perfect illustration as to why the hearsay rule is important, because as it turns out, indisputable evidence confirms that at least underline four of these seven individuals were not confused at all:

- ███ PERSON 1 ███ has submitted a sworn declaration confirming that she was fully aware she was signing her daughter up for Cub Scouts and not GSUSA.  SUF ¶ 65(a) (Declaration of ███ PERSON 1 ███).

- ███ PERSON 2 ███ has submitted a sworn declaration confirming she knew she was signing her daughters up for Cub Scouts.  SUF ¶ 65(b) (Declaration of ███ PERSON 2 ███).

- GSUSA's own internal documents confirm that GSUSA Council employees spoke to ███ PERSON 3 ███, who attended a BSA sign-up night with ███ PERSON 8 ███; ███ PERSON 3 ███ informed GSUSA that "[s]he was not misled during the meeting that it was Girl Scouts – she knew it was Cub Scouts the whole time."  SUF ¶ 65(c); *see also* SUF ¶ (d) (30(b)(6) designee doesn't "have any information" about ███ PERSON 8 ███).

As for the three remaining names, GSUSA's 30(b)(6) witnesses conceded that they had no idea why any of these three allegedly were confused.  SUF ¶¶ 65(e)-(f); *see also* SUF ¶ 65(g) (similar).  Without evidence of causation, these three instances prove nothing.  *See Inc. Publ'g*

---

[12]   The Court has broad discretion to discount or deem inadmissible anonymous, anecdotal evidence of actual confusion.  *Nora Beverages*, 269 F.3d at 123-24; *see also Star Indus., Inc.*, 412 F.3d at 388 ("testimony by several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants" does not sustain a triable issue of fact on actual confusion).  SUF ¶ 65; *cf.* SUF ¶ 55.

*Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 388-89 (S.D.N.Y. 1985) (anecdotal evidence not probative absent evidence of whether the mark caused the confusion alleged), *aff'd*, 788 F.2d 3 (2d Cir. 1986).  Even fully crediting them, they are *de minimis* and insufficient to raise a triable issue.  *See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) ("two anecdotes of confusion over the entire course of competition constituted *de minimis* evidence insufficient to raise triable issues").[13]

In sum, despite two years having passed since the BSA began welcoming girls into these two programs, and with *well over 120,000* girls having since enrolled, GSUSA has not substantiated a single admissible instance of actual confusion attributable to the Marks at issue. SUF ¶¶ 33-34; SUF ¶ 64.  The absence of such evidence is proof of the absence of actual confusion. *See, e.g.*, *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*, 634 F. Supp. 1468, 1478 (S.D.N.Y. 1986).

*Second*, GSUSA proffers the confusion survey conducted by its expert Dr. Eugene Ericksen.  But for the reasons explained in the BSA's motion to exclude the testimony of Dr. Eugene Ericksen, GSUSA's confusion survey is inadmissible and subject to exclusion because he used a fatally defective test stimulus (consisting of two interior pages plucked from inside a 12-page, non-consumer facing brochure) as well as a fatally defective control stimulus.  *See* BSA's

---

[13]  "[T]he number of instances of actual confusion must be placed against the background of the number of opportunities for confusion."  J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition ("McCarthy") § 23:14.  *See, e.g.*, *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) (court must compare number of instances to opportunity of exposure); *C.L.A.S.S. Promotions*, 753 F.2d at 18 (isolated instances over four years *de minimis*); *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, 2018 WL 3407709, at *11 (S.D.N.Y. Jan. 12, 2018) ("over 20 examples" *de minimis* because "the relatively low number of misdirected communications suggests than any confusion is minimal when measured against the reach of Defendant's television network"); *Denimafia Inc*, 2014 WL 814532, at *19 (five anecdotes is "*de minimis* evidence, insufficient to raise a triable issue").

Motion to Exclude Dr. Ericksen's Confusion Survey (incorporated by reference as though fully set forth herein); *see also Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *10 (S.D.N.Y. Aug. 6, 2007) (excluding survey due to defective stimulus). This "lack of survey evidence counts against finding actual confusion." *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994).

*Third*, GSUSA argues that customer inquiries as to whether GSUSA and the BSA had merged constitute actual confusion. They do not. "[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (quotations omitted); *see also, e.g.*, *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 672 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (inquiries about relationship between plaintiff and defendant are "not probative of actual confusion"). Nor does GSUSA have any evidence that any merger inquiry "was caused by the trademarks employed and [] swayed consumer purchases." *Streamline Prod. Sys., Inc.*, 851 F.3d at 457; *O'Keefe*, 590 F. Supp. 2d at 524 (similar). SUF ¶ 65.

Indeed, GSUSA cannot possibly prove, as it must, that the 2018 Scout Me In Campaign triggered actual confusion, because GSUSA's own research confirms that as of September 2017 – before any of the events in question in this lawsuit – fully half of Americans (mistakenly) believed GSUSA and the BSA were related. SUF ¶ 67. And based on a consumer study GSUSA commissioned back in 1980, Burns Roper advised GSUSA that up to 75% of the U.S. public were not certain the organizations were separate. See SUF ¶ 68; *see also* SUF ¶ 69.

GSUSA's confusion expert even admitted that **branding is not the cause** of any alleged confusion here: "it appears that when people look at marketing materials that show girls doing scouting activities, *regardless of what it's called*, unless the word boy is in the marketing materials,

people associate that with the Girl Scouts." SUF ¶ 70. The absence of causation evidence is yet another, independent reason why GSUSA's claimed confusion evidence cannot save it from summary judgment. *See, e.g., WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (not crediting anecdotal evidence of confusion where "there is nothing on the record to identify … whether each individual was confused by [defendant's] marketing itself or by gossip and word-of-mouth"). This factor favors the BSA.

## F.    Overwhelming Evidence Confirms That The BSA Did Not Intend To Trade Off Of GSUSA's Name

The sixth *Polaroid* factor "examines whether defendants "'adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [their] and [plaintiff's] product.'" *Streetwise Maps, Inc.*, 159 F.3d at 745; *see also Star Indus., Inc.*, 412 F.3d at 388 (similar). GSUSA has zero evidence of bad faith. This factor is a non-starter.

It is beyond reasonable dispute that the BSA did not "adopt" the SCOUT Marks in bad faith. Indeed, most of these marks are not even newly adopted in the first place. The BSA has used SCOUT, SCOUTS and SCOUTING for *over 100 years*, including for co-ed services since the 1970s. SUF ¶¶ 9, 16-19; *see also* SUF ¶¶ 101-103 (GSUSA witness testimony and documents admitting same). SCOUTS BSA has been used in singular form on uniform branding dating back to the 1970s:



SUF ¶ 42; *see* Waters Decl., Ex. Q. The BSA also has owned and used the "scoutsbsa.org" and "scoutsbsa.com" domain names for nearly two decades, having registered them in approximately 2001. SUF ¶ 43. Marks such as SCOUT ME IN and the phrase "Family Scouting" are a natural

extension of the BSA's extensive SCOUT-based branding history, for which the BSA holds dozens of registered trademarks.  SUF ¶ 13.  GSUSA's corporate designees have reluctantly admitted that they have no evidence of willfulness other than the BSA's choice of name itself, which of course is circular logic that proves nothing.  SUF ¶ 73.

Not only is there an absence of bad faith evidence, but in fact, the record affirmatively demonstrates the BSA's good faith in adopting these marks.  The BSA selected the "Scout Me In" slogan for use as a call to action to join in the fun of BSA programming, highlighting the inclusivity of the BSA's welcoming of girls.  SUF ¶ 44.  None of the feedback the BSA received regarding "Scout Me In" slogan indicated that anyone perceived it to be associated with GSUSA.  SUF ¶ 45.  And, the SCOUT Marks indisputably describe the characteristics of the BSA's programs: Scouting.  *See, e.g.*, *J.T. Colby & Co.*, 2013 WL 1903883, at *23 ("substantial evidence of [] good faith" on summary judgment where defendant "selected a mark that describes characteristics of its product" and "is also related to marks [defendant] has adopted for other products and services it offers").

This factor overwhelmingly favors the BSA.

## G.   The BSA's Programs Indisputably Are Of High Quality

"[Q]uality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product."  *Gruner + Jahr USA Pub'g*, 991 F.2d at 1079.  Thus, this factor is of little relevance here, but to the extent it is considered, it favors the BSA because it is beyond reasonable dispute that BSA programs are high quality.  SUF ¶ 74.  In the words of Congressman Glenn Thompson, "Scouting offers the world's finest leadership training for adults and youth, leadership training that can be generalized to any occupations,  including the United States House of Representatives."  SUF ¶ 76; *see also id.* (Senator Mike Enzi complimenting the BSA).

GSUSA's own actions confirm this factor as well.  GSUSA has partnered with the BSA in joint programs, events, and activities for decades, and continues to do so today.  SUF ¶ 71-72. GSUSA research also confirms that its own member feedback complimented the quality of the BSA's programs.  SUF ¶ 75.

This factor weighs in the BSA's favor.[14]

## H.   Parents And Guardians Take Great Care In Choosing To Whom They Will Entrust Their Children

"A court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product."  *Star Indus., Inc.*, 412 F.3d 373, 390 (2d Cir. 2005).  The Court should do so here, as it is beyond question that parents and guardians are careful when choosing whom to entrust with responsibility for their children.  *See Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A.*, LLC, 2007 WL 2049005, at *7 (E.D. Mich. July 17, 2007) (in "choosing between the parties' soccer camps, the ordinary buyer would be expected to use a higher degree of care" because "[t]he parent would be entrusting their child to the camp").  GSUSA's corporate designee also admitted that "parents are careful about signing their child up for anything."  SUF ¶ 77.[15]

Moreover, recruits typically have multiple touchpoints with the BSA before deciding to enroll.  SUF ¶ 78.  The joining process typically begins with BSA-branded fliers or posters that encourage prospective members and their families to attend BSA "sign-up" nights, staffed by BSA

---

[14]   *See, e.g.*, *Codename Enters., Inc.*, 2018 WL 3407709, at *12 (factor favors defendant where "there is no dispute that Defendant's product is high quality"); *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 305 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020).

[15]   *See also, e.g.*, *Quia Corp. v. Mattel, Inc.*, 2010 WL 2486364, at *10 (N.D. Cal. June 15, 2010) ("the fact that the products are aimed at parents and educators with vested interests in children's educational development, and the complicated process required to sign up for Plaintiff's product," weigh against confusion); *Heartsprings, Inc. v. Heartspring, Inc.*, 949 F. Supp. 1539, 1544 (D. Kan. 1996), aff'd, 143 F.3d 550 (10th Cir. 1998) (factor weighs "heavily against" confusion where "[e]ducators and parents would undoubtedly choose [educational materials for children] more carefully than the average person chooses the usual consumer goods").

volunteer leaders accompanied by current youth members (all in BSA uniforms), with BSA banners and flags on display.  SUF ¶ 79-80.  Prospective members and their families typically are presented an array of BSA-branded materials, and BSA volunteers interact with them and describe the experience youth members can expect.   SUF ¶ 80.  This is not a low involvement or casual decision.  This factor favors the BSA.

## I.    The Weighing Of The *Polaroid* Factors Favors The BSA

 All of the *Polaroid* factors weigh in the BSA's favor.  Summary judgment is warranted because GSUSA has not raised a triable issue of fact to dispute that confusion is *not* likely to result from the BSA's use of the Scouts Marks.[16]

Moreover, "[i]t is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law 'mirror the Lanham Act claims,'" except that "a viable common law claim for unfair competition requires an additional showing of bad faith."  *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)  (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 436, 456 (S.D.N.Y. 2004)).[17]

---

[16]    *See, e.g.*, *Saxon Glass Techs., Inc.*, 393 F. Supp. 3d at 306 (granting summary judgment on infringement to defendant over plaintiff's proffered survey); *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 438 (S.D.N.Y. 2018) (granting summary judgment on trademark infringement to defendant notwithstanding that the strength of plaintiff's mark and the similarity of the marks favored plaintiff); *J.T. Colby & Co.*, 2013 WL 1903883, at *25 (similar); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 637 (S.D.N.Y. 2012) ("The balance of the *Polaroid* factors does not demonstrate a likelihood of confusion between Plaintiff's family of marks and Defendant's mark."); *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d at 389-90 & n.142 (S.D.N.Y. 2008) (similar and citing cases) ("Although Louis Vuitton's mark is strong and there is a proximity between the products, no one factor is determinative and the *Polaroid* factors cannot be balanced according to a mathematical formula.").

[17]    GSUSA's failure to establish bad faith here, *see supra* Section I.F, independently warrants granting the BSA summary judgment on GSUSA's common law claim.

Accordingly, the Court should grant the BSA summary judgment on Counts I, II, and V (for federal and common law trademark infringement and unfair competition.

## II.    GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE OF FACT ON ITS TRADEMARK DILUTION CLAIMS

GSUSA's claims for trademark dilution by blurring – both under federal law (Count III) and state law (Count VI) – fail because GSUSA cannot raise a triable issue of material fact on either claim.  The Court should therefore grant the BSA summary judgment on dilution.

### A.    GSUSA's Federal Dilution Claim Fails

Federal anti-dilution law provides that "the owner of a famous mark … shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark … that is likely to cause dilution by blurring … of the famous mark, regardless of the presence or absence of actual or likely confusion, [or] of competition."  15 U.S.C. § 1125(c)(1).  "[M]any of the factors relevant to a likelihood of confusion are also relevant to a likelihood of dilution" by blurring.  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 422 (S.D.N.Y. 2002) ("the above discussion of the confusion factors also disposes of [plaintiff's] blurring claim").[18]  Proof of association alone between the marks is not sufficient to establish a blurring claim; rather, the plaintiff must establish that, "as a result of the likelihood that consumers will associate the marks, [the plaintiff] is likely to suffer an impairment of the distinctiveness of its marks."  *Gap, Inc. v. G.A.P. Adventures Inc.*, 2011 WL 2946384, at *17

---

[18]   The factors the Court may consider in determining whether a mark "is likely to cause dilution by blurring" include: (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark or trade name intended to create an association with the famous mark; and (vi) any actual association between the mark or trade name and the famous mark.  15 U.S.C. § 1125(c)(2)(B)(i)-(vi).  GSUSA no longer alleges tarnishment, having dismissed that claim with prejudice.  *See* Dkt. 88.

(S.D.N.Y. June 24, 2011) (Hellerstein, J.) (finding no blurring notwithstanding proof of association); *see also* MCCARTHY § 24:120 ("[t]he fact that people 'associate' the accused mark with the famous mark does not in itself prove the likelihood of dilution by blurring").

Here, GSUSA has no evidence whatsoever that the BSA's SCOUT Marks are likely to dilute the GIRL SCOUT, GIRL SCOUTS, or GIRL SCOUTING marks by "impair[ing] the distinctiveness of the famous mark." 15 U.S.C.§ 1125(c)(2)(B). Defendants often prevail on summary judgment based on the mere failure of the plaintiff to provide evidence of dilution, such as a survey. *See Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) (granting summary judgment for defendants because "evidence, in the form of surveys or polls, is commonly collected in cases like this one. … Given the conspicuous absence of evidence on this record, the defendants are entitled to judgment on Miss Universe's federal dilution claim.").

GSUSA has no dilution survey, and its own admissions foreclose the possibility of a likelihood of dilution, entitling the BSA to summary judgment on GSUSA's federal dilution claim.

### 1. *GSUSA's Own Evidence Forecloses its Dilution Claim*

GSUSA's own evidence confirms that the BSA's SCOUT marks are not likely to dilute the GSUSA marks.

*First*, GSUSA commissioned brand studies from one of the most well-reputed brand assessment companies, Interbrand, that showed no decline in the external strength of GSUSA's brand between 2015 – before the BSA announced it would welcoming girls to Cub Scouts and the program then known as Boy Scouts – and 2019 – two years after BSA announced it would begin welcoming girls into these two programs). SUF ¶ 82. It is difficult to imagine more compelling evidence on the question of dilution: These quantitative Interbrand studies show contemporaneous snapshots in time of the GIRL SCOUTS brand in 2015 and 2019, performed by the same company, using consistent methodology, and they reveal no decline in consumer perception of the brand.

SUF ¶ 83.  Indeed, the 2019 Interbrand study specifically noted that the GIRL SCOUTS brand was just as differentiated from its competition in 2019 as it was in 2015.  *Id*.  In other words, the distinctiveness of the GIRL SCOUT brand has not been diluted at all, rendering summary judgment appropriate.  *See, e.g., Gap, Inc.*, 2011 WL 2946384, at *17 (Hellerstein, J.) ("Gap has not proved that, as a result of the likelihood that consumers will associate the marks, Gap is likely to suffer an impairment of the distinctiveness of its marks.").  GSUSA's corporate designee admitted in deposition that GSUSA has no evidence supporting, "and could not think of any evidence suggesting," a conclusion contrary to the Interbrand's study of no external brand diminishment.  SUF ¶ 84; Scher Decl., ¶ 136 (identifying Ms. Godfrey as corporate designee on this topic).

*Second*, GSUSA's then-CEO Sylvia Acevedo admitted in deposition that GSUSA's brand "continues to be very strong" – years after the BSA announced it would welcome girls to Cub Scouts and the older youth program then known as Boy Scouts.  SUF ¶ 86.

*Third*, GSUSA has no expert evidence of dilution.  It commissioned no dilution survey, and its purported marketing expert Dr. Joachimsthaler admitted he made no attempt to compare the GIRL SCOUTS brand perception in 2020 to its perception in 2017, and thus has no opinion about if or how it has changed over that time.  SUF ¶ 85.  Dr. Joachimsthaler also acknowledged the reliability of the Interbrand study.

The Court need look no further than these GSUSA admissions to grant summary judgment.

## 2. **GSUSA Cannot Prove The Necessary Elements Of Dilution**

Even if the Court disregards GSUSA's dispositive admissions, GSUSA still cannot create a triable issue on its dilution claim because the same factors that defeat any claim of infringement likewise necessarily defeat GSUSA's claim for blurring.  The Second Circuit analyzes dilution by blurring using a multi-factor test that is similar to the test for likelihood of confusion.  *See*

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 207 n.10 (2d Cir. 2013) (factors for blurring "are similar in kind to the *Polaroid* factors").[19]  For the reasons discussed above, GSUSA cannot show that the public will associate the BSA's Scouts BSA program and use of any SCOUT Marks with GIRL SCOUTS, including for lack of causation.  *See supra* Part I.E.  Nor is GSUSA engaged in "substantially exclusive use" of the challenged marks.  The undisputed record establishes the BSA has been using "Scouts," "Scouting" and "Scout" for more than a century. SUF ¶¶ 9.[20]

### 3.  *To The Extent There Is Any Dilution, It Is A Self-Inflicted Harm*

If any doubt remained about GSUSA's inability to prove a likelihood of dilution, GSUSA's own actions demonstrate why no reasonable juror could find dilution as a result of the BSA's branding.  Once leaning that the BSA was considering welcoming girls into Cub Scouts and the older youth program now known as Scouts BSA, GSUSA actively took steps to *generate and foster* association of itself with BSA trademarks.  Moreover, GSUSA has continued to allow councils and troops to hold joint events with BSA councils and troops, leading some parents and members of the general public inevitably to think the organizations are related.  For example:

---

[19]  Although GSUSA's state-law dilution claim independently fails as discussed *infra* Part II.B, it is also subject to summary judgment for the same reasons as its federal claim because the same analysis of blurring applies.  *Knowles-Carter v. Feyonce, Inc.*, 347 F. Supp. 3d 217, 229 (S.D.N.Y. 2018) ("New York courts consider six factors when determining if blurring is likely," and "the first five of these factors are 'closely analogous' to the *Polaroid* factors.") (citation omitted).

[20]  Moreover, dilution is actionable only when a plaintiff proves, among other elements, that defendant's use "commences" *after* plaintiff's mark became famous.  15 U.S.C. § 1125(c)(1). GSUSA cannot do so because it is undisputed that the BSA began using SCOUT, SCOUTS and SCOUTING more than a century ago.  SUF ¶ 9; *See New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 323 (S.D.N.Y. 2015) (granting summary judgment for defendant on dilution because plaintiff's mark was not famous when the challenged use began); *accord* 15 U.S.C. § 1125(c)(1).

*1. GSUSA purchased keyword advertising to redirect online searches for BSA trademarks to GSUSA.*  GSUSA's then-CEO Acevedo instructed her team to purchase paid advertising tied directly to the BSA.  SUF ¶ 87.  And they did so.  GSUSA admitted that in 2017 and 2018, it bid on the BSA's BOY SCOUTS and CUB SCOUTS trademark as keywords to trigger GSUSA advertising on Google search results in response to searches for Boy Scouts and Cub Scouts.  SUF ¶ 88.  GSUSA further admitted that in 2017, 2018 and 2019, it paid for advertising so that GSUSA would show up in response to searches for BSA trademarks such as "Scout" and "Scouting."  SUF ¶ 89.

*2. GSUSA purchased and used BSA domain names and social media handles.*  In 2017 GSUSA launched an online shopping spree to obtain **hundreds** of domain names and social media handles associated with the BSA's intellectual property portfolio – such as URLs like scouts.net and scout.net that contained the word "scout" without being preceded by the word "girl."  SUF ¶ 90.  GSUSA also internally discussed purchasing domain names such as "stemscouts.com," "stemscouts.org," "stemscouts.net" (knowing of the BSA's registered trademark STEM SCOUTS), and "webelos.com," even though WEBELOS is a fanciful BSA term for a particular Cub Scout rank).  SUF ¶ 91.  GSUSA also obtained social media handles for "scoutingorg" even though the BSA has used that domain name, scouting.org, for more than a decade.  SUF ¶ 92.

The instructions to snap up these BSA-related website domains and social media handles came from the very top – GSUSA then-CEO Sylvia Acevedo herself, who ordered GSUSA's marketing team to "make sure we own as many sites, social media names as possible" because the BSA used its domain "@scouting.org" for its email addresses.  SUF ¶ 93.  Acevedo further instructed her team to "grab as many social media 'scouters' labels as possible" because "BSA is … us[ing] that phrase and I'd like web searches of that phrase to point to us."  SUF ¶ 94.  GSUSA's

Vice President of Marketing and Communications referred to these efforts to re-direct online consumers searching for the BSA to GSUSA online content instead as "BSA Combat." Scher Decl., Ex. ZZZ.

    *3. GSUSA unsuccessfully attempted to insert more references to GSUSA in "Scouting" Wikipedia pages.* Beginning in April 2018, GSUSA secretly tried to insert references to GSUSA on Wikipedia pages such as the "Scouting" Wikipedia page to create a false impression that the public associates the terms "scout" and "scouting" (without being preceded by the word "girl") with GSUSA. SUF ¶ 95. For example, through its PR firm Mercury, GSUSA inserted into the opening paragraph of the "Scouting" Wikipedia page the sentence: "In 1912, Girl Scouts of the USA was founded, which brought ***scouting*** to girls in the U.S." SUF ¶ 96 (emphasis added). Wikipedia rejected those and other attempts by GSUSA and its PR agency to manipulate those pages. SUF ¶ 96. GSUSA then tried to trick Wikipedia's editors by recruiting volunteers who lived outside of the New York area to edit those pages so that the manipulation would not be tracked back to GSUSA. SUF ¶ 96. GSUSA also hired third-party contractors to try to fool the Wikipedia edits in the same fashion. SUF ¶ 96. Neither effort succeeded.

    *4. GSUSA continues to allow Girl Scout troops to associate with BSA troops via joint events.* These activities include joint meetings and events and using BSA camping facilities. SUF ¶¶ 71-72. For example:

- Joint meetings of local BSA and GSUSA troops have been occurring for more than a decade within the Girl Scouts of Northern California council. The Northern California GSUSA and BSA troops also share property. SUF ¶ 71.

- A Membership Service Specialist of Girl Scouts of Central & Western Massachusetts Council confirmed that "there's no official ban on ever doing any joint event of any kind with the Boy Scouts," and noted that joint events include a "4th of July celebration." SUF ¶ 71.

- The Outside Recruitment and Marketing Manager of Girl Scouts Carolinas Peaks to Piedmont Council, confirmed that she believed she was permitted to "host a joint event in [her] region with the local BSA Council."  SUF ¶ 72.

- GSUSA executives and corporate designees on the topic of GSUSA's policies testified that joint events between the organizations "may continue" and that GSUSA "didn't mandate" that councils don't participate in joint events.  SUF ¶ 72.  GSUSA local councils also have the discretion to cobrand with the BSA.  SUF ¶ 72.

Indeed, GSUSA's own General Counsel continues to approve joint events between the parties. SUF ¶ 72(a).  Moreover, GSUSA has historically advertised its highest award, the Gold Award, by stating that it is comparable to the BSA's iconic Eagle Scout rank.  SUF ¶ 98.

*     *     *

All of these actions are incompatible with any genuine concern about affiliation with the BSA diluting GSUSA's brand, and they doom GSUSA's dilution claim because GSUSA has consented to, and in some cases actively fostered, this association.  *See Metro Pub., Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 877 (N.D. Cal. 1994) (defendant not liable for plaintiff's intentional association of the brands, because "[a]ny consumer confusion that resulted from [plaintiff's] decision is his fault, and [defendant] should not be held accountable for it").

## B.   GSUSA's State-Law Dilution Claim Fails

GSUSA's state-law dilution claim must be dismissed for the same reasons as above.  *See supra* Part II.A; *Allied Interstate LLC v. Kimmel & Silverman P.C.*, 2013 WL 4245987, at *5 (S.D.N.Y. Aug. 12, 2013) (two statutes "are substantively similar and may be analyzed together").

As a separate and independent basis, GSUSA's state law dilution claim fails because the BSA's federal registrations provide a complete defense.  Under the Lanham Act, a party's "valid registration … on the principal register under this chapter shall be a *complete bar* to an action against" the registrant for dilution under "common law or statute of a State."  15 U.S.C. § 1125(c)(6) (emphasis added).  *See Glob. Brand Holdings, LLC v. Church & Dwight Co.*, 2017

41

WL 6515419, at *2 (S.D.N.Y. Dec. 19, 2017) (quoting 15 U.S.C. § 1125(c)(6)) (dismissing state

dilution claim).  Here, it is undisputed that the BSA has registrations for multiple SCOUT-based

terms, including SCOUTING and SCOUT.  SUF ¶ 13.[21]  This applies to both the exact SCOUT

and SCOUTING marks the BSA has registered as well as additional terms that include these marks.

## III.  GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE ON ITS CLAIM FOR MODIFICATION OR PARTIAL CANCELLATION OF A REGISTRATION

The BSA possesses a trademark registration for the mark SCOUT in connection with

"education services" (Reg. No. 4,865,183), which it obtained by assignment on October 23, 2015.

GSUSA seeks "modification or partial cancellation" for this mark "in connection with educational

services for girls" on the same grounds as described above, *i.e.*, the BSA's use allegedly is likely

to cause  consumer confusion when used in connection with girls.  Dkt. 89 (Am. Compl.) ¶¶ 122-

125 (Count IV).  For the reasons discussed above, *see supra* Part I, because GSUSA cannot

establish a likelihood of confusion based on the BSA's use of the mark SCOUT in connection with

its educational services, GSUSA's requested remedy of modification or partial cancellation is

likewise unavailable as a matter of law.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S.

138, 154 (2015) (applying same likelihood of confusion standard to infringement and registration

inquiries); *Tarsus Connect, LLC v. Cvent, Inc.*, 452 F. Supp. 3d 1334, 1364 (N.D. Ga. 2020)

(granting summary judgment to defendant on § 1119 claim where plaintiff could not establish

likelihood of confusion on infringement).

---

[21]  GSUSA's attempt to modify or partially cancel GSUSA's SCOUT registration (Count III) is baseless, *see infra* Part III, and in any event "the provision precludes dilution claims under state law if the defendant has a valid registration *when the suit is filed*," *i.e.*, "not abandoned or already cancelled."  *Global Brand Holdings*, 2017 WL 6515419, at *6 (emphasis added).  Moreover, GSUSA does not dispute that the BSA's incontestable SCOUTING registration is valid.

## IV.  THE UNDISPUTED FACTS CONFIRM THAT THE DOCTRINE OF LACHES PROTECTS THE BSA'S USE OF ITS SCOUT MARKS

Although the Court need not even reach this issue because GSUSA has not raised a triable issue in its favor on any trademark-based claim, *see supra* Parts I-III, the BSA alternatively is entitled to summary judgment on Counts I-VI under the doctrine of laches.

"Laches is a defense that bars a plaintiff's claim in equity 'where [the plaintiff] is guilty of unreasonable and inexcusable delay that resulted in prejudice to the defendant.'"  *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *33 (S.D.N.Y. Apr. 19, 2006) (quoting *Ikelionwu v. U.S.*, 150 F.3d 233, 237 (2d Cir. 1998)).  In trademark cases, laches applies "where (1) plaintiff had knowledge of defendant's use of its marks, (2) plaintiff inexcusably delayed in taking action with respect to defendant's use, and (3) defendant suffered prejudice as a result."  *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, 2007 WL 2914452, at *1 (2d Cir. Oct. 5, 2007).

Since at least 1971, the BSA openly has offered programs to girls and young women.  SUF ¶ 16.  For decades, GSUSA has known that the BSA did not cease its longstanding use of non-gender-specific SCOUT marks in connection with this programming for girls, and even complained about it – but did not sue.  Specifically, in 1980 – ***40 years ago*** -- GSUSA's National Executive Director wrote a letter to the BSA stating GSUSA's preference to refer to the BSA's female Explorer Scouts as "young women" rather than "girls," expressing concern regarding possible "confusion caused by the generic use of the term 'Scouting' without an identifier."  SUF ¶ 99; *see also* SUF ¶¶ 101-102.  Likewise, ***1985***, more than a decade after the BSA launched its first co-ed program, GSUSA's National Executive Director acknowledged that "Scout" is "used world-wide by the Boy Scouts, and always has been."  SUF ¶ 100.

Yet GSUSA took no legal action to stop the BSA's use of the mark SCOUT in connection with programs that welcomed girls.  SUF ¶¶ 105-107.  Similarly, shortly after the BSA initiated

43

its co-ed STEM Scouts program in 2014, GSUSA was aware of it, and discussed it internally amongst themselves. SUF ¶ 104. Once again, GSUSA took no legal action. SUF ¶ 106.[22]

Thus, in 2018 when the BSA decided to invest in changing the name of its Boy Scouts program to Scouts BSA and to market its programs using "Scout Me In" and "Family Scouting," it felt comfortable doing so, as GSUSA had never previously taken legal action against it in connection with the BSA's use of "Scout"-formative terms in connection with its services for girls. SUF ¶ 107. By this time, almost 50 years after the BSA began offering services to girls in connection with the words "Scout," "Scouts," and "Scouting," and 40 years after GSUSA complained about it, the ship had long sailed on GSUSA's right to object. *Deere & Co. v. MTD Holdings Inc.*, 2004 WL 324890, at *18 (S.D.N.Y. Feb. 19, 2004) ("a presumption of laches will arise in a trademark action if the plaintiff fails to bring suit within the six-year statute of limitations period used in New York state law fraud actions"); *see also id.* at *22 (summary judgment for defendant on laches for products "which have remained substantially the same with respect to the color combination and pattern used since 1993 and 1995"); *Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*, 89 F. Supp. 2d 483, 485 (S.D.N.Y. 2000), *aff'd sub nom. Eppendorf-Netheler-Hinz GMBH v. Nat'l Sci. Supply Co.*, 14 F. App'x 102 (2d Cir. 2001) (summary judgment for defendant on laches where plaintiff delay was 8 years); SUF ¶ 101 (Andrea Bastiani Archibald's acknowledgement that "'scouts' generally refers to Boy Scouts" more than six years before action filed). Indeed, GSUSA's lengthy delay entitles the BSA to a ***presumption*** of laches, which shifts the burden to GSUSA to disprove the doctrine's application. *See Haggar Int'l Corp. v. United Co.*

---

[22]   Before authorizing this lawsuit in 2018, GSUSA's then-CEO had received emails describing "Scouting" as a term that the BSA has "historically" used "for the organization and its activities." SUF ¶ 103. This evidence demonstrates not only that GSUSA's allegation in its Complaint that the BSA "is now trying to alter its core brand identity from BOY SCOUTS to SCOUTS" (Compl. ¶ 5) was demonstrably false when filed, but that GSUSA's top executives ***knew*** it was false.

*for Food Indus. Corp.*, 2008 WL 11412128, at *5 (E.D.N.Y. Mar. 11, 2008) ("Once the presumption arises, the burden shifts to the other party to come forward with evidence to establish that the delay was excusable and there was no prejudice resulting from the delay.").

To be sure, the BSA has been economically prejudiced by GSUSA's now-pressed claim, decades after the BSA began using SCOUT-formative marks without being preceded by "boy" in connection with its programs for girls and boys. The BSA expanded its program offerings for girls and women over the years and spent significant sums marketing the expanded Cub Scouts and Scouts BSA programs. Examples of these incurred expenditures include: (1) adopting the name "Scouts BSA" and associated marketing costs for the expanded programs; (2) creating handbooks and associated costs; (3) creating uniforms and related items, such as T-shirts, and associated costs; and (4) rebranding "Boy Scouts" items and associated costs. SUF ¶ 108. This prejudice also includes the significant sums that the BSA has incurred running its co-ed Sea Scouts and STEM Scouts programs, as well as co-ed Venturing program and continuing to use Scout-branding during the delay period. SUF ¶ 109. The BSA would be unduly prejudiced if GSUSA was permitted to pursue its claim now. [23]

---

[23]   *See Juicy Couture*, 2006 WL 1012939, at *34 (prejudice "clearly established" where defendant "made a substantial commitment of corporate talent and money to the development of its … line of products"); *Eppendorf-Netheler-Hinz GmbH*, 89 F. Supp. 2d at 487 (prejudice due to "substantial expenditure of resources and effort to develop [] business in the United States"); *Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 753 (S.D.N.Y. 1997) (prejudice where "the defendant spent millions of dollars developing programs that prominently feature the Columbia name"). The BSA is also prejudiced by GSUSA's delay because the BSA's use of the SCOUT Marks goes back many decades, during which evidentiary materials are no longer available and witnesses have died, left the BSA, or memories have faded. *See RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 410 F. App'x 362, 365 (2d Cir. 2010) (affirming finding of prejudice because of "the difficulties posed by defending this action after so many years have passed" including because "memories faded and documents been lost" and because "many of the individuals who would have knowledge regarding the issues relevant to this case are now dead") (quotations omitted).

Because GSUSA records confirm it knew of the BSA's use of SCOUT-related marks for years – including in connection with programs and services that welcomed girls – but sat by as the BSA invested in building that goodwill, the BSA is entitled to summary judgment on its affirmative defense of laches and judgment entered for the BSA on Counts I – VI.

## V.   GSUSA HAS FAILED TO CREATE A TRIABLE ISSUE ON ITS CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

GSUSA's tortious interference claim is wholly unsupported by any facts whatsoever and should be dismissed. It was never pleaded properly in the first place (*see* Dkt. 19 at 7-13), let alone has it been proven.

To prevail on a claim for tortious interference with prospective business relations, a plaintiff "must prove that '[1] it had a business relationship with a third party; [2] the defendant knew of that relationship and intentionally interfered with it; [3] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [4] the defendant's interference caused injury to the relationship.'" *LuxSoma LLC v. Leg Res., Inc.*, 289 F. Supp. 3d 514, 525 (S.D.N.Y. 2018); *see also Lombardo v. Dr. Seuss Enters., L.P.*, 2017 WL 1378413, at *4 (S.D.N.Y. Apr. 7, 2017) (Hellerstein, J.) (citing same elements).[24] Courts are "stingy in their interpretation of this tort," resisting invitations to lower the bar for the wrongful conduct required. *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 346 (S.D.N.Y. 2008) (collecting cases). Discovery has confirmed that GSUSA has no evidence to support the required elements.

---

[24]   The tort is alternatively "referred to as tortious interference with prospective business relations or prospective economic advantage, among other names, but the legal standard is the same." *Berwick v. New World Int'l, Ltd.*, 2007 WL 949767, at *14 n.11 (S.D.N.Y. Mar. 28, 2007); *see also Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002) (same elements).

**A.    GSUSA Has Identified No Specific Relationships, Let Alone Has It Demonstrated That The BSA Knew Of Such (Unidentified) Relationships**

GSUSA's seven 30(b)(6) witnesses on the subject of tortious interference vaguely and variously testified about alleged incidents they had heard about that they contended reflected "interference" by the BSA.   But none of this testimony reflects (1) any specific relationship GSUSA had, (2) that the BSA was aware of.  SUF ¶¶ 110-11.  GSUSA's witnesses acknowledged this.  SUF ¶ 110.

The mere *possibility* of lost recruits or lost cookie customers is not enough; it is too speculative to support a tortious interference claim.[25]  Similarly, even if GSUSA had identified specific relationships with which the BSA purportedly interfered, it identified no evidence that the BSA "had actual knowledge of any contract between [GSUSA] and a third party."  *Ahluwalia v. St. George's Univ., LLC*, 63 F. Supp. 3d 251, 266 (E.D.N.Y. 2014); *see also Sedona Corp. v. Ladenburg Thalmann & Co.*, 2009 WL 1492196, at *9 (S.D.N.Y. May 27, 2009) (dismissing claim because "at no point does the SAC actually allege that Defendants knew about the specific business relationships identified").  It is not enough for GSUSA to show that the BSA "is aware that GSUSA

---

[25]   *See, e.g., Daniels v. Kostreva*, 2017 WL 823583, at *9 (E.D.N.Y. Jan. 12, 2017) (dismissing claim even if possibility of lost relationship was "not farfetched"); *see also, e.g., Lesnik v. Lincoln Fin. Advisors Corp.*, 2020 WL 3057456, at *3 (S.D.N.Y. June 9, 2020) (granting summary judgment for defendant because "Plaintiff has not identified any specific relationship with which Defendant interfered" despite arguing that it had "formed relationships with 'a book of business with clients'"); *Insurent Agency Corp. v. Hanover Ins. Co.*, 2018 WL 3979589, at *5 (S.D.N.Y. Aug. 20, 2018) (recognizing dismissal of claims "containing 'only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship'") (quoting *McGill v. Parker*, 582 N.Y.S.2d 91, 95 (App. Div. 1st Dep't 1992)); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, 2016 WL 3676686, at *6 (S.D.N.Y. July 5, 2016) ("Allegations of interference with 'customers,' without more, are insufficient to state a claim for tortious interference with business relations."); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013) (dismissing claim where plaintiff failed to "identify the potential customers at issue" with specificity).

has a prospective business relationship with the parents and girls who attend … recruitment events."
Dkt. 89 (Am. Compl.) ¶ 141.  *See, e.g., Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 423
(E.D.N.Y. 2013) (granting summary judgment for lack of support that "Defendants knew or should
have known the Plaintiffs had customers who enjoyed [Plaintiff's product]").

As in its Complaint, in discovery GSUSA identified only a single specific relationship with
any named third party that it alleged was "interfered" with – a  "Tractor Supply" store in Red Bluff,
California.   SUF  ¶ 112.   GSUSA alleges that the BSA "intentionally interfered with that
relationship when it attempted to dissuade the retailer from providing booth space" to GSUSA.
Am. Compl. ¶ 142.[26]  However, as GSUSA representatives admitted, whatever the store employee
was told, GSUSA got its booth space and was ***not*** prevented from selling cookies there.  SUF
¶ 112.  Further, GSUSA admitted that it had no evidence suggesting the BSA encouraged or
approved this alleged interference.  SUF ¶ 115.

**B.**    **GSUSA Has No Evidence Whatsoever That The BSA Acted Solely Out Of Malice, Or Used Dishonest, Unfair, or Improper Means**

GSUSA proffered no evidence that the BSA acted solely out of malice or used improper
means, much less that its "conduct … amount[ed] to a crime or an independent tort.'"  *Lombardo*,
2017 WL 1378413, at *4 (quoting *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190 (N.Y. 2004)).  To
state a claim, GSUSA "must allege that a 'defendant's conduct was motivated solely by malice or

---

[26]   GSUSA based this allegation on a multiple-hearsay statement that purportedly originated with
a Girl Scout Leader Support Manager in GSUSA's Northern District council as to what she was
supposedly told by a store clerk or manager at Tractor Supply about what he was supposedly told
by a Boy Scout leader about the BSA now serving "girl scouts."  SUF ¶ 113.  Beyond what was in
an email authored by a Girl Scout council staff member relating what she was told by a Girl Scout
Leader Support Manager about what she was told by a store clerk or manager about what he was
told, GSUSA's 30(b)(6) witnesses on this issue had no factual information.  SUF ¶ 114; *see also*
Scher Decl., ¶ 136 (identifying corporate designee).

to inflict injury by unlawful means, beyond mere self-interest or other economic considerations.'"

*S&L Vitamins, Inc. v. Australian Gold, Inc.,* 521 F. Supp. 2d 188, 217 (E.D.N.Y. 2007); *see also*

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp. Inc.*, 628 N.Y.S.2d 408, 412 (3d Dep't 1995), *aff'd*,

87 N.Y.2d 614 (1996) (granting summary judgment to defendant where evidence showed at most

that defendant's alleged acts "were done to secure an economic advantage, not solely to injure

plaintiffs").[27]  The only "relationship" identified, the Red Bluff incident, was not even an act of

the BSA, but concerned statements allegedly made by a unit leader of a local council.  GSUSA

has proffered no evidence whatsoever as to purported malice on the part of that unnamed local

council unit leader nor on the part of any BSA personnel.  SUF ¶ 115.

## C.   GSUSA Has No Evidence Of Injury

GSUSA also has utterly failed to identify any evidence of specific injury that directly

resulted from the BSA's purported interference with any prospective relationship.  SUF ¶¶ 110-

111.  Again, the only "relationship" identified pertained to the opportunity to sell cookies in front

of the Red Bluff Tractor Store, and there, GSUSA admittedly suffered no actual injury because it

was indeed given cookie selling space.[28]  SUF ¶¶ 112.

---

[27]   *See also, e.g., RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196 (S.D.N.Y. 2011) (plaintiff must show "defendant acted with the *sole purpose* of harming the plaintiff or used dishonest, unfair, or improper means") (emphasis in original) (quoting *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009)); *MVB Collision, Inc. v. Progressive Ins. Co.*, 13 N.Y.S.3d 139, 140 (App. Div. 2015) (affirming dismissal of tortious interference claim where the defendant's "conduct was, at least in part, to advance its own interests, not solely for the purpose of harming the plaintiff").

[28]   *See Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 244-45 (S.D.N.Y. 2018), *reconsid. denied*, 2018 WL 5650004 (S.D.N.Y. Oct. 30, 2018) (granting summary judgment for defendants where plaintiffs did not present any evidence showing alleged interference caused injury); *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 599 (S.D.N.Y. 2014) ("Plaintiff also fails to demonstrate that, but for Defendants' interference with the doctors from whom she sought employment, she would have been hired.").

GSUSA also failed to identify any damages associated with its tortious interference claim at all, as its damages expert admitted.  SUF ¶ 116.  Indeed, GSUSA could not identify even a "correlation between BSA impact and GS membership loss," much less the loss of any specific contract.  SUF ¶ 117.  Because GSUSA's tortious interference claim lacks any colorable basis now (just as it did when filed), summary judgment should be granted on Count VII.

## VI.   GSUSA HAS IDENTIFIED NO RECOVERABLE DAMAGES

The BSA also is entitled to summary judgment with respect to GSUSA's damages claims, as the BSA has proffered no evidence for its two requested remedies:  disgorgement of the BSA's profits and "corrective advertising" as a form of GSUSA's actual damages.

### A.   The BSA Is Entitled To Summary Judgment On GSUSA's Claim For Disgorgement Damages

GSUSA's claim for disgorgement damages fails because, as set forth in the accompanying BSA's Motion to Exclude Testimony of Lauren Kindler (incorporated by reference as though fully set forth herein); GSUSA has no evidence of or basis to calculate a reasonable estimate of girls who have been purportedly confused by the BSA's advertising.  GSUSA's damages expert Ms. Kindler offers two disgorgement figures, both of which are based on GSUSA's made-for-litigation surveys that either have already been excluded (the Butler Confusion Survey) or are about to be excluded by the Court (the Ericksen Confusion Survey).  Absent those surveys, Ms. Kindler's disgorgement calculations are missing a required variable – the confusion rate – and thus cannot provide the factfinder with an estimate of the profits associated with girls who purportedly mistakenly signed up for Cub Scouts or Scouts BSA.  *See* Mot. to Exclude Kindler at 5-7; *Kargo Global*, 2007 WL 2258688, at *12-13.  Additionally, even if Dr. Ericksen's survey is not excluded in its entirety (as it should be), Dr. Ericksen admitted his survey did not test any Cub Scouts marketing material, and thus, his confusion rate cannot be used to calculate the BSA's alleged

profits associated with its Cub Scouts program, as Ms. Kindler purports to do.  *See* Mot. to Exclude Kindler at 7-8.  Thus, GSUSA's $3,911,936 Cub Scouts Disgorgement Remedy is missing a required variable and cannot proceed to a jury.  *See Kargo Global*, 2007 WL 2258688, at *12-13.

### B.    The BSA Is Entitled To Summary Judgment On GSUSA's So-Called "Corrective Advertising" Damages

GSUSA's seeks "actual damages" in the form of its expenditures for purported "corrective advertising" to correct the supposed marketplace confusion caused by the BSA's alleged trademark infringement and dilution.  SUF ¶ 118.  GSUSA is not entitled to actual damages here, and even if it was, it has proffered no "corrective advertising" expenses to speak of.

"Corrective advertising is a remedy that seeks to counteract public confusion resulting from trademark infringement."  *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1359955, at *1 (S.D.N.Y. May 18, 2006).  To recover corrective advertising expenditures under the Lanham Act, the corrective advertising "must be reasonable and causally related to the" violation.  *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software*, Inc., 880 F. Supp. 1005, 1025 n.13 (S.D.N.Y. 1994) (false advertising); *cf. C=Holdings B.VC. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 250 (S.D.N.Y. 2013).

It is axiomatic that the corrective advertising must actually seek to correct the alleged confusion at issue – such as, in the present case, the misimpression that the parties are associated. *C=Holdings*, 992 F. Supp. 2d at 250.  Courts will not award a plaintiff damages for its general advertising.[29]

---

[29]    *See, e.g.*, *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 2016 WL 2637801, at *5 (D. Minn. May 6, 2016) (granting defendant summary judgment on actual damages, rejecting plaintiff's claim to "corrective advertising" damages as a matter of law:  "Rather than being corrective, these advertisements are self[-]promotional. … Claiming to provide a heightened level of service over the competition is typical promotion and does nothing to correct Defendants' trademark infringement.  The same is true for … [advertisements] promoting a competitive advantage rather than correcting trademark infringement."); *cf. WE Media*, 218 F. Supp. 2d at 473-74 (rejecting request for $50 million in actual damages for "promotion of its marks," instead

### 1.      GSUSA Does Not Qualify For Actual Damages In The First Place

*First*, as a threshold matter, in the Second Circuit for a plaintiff to qualify for an award of

actual damages she "must prove either actual consumer confusion or deception resulting from the

violation, or that the defendant's actions were intentionally deceptive." *George Basch Co. v. Blue*

*Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) (quotations omitted);[30] For the reasons set forth

above, *see supra* Parts I.E-F, GSUSA has no admissible evidence on either score, and thus is

ineligible for any actual damages (including in the form of corrective advertising).

### 2.      GSUSA Admits Its Expenses Were Not Focused on Correcting Anything

GSUSA improperly seeks reimbursement of general advertising expenses that it has

*admitted* were not corrective.  As GSUSA's 30(b)(6) witness Lynn Godfrey confirmed, none of

the advertising at issue sought to "correct" any alleged acts of trademark infringement or even

sought to reinforce that the BSA and GSUSA are separate organizations:

> Q.      "In 2018, did you design any ads to correct statements made
>         by BSA's advertising?"
>
> A.      "…*We weren't focused on correcting statements*."

SUF ¶ 119 (emphasis added); Scher Decl., ¶ 136.  Ms. Godfrey further admitted that none of the

advertising related to the damages GSUSA seeks even mentioned the BSA.  SUF ¶ 120 ("Q. Did

---

requiring evidence of losses quantifying "the nominal amount of manpower to correcting confused
impressions").

[30]    *See Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, at *9 (E.D.N.Y. Mar. 26,
2004) (finding likelihood of confusion and dilution, but denying actual damages because "Plaintiff
has not proven actual confusion or deception through circumstantial evidence, and has failed to
demonstrate that Defendants' actions are … intentionally deceptive"); *see also, e.g.*, *W.W.W.*
*Pharm.*, 984 F.2d at  576 n.6 ("in this circuit proof of real and precise actual consumer confusion
is required to recover damages"); *Randa Corp. v. Mulberry Thai Silk, Inc.*, 2000 WL 1741680, at
*2 (S.D.N.Y. Nov. 27, 2000) ("To show entitlement to monetary damages under Section 43(a), a
plaintiff must show an additional element – he or she must show actual damages … that were
causally related to 'actual consumer confusion or deception' of the purchasing public.").

any of Girl Scouts advertising in 2018 mention Boy Scouts?  A. Coming from GSUSA? No, not that I recall.").[31]  These admissions from GSUSA's 30(b)(6) witness are dispositive.

### 3.    On Their Face, GSUSA's Expenses Were Mere General Advertising And Thus Unrecoverable

Even a cursory glance confirms that GSUSA's "corrective advertising" was simply general advertising and promotional work, which GSUSA undertook to combat what it considered to be competition from the BSA.  For instance, nearly $5 million of the $6.76 million GSUSA seeks in corrective advertising expenses were for a multi-million dollar contract GSUSA signed with high profile PR firm Mercury LLC, for a "High Stakes Public Strategy Campaign" dubbed the "Athena Campaign," aimed at "measurable acceleration of Girl Scout membership acquisition and retention."  SUF ¶ 54.  Work under the Mercury agreement included a host of general advertising work, such as lead generation, digital ad buys, a grassroots community organizing campaign for local acquisition and retention strategies, and the creation of a Latino membership acquisition engine.  SUF ¶ 52.  As can be seen from the below examples of digital ad assets, these  general promo pieces have no plausible connection to any form of corrective advertising:

---

[31]    GSUSA unsuccessfully tries to bolster its claim by having its damages expert parrot GSUSA's witnesses' self-serving testimony, but she offered no expert opinions on this subject, and her testimony on this issue should be excluded.  *See* Motion to Exclude Testimony of Lauren Kindler at 9-12.





SUF ¶ 119; Scher Decl., Ex. VVVVV at -684, -85, -86.  Notably, the Mercury Agreement does not mention the BSA, nor does it mention any deliverables or projects focused on clearing up confusion in the marketplace as to whether GSUSA and the BSA are associated with each other.

This is unsurprising, as the budget for this advertising was approved in April 2018, *before* the allegedly confusing BSA May 2018 "Scout Me In" advertising campaign even launched. *Compare* SUF ¶ 124 (BSA announcement in May 2018), *with* SUF ¶ 124 (GSUSA budget approved in April 2018).  And, the Mercury Agreement was signed the month *after* the Scout Me In Campaign was launched – yet makes no mention of it whatsoever.  Instead, it speaks of responding to "competitive action," Scher Decl., Ex. HHHH, which is not recoverable.  *See, e.g.*, *Zerorez Franchising Sys., Inc.*, 2016 WL 2637801, at *5.

Likewise,  much of GSUSA's expenses were not for advertising at all, but rather were for (unrecoverable) projects like paying for call centers to communicate with existing Girl Scout families, and the development of virtual field trips for in-school programming.  SUF ¶ 122.

Summary judgment should be granted on GSUSA's so-called corrective advertising expenses. *See, e.g.*, *Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1107 (N.D. Cal. 2019).

## **CONCLUSION**

The Court should grant the BSA's motion for summary judgment in full.

Dated:   November 24, 2020                    Respectfully submitted,

By: _____
Rachel Kassabian (*pro hac vice*)
rachelkassabian@quinnemanuel.com
Margret M. Caruso
margretcaruso@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5005
Facsimile: (650) 801-5100

Todd Anten
toddanten@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendant Boy Scouts of America*