L9fWgirO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GIRL SCOUTS OF THE UNITED
STATES OF AMERICA,

                    Plaintiff,

             v.                           18 Civ. 10287 (AKH)

BOY SCOUTS OF AMERICA,

                    Defendant.
                                          Oral Argument
------------------------------x
                                          New York, N.Y.
                                          September 15, 2021
                                          10:30 a.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                          District Judge

                              APPEARANCES

DORSEY & WHITNEY LLP
        Attorneys for Plaintiff
BY:  BRUCE R.M. EWING
     FARA S. SUNDERJI
     KIMBERLY B. FRUMKIN


QUINN EMANUEL URQUHART & SULLIVAN LLP
        Attorneys for Defendant
BY:  RACHEL M. KASSABIAN
     MARGRET M. CARUSO
     TODD ANTEN
     SARA E. JENKINS
     DYLAN I. SCHER

L9fWgirO

1          THE COURT:  For the Girl Scouts, Bruce Ewing, Fara

2     Sunderji, and Kimberly Frumkin, are you all here?

3          MR. EWING:  Your Honor, yes, I'm here.

4          And Fara and Kim, are you both on as well?

5          MS. SUNDERJI:  Yes, I am.

6          MS. FRUMKIN:  Yes, I'm here, Judge.

7          THE COURT:  For the Boy Scouts of America, Rachel

8     Kassabian, Margret Caruso, Todd Anten, Sarah Jenkins, and Dylan

9     Scher.

10          Ms. Kassabian, are you here?

11          MS. KASSABIAN:  Yes, I am, your Honor.  Thank you.

12     Good morning.

13          THE COURT:  Good morning.

14          And are your four colleagues here?

15          MS. KASSABIAN:  They are, indeed.

16          THE COURT:  OK.  We're ready to go.

17          This is a motion of the Boy Scouts of America for

18     summary judgment, dismissing the complaint.

19          You'll speak first, Ms. Kassabian.

20          MS. KASSABIAN:  Thank you, your Honor.

21           Hi.  With introductions out of the way, I'd just

22     like to note that I will be addressing the plaintiff's

23     trademark infringement claim, damages issues and the BSA

24     affirmative defense of laches.  And my colleague, Margret

25     Caruso, will be addressing the plaintiff's dilution and

L9fWgirO

1    tortious interference claims.

2              THE COURT:  OK.

3              MS. KASSABIAN:  So, I'd like to start by addressing

4    what we are dealing with here in this case.

5              There is no genuine, actionable trademark infringement

6    claims here.  Instead, this lawsuit is an effort by the Girl

7    Scouts to restrain competition and to pressure the BSA not to

8    welcome girls into more of its programs.  It's about the Girl

9    Scouts not wanting to lose its perceived monopoly, as its own

10   documents confirm.

11             THE COURT:  Have you cited a case that trademark can't

12   be used to preclude competition?

13             MS. KASSABIAN:  Well, your Honor, there is, of course,

14   the doctrine of trademark misuse, and while trademark claims

15   are often brought between competitors, there has to be

16   actionable likelihood of confusion to sustain the claim, and

17   there simply is not any of that here.

18             THE COURT:  What is it that's being confused?  As I

19   understand it, the Boy Scouts had determined, I think, in 2017

20   to become co-ed in all of its activities, and so the term "Boy

21   Scouts of America" could no longer describe the activities.

22   What terms are being used?

23             MS. KASSABIAN:  That's a great question, your Honor,

24   because really that's what this case is about.  The BSA has not

25   changed its organizational name.  It is still the Boy Scouts of

L9fWgirO

1  America, as it has been for more than a hundred years.

2         Additionally, the two core programs that are at issue

3  here, Cub Scouts and Boy Scouts, let's talk about the naming

4  there.  The Cub Scouts name is the same.  It has not changed.

5  Cub Scouts has been the name for the BSA's --

6         THE COURT:  Excuse me.  I don't think the trademark

7  infringement lies in the use of Boy Scouts nor in Cub Scouts,

8  but in your more general term of Scouts.

9         MS. KASSABIAN:  That's right, your Honor.

10         THE COURT:  Am I right, Mr. Ewing?

11         MR. EWING:  Your Honor, you're correct.  Of course,

12  there are also claims where there have been uses of the words

13  "Girl Scouts" as well, but generally speaking, yes, you are

14  correct.

15         THE COURT:  All right.  And you're not asking to

16  consider as infringement the use of Boy Scouts alone.

17         MR. EWING:  No, nor Cub Scouts alone.

18         THE COURT:  Nor are you attempting to stop the Boy

19  Scouts from being co-ed.

20         MR. EWING:  No, not at all.

21         THE COURT:  OK.

22         Ms. Kassabian.

23         MS. KASSABIAN:  Yes.

24         So, your Honor, on the issue of Scouts branding --

25         THE COURT:  What are you using?  Are you using Boy

L9fWgirO

1    Scouts if you have both girls and boys?

2             MS. KASSABIAN:  So, the Cub Scouts programming has not

3    changed.  The program for older youth changed from Boy Scouts

4    to Scouts BSA to, of course, be more inclusive of those

5    genders.  And BSA, of course, stands for Boy Scouts of America.

6             THE COURT:  I don't care what it stands for.  It's

7    what you're branding.

8             MS. KASSABIAN:  That's correct.

9             THE COURT:  Scouts BSA is your trademark, right?

10            MS. KASSABIAN:  That's right.  Scouts BSA.

11            THE COURT:  Have you applied for registration?

12            MS. KASSABIAN:  Yes.

13            THE COURT:  Are you granted registration?

14            MS. KASSABIAN:  So, Scouts BSA, I believe that

15   application is on hold pending this case.

16            Scouts BSA as a mark, though, has been used as a

17   common law mark by the BSA dating back to the 1970s, as you'll

18   see in the Ramsey declaration and the Waters declaration.

19   Scouts BSA was also used by the BSA dating back to the year

20   2000 as a website domain name, so it's not really a new mark or

21   term.  It's simply a new program name.

22            THE COURT:  It's describing a new service.

23            MS. KASSABIAN:  It's a new program name.

24            THE COURT:  It's describing a service that's open to

25   boys and girls.

L9fWgirO

1              MS. KASSABIAN:  Right.  The program name for the Boy

2     Scouts has changed to Scouts BSA.  That is correct.  And

3     there's nothing --

4              THE COURT:  And that's because you are servicing boys

5     and girls.

6              MS. KASSABIAN:  In that program, correct.

7              THE COURT:  Are you using Girl Scouts?

8              MS. KASSABIAN:  No, not at all.  In fact, the Girl

9     Scouts --

10             THE COURT:  The issue is whether you can use Scouts

11    BSA as a trademark to explain the source or describe the source

12    of the service that you're providing; that is, BSA scouting

13    activities for boys and girls.

14             MS. KASSABIAN:  That's certainly part of it, although

15    the BSA always uses its house brand in connection with

16    Scout-related marks.  The program name --

17             THE COURT:  Uses its what?

18             MS. KASSABIAN:  Its house brand.

19             THE COURT:  I can't get the word.  What's the word?

20             MS. KASSABIAN:  House brand.

21             THE COURT:  House brand.

22             MS. KASSABIAN:  Its house mark, so for instance, it

23    uses Boy Scouts of America.  It uses Cub Scouts.  It uses Eagle

24    Scouts.  It uses BSA.  It uses its famous and ionic

25    *fleur-de-lis*.  So there are many indicia, brand indicia, that

L9fWgirO

1   the BSA uses in connection with using its Scout-formative

2   marks, such as --

3              THE COURT:  All those are now open to girls.

4              MS. KASSABIAN:  So, the programs are now all open to

5   girls.

6              THE COURT:  Yes or no?  Yes or no?

7              MS. KASSABIAN:  The programs are.  Yes, that's

8   correct, all six of the BSA programs.

9              THE COURT:  And girls can become Eagle Scouts.

10             MS. KASSABIAN:  Exactly right, and they have.

11             THE COURT:  And can they become Cub Scouts?

12             MS. KASSABIAN:  Absolutely.  They were welcomed into

13  the Cub Scouts program in 2018.

14             THE COURT:  So you have, in effect, opened everything

15  that the Boy Scouts traditionally did to co-ed use, girls and

16  boys --

17             MS. KASSABIAN:  That's right.  All of the programs --

18             THE COURT:  Wait for the question.

19             All right.  I'm saying that all these marks -- Eagle

20  Scouts, Cub Scouts, Boy Scouts -- its difference in treatment

21  now is that they are all co-ed; girls can become Eagle Scouts

22  as easily as boys, correct?

23             MS. KASSABIAN:  Yes, that's correct.

24             THE COURT:  Let me turn now to Mr. Ewing.

25             MR. EWING:  Yes, your Honor.

L9fWgirO

1          THE COURT:  Now, you've told me that you're not trying

2    to stop the Boy Scouts as being co-ed.

3          MR. EWING:  That is correct, your Honor.

4          THE COURT:  Do you oppose their use of the term

5    "Scouts BSA" --

6          MR. EWING:  Yes.

7          THE COURT:  -- as a name for their services?

8          MR. EWING:  Yes.  Among other terms that they are

9    using, yes.

10          THE COURT:  What terms are you complaining about?

11          MR. EWING:  Terms like "Scout" alone, "Scouts" alone,

12    "Scouting" alone and "Scout Me In" along with "Scouts BSA."

13    Those are the five that are discussed in the parties' papers.

14          We are also opposed, though -- I do want to address

15    one issue.  There has been frequent, ongoing use of the term

16    "Girl Scouts" to describe Boy Scouts programs by Boy Scouts

17    councils, units, and volunteers around the country, and so that

18    is also very much a part of the case.

19          THE COURT:  Well, can the overall agency stop that?

20          MR. EWING:  Absolutely.  We have put into the record

21    multiple documents that show that Boy Scouts exercises complete

22    control over marketing and recruiting activities.  It works

23    hand in glove with its councils, with its units, with its

24    volunteers to recruit members, boys and girls, using these

25    terms.  And whenever there has been an issue in the runup to

L9fWgirO

1   the lawsuit, it was Boy Scouts that addressed it, not the

2   councils, not the units.  So yes.

3             THE COURT:  How do they address it?

4             MR. EWING:  They address it generally by stopping it.

5   The problem is it keeps happening.  It happened as recently as

6   last week in Minnesota.

7             THE COURT:  What is happening --

8             MR. EWING:  This is an ongoing problem.

9             THE COURT:  What is happening?  The local branches are

10  doing what?  What are they saying?

11            MR. EWING:  They are telling people that, Join the

12  Girl Scouts, this is a Girl Scouts meeting, you don't need to

13  join the Girl Scouts anymore because Boy Scouts and Girl Scouts

14  have merged.  They have used Girl Scouts --

15            THE COURT:  When you say it's a Girl Scouts meeting,

16  there are boys there too, right?

17            MR. EWING:  What they have told schools is you don't

18  need to have the Girl Scouts in, according to the record.  You

19  don't need to have them in anymore because Boy Scouts is

20  recruiting girls; it's all one thing now; you don't need to be

21  concerned about that.

22            That is where the theory of vicarious liability comes

23  in, your Honor.

24            THE COURT:  And in effect, they've told the public

25  that there's a merger between the Girl Scouts and the Boy

L9fWgirO

1    Scouts.

2            MR. EWING:  Correct.

3            THE COURT:  -- deal with the Girl Scouts separately.

4            MR. EWING:  The branding at both the national and the

5    local level is not clear.  It has caused rampant confusion

6    around the country.  It has damaged Girl Scouts.

7            According to Boy Scouts' records, we even have people,

8    according to their own survey data, signing their daughters up

9    for Boy Scouts and then telling their Boy Scouts later, Well,

10   we thought we were signing up for Girl Scouts, but look what

11   happened.

12           THE COURT:  All right.

13           MR. EWING:  The fact that people would actually admit

14   that is extraordinary.

15           THE COURT:  It seems to me, Mr. Ewing, that there are

16   services that girls want to have Girl Scouts only, just as they

17   want to have in the case of girls' school, like Barnard rather

18   than Columbia, and some want to have co-ed.  And sometimes

19   people go into a co-ed.

20           MR. EWING:  I think --

21           THE COURT:  And they see it's not suitable and they

22   want to go into the one-sex program --

23           MR. EWING:  I think the difference here is --

24           THE COURT:  -- the girls can.

25           MR. EWING:  Yeah, well, I think the difference here,

L9fWgirO

though, your Honor, and there really is a critical one, is

this.  When Columbia went co-ed and opened up its historically

male programs to young women, the fundamental difference is

that Columbia and Barnard were not sharing rights in the same

words.  All right?

       That's the case that we have here.  Historically,

there was the sharing of the words "Scouts" and "Scouting" by

the two organizations for generations, and when that happened,

and while that coexistence was taking place -- and this is

reflected in the congressional charters -- Girl Scouts was

serving girls and Boy Scouts was serving boys.  What you have

now, to borrow from the Court's Columbia-Barnard analogy, is

Columbia -- in this case, Boy Scouts -- is actually telling

people who contacted about Barnard that, you know, Don't bother

contacting Barnard, come contact us.  You don't have --

       THE COURT:  I don't think that's your major thrust.

These things may have happened on the local scene, but your

main thrust is to bar Boy Scouts from using the word "Scouting"

or "Scouts"; that is a clear identification that is Boy Scouts?

       MR. EWING:  That is correct, your Honor.

       THE COURT:  Yet they can't do that --

       MR. EWING:  Yes.

       THE COURT:  -- accurately describe their --

       MR. EWING:  Oh, yes, they can, your Honor.  They can

clearly brand their program as coming from the Boy Scouts of

L9fWgirO

1    America, which they do not do consistently.  They can stop

2    using Scout and Scouts and Scouting alone and put something

3    else in front of it or use boy or use something else.  There

4    are a range of options available to them.

5              The problem here is they have entered into a space

6    that, as you've observed, they were not historically involved

7    in, but they've done so by using ambiguous terminology, if not

8    outright use of Girl Scouts' proprietary intellectual property,

9    to do it.  The law affords a remedy for that solution.

10             THE COURT:  OK.

11             MR. EWING:  Just as it did back in the 1980s.

12             THE COURT:  Can you tone down, please.

13             MR. EWING:  Oh, sorry, your Honor.  I want to make

14   sure you heard me.

15             THE COURT:  I heard you.  We don't need the heat.

16             MR. EWING:  OK.

17             THE COURT:  Is scouting a descriptive term?

18             MR. EWING:  No.  It is a trademarked term.  It is

19   defined in the dictionary in relation to both parties.

20             THE COURT:  What does the Girl Scouts do?  They

21   provide services to create leadership, but the services are

22   scouting services.

23             MR. EWING:  Yes, they are scouting services.

24             THE COURT:  So what is a scouting service?

25             MR. EWING:  A scouting service, and this, frankly, is

L9fWgirO

1     a long and complicated answer, but the shorthand version is

2     this.

3          For over a century, both programs have offered

4     leadership and development programs to boys and girls,

5     historically separated, in which, to the same age ranges of

6     children and young people, progressing from roughly

7     kindergarten through the high school level, and at each level

8     you advance from one rank to the next.  It's organized in some

9     respects like the military.  There are a series of ranks that

10    one progresses through before ultimately attaining a peak

11    award.  For the Boy Scouts, it would be Eagle Scout.  For Girl

12    Scouts, it would be the Gold Award.  Both programs --

13          THE COURT:  It's activity then.  It's an activity that

14    is exercised by both the Girl Scouts and the Boy Scouts.  Both

15    are involved in Scouts.

16          MR. EWING:  Yes, and we're not seeking to stop Boy

17    Scouts from -- we're not seeking to prevent them from using the

18    word "Scouting."  Just do it with other distinguishing --

19          THE COURT:  If scouting is descriptive of what the Boy

20    Scouts and Girl Scouts did, how could scouting be preempted --

21          MR. EWING:  It's not.

22          THE COURT:  -- by the co-ed --

23          Please.

24          MR. EWING:  I'm sorry.

25          THE COURT:  How could scouting be preempted from

L9fWgirO

1    describing a co-ed activity?

2           MR. EWING:  "Scouting" is a trademarked term in which

3    both parties enjoy incontestable rights for their respective

4    services.  In fact, the trademark office has registered Girl

5    Scouts across every class of goods available to it.  Over

6    time -- those terms are not descriptive, your Honor.  They are

7    brands.  Again, if you look at the dictionary definitions of

8    record, it's not defined as some sort of program that anyone

9    can use.  It's defined in relation --

10          THE COURT:  Girls Scouts is a brand.  Boy Scouts is a

11   brand.

12          MR. EWING:  Yes.

13          THE COURT:  But scouting is not a brand.

14          MR. EWING:  Scouting is defined --

15          MS. KASSABIAN:  Your Honor --

16          MR. EWING:  Scouting is defined as a brand in the

17   dictionary, your Honor, in relation to both parties, initial

18   caps on the S in scouting.

19          THE COURT:  Excuse me --

20          MR. EWING:  It's not a descriptive term.

21          THE COURT:  -- Mr. Ewing.

22          MR. EWING:  Sorry, your Honor.

23          THE COURT:  Don't talk over me.

24          MR. EWING:  Sorry, your Honor.

25          THE COURT:  I'm saying that Boy Scouts is a brand.

L9fWgirO

```
1    Girl Scouts is a brand.  Scouting alone is an activity.  It's
2    descriptive of an activity.
3           MR. EWING:  It is a term -- are you finished, your
4    Honor?  Sorry.
5           It is a term that, over time, has come to designate as
6    a brand the services and, in some cases, the goods of both
7    parties, and we have put evidence of record -- Boy Scouts has
8    said that multiple times in legal filings.  We have put in
9    evidence of record, in the form of deposition testimony, use by
10   third parties, the dictionary definitions I've mentioned, and
11   other evidence establishing that those terms, when used in
12   relation with youth leadership and development services for
13   girls, are a brand that belongs to Girl Scouts in the same way
14   that Boy Scouts claims --
15           THE COURT:  Mr. Ewing --
16           MR. EWING:  Sorry.
17           THE COURT:  Mr. Ewing, you can't prevent the Boy
18   Scouts from becoming co-ed and you can't prevent them from
19   adopting a name that describes their new activity.
20           MR. EWING:  We can --
21           THE COURT:  If they advertised Boy Scouts and wanted
22   to be co-ed, it won't work.
23           MR. EWING:  Your Honor, the problem is -- again,
24   you're allowed to take -- the allow laws for a descriptive term
25   over time to become associated with a party and thereby become
```

L9fWgirO

| | |
|---|---|
| 1 | a trademark.  The "Scouting" term has been used and associated |
| 2 | by the public with Girl Scouts, again, for girls services for |
| 3 | over a century.  It is very much a trademark and the Girl |
| 4 | Scouts does have the right to prevent Boy Scouts from using |
| 5 | that term -- |
| 6 | THE COURT:  Excuse me. |
| 7 | MR. EWING:  -- in a way that confuses -- |
| 8 | THE COURT:  One minute. |
| 9 | OK.  Sorry.  Go ahead. |
| 10 | MR. EWING:  That's all right, your Honor. |
| 11 | -- that confuses the public.  That is the essence of |
| 12 | trademark protection.  It allows for the recognition.  Then the |
| 13 | protection of, if your Honor is correct, and respectfully, I |
| 14 | don't think you are, but if "Scouting" were to be a descriptive |
| 15 | term, it has clearly come to designate services and, in some |
| 16 | cases, goods offered by the Girl Scouts in connection with |
| 17 | girls -- |
| 18 | THE COURT:  Or the Boy Scouts. |
| 19 | MR. EWING:  Yes, both, obviously. |
| 20 | THE COURT:  Do you -- |
| 21 | MR. EWING:  Look, I think the issue here, your Honor, |
| 22 | is this.  Boy Scouts and Girl Scouts at times historically have |
| 23 | worked together to prevent others from offering so-called |
| 24 | scouting services under words that used "Scouts" and |
| 25 | "Scouting," and they've succeeded in doing so.  And they did so |

L9fWgirO

1    cooperatively at the time because they were both serving

2    different markets.  Now Boy Scouts has entered the Girl Scouts

3    market, confusion has resulted, and the law affords Girl Scouts

4    a remedy.  That's really what this case is about, preventing

5    confusion.

6              Go ahead, your Honor.

7              THE COURT:  Mr. Ewing, confusion cannot arise from the

8    activity.  It arises only from the use of the name.

9              MR. EWING:  That's correct, and that is in fact what's

10   happened here.

11             THE COURT:  What you're doing is getting likelihood of

12   confusion from activity.

13             MR. EWING:  Your Honor, we're respectfully disagreeing

14   with that.  The evidence of what you're seeing here is people

15   seeing the words "Scouts" and "Scouting" when used alone by Boy

16   Scouts in connection with girls' services and signing their

17   daughters up.  That's what's happened here, and we've

18   documented that through an array of evidence across the

19   country, from many different types of consumers, in many

20   different ways.  It's all of record in our submission.

21             THE COURT:  Let me summarize it this way.

22             Mr. Ewing has been arguing that "Scouting" as a

23   function of Girl Scouts or Boy Scouts is part of a name, not a

24   description of a service, and that the use of "Scouting,"

25   without a clear identification with boys or girls, creates

L9fWgirO

1    confusion or is likely to cause confusion.

2              Do I have it right, Mr. Ewing?

3              MR. EWING:  Yes, you do, your Honor.

4              THE COURT:  All right.  And I'm about to ask

5    Mr. Ewing, so he will pick up from here, please tell me how you

6    react to the case of *United States Patent and Trademark Office*

7    *v. Bookings.com.*

8              MR. EWING:  Well, that's a case that's really off

9    point here, your Honor, because that involves a generic term,

10   "booking," and the argument about whether Booking.com was or

11   was not generic.  No party in this case has made such a claim.

12   In fact, that would be antithetical to Boy Scouts's position.

13   It does not in any way, shape, or form claim that "Scouts" or

14   "Scouting" are generic.  They claim that those are terms that

15   belong exclusively to them when used alone.

16             THE COURT:  Ms. Kassabian, how do you read the case?

17             MS. KASSABIAN:  Your Honor, I agree that it is a case

18   about genericism, although ultimately Booking.com was held to

19   be registerable because it gained secondary meaning.

20             Here, the BSA already holds registered trademarks on

21   the term "Scouts" and on the term "Scouting."  The Girl Scouts

22   do not hold any registered trademark on either of those terms,

23   and as to your question about whether the BSA is using Scouts

24   alone without other identifying marks or indicia, it isn't.

25   The BSA uses the Scouts mark, its Scouts mark, in connection

L9fWgirO

1    with other brand indicia.  There's not a single piece of

2    evidence in the record from the BSA, submitted by either party,

3    where Scout is used by itself by the BSA without any other

4    brand indicia.  It simply doesn't use the mark that way.

5              THE COURT:  I asked you about the case.

6              I'm struck by this dictum that appears on page 13 of

7    the Supreme Court decision.  It's a lengthy quote:

8              "The PTO's principal concern is that trademark

9    protection for a term like 'Booking.com' would hinder

10   competitors.  But the PTO does not assert that others seeking

11   to offer online hotel-reservation services need to call their

12   services 'Booking.com.'  Rather, the PTO fears that trademark

13   protection for 'Booking.com' could exclude or inhibit

14   competitors from using the term 'booking' or adopting domain

15   names like 'ebooking.com' or 'hotel-booking.com.'  The PTO's

16   objection, therefore, is not to exclusive use of 'Booking.com'

17   as a mark, but to undue control over similar language --

18   'booking' -- that others should remain free to use."

19             And it goes on:

20             "That concern attends any descriptive mark.

21   Responsive to it, trademark law hems in the scope of such marks

22   short of denying trademark protection altogether.  Notably, a

23   competitor's use does not infringe a mark unless it is likely

24   to confuse consumers," and I would add "from the mark."

25             Now, it seems to me, in reading this, that Girl Scouts

L9fWgirO

of America, in claiming exclusive use of the term "Scouting"

without a gender limitation is using a control over language to

prevent another competitor from extending its services to

become co-ed and not just male.  That's how I read it.

I'll give you a crack at commenting, Mr. Ewing, and

then we'll move on to other issues.

MR. EWING:  Thank you, your Honor.

Your Honor, again, we are not trying to stop Boy

Scouts from offering services to girls using words like

"Scout," "Scouts," and "Scouting."  The problem here is not

competition or the use of those words *per se*.  After all,

trademark is not a monopoly.  The issue is unfair competition

and the way in which Boy Scouts is marketing and branding its

services.  It is not doing so in a way that communicates to the

public who the sponsor is and what the organization is, and the

law allows a remedy for that.  It allows Girl Scouts to ask the

Court to enjoin Boy Scouts from using those terms in a

confusing way and to require them to do what they are not

currently doing --

THE COURT:  You don't think --

MR. EWING:  -- which is communicate clearly that the

sponsor of these services is Boy Scouts of America.

THE COURT:  -- you don't --

MR. EWING:  Or --

THE COURT:  You don't think that Girl Scouts, by

L9fWgirO

1   trying to preempt the use of Scouting without a gender

2   limitation, is controlling language --

3             MR. EWING:  I think it.

4             THE COURT:  -- to describe --

5             MR. EWING:  I think if they put something like "trail"

6   before Scouts and offered a program called trail scouts or put

7   Boy Scouts of America, which they do not currently do, contrary

8   to what Ms. Kassabian said, clearly in their marketing and

9   branding materials to designate a sponsor, if they were to do

10  that, there would there not be any claim the Girl Scouts could

11  make.  But they're not doing that, and that's the problem.

12            THE COURT:  Ms. Kassabian, I want you to address one

13  of Mr. Ewing's remarks, that some of your franchisees or local

14  activities -- I don't know what you would call them -- are

15  using terms to disparage Girl Scouts and to suggest people no

16  longer have to join the Girl Scouts because the Boy Scouts does

17  everything.

18            MS. KASSABIAN:  Your Honor, I'd be happy to address

19  that.

20            As to the theory of vicarious liability that the BSA

21  should be responsible for and can control the innocent mistakes

22  of volunteers associated with BSA councils, that's simply

23  unproven.  The Girl Scouts have failed to demonstrate that.

24            First of all --

25            THE COURT:  You like --

L9fWgirO

1          MS. KASSABIAN:  -- there has been --

2          THE COURT:  You like --

3          MS. KASSABIAN:  That's right.

4          THE COURT:  You like --

5          MS. KASSABIAN:  That's right.  That's right.

6          THE COURT:  And that gives you control of their

7   marketing, doesn't it?

8          MS. KASSABIAN:  It doesn't.  Being a trademark

9   licensee does not establish vicarious liability.  That's the

10  *Lepore v. NL Brand Holdings* case, cited in our briefing.

11         The Girl Scouts have to show an actual partnership,

12  authority to bind one another in transactions with third

13  parties or joint ownership over an infringing product.  The

14  Girl Scouts have not shown that, and to the contrary, the Girl

15  Scouts have argued in other litigation that the BSA's

16  organization of a national council and local councils is a

17  model for why the Girl Scouts, who have a parallel structure,

18  cannot be held vicariously liable for the acts of the Girl

19  Scouts' own councils and volunteers.  The Girl Scouts made that

20  argument in the *Weiss-Russell v. Girl Scouts* case.

21         THE COURT:  -- nothing that will prevent a general

22  instruction from your headquarters on the local franchisees,

23  saying that it is impermissible to disparage the Girl Scouts or

24  to use any kind of a name that would take away the Girl

25  Scouts --

L9fWgirO

| | |
|---|---|
| 1 | MS. KASSABIAN:  Absolutely, your Honor.  Absolutely. |
| 2 | THE COURT:  -- I think -- |
| 3 | MS. KASSABIAN:  You are correct in that -- |
| 4 | THE COURT:  -- something to what Mr. Ewing has said |
| 5 | about saying to people, in effect, that since we're co-ed you |
| 6 | don't need to pay attention to Girl Scouts of America. |
| 7 | MS. KASSABIAN:  And your Honor, that's not what the |
| 8 | record shows.  The BSA absolutely does issue those |
| 9 | instructions.  The BSA has brand guidelines that instruct not |
| 10 | to use the Girl Scouts mark in any way and not to in any way |
| 11 | disparage or negatively comment about other youth-serving |
| 12 | organizations, including the Girl Scouts.  If you look it up, |
| 13 | your Honor, you'll see that. |
| 14 | THE COURT:  Doesn't such an instruction suggest that |
| 15 | you do have some control? |
| 16 | MS. KASSABIAN:  Actually, it doesn't.  There's an *ex* |
| 17 | *ante* and an *ex post*.  Right?  And so of course the BSA does |
| 18 | have guidelines and does request compliance with those |
| 19 | guidelines, but that does not mean that *ex ante* the BSA has |
| 20 | control over what a volunteer in a small town somewhere in the |
| 21 | United States might do in terms of, for instance, making a |
| 22 | homemade flier to promote a local recruiting night. |
| 23 | Occasionally, one of those volunteers will make a mistake and |
| 24 | will say something like -- |
| 25 | THE COURT:  I have the picture. |

L9fWgirO

1          In order to assess the likelihood of confusion between

2     two marks, the Second Circuit instructs me to go over the eight

3     *Polaroid* factors.

4          One is the strength of the prior owner's mark.  The

5     Girl Scouts mark.

6          Two is the similarity between the two marks.  The

7     marks have been similar, are similar and are distinctive only

8     as to each other by gender.

9          Three is the competitive proximity of the products.

10    Scouting is the product.  Scouting by boys is a product that up

11    to now has been enjoyed by the Boy Scouts alone.  Scouting by

12    girls has, up to now -- or since 2017 been the exclusive

13    province of the Girl Scouts of America.  But nothing prevents

14    either one from extending its activities to become co-ed.  The

15    Girl Scouts can attract boys and the Boy Scouts can attract

16    girls, and they would have to modify their names in some

17    fashion to signify that.  In that sense, Scouting is

18    descriptive, and I would hold that.

19         The fourth factor is the likelihood that the prior

20    user will bridge the gap.  I don't know how that applies here

21    because bridging the gap would extend services to boys and

22    girls either by the Girl Scouts of America or Boy Scouts of

23    America or both.

24         Five is actual confusion.  Although there have been

25    instances, it seems, of confusion, the confusion is not from

L9fWgirO

1    the mark but from the activity.  As a co-ed activity it's

2    simultaneously exclusive sex activity (inaudible) danger of

3    confusion between the two, and I don't think that is important

4    in this case.

5           Six is good faith.  I find there is good faith.  I

6    find that the Boy Scouts of America have created a name that is

7    descriptive of their openness to boys and girls under the

8    generic legend of "Scouting."

9           Seven is the quality of defendant's product.  There's

10   nothing that distinguishes the two products.

11          And eight is the sophistication of the buyers.  I

12   don't think that is a factor that's supported here because I

13   don't know what the sophistication of the buyers is in

14   relationship to this.

15          I hold, taking these factors into consideration, that

16   there has not been (inaudible) created a likelihood of

17   confusion by the Boy Scouts with respect to using Scouts BSA or

18   Scouts, Scouting or "scout me too," whatever the name is, as to

19   the use from time to time (inaudible) disparaging materials of

20   the Girl Scouts of America.  I think there can be more by the

21   Boy Scouts to change that and to make it clear what can and

22   cannot be done.

23          Those are my temporary findings.  I'm going to tell

24   you this more, but I thought it would be useful to you to know

25   where I stand on these issues.

L9fWgirO

1    As to the dilution claims, there is a similar set of

2    factors.  There are six:

3    Similarity of the marks.  The mark, as I said, has

4    long been similar and has only changed because of the need to

5    have a different description for a co-ed activity.

6    I've discussed the similarity of the products.

7    I've discussed sophistication of consumers.

8    I've discussed the existence of predatory intent.

9    There is no proven predatory intent.  The decision to go co-ed

10   was a decision that was open to the Boy Scouts of America or to

11   the Girl Scouts of America, and becoming co-ed at this time,

12   even though it may affect others' attempt to be exclusive to

13   gender, does not show a predatory act.

14   The renown of the senior mark, in this case the Boy

15   Scouts of America is two years' senior to Girl Scouts of

16   America, the difference being 1910 and 1912 for the origination

17   of the marks.  Both can be considered as senior marks with

18   equal analysis (inaudible) not a factor that can be used.

19   Under all the factors, again, I find that there is

20   dilution.  That's my temporary finding on that issue as well.

21   That brings us to the effort to cancel the marks, some

22   holding that the Boy Scouts are entitled to use a general term

23   or generic term for Scouting.  That count will be dismissed as

24   well.

25   And with tortious interference of the contract, who is

L9fWgirO

1    going to argue that?

2              Mr. Ewing, are you going to do that one too?

3              MR. EWING:  I'll be doing that for Girl Scouts, your

4    Honor, but I believe Ms. Caruso is arguing that for Boy Scouts.

5              THE COURT:  Ms. Caruso goes first.

6              MS. CARUSO:  Thank you, your Honor.

7              On tortious interference, the Girl Scouts have not

8    satisfied their burden at all.  One way is that the sole

9    tortious interference element they have of wrongful activity is

10   based on trademark infringement.  That's their only theory of

11   wrongful activity, wrongful interference, and that isn't

12   present here.  But they also don't meet any of the other

13   elements.

14             They don't identify a single relationship in the

15   ongoing relationship with anyone -- vendor, volunteer,

16   prospective member, anyone at all -- that they lost that

17   relationship as a result of any action by the Boy Scouts of

18   America or even by a volunteer or council member of the BSA.

19             THE COURT:  Mr. Ewing.

20             MR. EWING:  Your Honor, if you look at the following

21   paragraphs in our 56.1 statement, which are 204, 231, 232, 234

22   to '35 and 241 to '42, what you see there are repeated

23   instances in which potential Girl Scouts recruits reach out

24   incorrectly to Boy Scouts and say I'd like to sign my daughter

25   up for Girl Scouts.  The response from the employees in

L9fWgirO

1    question is:  Great.  We're going to sign you up for Cub

2    Scouts.  Great.  Thanks for contacting us.

3         Do they refer these people to Girl Scouts?  No.  They

4    simply poach these recruits for themselves.  This is the sort

5    of thing that is happening all over the country, your Honor.

6    There is abundant evidence of record of this interference.  You

7    are not allowed, for purposes of a tortious interference claim,

8    to misrepresent yourself, to present yourself as being

9    connected to another organization, or to interfere with

10   recruiting efforts in this way.  That satisfies the third

11   element of the claim for tortious interference with contract.

12        THE COURT:  Thank you.

13        There are four factors that are set out by the law,

14   (inaudible) *LLC v. Park Place Entertainment Corp.*, page 132 (2d

15   Cir. 2008).  These are the four factors:

16        First is the plaintiff had business relations with the

17   third party.  The Girl Scouts would say (inaudible) business

18   relationships with the girls who were its members; has the Boy

19   Scouts had business relationships with the boys who are their

20   members.

21        The second factor is defendant interfered with those

22   business relationships.  Once the Boy Scouts decided to make it

23   co-ed, there's nothing to prevent a marketing campaign, even an

24   aggressive marketing campaign, to bring girls into the Boy

25   Scouts, now named Scouting BSA, providing a co-ed activity.

L9fWgirO

1    Once again, there's an effort to use the trademark to create a

2    favored or monopoly position by a gender-limited organization.

3            Third, the defendant acted for a wrongful purpose or

4    used dishonest, unfair, or improper means.  I don't think there

5    have been unfair, dishonest, or improper means, as Mr. Ewing

6    argues.  That alone, I think, would not create a triable issue

7    of fact given the overall regard to tortious interference.

8            And four is defendants' acts interfered with the

9    relationship.  Again, you can't complain that the acts are

10   legitimate in terms of an aggressive marketing of a co-ed

11   activity.  I find that these claims should be dismissed.

12           The next claim is laches, and to make it short, I

13   don't think that the Girl Scouts delayed.  The record shows

14   that the parties were complaining to each other all along in

15   dealing with each other, and the Girl Scouts did not delay

16   unduly in making their claims, so that aspect of the motion is

17   denied.

18           Have I missed anything, Mr. Ewing?

19           MR. EWING:  I don't think you have, your Honor.

20           May I have an opportunity to be heard on a couple of

21   points?

22           THE COURT:  Just a minute.

23           MR. EWING:  Thank you.

24           THE COURT:  Ms. Kassabian, have I missed anything?

25           MS. KASSABIAN:  I don't believe you have, your Honor.

L9fWgirO

```
 1    I believe you've disposed of all of the claims.

 2              THE COURT:  Mr. Ewing, go ahead.

 3              MR. EWING:  Thank you, your Honor.

 4              Your Honor has served on the bench for many years, and

 5    I won't repeat the summary judgment standard, but with your

 6    rulings, which you indicated were tentative, the only way to

 7    get to those results, from our perspective, and respectfully,

 8    your Honor, is to draw inferences from evidence of record

 9    against Girl Scouts and in favor of Boy Scouts.

10              THE COURT:  You feel that I've been fact finding

11    rather than fact identification -- I've been fact finding

12    rather than issuing identification.

13              MR. EWING:  I do think that's what's happened, your

14    Honor, again, with the greatest respect.

15              And as you know, on a summary judgment motion, the

16    party that is opposing the motion -- in this case, Girl

17    Scouts -- is entitled to the benefit of every favorable

18    inference, and if some fact finder -- a jury, in this case --

19    could reach a conclusion that is different from that of your

20    Honor -- not would reach a conclusion but could reach a

21    conclusion different from that of your Honor, then Girl

22    Scouts --

23              THE COURT:  Any reasonable juror.

24              Ms. Kassabian, comment on that.  Have I been engaged

25    in drawing inferences?
```

L9fWgirO

1          MS. KASSABIAN:  No, your Honor, you haven't.

2          THE COURT:  (inaudible)

3          MS. KASSABIAN:  Apologies.  Can you say that again?

4          Sorry, your Honor.  I didn't hear the last thing that

5     you said.

6          THE COURT:  I asked if I've been engaging in fact

7     finding, in drawing inferences?

8          MS. KASSABIAN:  No, sir.  Not against the Girl Scouts.

9     You have not.

10          THE COURT:  My finding that, for example, the

11     activities that have been engaged for displaying the co-ed

12     features of what was previously a gender-limited activity of

13     Scouting.

14          MS. KASSABIAN:  That's right.  That's correct, your

15     Honor.  The two programs at issue were single-gender programs

16     and are now co-ed, and you've correctly identified that there

17     is no triable issue here on any of these claims as a result.

18          THE COURT:  I will review the comments I've made and

19     the rulings I've made in light of the reservation that

20     Mr. Ewing has expressed.

21          Thank you, all.  Decision is reserved.  And I thank

22     you all for your arguments.  If the case continues, my decision

23     will set a date for a status conference to discuss where we go

24     from here.

25          Thank you, all.  Bye.    (Adjourned)