UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

GIRL SCOUTS OF THE UNITED STATES OF
AMERICA,

:
:
:                      **OPINION AND ORDER**
                Plaintiff,    :    **GRANTING DEFENDANT'S**
:                      **MOTION FOR SUMMARY**
:                      **JUDGMENT**
        v.                    :
:
BOY SCOUTS OF AMERICA,        :    18 Civ. 10287 (AKH)
:
                Defendant.    :
:
:
---------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The Girl Scouts have sued the Boy Scouts in this serious, contentious and

expensive litigation.  The Girl Scouts claim that the Boy Scouts' use of the term "Scouting" to

market themselves, undifferentiated by gender, is likely to cause confusion and divert girls who

wish to become Girl Scouts to join the Boy Scouts.  The Girl Scouts sue for trademark

infringement, trademark dilution, and unfair competition with respect to the terms "Girl Scouts,"

"Scout," "Scouts," and "Scouting," in connection with services offered to girls.  The Boy Scouts,

countering that they had every right to offer their scouting programs to both boys and girls, and

that "scouting" is a descriptive term of their gender-neutral scouting activities, oppose.  These

are the issues I must decide, and whether I can do so by summary judgment.

        I hold, for the reasons discussed in this opinion, that the Boy Scouts have the right

to describe their activities as "scouting", without reference to gender, that there are no issues to

be tried, and that the Girl Scouts' complaint should be dismissed.

# BACKGROUND[1]

The Boy Scouts of America ("BSA" or "Boy Scouts") is a non-profit organization that seeks to provide leadership and development activities to young people. Similarly, the Girl Scouts of the United States of America ("GSUSA" or "Girl Scouts") is a non-profit organization that works to provide leadership and development services to girls. Both organizations have existed for more than one hundred years and both have served millions of young people. The Boy Scouts of America began in 1910 and the Girl Scouts of America began two years later in 1912. Both organizations are Congressionally chartered, the Boy Scouts in 1916, and the Girl Scouts in 1950.

In 1930, the Boy Scouts launched the Cub Scout program to serve younger children. Since then, Boy Scouts has launched other initiatives, including the Venturers, Sea Scouts, and STEM Scouts, to cater to those with more specialized interests. Since 1971, several of these specialty programs have allowed female youth to join, but the total number of participants has consistently been less than 5% of Boy Scouts' overall membership. Today the Boy Scouts operates as a national organization that has granted more than 50,000 charters to local units across the country. The local units are overseen by 250 regional councils, all separately incorporated.

For almost its entire existence, Boy Scouts has used the terms "Scout," "Scouts," and "Scouting" (collectively, the "Scout Terms") to refer to its single-gendered programming for boys. Boy Scouts continues to use the Scout Terms in conjunction with other words or phrases, such as "EAGLE SCOUT," "SCOUT STUFF," and "NATIONAL SCOUT JAMBOREE." The U.S. Patent and Trademark Office (USPTO) has repeatedly granted trademark registrations to

---

[1] Unless otherwise indicated, the facts in this section are taken from the parties Rule 56.1 statement, counter statement, and reply (collectively "SUF Reply"). Unless noted, the parties agree, in material part, on the facts as stated.

Boy Scouts for these and other phrases incorporating the word "scout." *Id.* Boy Scouts maintains that its use of SCOUT and SCOUTING is typically accompanied by other Boy Scouts branding indicia, such as specific program names, the Boy Scouts' corporate name, Boy Scout program logos, and its fleur-de-lis logo.

Similarly, Girl Scouts has used its GIRL SCOUTS mark continuously since the founding of Girl Scouts. The USPTO has also granted Girl Scouts trademark rights in GIRL SCOUT; the GIRL SCOUT mark accompanied by its logo; SCOUT COOKIES; and other phrases that include the words "GIRL SCOUT." In part to delineate its services from those of the Boy Scouts, Girl Scouts has on several occasions, including in 2009, released branding guidance instructing that the word "girl" should precede the word "scout" in connection with Girl Scouts.

In October 2017, Boy Scouts announced that its two largest programs, for boy scouting and cub scouting, would open to girls. In May 2018, Boy Scouts announced it would change the name of the Boy Scouts program to "SCOUTS BSA" and launched a marketing program with the slogan "SCOUT ME IN." The Cub Scouts formally began welcoming girls in August 2018; Scouts BSA formally began welcoming girls in February 2019. The Boy Scouts general branding materials, as well as those for the SCOUT ME IN campaign, do not use the term GIRL SCOUTS and forbid incorporating the term to describe the Boy Scouts' activities.

Since Boy Scouts' October 2017 announcement and subsequent use of SCOUTS BSA and SCOUT ME IN, both the Boy Scouts and the Girl Scouts have identified instances in which parents have reported confusion between Boy Scouts and Girl Scouts programming. At times, local Boy Scouts units have mixed the two organizations and their trademarks, as when a Boy Scouts council in Massachusetts referred to a co-ed Boy Scouts camp as offering Girl

Scouts programs, and another time when a Boy Scouts flyer posted on Facebook showed a Girl Scout in a Brownie uniform. In November 2018, Girl Scouts filed the instant suit.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of pointing out evidence in the record, "which it believes demonstrate[s] the absence of a genuine issue of material fact . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may support an assertion that there is no genuine dispute of any material fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the movant fulfills its preliminary burden, the onus shifts to the non-movant to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must "draw all rational inferences in the non-movant's favor" while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id* at 250.

4

## DISCUSSION

Girl Scouts and Boy Scouts each has operated for more than one hundred years, providing scouting experiences separately to girls and boys. As has happened in many sectors of society, the Boy Scouts has become co-ed, opening its scout membership and programs to girls and boys, and dropping its gender-specific name as an inaccurate and misleading descriptor. It now uses "scouts" or "scouting", without reference to boys or girls, as more accurate descriptive terms. Girl Scouts, fearing inability to maintain its own separate identity and confusion between the two organizations, objects. In truth, this case boils down to a single question: must the Boy Scouts continue to use the word "Boy" in its name now that it has become a co-ed institution, providing scouting experiences to boys and girls without distinction?

There are seven issues of contention before the Court. The parties dispute whether summary judgment is appropriate as to Girl Scouts' claims for (i) trademark infringement and unfair competition under the Lanham Act, (ii) trademark infringement under New York law (iii) trademark dilution, (iv) modification and cancellation of registration, and (v) tortious interference. Boy Scouts also seeks summary judgment on (vi) its affirmative defense of laches and (vii) on Girl Scouts' entitlement to monetary damages. I discuss these issues in turn, and conclude that summary judgment should be granted to the Boy Scouts, dismissing the Girl Scouts' complaint.

## I.        Trademark Infringement.

Counts I, II, and V of the Amended Complaint claim trademark infringement and unfair competition under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a), and New York common law. *See Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 440 (S.D.N.Y. 2017) (concluding that "[c]ourts use the same standards" to evaluate trademark

infringement and unfair competition claims under the Lanham Act and New York common law, except that a plaintiff must prove "bad faith" to prevail on an unfair competition claim under New York common law); *Twentieth Century Fox Film Corp. v. Marvel Enter., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) ("[T]he standards for trademark infringement . . . under New York common law are essentially the same as under the Lanham Act."); *see also Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 526 (S.D.N.Y. 2009). Under Section 32 of the Lanham Act, "the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007). To allege trademark infringement, a plaintiff "must demonstrate that (1) 'it has a valid mark that is entitled to protection' and that (2) the defendant's 'actions are likely to cause confusion with [that] mark.'" *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (quoting *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)).

## A.   Validity of the Marks

The parties do not dispute that the "GIRL SCOURTS" mark is valid and protectable. That mark is federally registered and has appeared on Girl Scouts products and in connection with Girl Scout activities for decades. The GIRL SCOUTS mark is suggestive because it denotes the membership and features of the organization and requires some degree of thought or imagination to associate the organization with its services. *See Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998). "Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark." *Id.* I discuss the strength of the GIRL SCOUTS mark and its scope of protection below in my discussion of the mark's strength as one of the *Polaroid* factors.

Girl Scouts also claims rights to the terms "Scout," "Scouts," and "Scouting" (collectively, the "Scout Terms"), when used to describe scouting activities for girls, and challenges the Boy Scouts' rights to those same terms, unless "boy" or another gender-specific modifier is added to the use.  Girl Scouts claims that, in connection with girls' leadership and development services, the Scout Terms have acquired a secondary meaning because the public has come to associate the significance of those terms with Girl Scouts.  Girl Scouts also challenges Boy Scouts' use of the phrases SCOUT ME IN and SCOUTS BSA as infringing Girl Scouts' rights in the Scout Terms.

### 1.  General Principles.

In analyzing Girl Scouts' claims, I must first consider whether valid trademarks exist in the Scout Terms alone.  Courts assess "whether plaintiff's mark merits protection" to resolve this question. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006).  Trademark law protects only "distinctive marks—words, names, symbols, and the like" that "distinguish a particular artisan's goods from those of others." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (quoting *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 142 (2015)).  A plaintiff can establish a mark as distinctive by showing that the mark is "inherently distinctive," *i.e.*, intrinsically capable of identifying its source, or by demonstrating that the mark has acquired "secondary meaning." *Louis Vuitton*, 454 F.3d at 116 (quoting *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005)).  Courts assess inherent distinctiveness by "classifying a mark in one of four categories." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004).  Arranged in increasing order of inherent distinctiveness, which roughly reflects "their eligibility to trademark status and the degree of protection accorded," these classes are "(1) generic, (2) descriptive, (3) suggestive, and

(4) arbitrary or fanciful." *Bristol–Myers Squibb Co., v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir. 1992).

Arbitrary or fanciful marks are ones that "do not communicate any information about the product either directly or by suggestion." *Star Indus., Inc.*, 412 F.3d at 385. A mark is suggestive if it "merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). Suggestive, arbitrary, or fanciful marks are deemed inherently distinctive "because their intrinsic nature serves to identify a particular source of a product." *Bristol–Myers*, 973 F.2d at 1039.

By contrast, "[a] mark is generic if it is a common description of products and refers to the genus of which the particular product is a species." *Lane Capital Mgmt.*, 192 F.3d at 344. Generic marks "are not at all distinctive and thus are not protectable under any circumstances." *Star Indus., Inc.*, 412 F.3d at 385. Some marks—such as aspirin or thermos— become so successful and ubiquitous that they become generic and pass into the public domain. *See King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579 (2d Cir. 1963) ("thermos" had become generic term for an insulating vessel or vacuum flask). Descriptive marks occupy a middle ground, "convey[ing] an immediate idea of the ingredients, qualities, or characteristics of the goods." *Bernard v. Commerce Drag Co.*, 964 F.2d 1338, 1341 (2d Cir.1992) (internal quotation marks omitted). Although it is not inherently distinctive, a descriptive mark is afforded protection when it has acquired distinctiveness through "secondary meaning," such that "in the minds of the public, the primary significance of [the] mark is to identify the source of the product rather than the product itself." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (internal quotation marks omitted).

"The crux of the doctrine . . . is that the mark comes to identify not only the goods but the source of those goods, even though the relevant consuming public might not know the name of the producer." *Centaur Commc'ns Ltd. v. A/S/M Commc'ns Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) (internal quotation marks omitted), *abrogated on other grounds by Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993). Secondary meaning analysis centers not on the public at large, but rather the consumer group relevant to the product or service. *See id.* at 1222. A plaintiff must show that "a substantial segment" of the relevant consumer group makes the "requisite association between the product and the producer." *Id.* In establishing secondary meaning, the burden of proof falls on the party invoking the doctrine. *Papercutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990). A plaintiff "bears the vigorous evidentiary burden of proving by a preponderance of the evidence that his mark had acquired secondary meaning at the time defendant began his allegedly infringing activities." *Centaur*, 652 F. Supp. at 1108. In carrying that burden, "deliberate resistance to linking [a] word to [a party's] products" will weigh against a finding of secondary meaning. *See Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999).

## 2. Validity Analysis.

The evidence Girl Scouts cites does not establish that the Scout Terms have acquired secondary meaning in connection exclusively with Girl Scouts. In support of its position, Girl Scouts asserts that the association between its programs and the Scout Terms is evidenced by, among other things, (i) dictionary definitions, (ii) news articles, (iii) uses of the Scout Terms by third-party organizations, and (iv) documents produced by Boy Scouts that use the Scout Terms to refer to both Boy Scouts and Girl Scouts. Such examples are of little help, as the cited dictionary definitions reference both Boy Scouts and Girl Scouts, SUF Reply at

¶ 141(a), as do the uses of the Scout Terms by the Boy Scouts and third-party organizations. *Id.* at ¶ 141(d). The evidence indicates that the word "scout" is a descriptive term with connections to both Boy Scouts and Girl Scouts. "Scouting" is distinctive of both the Boy Scouts and Girl Scouts, but not as between them. That cannot afford Girl Scouts the protection it seeks.

Girl Scouts rarely, if ever, has used the Scout Terms alone in commerce. *See Gameologist Grp., LLC v. Scientific Games Intern., Inc.*, 838 F.Supp.2d 141, 154–55 (S.D.N.Y 2011) (a party must show more than *de minimis* use of a mark in commerce to garner trademark protection) (citing *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir.1974)). It is undisputed that, historically, the word "Scout" in connection with girls' leadership activities has been accompanied by the word "Girl," as reinforced by the Girl Scouts own guidelines from 2009 and subsequent years. While Girl Scouts points to a limited number of contrary examples, a reasonable jury could not conclude that these examples support a finding of secondary association. Most of Girl Scouts' examples are from the 1960s or earlier, and do not involve the words "scout" or "scouting" alone. Additionally, Girl Scouts' purely internal uses of the word "scout" unaccompanied by gender modifiers, says nothing about what secondary meaning the broader public may attribute to those words. Such uses cannot rise to a level sufficient to warrant protection for the Scout Terms, unaccompanied by the word "Girl." *See Gameologist*, 838 F.Supp. at 155–56 (collecting cases and noting that use must be widespread or intensive).

In response, Girl Scouts invokes the public use doctrine and points to examples of cases from inside and outside this circuit in which courts have granted protection to nicknames or shortened forms of famous products. But in the cited examples, the party seeking protection either used the mark in question, or at least did not actively discourage its use. *See Johnny*

*Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999); *Coca-Cola Co. v. Busch*, 44 F. Supp. 405, 407-08 (E.D. Pa. 1942); *Anheuser-Busch, Inc. v. Power City Brewery, Inc.*, 28 F. Supp. 740, 742-43 (W.D. N.Y. 1939). Ordinarily, the Lanham Act protects only *use* of a given word or mark. *See 1–800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 408 (2d Cir.2005). In contrast, Girl Scouts has either refrained from using "scout" alone for decades, or proactively discouraged use of the word "scout" without "girl."

Even if I credited a public use argument with respect to the Scout Terms, it would not give rise to the trademark rights Girl Scouts seeks to establish. The evidence Girl Scouts cites indicates that the public associates the Scout Terms with both the Boy Scouts and the Girl Scouts; if any protectable rights exist in the Scout Terms alone, both the Boy Scouts and the Girl Scouts have claim to those rights. As used to describe both organizations, the evidence in the record suggests that that the Scout Terms are understood by the public to be generic, or at best descriptive, of scouting activities. As the Girl Scouts acknowledges in its brief, Opp'n Br. at 45, dictionary definitions of alleged trademark use are often evidence that a given term is generic. *See In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1176 (Fed. Cir. 2004). While Girl Scouts argues that dictionary definitions of "the terms SCOUTS and SCOUTING are understood by the public to connote . . . Girl Scouts and Boy Scouts, both equally," *id.* at 45–46, that favors the conclusion that public use of the Scout Terms is either generic or descriptive in nature. Public use of the Scout Terms, such as in the dictionary definitions and news articles Girl Scouts identifies, indicates that those terms are used to describe the Boy Scouts, Girl Scouts, and their activities. *See Tiffany and Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 93–94 (noting "a single word [can be] both a source identifier and a descriptive term within the same product class"). Any such uses by the public cannot give rise to the protection Girl Scouts seeks.

Accordingly, even when viewing the evidence in the light most favorable to Girl

Scouts, I cannot find that Girl Scouts has valid trademark rights in the Scout Terms alone. Both

parties have long records of providing leadership and development services to young people,

both are free to recruit young people of any gender, and both are free to modify reasonably their

organization names and marketing to do so.

**B.     Likelihood of Confusion.**

Next, I turn to "the crucial issue in an action for trademark infringement," that is,

"whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are

likely to be misled, or indeed simply confused, as to the source of the goods in question."

*Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978). "Likelihood of

confusion means a probability of confusion; it is not sufficient if confusion is merely possible."

*Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997). "A probability of

confusion may be found when a large number of purchasers likely will be confused as to the

source of the goods in question." *Nora Beverages, Inc. v. Perrier Grp. Amer., Inc.*, 269 F.3d

114, 121 (2d Cir. 2001).

In the Second Circuit, courts consider the well-established *Polaroid* factors as a

framework for evaluating whether there is a likelihood of confusion. *See Polaroid Corp. v.

Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Those factors are: (1) the strength of

the prior owner's mark; (2) the similarity between the two marks; (3) the competitive proximity

of the products; (4) the likelihood that the prior user will bridge the gap; (5) actual confusion;

(6) the defendant's good faith; (7) the quality of defendant's product; and (8) the sophistication of

the buyers. *Polaroid*, 287 F.2d at 495. "[T]he proper balancing of [the *Polaroid*] factors is

considered a question of law." *Playtex Prod., Inc. v. Georgia-Pac. Corp.,* 390 F.3d 158, 162 (2d Cir. 2004)

"The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (citation omitted). "The pertinence of individual factors varies with the facts of the particular case. Courts should not treat any one factor as dispositive, nor apply a mechanical process awarding judgment to the party with the greatest number of factors weighing in its favor." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (citation omitted). Although "the likelihood of confusion [centers] on the probable reactions of prospective purchases of the parties' goods, . . . [c]laims . . . may be dismissed as a matter of law where the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990) (citation omitted).

## 1. Strength of the Prior Owner's Mark.

In gauging a mark's strength, courts look to the inherent distinctiveness of the mark, as well as its commercial distinctiveness when used in the marketplace. *See Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314 (2d Cir. 2020). A mark that is more distinctive or commercially stronger will generally be entitled to a greater degree of protection. *Centaur Comms., Ltd. v. A/S/M Comms., Inc.*, 830 F.2d 1217, 1225 (2d Cir. 1987). A mark will not necessarily be a strong mark for purposes of the *Polaroid* factors simply because it is suggestive. *Streetwise*, 159 F.3d at 744.

The parties agree that the GIRL SCOUTS mark is strong but disagree as to the proper weight to accord that fact. They dispute whether "GIRL SCOUT" is properly viewed as a

composite mark—that is, a distinctive mark comprised of two or more words that could be generic if used alone—and whether Girl Scouts has exclusive rights to the Scout Terms alone.

Boy Scouts argues that the strength of the GIRL SCOUTS mark lies solely in its composite form, citing *W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1022 (S.D.N.Y. 1992), *amended* (July 14, 1992), *aff'd*, 984 F.2d 567 (2d Cir. 1993) (analyzing strength of SPORTSTICK mark as a composite term). In support of its position, Girl Scouts relies on *Kenner Parker Toys, Inc. v. Rose Art Industries*, 963 F.2d 350 (Fed. Cir. 1992), in which the court held the strength of the PLAY-DOH mark weighed in favor of a finding of confusion with the potential FUNDOUGH mark. But in that case, the court specifically found that *each* of the elements in the composite FUNDOUGH mark was similar to *each* of the corresponding elements in the composite PLAY-DOH mark.

The better analogy is *W.W.W. Pharm. Co.*, 808 F. Supp. 1013, particularly since Boy Scouts has used SCOUT-related branding for decades. *See* SUF Reply ¶¶ 12–14. In *W.W.W. Pharm. Co.*, the strength of the SPORTSTICK mark resided in the composite mark, not "sport" or "stick" standing alone. The same is true here, as the strength of Girl Scouts' mark arises from the combination of "girl" and "scout." Girl Scouts points to *Wrenn v. Boy Scouts of Am.*, 2008 WL 4792683 (N.D. Cal. Oct. 28, 2008), in which Boy Scouts successfully asserted rights against the use of YOUTHSCOUTS. That case, however, is distinguishable for two reasons. In *Wrenn* the word "Scout," even without the accompanying term "youth," was an infringing use, whereas here the composite term GIRL SCOUT is the operative mark. Second, the alleged infringer has been using the word "Scout" for more than one hundred years. *See* SUF ¶¶ 2–3, 13–14. Since Boy Scouts and Girl Scouts each possess strong marks in their respective "BOY SCOUT" and "GIRL SCOUT" marks, any rights in the word "Scout" alone are weak as against the other party.

*See Kate Spade LLC v. Saturdays Surf LLC*, 950 F.Supp.2d 639, 644 (S.D.N.Y. 2013) (finding that while the composite mark "Saturdays Surf NYC" was moderately strong, it was weakened by the fact that the word actually in dispute—"Saturdays"—had extensive, legitimate third party use).

While the composite mark GIRL SCOUTS is strong, Boy Scouts does not use that mark and has prohibited its use in identifying its members or programs. *See* SUF ¶¶ 48–50.  Girl Scouts does not dispute that fact. *See id.*  Moreover, Boy Scouts has pointed to significant evidence, undisputed by Girl Scouts, that Girl Scout brand guidelines consistently use GIRL SCOUT rather than SCOUT alone. *See id.* at ¶ 22.  In this context, even when drawing inferences in favor of Girl Scouts, the strength of the GIRL SCOUTS mark lies in the combination of the words "Girls" and "Scouts."  References to "Scouts" or "Scouting" do not favor either party.

### 2.  The Similarity between the Marks.

"In assessing similarity, courts look to the overall impression of the mark and compare each trademark as a whole against the other as a whole. *Kate Spade*, 950 F.Supp.2d at 644 (citing *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 133 (2d Cir.2004)).  Courts also examine "the context in which [trademarks] are found." *Car-Freshner Corp*, 980 F.3d at 331 (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).

Although the marks share similarity in the use of the term "scouts"—and the related Scout Terms "scouts" and "scouting"—they are readily distinguishable from one another in context.  The marks are distinctive as to gender, even accepting that "scouts" alone is less distinct from "Girl Scouts" than the composite mark "Boy Scouts" is from "Girl Scouts."  The Scout Terms include no reference to "girl" while "GIRL SCOUTS" plainly does.  In this context,

"GIRL SCOUTS" is a composite term, with a meaning distinct from that of the Scout Terms. *See W.W.W. Pharm. Co.* 808 F. Supp. at 1022 (S.D.N.Y. 1992). GSUSA's brand guidelines recommend that "Girl" always appear before "Scout," "Scouts" or "Scouting." SUF Reply at ¶ 22. Boy Scouts consistently accompanies use of the Scout Terms with other brand indicia, such as its fleur-de-lis emblem, Cub Scout logo, Boy Scout logo, and the full name Boy Scouts of America. *Id.* at ¶¶ 57–58. The Second Circuit has repeatedly acknowledged that the presence of such brand indicia can weigh against a finding of similarity. *See Playtex*, 390 F.3d at 164–65. Thus, even if the Scout Terms appear similar to the GIRL SCOUTS mark, that similarity is significantly undercut by the Boy Scouts' use of brand indicia.

Girl Scouts relies on *Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc.*, 683 F. Supp. 50 (S.D.N.Y.), *aff'd*, 859 F.2d 148 (2d Cir. 1988), but that case is readily distinguishable. There, defendant sought to change its name to "Boys and Girls Clubs of America" after it allowed girls to join. *Girls Clubs of Am.*, 683 F. Supp. at 52. In the instant case, however, Boy Scouts has refrained from using the modifier "girl" in any of its marks, branding, or marketing materials. SUF Reply at ¶¶ 48–50. Thus, the likelihood of confusion is substantially lower here than in *Girls Clubs*. The second *Polaroid* factor, like the first, is neutral, and does not favor Plaintiff's claims.

### 3. The Competitive Proximity of the Products.

"Competitive proximity 'concerns whether and to what extent the two products compete with each other' and 'the nature of the products themselves and the structure of the relevant market.'" *Joules Ltd v. Macy's Merch. Grp.*, 695 Fed.Appx. 633, 636 (2d Cir. 2017) (citing *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 140 (2d Cir. 1999)). The closer products or services are to one another in commerce, the more likely it is that

confusion will result. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988). However, a court must examine the context in which providers offer their products to the marketplace. *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (sellers of staplers were not competitively proximate because they sold to different sectors of the market).

      The parties are competitors in that they both seek to enroll girls in scouting activities. However, it is undisputed that the Girls Scouts offers its services to girls exclusively. SUF Reply at ¶ 8. Likewise, there is no dispute that the Boy Scouts offers its services on a co-ed basis. *Id.* at ¶¶ 32–35. When Boy Scouts altered its core programs to allow girls to join, it modified its name and branding to signify that change. *Id.* at ¶¶ 40–41. While the target markets overlap to some degree, the products are distinct: Girl Scouts offers scouting activities exclusively for girls while Boy Scouts offers scouting activities on a co-ed basis. *Id.* Likewise, while membership in either organization was once mutually exclusive, that is no longer the case: girls are free to join only Girl Scouts, only Boy Scouts, or both organizations simultaneously. *See id.*

      Accordingly, I find that this factor also is neutral. Although there exists some overlap between Girl Scouts and Boy Scouts, the fundamental nature of each organization's services remains distinct. Nothing bars Girl Scouts from opening its doors to boys, but it has declined to do so. *Id.* at ¶ 8.

### 4. The Likelihood that the Prior User Will Bridge the Gap.

      "Bridging the gap" is the likelihood a senior user will enter the junior user's market, or that consumers will perceive the senior user as likely to do so. *Reply All Corporation v. Gimlet Media*, 843 Fed.Appx. 392, 397 (2d Cir. 2021). This factor weighs in favor of Boy

Scouts. Girl Scouts does not, and has no plans to, allow boys to be members.[2] SUF Reply at ¶ 8. Girl Scouts argues that there is not truly any gap to bridge because its services are already in direct competition with those of Boy Scouts. Opp'n Br. at 69. Even if the relevant gap between Girl Scouts and Boy Scouts is small, it is undisputed that there remains a gap: Boy Scouts is co-ed and Girl Scouts is not. This factor weighs in favor of Boy Scouts.

### 5. Actual Confusion.

In the instant case, both parties agree that there have been at least some instances of confusion. "[T]o be useful to the Polaroid analysis, th[e] evidence of confusion must be related to the actions or behaviors at issue." *Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am.*, 307 F.Supp.3d 260, 293 (S.D.N.Y. 2018) (citations omitted). Instances of confusion not caused by the allegedly infringing use are insufficient in weighing this *Polaroid* factor. *See* 2 McCarthy on Trademarks § 23:13 (5th ed.) ("Confusion may not be causally related to the use of similar marks at all.") Evidence of a limited number of instances of confusion can be dismissed as *de minimis* and thus insufficient to raise a triable issue of fact. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 60 U.S.P.Q.2d 1038 (2d Cir. 2001). The fact that some instances of actual confusion exist does not preclude summary judgment, particularly when "evidence in rebuttal provides a reasonable explanation discounting isolated instances of confusion." *Id.* (citing *Lang v. Retirement Living Publishing Co.*, 949 F. 2d 576 (2d Cir. 1991)).

The instances of confusion Girl Scouts relies on are anecdotal and isolated and the evidence does not support the claim that any confusion stems from Boy Scouts' branding or use of the Scout Terms. Rather, the public historically has been confused as to the relationship between Girl Scouts and Boy Scouts. A September 2017 consumer perception study

---

[2] Nothing prevents Girl Scouts from admitting boys, just as nothing prevented Boy Scouts from admitting girls.

commissioned by Girl Scouts found that 48% of respondents did not know that Boy Scouts and Girl Scouts were separate organizations, even before the Boy Scouts announced it would admit girls. SUF Reply at ¶ 67. That strongly suggests that any confusion as to the two organizations stems not from the use of the Scout Terms, but from a general misperception in the public that predates Boy Scouts' alleged infringing activity.

Girl Scouts presents instances of parents confusing the two organizations but, generally, the choice to join one organization or the other is made after several interactions with the organizations, by children's desires to join a group siblings or friends have joined, or other factors not related to trademarks and branding. *See* SUF Reply at ¶¶ 78–79. Likewise, it is undisputed that parents who enroll their children in a Boy Scouts program typically attend information sessions before deciding to participate, *see id.*, alleviating any potential confusion. None of the evidence Girl Scouts presents distinguishes between confusion caused by alleged infringement and confusion caused by factors that predate the 2017 decision to allow girls to join the Boy Scouts and Cub Scouts. Thus, the several examples of consumer confusion favor neither party in the *Polaroid* analysis.

### 6. The Defendant's Good (or Bad) Faith.

The sixth factor examines whether the Defendant "adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp. v. Savin Group*, 391 F.3d 439, 460 (2d Cir. 2004). Even when a defendant knows of a senior mark, bad faith can be demonstrated by "additional evidence indicating an intent to promote confusion or exploit good will or reputation." *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 388 (2d Cir. 2005). Evidence a defendant adopted marks related to other of its marks, or that an adopted mark describes the

characteristics of a given product, will weigh in favor of a finding that the defendant acted in good faith. *See J.T. Colby & Co.*, 2013 WL 1903883, at *23

This factor weighs in favor of the Boy Scouts. The Boy Scouts adopted the Scout Terms to describe accurately the co-ed nature of programming, not to confuse or exploit Girl Scouts' reputation. Such branding is consistent with the scout-formative branding Boy Scouts has used for a century, including in its co-ed programs that have existed since the 1970s. *See* SUF Reply ¶ 16. The Scout Terms the Boy Scouts use are descriptive of their programs, just as Girl Scouts' use of the word "scouts" is descriptive of its programs. The Boy Scouts' decision to become co-ed, even if it affects Girl Scouts' operations, does not demonstrate bad faith. Accordingly, a reasonable jury could not conclude that adoption of the Scout Terms was in bad faith, and this factor weighs in favor of the Boy Scouts.

### 7. Quality of Defendant's Product.

The parties dispute this factor only to a limited extent, *see* Opp'n Br. at 82-83; Reply Br. at 20, and it is of little relevance here. I thus give it little weight in my overall assessment. To the extent that this factor is relevant, it considers instances in which a "marked difference in quality … tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Savin*, 391 F.3d at 460-61; *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 152 (2d Cir. 2003). Importantly in the instant case, negative publicity, without more, does not warrant a finding adverse to the defendant; rather, the negative publicity "must establish that the quality of the product provided was inferior." *Nat'l Baseball Hall of Fame & Museum, Inc. v. All Sports Promotions Grp., Inc.*, 2001 WL 196755, at *9 (S.D.N.Y. Feb. 20, 2001).

Boy Scouts asserts that its programs are of high quality and the evidence does not indicate otherwise. The same is true of Girl Scouts' programs. This factor weighs in favor of neither party.

### 8. Sophistication of the Buyers.

Courts typically weigh consumer sophistication in the context of consumer decisions to purchase goods, rather than enroll children in a particular activity. *See Savin Corp.*, 391 F.3d at 461. As a general proposition, "[t]he greater the value of an article the more careful the typical consumer can be expected to be." *Better Angels Soc'y, Inc. v. Inst. for Am. Values, Inc.*, 419 F.Supp.3d 765, 779 (S.D.N.Y. 2019) (quoting *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979)).

This factor has limited importance in the present case. In *Girls Clubs*, the court found that "sophistication factors do not weigh unequivocally in favor of either party." *Girls Clubs*, 683 F.Supp. at 54. Though the relevant mark in that case was distinct from the marks in question here, the set of "consumers" is analogous. Here, Girl Scouts relies on limited instances of confusion to argue parents lack sophistication, while Boy Scouts points to evidence indicating parents are careful about the organization their children join, and that parents have multiple avenues for considering whether to join Boy Scouts or Girl Scouts. SUF Reply at ¶¶ 77–79. On balance, however, the parties agree that typical parents are careful when selecting what programs their children will join. *See id.* To the extent this factor has any bearing on the present case, it does not tip in favor of either party.

### 9. Weighing the *Polaroid* Factors.

In truth, Girl Scouts' complaint is based, not on concern for trademark confusion, but on fear for their competitive position in a market with gender neutral options for scouting.

While some girls and their parents may prefer an all-girls scouting environment, others prefer a co-ed scouting environment. Just as many organizations have done in other contexts—such as colleges that were once exclusively male—Boy Scouts chose to open its doors to girls and provide them with an opportunity to choose which form of scouting they prefer. Though Boy Scouts and Girl Scouts may now compete more than they once did, neither organization can preempt the other's use of the Scout Terms and their trademarks are not likely to be confused.

Taking all the *Polaroid* factors into account, and drawing all inferences in the plaintiffs' favor, I find that Girl Scouts has failed to raise a genuine issue of material fact with respect to likelihood of confusion. There is no trademark confusion. Girls Scouts has no trademark rights in "Scouts" alone, and "Girl Scouts" in its full form is distinct from the Scout Terms. Boys and girls can join the organization of their preference. If a parent or child makes a mistake as to the actual organization they have joined, they can quickly correct it. The *Polaroid* factors are not of much help, but I am satisfied that the marks at issue "are so dissimilar that no question of fact is presented." *Pirone*, 894 F.2d 579 at 584. Boy Scouts' motion for summary judgment is granted as to Counts I, II, and V of the Amended Complaint.

## C. Vicarious Liability.

As an alternative theory of liability for trademark infringement, Girl Scouts argues that Boy Scouts is vicariously liable for the acts of local councils, troops, packs and individual Boy Scouts participants. Opp'n Br. at 50–54. Boy Scouts maintains it cannot be held liable for the unauthorized acts of these entities. Reply Br. at 28.

The parties agree on the relevant standard for vicarious liability. *See* Opp'n Br. at 51; Reply Br. at 28. A party can be held vicariously liable when "the defendant and the infringer (1) have an apparent or actual partnership, (2) have authority to bind one another in transactions with third parties or (3) exercise joint ownership or control over the

infringing product." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 314 (2d Cir. 2013). Girl Scouts contends Boy Scouts is liable under the first or third theory of vicarious liability.

To demonstrate existence of a partnership, Girl Scouts must show "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 171 (S.D.N.Y.2004). The requisite level of control approximates that of actual joint ownership. *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 247 (S.D.N.Y. 2010).

Here, Boy Scouts is not in partnership with its local councils or members. No facts suggest Boy Scouts shares profits or losses with its local members, and there is no indication Boy Scouts intends the existence of such relationships. *See* SUF Reply at ¶ 6. Likewise, although Boy Scouts does distribute brand guidelines for the Scout Terms and related marks, that fact at most indicates Boy Scouts has the *ex ante* ability to influence local actors and the *ex post* ability to help correct mistakes when they arise. "Joint ownership or control" has not been shown. *See Gucci Am.,* 721 F. Supp. 2d at247; *Lepore v. NL Brand Holdings LLC*, 2017 WL 4712633, at *4 (S.D.N.Y. Sept. 28, 2017). Accordingly, Girl Scouts' vicarious liability theory fares no better than its direct infringement theories.

## II.      **Trademark Dilution.**

Counts III and VI of the Amended Complaint allege trademark dilution under 15 U.S.C. § 1125(C) and New York General Business Law Section 360-1. "Federal law allows the owner of a famous mark to enjoin a person from using a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." *Starbucks*,

736 F.3d at 205 (citations and internal quotation marks omitted). "[D]ilution by blurring is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Similarly, New York law provides that the "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition." N.Y. Gen. Bus. Law § 360-l.

To succeed on a federal or state law dilution claim, a plaintiff must show a likelihood of dilution. *Deere & Co. v. MTD Prods.*, 41 F.3d 39, 42 (2d Cir. 1994). "To determine the likelihood of dilution by blurring, courts consider six factors similar to the *Polaroid* factors." *Lapine v. Seinfeld*, 375 F. App'x 81, 85 (2d Cir. 2010); *see also N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel*, LLC, 293 F.3d 550, 558 (2d Cir. 2002) (providing that the six-factor New York dilution test considers "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark"); *Hamilton Int'l Ltd. v. Vortic LLC*, 414 F. Supp. 3d 612, 622 (S.D.N.Y. 2019); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 422 (S.D.N.Y. 2002) ("[T]he above discussion of the confusion factors also disposes of Hilfiger's blurring claim.").

These factors, the same as the *Polaroid* factors, have been discussed. Likelihood of dilution has not been shown.

III.     **Modification or Partial Cancellation.**

Count IV of the Amended Complaint seeks modification or partial cancellation of Boy Scout's trademark registration of the "SCOUT" mark, Reg. No. 4,865,183, under 15 U.S.C.

§ 1119.  Because I find that Girl Scouts cannot establish a likelihood of confusion in connection with Boy Scouts' use of the Scout Terms, summary judgment in favor of Boy Scouts is appropriate on Girl Scouts' modification or partial cancellation claims as a matter of law.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) (applying same likelihood of confusion standard to registration inquiries).

**IV.**      **Tortious Interference.**

Count VII of the Amended Complaint pleads the common law claim of tortious interference with prospective economic advantage.  A claim for tortious interference under New York law requires proof that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., LLC v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

With respect to the first element, "New York courts have placed some limits on what constitutes 'business relations' by rejecting, for example, a claim containing 'only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship . . . .'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (quoting *McGill v. Parker*, 582 N.Y.S.2d 91, 95 (1st Dep't 1992)).  "Failure to identify specific business entities with which the [p]laintiffs had business relationships is fatal to [a] tortious interference with business advantage claim[]." *Katz v. Travelers*, No. 16 Civ. 4389, 2017 WL 1317000, at *7 (E.D.N.Y. Mar. 10, 2017) (collecting cases); *see also Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 195 (1st Dep't 2017).

Girl Scouts' tortious interference claim contains only "general allegation[s] of interference with customers without any sufficiently particular allegation of interference."

*Merkin*, 791 F.3d at 262.  To date, Girl Scouts has identified only unspecified "new members,"
"potential customers," and members of the general public who were allegedly "confused."
Opp'n Br. at 95–96.  Even viewing the evidence in the light most favorable to Girl Scouts, the
Court cannot find that these conclusory statements identify "sufficiently particular allegations of
interference with a specific contract or business relationship." *Merkin*, 791 F.3d at 262.  With
respect to the only specific relationship it did identify, an opportunity to sell cookies in front of a
particular store, Girl Scouts concedes that it suffered no injury because it was ultimately given
the space to sell. *See* Opp'n Br. at 99.  Because Girl Scouts cannot point to any specific business
relationship with which the Boy Scouts intentionally and tortiously interfered, this claim fails.

Additionally, in most cases, a "defendant's conduct must amount to a crime or an
independent tort in order to constitute tortious interference." *Abbas v. Martin*, 689 Fed. Appx.
43, 44 (2d Cir. 2017) (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)).  In support of
this element, Girl Scouts points only to the violations of the Lanham Act discussed above. *See*
Opp'n Br. at 98.  Because those claims have failed, so too must its tortious interference claim.

Because the facts do not support the first or third element of Girl Scouts' tortious
interference claim, I grant summary judgment to Boy Scouts. *See* Fed. R. Civ. P. 56(e) ("If a
party fails to properly support an assertion of fact or fails to properly address another party's
assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the
motion and supporting materials — including the facts considered undisputed — show that the
movant is entitled to it.").

V.      **Laches.**

Boy Scouts argues as an affirmative defense that Girl Scouts' trademark claims
are barred by the doctrine of laches. *See* Def. Br. at 43.  Because the present record does not

demonstrate that Girl Scouts had knowledge of an actionable claim more than six years before the commencement of this action, the motion for summary judgment on laches grounds is denied.

"[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014). "While the Lanham Act includes no specific statute of limitations, in evaluating a laches defense to trademark infringement in a New York suit, [courts] analogize to New York's six-year statute of limitations for fraud claims." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018). "The laches clock begins to run when the trademark owner 'knew or should have known, not simply that [the infringer] was using the potentially offending mark, but that [it] had a provable infringement claim against [the infringer.]'" *Id.* (quoting *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (alterations in original)). For claims brought more than six years after plaintiff had knowledge of infringement, a presumption of laches arises, and the trademark owner must show the inequity of dismissal. *Excelled Sheepskin*, 897 F.3d at 419. For claims brought within six years, there is no presumption of laches, and the defendant bears the burden of proving that it was prejudiced by an unreasonable delay. *Id.*

"[T]he doctrine of progressive encroachment allows a plaintiff some latitude in the timing of its bringing suit, permitting it to wait until the 'likelihood of confusion looms large.'" *ProFitness*, 314 F.3d at 70 (quoting *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 n.2 (6th Cir. 2000) (alterations and internal quotation marks omitted)). The primary rationale of the doctrine is that a plaintiff should not be obligated to sue until "its right to protection has ripened

such that plaintiff knew or should have known . . . [that he] had a provable infringement claim against defendant." *ProFitness*, 314 F.3d at 70. "Any other rule would require each trademark owner to sue first and ask questions later," and would foster meritless litigation. *Id.* (citation and alterations omitted). The doctrine of progressive encroachment, therefore, focuses "the court's attention on the question of whether defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks." *Id.*

      Here, Boy Scouts did not open its core programs to girls until 2017. Before then, the girls that Boy Scouts admitted to its Exploring program were called "Explorers," not "Scouts." Pl. 56.1 St. at ¶¶ 33–34. Boy Scouts offered three other co-educational specialty programs over time, which, as of December 31, 2017, amounted to approximately 4% of Boy Scouts' total membership, with girls involved in those programs amounting to approximately 2.4% of Boy Scouts' total membership. *Id.* at ¶¶ 155–57. Girl Scouts claims that it was unaware of any confusion or dilution in the marketplace caused by these specialty programs prior to 2017. *Id.* at ¶¶ 158, 185–251. It was only after Boy Scouts' October 2017 announcement, when Boy Scouts "redirected its business" to admit girls to its core programs that Girl Scouts' claim arguably ripened. *See* SUF Reply at ¶¶ 31–31, 53, 59, 164–68. Based on the record before trial, the Court cannot conclude as a matter of law that Girl Scouts had a "provable infringement claim" against Boy Scouts until at least October 2017, when Boy Scouts announced that girls would be permitted to join its core programs. *ProFitness*, 314 F.3d at 70. Boy Scout's motion for summary judgment on its affirmative defense of laches is denied.

**VI.**       <u>**Monetary Damages**</u>.

Girl Scouts' claim to damage, including disgorgement of Boy Scouts' profits and recovery of amounts that Girl Scouts expended for corrective advertising, cannot succeed because Girl Scouts' underlying claims cannot succeed.

## CONCLUSION

Boy Scouts' motion for summary judgment is granted.  Girl Scouts' complaint is dismissed.  The Clerk of Court shall terminate ECF No. 97, enter judgment in favor of Defendant, tax costs, and mark the case closed.

SO ORDERED.

Dated:        April 7, 2022
              New York, New York

ALVIN K. HELLERSTEIN
United States District Judge